# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP., SIDERCA S.A.I.C., TUBOS DE ACERO DE MEXICO, S.A.,

Plaintiffs-Appellants

TMK GROUP,

Plaintiff

v.

UNITED STATES, UNITED STATES STEEL CORPORATION, BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, WELDED TUBE USA INC.,

Defendants-Appellees.

Appeal from the United States Court of International Trade
in Case Nos. 1:22-cv-00344-JCG, 1:22-cv-00346-JCG, 1:23-cv-00002-JCG
Judge Jennifer Choe-Groves

## NONCONFIDENTIAL VERSION

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS
## TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO
## TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP.,
## SIDERCA S.A.I.C., TUBOS DE ACERO DE MEXICO, S.A.

Frank J. Schweitzer
Gregory J. Spak
Kristina Zissis
Matthew W. Solomon
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs-Appellants
Tenaris Bay City, Inc., Maverick Tube
Corporation, IPSCO Tubulars Inc.,

October 20, 2025

Tenaris Global Services (U.S.A.) Corp., Siderca S.A.I.C., Tubos de Acero de Mexico, S.A.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-2034

**Short Case Caption** Tenaris Bay City, Inc. v. US

**Filing Party/Entity** Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corp., Siderca S.A.I.C., Tubos de Acero de Mexico, S.A.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/20/2025

Signature: /s/ Frank J. Schweitzer

Name: Frank J. Schweitzer

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Tenaris Bay City, Inc. | | Tenaris S.A. |
| Maverick Tube Corporation | | Tenaris S.A. |
| IPSCO Tubulars Inc. | | Tenaris S.A. |
| Tenaris Global Services (U.S.A.) Corporation | | Tenaris S.A. |
| Siderca S.A.I.C. | | Tenaris S.A. |
| Tubos de Acero de Mexico, S.A. | | Tenaris S.A. |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Ron Kendler, White & Case LLP | Luca Bertazzo, White & Case LLP | Neeraj Rajan Sabitha, White & Case LLP |
| Jasper Wauters, White & Case LLP | Colin Alejandro Dilley, White & Case LLP | Cristina Maria Cornejo, White & Case LLP |
| Danica Noble, White & Case LLP | Jessica E. Lynd, White & Case LLP | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted on pages 6-8, 38-39, 41, 44 and 47 describes the data collected by the U.S. International Trade Commission ("Commission"), or submitted by parties to the underlying investigation, relating to the market conditions during the period of investigation. The Addendum to this brief contains the non-confidential versions of the Views of the Commission on Remand and the Views of the Commission (Final) that are the subject of this appeal. The Commission redacted from its determinations certain material determined to be confidential, pursuant to the protective order of the Commission in the underlying investigation. Specifically, confidential material has been redacted from: (1) Views of the Commission on Remand at Appx068, Appx083-Appx085, Appx087, Appx090, Appx092-Appx095, Appx097-Appx102, Appx104-Appx105, Appx109, Appx111-Appx112, Appx116, Appx119-Appx121; (2) Views of the Commission (Final) at Appx174-Appx175, Appx184-Appx192, Appx195-Appx200, Appx206-Appx222, Appx224-Appx238.

STATEMENT OF RELATED CASES ..................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES ........................................................... 2

INTRODUCTION ............................................................................... 3

STATEMENT OF THE CASE ............................................................. 5

I.    The investigation period was characterized by unprecedented market conditions ......................................................................... 5

II.    The Commission largely ignored the market conditions, mechanically found subject imports to be "significant" without giving meaning to that term, then presumed causation, and misattributed to subject imports the impact of other conditions on the domestic industry ............................................................. 14

i

III.   The CIT's remand ruling in *Tenaris I* ......................................................17

IV.   The Commission's remand determination failed to comply with the CIT's remand instructions in *Tenaris I* ....................................................18

V.   The CIT's ruling in *Tenaris II* ...................................................19

SUMMARY OF THE ARGUMENT ...................................................22

ARGUMENT ...................................................27

I.   Standard of review ...................................................27

II.   The Commission's finding that subject import volumes were "significant" was not supported by substantial evidence and was contrary to law ...................................................29

    A.   Assessing whether subject import volume is "significant" requires consideration of the market context ...................................................29

    B.   The market context confirmed that domestic producers could not meet the demand for OCTG and that imports were needed ...................................................32

III.   The Commission's finding that the domestic industry was materially injured by reason of subject imports was not supported by substantial evidence and was contrary to law ...................................................34

    A.   The Commission failed to evaluate causation and impact in the context of market conditions distinctive to the domestic industry ...................................................34

    B.   The historic demand collapse and supply constraints impeded U.S. producers from meeting the increasing demand ...................................................36

        1.   OCTG demand collapsed and then surged ...................................................36

        2.   High OCTG inventory levels and subsequent destocking delayed ramp up ...................................................38

        3.   High HRC prices reduced welded OCTG production ...................................................39

        4.   Labor shortages impeded ramp up ...................................................41

5. Tenaris' $10 billion investment in U.S. OCTG production .......................................................... 42

C. The domestic industry was already recovering before the petitions were filed and the data for first half of 2022 confirmed domestic industry's full recovery .................................. 43

D. The Commission's conclusions regarding the interim 2022 data and post-petition effects evidence are unsupported by substantial evidence and not in accordance with law .................... 44

1. The statute refers to changes in "volume," not market share, in assessing post-petition effects ............................... 46

2. The Commission relied solely on market share in assessing post-petition effects .............................. 47

3. The post-petition increase in subject import volume confirmed no causal link and justified reliance on post-petition data demonstrating the domestic industry's recovery .................................................................. 48

E. The CIT erroneously affirmed the Commission in *Tenaris II* ....... 51

IV. The Commission did not properly interpret 19 U.S.C. § 1677(7)(G)(I) ............................................................ 51

A. The term "compete with" uses the present tense; the Commission failed to give the statute its plain meaning .............. 51

B. The Plaintiffs-Appellants never abandoned the argument that the Commission's interpretation of "compete with" is inconsistent with the statute .......................................... 57

CONCLUSION AND RELIEF SOUGHT ............................................ 62

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams v. United States,*
59 F.4th 1349 (Fed. Cir. 2023) ........................................................58

*Allegheny Ludlum Corp. v. United States,*
112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ................................28

*Altx, Inc. v. United States,*
167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) ........................passim

*Altx, Inc. v. United States,*
26 C.I.T. 709 (2002) ..........................................30, 31, 35, 60

*Altx, Inc. v. United States,*
370 F.3d 1108 (Fed. Cir. 2004) ....................................................30

*Am. Silicon Techs. v. United States,*
334 F.3d 1033 (Fed. Cir. 2003) ....................................................27

*Angus Chem. Co. v. United States,*
944 F. Supp. 943 (Ct. Int'l Trade 1996) ..........................29, 32, 34

*Arlanxeo USA LLC v. United States,*
389 F. Supp. 3d 1330 (Ct. Int'l Trade 2019) ...............................32

*CamelBak Prods., LLC v. United States,*
649 F.3d 1361 (Fed. Cir. 2011) ....................................................58

*Chaparral Steel Co. v. United States,*
901 F.2d 1097 (Fed. Cir. 1990) ........................................52, 53, 61

*Chemours Co. FC, LLC v. United States,*
443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) ...............................48

*CP Kelco US, Inc. v. United States,*
24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014) .................................46

*General Motors Corp. v. United States,*
17 C.I.T. 697 (1993) ......................................................................29

*Huaiyin Foreign Trade Corp. v. United States*,
    322 F.3d 1369 (Fed. Cir. 2003) ....................................................28

*Hynix Semiconductor, Inc. v. United States*,
    431 F. Supp. 2d 1302 (Ct. Int'l Trade 2006) ................................38

*Hyundai Steel Co. v. United States*,
    659 F. Supp. 3d 1327 (Ct. Int'l Trade 2023) ................................54

*In re Walter*,
    698 Fed. Appx. 1022 (Fed. Cir. 2017) .........................................58

*JTEKT Corp. v. United States*,
    642 F.3d 1378 (Fed. Cir. 2011) ....................................................27

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024)...............................................28, 29, 53, 54

*Meyer Corp. v. United States*,
    123 F.4th 1306, 1314 (Fed. Cir. 2024) ...................................60, 61

*Nippon Steel Corp. v. United States*,
    182 F. Supp. 2d 1330 (Ct. Int'l Trade 2001) ....................29, 31, 34

*Nucor Corp. v. United States*,
    318 F. Supp. 2d 1207 (Ct. Int'l Trade 2004) ................................53

*OCP S.A. v. United States*,
    658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) .........................passim

*OCP S.A. v. United States*,
    Consol. Court No. 21-00219, Slip Op. 25-51
    (Ct. Int'l Trade Apr. 22, 2025) ................................................31, 32

*Steel Authority of India ("SAIL") v. United States*,
    146 F. Supp. 2d 900 (Ct. Int'l Trade 2001) ............................52, 53

*Tenaris Bay City, Inc. et al. v. United States*,
    698 F. Supp. 3d 1287 (Ct. Int'l Trade 2024) .........................passim

*Tenaris Bay City, Inc. et al. v. United States*,
    Slip Op. 25-78 (June 20, 2025)................................................. passim

*United States v. United States Gypsum Co.*,
    333 U.S. 364 (1948).......................................................................58

*Usinor v. United States*,
    26 C.I.T. 767 (Ct. Int'l Trade 2002) .......................................35, 60

*USX Corp. v. United States*,
    655 F. Supp. 487 (Ct. Int'l Trade 1987) .......................................29

*Viraj Group v. United States*,
    476 F.3d 1349 (Fed. Cir. 2007) ....................................................28

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ....................................................28

## STATUTES AND REGULATIONS

1 U.S.C. § 1 ..........................................................................................54

19 U.S.C. § 1677(5)(D)(ii).................................................................54

19 U.S.C. § 1677(7)(C)(i)..........................................................21, 31, 32

19 U.S.C. § 1677(7)(C)(iv) (1988) ....................................................52

19 U.S.C. § 1677(7)(G)(i)...........................................................passim

19 U.S.C. § 1677(7)(I) ................................................................21, 46

28 U.S.C. § 1295(a)(5)..........................................................................2

28 U.S.C. § 1581(c) ..............................................................................2

## ADMINISTRATIVE DETERMINATIONS

*Brass Rod from India*,
    Inv. No. 701-TA-686 (Final), USITC Pub. 5485 (Feb. 2024) .....................60

*Certain Aluminum Plate From South Africa*,
    Inv. No. 731-TA-1056 (Final), USITC Pub. 3734 (Nov. 2004) ...................49

*Certain Corrosion-Resistant Steel Products from China, India, Italy, South Korea, and Taiwan*,

Inv. Nos. 701-TA-534-537 and 731-TA-1274-1278 (Review), USITC Pub. 5337 (Aug. 2022) ..................................................................................9

*Certain Freight Rail Couplers from Mexico and Parts Thereof*,
Inv. No. 731-TA-1593 (Final), USITC Pub. 5470 (Nov. 2023) ...................57

*Certain Steel Wheels from China*,
Inv. *Nos*. 701-TA-478 and 731-TA-1182 (Final), USITC Pub. 4319 (May 2012) ....................................................................................................49

*Certain Steel Wire Rod From Canada, Germany, Trinidad & Tobago, and Venezuela*,
Inv. Nos. 731-TA-763-766 (Final), USITC Pub. 3087 (March 1998) ..........50

*Emulsion Styrene-Butadiene Rubber from Brazil, Korea, Mexico, and Poland*,
Inv. Nos. 731-TA-1334-1337 (Final), USITC Pub. 4717 (Aug. 2017).........49

*Emulsion Styrene-Butadiene Rubber from Czechia and Russia*,
Inv. Nos. 731-TA-1575 and 731-TA-1577 (Final), USITC Pub. 5392 (Jan. 2023) ....................................................................................................37

*Gas Powered Pressure Washers from China*,
Inv. Nos. 701-TA-684 and 731-TA-1597 (Final), USITC Pub. 5488 (Feb. 2024) ....................................................................................................57

*Steel Nails from India, Oman, Sri Lanka, and Turkey*,
Inv. Nos. 701-TA-673-675 and 677 (Final),
USITC Pub. 5370 (Oct. 2022) ....................................................................37

*Large Diameter Welded Pipe from China and India*,
Inv. Nos. 701-TA-593-594 and 731-TA-1402 and 1404 (Final),
USITC Pub. 4859 (Jan. 2019) ....................................................................49

*Oil Country Tubular Goods From Argentina, Mexico, Russia, and South Korea*,
87 Fed. Reg. 69,331 (Nov. 18, 2022) ............................................................1

*Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*,
87 Fed. Reg. 70,785 (Nov. 21, 2022) ............................................................2

*Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico,*
Inv. Nos. 731-TA-711 and 713-716 (Second Review), USITC Pub. 3923
(June 2007) ...................................................................................42

*Organic Soybean Meal from India,*
Inv. Nos. 701-TA-667 and 731-TA-1559 (Final), USITC Pub. 5321 (May
2022) ............................................................................................47

*Outboard Engines From Japan*,
Inv. No. 731-TA-1069 (Final), USITC Pub. 3752 (Feb. 2005) ....................59

*Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the
Netherlands, Saudi Arabia, Taiwan, Turkey, and the United Arab Emirates,*
Inv. Nos. 701-TA-646 and 731-TA-1502-1504, 1508-1509, 1512, 1514, and
1516 (Final), USITC Pub. 5153 (Jan. 2021) ..................................47

*Sodium Nitrite from China and Germany*,
Inv. Nos.701-TA-453 (Final) and 731-TA-1136-1137 (Final), USITC Pub.
4029 (Aug. 2008)............................................................................59

*Steel Nails from India, Thailand, and Turkey,*
Inv. Nos. 731-TA-1580, 1582, and 1583 (Final), USITC Pub. 5404 (Feb.
2023) ............................................................................................57

*Steel Wheels from China,*
Inv. Nos. 701-TA-602 and 731-TA-1412 (Final), USITC Pub. 4892 (May
2019) ............................................................................................48

*Tin Mill Products from Canada, China, Germany, Netherlands, South Korea,
Taiwan, Turkey, and United Kingdom*,
Inv. Nos. 701-TA-685 and 731-TA-1599-1606 (Preliminary), USITC Pub.
5413 (March 2023) ........................................................................59

## LEGISLATIVE MATERIALS

Statement of Administrative Action to the Uruguay Round Agreements Act,
H.R. Rep. No. 103-316, vol. 1 (1994) .............................................21

## OTHER MATERIALS

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1994) ................................. 29

*Oxford English Dictionary*, https://www.oed.com (last visited Oct. 20, 2025) ......54

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of this Court, counsel for Plaintiffs-Appellants, Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation (collectively "Tenaris USA"), Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A. (collectively, "Plaintiffs-Appellants" or "Tenaris") make the following statement:

1.    No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate court.

2.    No other action pending before the Court of International Trade ("CIT") may be directly affected by this Court's disposition of this appeal.

## JURISDICTIONAL STATEMENT

The action filed by Plaintiffs-Appellants, *Tenaris Bay City, Inc. v. United States*, Court No. 22-00344, which resulted in this appeal, contested certain aspects of the final determination by the U.S. International Trade Commission, in the antidumping duty ("AD") investigations involving oil country tubular goods ("OCTG") from Argentina and Mexico. The final determination was published in the *Federal Register* as *Oil Country Tubular Goods From Argentina, Mexico, Russia, and South Korea*, 87 Fed. Reg. 69,331 (Nov. 18, 2022), Appx171. The corresponding AD order was published in the *Federal Register* on November 21, 2022. *See Oil Country Tubular Goods from Argentina, Mexico, and the Russian*

*Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*, 87 Fed. Reg. 70,785 (Nov. 21, 2022), Appx240-242. The CIT had exclusive jurisdiction over the Plaintiffs-Appellants' complaint under 28 U.S.C. § 1581(c).

This Court has exclusive jurisdiction over appeals from final decisions of the CIT under 28 U.S.C. § 1295(a)(5).

On June 20, 2025, the CIT issued the final decision from which this appeal was taken. The Plaintiffs-Appellants filed a notice of appeal on August 18, 2025. Appx39268-39269.

## STATEMENT OF THE ISSUES

**Issue 1:** Whether the Commission's finding that the volume of subject imports, and increase in that volume, was "significant" was supported by substantial evidence and was otherwise in accordance with law.

**Issue 2:** Whether the Commission's determination that the domestic industry was materially injured by reason of subject imports was supported by substantial evidence and was otherwise in accordance with law.

**Issue 3:** Whether the CIT erred in finding that the Plaintiffs-Appellants abandoned their argument that the Commission did not properly interpret 19 U.S.C. § 1677(7)(G)(i) and the meaning of the phrase "compete with" in the Commission's

analysis of the ability of subject imports to compete with other imports and the domestic like product in the U.S. market.

## INTRODUCTION

The investigation period, January 2019 to June 2022, coincided with extraordinary economic conditions that deeply impacted the U.S. industry that supplies steel pipe for drilling wells and extracting oil. The Commission failed to follow its statutory mandate to conduct the material injury analysis within the context of the conditions of competition distinctive to the domestic industry. Merely describing conditions separately and in isolation does not satisfy the analysis the statute requires.

Oil supply wars and a global pandemic in March 2020 ushered in a historic collapse of demand for OCTG. Mill closures, production curtailments, and layoffs resulting from the collapse affected output, shipments, and inventories. Nearly as quickly as the market had collapsed, however, it abruptly changed course and by 2021 demand was dramatically rising: a "V"-shaped demand recovery. But a convergence of market supply constraints prevented domestic producers from meeting the rising demand. The record showed (1) large inventory buildups that needed to be drawn down before new orders could be placed, (2) rapidly rising prices for the primary input for welded OCTG (with the input price exceeding at times the final product price), and (3) labor shortages. These constraints prevented domestic

producers from ramping up production to meet demand. OCTG shortages in the market confirmed that imports were needed to meet the rising demand. But the Commission failed to give meaning to the term "significant" in its assessment of subject import volume.

The Commission focused on a sliver of the investigation period, 2020 to 2021, employed a subjective standard, and declared the domestic industry "weaker than would have been expected" given the increasing demand. The Commission's "expectation" was completely detached from the commercial reality of the market. The objective metrics showed the domestic industry's condition was already improving in 2021, before the petitions were filed, as demand was increasing and supply constraints were starting to ease. And, by nearly every production, employment, and financial indicator, the domestic industry was healthy and very profitable by the first half of 2022, as prices and volumes continued to increase for both domestic and imported products. The record evidenced no injury by reason of subject imports. Yet, the Commission largely ignored the market conditions, mechanically measured volume and found subject imports to be "significant" without giving meaning to that term, then presumed causation, and misattributed to subject imports the impact of other conditions on the domestic industry.

# STATEMENT OF THE CASE

Tenaris appeals from the final decision of the CIT in *Tenaris Bay City, Inc. et al. v. United States*, Slip Op. 25-78 (June 20, 2025) ("*Tenaris II*"), Appx003-064, in which it sustained the Commission's affirmative material injury determination in the AD investigations on imports of OCTG from Argentina, Mexico, Russia, and South Korea. The CIT issued *Tenaris II* after a remand proceeding by the Commission pursuant to the CIT's remand order and decision in *Tenaris Bay City, Inc. et al. v. United States*, 698 F. Supp. 3d 1287 (Ct. Int'l Trade 2024) ("*Tenaris I*"), Appx123-170.

## I. The investigation period was characterized by unprecedented market conditions

On October 6, 2021, petitions were filed for the imposition of AD and countervailing duties ("CVD") on OCTG from Argentina (AD), Mexico (AD), Korea (CVD), and Russia (AD/CVD). Appx357-777.

The period of investigation ("POI"), January 2019 to June 2022, coincided with intense and volatile conditions that disrupted the U.S. market for OCTG:

- Russia-Saudi oil supply war, COVID-19, and a historic collapse of demand in OCTG that was followed by a surging recovery.

- Converging supply constraints prevented domestic producers from meeting the rapidly rising demand in the wake of the historic collapse.

- OCTG shortages prevented U.S. energy producers from ramping up drilling activity.

- Tenaris' emergence as the largest U.S. OCTG producer through decades-long investment of more than $10 billion in U.S. production facilities.

- Twenty-four months of increasing OCTG prices, including over a year in advance of the filing of the petitions.

- Restrictions on imports from Russia following its invasion of Ukraine that effectively eliminated the ability of imports from Russia to compete in the U.S. market.

***Oil supply wars and global pandemic ushered in historic collapse of demand in OCTG followed by a surging – "V"-shaped – recovery***

The Russia-Saudi oil supply war in early 2020 crashed the oil market and, in turn, the OCTG market. Congressional testimony reflects that "national oil companies in Saudi Arabia, Russia and other OPEC+ member countries chose to compete for market share based on price" and that "oil stood well below $40 per barrel, and actually turned negative for a period of time." Appx31361- 31362. The COVID-19 pandemic further suppressed demand for OCTG during 2020. Appx33979. The active U.S. rig count, the principal driver of OCTG demand, fell from 1083 in December 2018 to 790 in February 2020, before tumbling to 251 in July 2020. Appx30355; Appx33980-33981. Petitioners recognized that "{t}he domestic OCTG industry is experiencing a historically weak market, as demand plummeted and prices crashed in 2020, and with conditions having barely improved in the first half of 2021." Appx373.

Operational consumption of OCTG [ *Change in number* ] net tons in January 2019 to [ *Number* ] in February 2020, [ *Change in number* ] net tons in August 2020.

Appx33982. The Commission noted the collapse in demand resulted in U.S. plant closings, shutdowns, and curtailments during the POI, and that the majority of U.S. producers reported supply constraints since 2019. Appx206; Appx34015-34016. Closing a steel mill is significant. Restarting a factory to ramp up production takes time, people, and resources – it does not happen with a flick of a switch. The Commission's reaction to these circumstances, including oil trading below zero $USD/barrel, was one of remarkable understatement: "U.S. oil and gas prices fell irregularly from January 2019 to mid-2020, and then increased irregularly through the end of the POI." Appx205.

Demand and prices for OCTG substantially increased after the collapse and well before the filing of the petition. Rig count increased from 250 rigs in August 2020 to 560 in November of 2021, reaching 764 rigs in August 2022. Appx33980. Operational consumption of OCTG [ Change in number ] net tons in August 2020 to [ Number ] net tons in November of 2021 and [ Number ] net tons in June of 2022. Appx33982.

### Supply constraints prevented domestic producers from meeting the rapidly rising demand in the wake of the historic collapse

*First supply constraint – "inventory overhang."* A significant inventory buildup by U.S. distributors in mid-2020 due to the historic decline in demand, and the subsequent destocking of that inventory, delayed the ramp up of production as demand improved in 2021. The collapse of consumption led U.S. distributors to

increase their inventories above the industry standard of about four months' supply. Appx5210. Months-on-hand inventory rose from [ No. ] months in January 2019 to [ No. ] months in August 2020. Appx33976. This is a [ Number ] percent increase in inventory buildup.

Destocking caused OCTG inventories to [ Change in number ] tons in September 2020 to [ Number ] tons in September 2021, the [ Description of number ]. Appx30365-30366, Appx30962, Appx30967. The Commission found that "inventories, or inventories alone, cannot explain why additional demand in 2021 was satisfied by increased subject imports, rather than domestic producers and nonsubject imports." Appx231. Tenaris emphasized the combined impact of the supply constraints. The Commission's determination shows no attempt to evaluate their collective impact.

**_The second supply constraint – meteoric rise in price of hot-rolled coil ("HRC"), the key input to produce welded OCTG._** OCTG is manufactured by either the seamless or welded process. Both seamless OCTG and welded OCTG are used in drilling and conveyance applications. Appx33946. From August 2020 through August 2021, the price of HRC rose dramatically, sometimes even eclipsing the price of welded OCTG. Appx30362-30363. HRC prices thereafter remained at elevated levels throughout the POI, [ Change in price ]/ST in August 2020 to [ Price ]/ST in September 2021, [ Change in price ]/ST in June 2022. Appx30362-30363;

Appx32327; Appx34098. The Commission recognized the significant HRC price increases relative to downstream steel products during 2021 in other contemporaneous cases. *Certain Corrosion-Resistant Steel Products from China, India, Italy, South Korea, and Taiwan*, Inv. Nos. 701-TA-534-537 and 731-TA-1274-1278 (Review), USITC Pub. 5337 at 45, 54 (Aug. 2022).

Welded OCTG producers faced difficult production decisions given high HRC costs. Petitioners conceded they could not pass on increasing HRC costs to their OCTG customers. Appx33626 ("being unable to pass along our cost increases, we decided not to produce more tons and sell them at prices that end up losing money on every sale"). Several welded OCTG producers halted production. Appx31094. The Commission ignored the high HRC prices that constrained welded OCTG production, simply noting: "The U.S. price for HRC decreased irregularly from 2019 to mid-2020, then increased substantially through mid-2021, before falling irregularly to the end of the POI{.}" Appx210.

***The third supply constraint – domestic industry labor shortages***. U.S. OCTG producers idled operations and laid off workers in 2020 due to the demand collapse. Appx34015-34016. When demand increased in 2021, U.S. market participants confirmed the difficulties U.S. producers faced fulfilling orders because of the challenge of hiring OCTG workers. Appx33973-33974. The largest producer suspended certain operations and reduced employees when demand fell, but as

market conditions improved, "{Tenaris'} challenge {was} hiring enough qualified workers to ramp up U.S. production quickly enough to meet the increased demand for OCTG of {its} U.S. customers." Appx33771; *see also* Appx32215-32216, Appx32222-32223, Appx32339-32351. Tenaris documented its hiring challenges. *See* Appx32215-32216.

Purchasers reported that domestic producers could not fulfill orders on account of insufficient workers. Appx33964-33965, Appx33973-33974. As a U.S. producer explained, "labor availability had hampered U.S. producers' ability to ramp up production." Appx33964-33965. The Commission relied instead on unsubstantiated assertions about Petitioners' ability to hire employees. Appx232 (citing Appx33973, Appx34011-34015; Appx33661-33662).

### OCTG shortages in the U.S. market prevented drilling activity

Customers could not obtain sufficient OCTG. U.S. purchasers were "asked about whether they had experienced OCTG supply shortages both before {between January 1, 2019 and October 5, 2021} and after the petitions were filed" (after October 5, 2021), and the purchasers responded they had during both time frames. Appx33974; Appx23260; Appx30369-30370, Appx31324, Appx31379-31396. A large majority of U.S. purchasers reported that firms "had refused, declined, or been unable to supply" OCTG between January 1, 2019 and October 5, 2021 (*i.e.*, the petitions' filing date). Appx33974. Purchasers explained that U.S. mills reduced

their capacity in 2020 and had difficulty restoring it due to labor shortages and raw material shortages. Appx33974-33975. After the petitions were filed, 26 out of 27 purchasers observed similar trends they attributed in part to "preexisting supply tightness." Appx33974-33975.

Market surveys in 2022 confirmed shortages. A Texas Alliance of Energy Producers survey confirmed a lack of OCTG availability and called supply constraints "highly significant." Appx31324. Similarly, a Dallas Federal Reserve Energy Survey documented 89 percent of oil and gas executives reporting a "shortage" or "significant shortage" of steel tubular goods. Appx30369-30370, Appx31379-31396.

U.S. energy executives testified before Congress about shortages in their supply chains related to rising oil and gas prices. Appx30369, Appx31358-31370. Permian oil producers announced that, despite increasing production and record profits, they would necessarily need to start "riding the brakes" because of disruptions to pipe supplies. Appx30369, Appx31376. And the Commission noted U.S. plant closings and supply constraints reported by a majority of U.S. producers. Appx206.

### *24 straight months of rising OCTG prices, including for the 12 months that preceded the petitions*

OCTG prices increased for twenty-four consecutive months starting in August 2020 – more than a year in advance of the filing of the petitions. Appx31653. The

price increases reflected the difficulty of obtaining OCTG in the U.S market because of the supply constraints: the inventory overhang and drawdown required to reach the industry standard of 4-6 months of supply; the HRC pricing that impacted welded OCTG production; and the labor shortages that delayed the ramp-up of domestic production, which can take several quarters from restart to reach full operational capacity. *See* Section III.B below.

***The domestic industry was already recovering before the petitions were filed and the first half data for 2022 showed that the domestic industry had fully recovered***

During 2020-2021 – the sliver of the POI on which the Commission based its material injury finding – the domestic industry's condition improved as measured by multiple metrics. Appx34263-34265. That improvement continued and by the first half of 2022 the domestic industry's performance improved dramatically by every relevant metric in terms of production, net sales, employment, and financial indicators, even as the volume of subject imports also increased. Appx34263-34265. The domestic industry's complete recovery, as shown in the interim 2022 data, was corroborated by the public statements of domestic producers proclaiming they were experiencing "best ever" financial results and pointing to "continued improvements in profitability." Appx34263-34265; Appx30359-30361, Appx31010-31082. Similarly, with regard to *employment and wages*, the Commission stated that "{c}onsistent with the trend in the domestic industry's production over the POI, the domestic industry's employment indicia generally declined from 2019 to 2020,

increased somewhat from 2020 to 2021, and were significantly higher in interim 2022 than in interim 2021" and further noted that "{t}he industry's employment, hours worked, and wages paid all followed this pattern." Appx224. These positive trends occurred while the volume of subject imports was increasing, and while demand (as measured by rig count) and prices were continuing a steadily increasing trend that began before the October 2021 petitions. Appx34263-34265.

### *Sanctions on subject imports from Russia following its invasion of Ukraine effectively ended the ability of OCTG from Russia to compete with other imports and the domestic like product*

Sanctions imposed on Russia following its February 2022 invasion of Ukraine effectively eliminated imports of OCTG from Russia in the months leading up to the Commission's determination. Appx32199 (citing Appx31571; Appx33971) ("The effects of these events are borne out in the record, with Russian sales of OCTG in the U.S. dropping to zero this year"). The record demonstrated:

- Loss of API certification for OCTG produced in Russia (March 17, 2022); testimony confirmed that "no reasonable operator or end user would ever run the risk of running casing or tubing into their wells without an API monogram";

- Revocation of "Permanent Normal Trade Relations" status for Russia resulting in higher tariffs on April 18, 2022;

- Existence of Section 232 duties;

- Various sanctions imposed on certain Russian entities and individuals;

- 35 percent tariff rate increase for 570 products, including OCTG (June 2022); and

- Presidential proclamation prohibiting Russian-affiliated vessels from entering U.S. ports.

Appx30378-30379; Appx32197-32200; Appx32158-32165.

## II. The Commission largely ignored the market conditions, mechanically found subject imports to be "significant" without giving meaning to that term, then presumed causation, and misattributed to subject imports the impact of other conditions on the domestic industry

### *The Commission found subject import volume to be "significant" even though imports were needed because the domestic industry could not meet the demand*

The Commission's evaluation of subject import volume comprises a few hundred words covering about a single page out of the more than 50 pages of the Commission's views. Appx212-213. The Commission merely summarized fluctuations in absolute and relative volumes during the POI to summarily conclude that "the volume of cumulated subject imports, and the increase in that volume, are significant in absolute terms and relative to consumption in the United States." Appx212-213. That volume tracking exercise contains no meaningful analysis of the market context and conditions of competition relevant to subject imports. The subject import volume in the market was tied to OCTG shortages confirmed by end users and the fact that domestic producers were unable to meet that demand. *See* Section I above.

### *The Commission wrongly presumed that subject imports captured market share because of "underselling," rather than because the domestic industry could not meet demand*

The Commission's failure to assess volume in the context of market conditions then tainted the Commission's price effects analysis. The Commission found underselling by subject imports and speculated that this "led the domestic industry to lose market share to subject imports." Appx221. Assessing the role of subject imports in relation to market demand is fundamental to the Commission's statutory obligation to assess whether subject import volume is "significant." *OCP S.A. v. United States*, 658 F. Supp. 3d 1297, 1312-1320 (Ct. Int'l Trade 2023). The evidence demonstrates that subject imports were required to fulfill demand that the U.S. industry could not supply, and that explained why the domestic industry lost market share.

### Any harm to the domestic industry resulted from the conditions of competition distinctive to the OCTG industry and could not be attributed to subject imports

The Commission found a "casual nexus between cumulated subject imports and the domestic industry's weak performance relative to the strong growth in apparent U.S. consumption from 2020 to 2021." Appx227. However, the Commission failed to account for the conditions of competition during the POI in assessing the cause of any harm to the domestic industry and its improvement in interim 2022. The Commission itself essentially confirmed such an approach in its response brief submitted to the CIT:

> Declining demand earlier in the POI obviously could not explain injury later in the POI, which occurred as demand increased. Indeed, as discussed, the very nature of this injury was that the industry's

performance was weaker than would have been expected in light of the strong increase in demand.

Appx39055.  In fact, the record demonstrated that the historic demand collapse and mill closures in 2020, combined with the severe market supply constraints that followed, prevented the domestic industry from responding to the rising demand later in the POI.  That the Commission considered the record before it "obviously could not explain" the domestic industry's condition "later in the POI" perfectly summarizes its determination:  a conclusory analysis, a presumption of causation, and a failure to address detracting record evidence.

### *The domestic industry's condition improved despite rising subject import volumes in interim 2022 but the Commission arbitrarily switched theories to find material injury*

The Commission considered the decrease in subject import market share rather than the increase in subject import volume during interim 2022.  On that basis, the Commission accorded less weight to the post-petition data that showed the positive condition of the domestic industry in interim 2022.  Appx212-213.  This approach departed fundamentally from the approach used by the Commission to demonstrate a causal nexus between the "weaker" condition of the domestic industry and the subject import volume increase during 2020-2021.

When the evidence confirmed that the domestic industry's condition improved despite rising subject import volumes in interim 2022, the Commission had to switch theories.  The Commission ignored the volume increase.  Instead, it

focused on the subject imports' falling market share, attributed it to imports purportedly competing "less aggressively" in the post-petition period, and ascribed the domestic industry's significant improvement to the effect of the petitions. Appx212-213, Appx227. The Commission cannot simply switch theories when "the same rationale applied to {the} data" would compel a different conclusion (*i.e.*, here that any harm to the domestic industry was not caused by subject imports). *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1363 (Ct. Int'l Trade 2001). The Commission's maneuvering was also contrary to its practice of considering (1) improvements that began before the petition was filed as a basis to give full weight to post-petition data, such as the interim 2022 data in this case, and (2) improvements to the domestic industry's condition during the interim period at a time of increasing import volume and rising prices, as here, as a basis to find no adverse impact. *See* Section III.D below.

## III. The CIT's remand ruling in *Tenaris I*

On April 19, 2024, the CIT held "the Commission's cumulation determination is not supported by substantial evidence and not in accordance with law." *See Tenaris I*, Appx169. The CIT remanded on three issues, including that the Commission reconsider its determination "to cumulate subject imports from Russia{.}" *Tenaris I*, Appx169. The CIT "defer{red}" its analysis of the challenges

to the ITC's additional determinations regarding volume, price effects, and impact in the material injury determination at this time." *Tenaris I*, Appx169.

The CIT faulted the Commission's cumulation analysis of imports from Russia in two respects. First, the CIT found that the "timing" of the Commission's cumulation analysis, which considered the POI, January 2019-June 2022, was not consistent with the statute, which requires the Commission's determination "to be made in the present tense on vote day …." *Tenaris I*, Appx138. Second, the CIT found that the Commission's determination that subject imports from Russia were fungible with other subject imports was not supported by substantial evidence because the Commission "did not consider contrary evidence on the record pertaining to effects of the sanctions on Russian OCTG, especially the loss of API-certification on Russian OCTG …." *Tenaris I*, Appx144-145.

## IV. The Commission's remand determination failed to comply with the CIT's remand instructions in *Tenaris I*

The Commission failed to interpret "compete with" – which employs the present tense – consistent with its plain meaning. The CIT itself reiterated that "conditions of competition must exist in the present tense at the end of the investigation," and that "{i}t is not enough for the conditions of competition to have existed at some point during the period of investigation." *Tenaris II,* Appx021. On remand, the Commission erroneously focused on whether imports from Russia were "prevented" or "prohibited" from entering the U.S. market, essentially requiring

proof of a full embargo on Russia. Appx084, Appx100-101. The Commission then speculated about whether such imports "could" technically still enter and be sold in the U.S. market despite the sanctions. Appx093. Moreover, the Commission employed this flawed standard arbitrarily and narrowly, focusing only on the green pipe segment of the OCTG product market. Despite contrary evidence, the Commission speculated that the lack of API certification would not affect U.S. purchasers' interest or ability to purchase Russian green pipe. The Commission's limited product analysis coupled with its speculation rendered the market restrictions on OCTG from Russia, including the lack of API certification, essentially meaningless and its decision contrary to record evidence.

## V. The CIT's ruling in *Tenaris II*

*Cumulation of imports from Russia.* The CIT found the Commission's explanation on remand – that it assessed the competition of Russian OCTG throughout the entire 42-month POI – to be reasonable. *Tenaris II*, Appx022. Inexplicably, the CIT also found that plaintiffs "abandoned" their argument regarding the statutory meaning of the phrase "compete with" based on a response to a question during oral argument about the POI. The CIT cited counsel during oral argument ("Just to be clear, we are not asking to change the {period of investigation}," which the CIT then wrongly framed as Tenaris "abandon{ing} the{} argument that vote day should be the proper timeframe of assessment, framing

the issue instead as greater weight that the ITC should have accorded to the last few months of the period of investigation." *Tenaris II*, Appx018 (quoting Oral Arg. at 2:00:00–2:00:31).

Tenaris never expressly or implicitly abandoned its argument. The CIT misunderstood the argument and erroneously conflated the POI with the separate questions of the meaning of the statutory phrase "compete with," the statute's use of the present tense, and whether the Commission should consider information and other developments after the POI to inform its cumulation analysis consistent with the meaning of the statute. Recognizing the POI was defined in no way constitutes an abandonment of the statutory argument.

Indeed, the CIT continued to echo Tenaris' argument in its opinion. As to the meaning of "compete with" in 19 U.S.C. § 1677(7)(G)(i) – and, more generally, the temporal aspect of the Commission's cumulation determination – the CIT reiterated that "conditions of competition must exist in the present tense at the end of the investigation," and that "{i}t is not enough for the conditions of competition to have existed at some point during the period of investigation." *Tenaris II*, Appx021. The CIT declined to accord greater weight to the conditions of competition at the end of the POI, but nonetheless concluded that, "{f}or there to be competition, subject imports from competing countries must be evaluated under similar circumstances

and *in the present tense at the end of the investigation*." *Tenaris II*, Appx022 (emphasis added).

The CIT offered a three-sentence analysis of the Commission's explanation on remand – that it considered the entire POI – and concluded that "its review of Russian OCTG in the United States market for its material injury determination is reasonable." *Tenaris II*, Appx022. The CIT also sustained the Commission's determination that imports of OCTG from Russia satisfied the four cumulation factors. *Tenaris II*, Appx023-028.

*Volume.* Because the Commission cited an increase in absolute and relative volume, the CIT found that the Commission's volume determination was in accordance with law and supported by substantial evidence. *Tenaris II*, Appx042. In rejecting Tenaris' argument that 19 U.S.C. § 1677(7)(I) only allows the Commission to discount post-petition data based on changes in absolute volume (as opposed to market share – *see* Appx38924), the CIT relied on the Statement of Administrative Action to the Uruguay Round Agreements Act, H.R. REP. NO. 103-316, vol. 1 at 851-52 (1994) ("SAA") and 19 U.S.C. § 1677(7)(C)(i), which it claimed supported the Commission's finding.

*Causation and impact.* The CIT essentially accepted the Petitioners' case theory (just as the Commission had), excerpting the Commission's one-sentence discussion of its subjective assessment of purported underperformance prior to the

petition: "the industry's production, employment, and financial performance remained weaker in 2021 than would have been expected in light of the strong increase in demand." *Tenaris II*, Appx063 (citing Appx227). Based on this, the CIT found that the Commission's impact determination was supported by substantial evidence and in accordance with law. *Tenaris II*, Appx064.

## SUMMARY OF THE ARGUMENT

***Issue 1.*** The statutory mandate to assess whether subject import volume is "significant" is a contextual exercise. That is consistent with the statute's plain meaning because an occurrence is "significant" when it is "caused by something other than mere chance." The courts have confirmed that the "touchstone" of the volume inquiry is "significance" and that the Commission cannot comply with the statute by simply describing separately various conditions of competition in isolation. Rather, courts have recognized that the Commission must analyze subject import volume in terms of whether products are "practically unavailable from U.S. sources" and the Commission must consider "actual limitations" in assessing whether subject imports are significant. The courts further recognize that subject import volumes may not be "significant" if the imported quantities fill demand that the domestic industry is unable to meet "either because of incapability or lack of viability."

In assessing the "significance" of subject import volume, the Commission failed to consider the market conditions distinctive to the OCTG industry, including whether subject imports were needed to satisfy demand. The evidence demonstrated OCTG shortages in the market, that domestic industry production was constrained by market factors, that domestic producers could not meet the rising demand, and that imports were needed. Yet, in three paragraphs, in a material injury determination of more than 50 pages, the Commission merely summarized the absolute and relative volume fluctuations during the POI to summarily conclude that the subject import volume was "significant in absolute terms and relative to consumption in the United States." That rote exercise of noting volume figures contains no meaningful analysis of the market context and conditions of competition distinctive to the OCTG industry. The need for subject imports was clear from the record of OCTG shortages confirmed by end users and the inability of domestic producers to meet the demand. Context must be considered when assessing the volume of subject imports in the market and whether such volume is "significant." The Commission failed to do so.

*Issue 2.* The Commission failed to analyze impact within the context of the conditions of competition as the statute mandates. The Commission's determination that the domestic industry was materially injured by reason of subject imports was unsupported by substantial evidence. The Commission employed a subjective

standard and found a "causal nexus between cumulated subject imports and the industry's weak performance relative to the strong growth in demand from 2020 to 2021" and that this causal nexus was confirmed because the industry's performance significantly improved in interim 2022 (January-June 2022) relative to interim 2021 (January-June 2021), as subject imports purportedly competed "less aggressively" and lost market share. The factual record does not support a causal nexus between subject imports and the domestic industry's performance during 2020-2021 or during interim 2022, when subject import volume continued to increase and the domestic industry's condition dramatically improved.

The Commission's failure to assess volume in the context of market conditions that demonstrated that subject imports were required to fulfill demand that the U.S. industry could not supply (issue 1) then tainted the Commission's price effects analysis. The Commission relied on its finding of underselling to further speculate that this "led the domestic industry to lose market share to subject imports." The record shows, however, that the OCTG demand collapse in 2020 led to plant shutdowns, job losses, and OCTG inventory build-ups. The record also shows that the demand collapse was followed by a surging recovery (a "V"-shaped demand recovery), but that market supply constraints – the inventory overhang and subsequent destocking, the crushing rise of the primary input cost for welded OCTG, and labor shortages – prevented domestic producers from meeting the rising demand.

These conditions – and not subject imports – explained the domestic industry's condition throughout the POI.

Coinciding with easing of market supply constraints at the end of 2021, and during the first half of 2022, the metrics showed, objectively, the domestic industry's condition was already improving in 2021, before the petitions were filed, as demand was increasing and supply constraints easing. And, by nearly every production, employment, and financial indicator, the domestic industry was healthy and very profitable by the first-half 2022, as prices and volumes continued to increase for both domestic and imported products.

When the evidence confirmed that the domestic industry's condition improved despite rising subject import volumes in interim 2022, the Commission had to switch theories to find a causal link. The Commission ignored the volume increase in interim 2022. Instead, it focused on the subject imports' falling market share, attributed that solely to imports competing "less aggressively" in the post-petition period, and ascribed the domestic industry's significant improvement to the effect of the petitions. The evidence confirmed that the domestic industry performed dramatically better in terms of nearly every measure (production, output, employment, wages, and financial indicators), even as subject import volumes were increasing and that the causal nexus was severed.

The Commission "must draw all those inferences that the evidence fairly demands" and the Commission cannot simply switch theories when "the same rationale applied to {the} data" from one part of the POI would compel a different conclusion when applied to data from another part of the POI (*i.e.,* here that any harm to the domestic industry was not caused by subject imports). The Commission's change of theory also ignored that the Commission routinely considers (1) improvements that began before the petition was filed as a basis to give full weight to post-petition data, such as the interim 2022 data in this case, and (2) improvements to the domestic industry's condition during the interim period at a time of increasing import volume and rising prices, also present here, as a basis to find no adverse impact.

**Issue 3.** Tenaris never expressly or implicitly abandoned the argument that the Commission did not properly interpret 19 U.S.C. § 1677(7)(G)(i) and the meaning of the phrase "compete with" in the Commission's analysis of the ability of subject imports to compete with other imports and the domestic like product in the U.S. market.

The CIT misunderstood the argument and erroneously conflated the issue of the POI established by the Commission with the issues before the court – the meaning of the statutory phrase "compete with," the statute's use of the present tense, and the Commission's routine procedures to evaluate information available

from final comments and otherwise placed on the record, which occurs well after the POI. Recognizing that the Commission set a POI, and that Plaintiffs-Appellants were not seeking to change the POI, in no way constitutes an abandonment of the statutory and evidentiary arguments that were advanced by Plaintiffs-Appellants. The record confirms that there was no abandonment of the argument, let alone "unambiguous abandonment" or an "express disavowal" of the argument – the standard for the CIT to find the argument waived. Tenaris never expressly abandoned any of its arguments related to its claim that the Commission failed to properly interpret the phrase "compete with" in the statute. Nor can it be argued that Tenaris implicitly waived any argument. The CIT's finding of abandonment is inconsistent with the briefing before the CIT, the oral argument, and the rationale that the CIT itself employed in *Tenaris I* with its initial remand decision and order. The CIT erred.

## ARGUMENT

### I.  Standard of review

This Court reviews the CIT's rulings de novo, "stepping into its shoes and applying the same standard of review." *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011) (citation omitted). It does so "without affording any deference to the {CIT}." *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed. Cir. 2003) (citation and internal quotation marks omitted). This Court "must

reverse a determination that is unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Viraj Group v. United States*, 476 F.3d 1349, 1354 (Fed. Cir. 2007) (citation and internal quotation marks omitted).

The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (citation omitted). "{I}t is … well-established that {the agency's} total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders {its} determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000). The "substantial evidence" standard governing the courts' review does not ever allow the Commission to base its determinations on "mere conjecture or supposition." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013).

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) overruled the doctrine requiring a to defer to an agency's statutory interpretation. The Supreme Court stated that "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and that courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous."

*Loper Bright*, 144 S. Ct. at 2273. "{C}ourts, not agencies" are the ones that "will decide 'all relevant questions of law' arising on review of agency action, … even those involving ambiguous laws …." *Loper Bright*, 144 S. Ct. at 2261 (emphasis in original).

## II. The Commission's finding that subject import volumes were "significant" was not supported by substantial evidence and was contrary to law

### A. Assessing whether subject import volume is "significant" requires consideration of the market context

The statutory mandate to assess whether subject import volume is "significant" is a contextual exercise. The plain meaning of "significant" compels that conclusion. "Significant" is defined as "having meaning," "having or likely to have influence or effect," and "probably caused by something other than mere chance." *Merriam-Webster's Collegiate Dictionary*, "significant" (10th ed. 1994).

The CIT in *OCP* confirmed that the "touchstone" of the volume inquiry is "significance."

> Congress, this court, and ITC itself have repeatedly recognized that it is the *significance* of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis under section 1677(7)." *USX Corp. v. United States*, 11 CIT 82, 85 (1987) (emphasis in original). To determine if a volume of imports is significant, the Commission "must analyze the volume and market share data in the context of the conditions of competition." *Nippon Steel {Corp. v. United States}*, 25 CIT {1415,} 1420; *see also Angus Chemical Co. v. United States*, 20 CIT 1255, 1266 (1996) ("The Commission evaluates import volume 'in light of the conditions of trade, competition, and development regarding the industry concerned.'") (quoting *General Motors Corp. v.*

*United States*, 17 CIT 697, 711 (1993), *aff'd*, 140 F.3d 1478 (Fed. Cir. 1998)).

*OCP*, 658 F. Supp. 3d at 1319-1320.

The Commission found that subject import volume increased significantly in absolute terms and relative to domestic consumption. Appx212-213. About a single page of a 52-page material injury analysis reflects the entirety of the Commission's evaluation of the evidence and arguments related to subject import volume. Appx212-213. In the three paragraphs comprising the Commission's volume "analysis," the Commission merely summarized fluctuations in absolute and relative volumes during the POI to summarily conclude that "the volume of cumulated subject imports, and the increase in that volume, are significant in absolute terms and relative to consumption in the United States." Appx212-213. That recounting of data points contains no meaningful analysis of the evidence of the OCTG market context and conditions of competition of subject imports.

The Commission made no reference to the conditions of competition in its volume analysis. In *OCP*, the court recognized: "{T}he Commission does not comply with its statutory mandate by simply describing various conditions of competition in isolation" and that the Commission must "analyze the significance of subject import volume in terms of product types available and practically unavailable from U.S. source during the {period of investigation}… in a manner that reflects the actual limitations." *OCP*, 658 F. Supp. 3d at 1313 (citing *Altx, Inc. v.*

*United States*, 26 C.I.T. 709, 719 (2002), *aff'd*, 370 F.3d 1108 (Fed. Cir. 2004)).

*OCP* highlighted the domestic industry and the market context in assessing subject

import volume: "{T}he principle that imported volumes may not be significant if

the imported quantities fill demand that the domestic industry is unable to meet

"either because of incapability or lack of viability." *OCP*, 658 F. Supp. 3d at 1320

(citing *Altx*, 26 C.I.T. at 717). Thus, an assessment of whether subject imports are

needed to meet demand that the domestic industry cannot satisfy – whether "because

of incapability or lack of viability" – necessarily informs the Commission's

assessment of whether subject import volume is "significant":

> If domestic producers were unable or unwilling to meet the needs of
> U.S. consumers, that would create a supply gap. Any imports filling
> this gap would not materially injure domestic producers because those
> imports would be making sales that U.S. producers otherwise could not,
> or would not, make.

*OCP S.A. v. United States*, Consol. Court No. 21-00219, Slip Op. 25-51 at 48 (Ct.

Int'l Trade Apr. 22, 2025).

"'For the Commission's findings under 1677(7)(C)(i) to be supported by

substantial evidence … the Commission must analyze the volume and market share

data in the context of the conditions of competition' to determine if subject import

volume is significant." *Altx*, 26 C.I.T. at 719 (quoting *Nippon Steel Corp. v. United

States*, 182 F. Supp. 2d 1330, 1335 (Ct. Int'l Trade 2001); *see also* Appx38922-

38923. Other decisions are in accord that the Commission must consider conditions

of competition in analyzing whether subject import volume is "significant" under 19 U.S.C. § 1677(7)(C)(i).  *See Angus Chem. Co. v. United States*, 944 F. Supp. 943, 952 (Ct. Int'l Trade 1996), *aff'd*, 140 F.3d 1478 (Fed. Cir. 1998); *Arlanxeo USA LLC v. United States*, 389 F. Supp. 3d 1330, 1338 (Ct. Int'l Trade 2019), *aff'd*, 819 Fed. Appx. 925 (Fed. Cir. 2020).  Central to the inquiry is whether subject imports are satisfying demand that the domestic industry cannot meet.  *OCP*, Slip Op. 25-51 at 48.

### B.  The market context confirmed that domestic producers could not meet the demand for OCTG and that imports were needed

The case law confirms that assessing the market context, including whether imports are needed to satisfy the demand of U.S. consumers, is fundamental to the Commission's statutory obligation to assess if the subject import volume is "significant."  A large majority of U.S. purchasers reported that firms "had refused, declined, or been unable to supply" OCTG between January 1, 2019, and October 5, 2021 (*i.e.*, the petitions filing date).  Appx33974.  Purchasers explained that U.S. mills reduced their capacity in 2020 and had difficulty restoring it due to labor shortages and raw material shortages.  Appx33974-33975.  After the petitions were filed, 26 out of 27 purchasers observed similar trends they attributed in part to "preexisting supply tightness."  Appx33974-33975.

Market surveys confirmed that OCTG shortages impeded drilling activity. The Texas Alliance of Energy Producers survey confirmed a lack of OCTG

availability continuing in 2022, with 87.5% of end users noting that not having OCTG "ma{de} it difficult to ramp up drilling activities and production of crude oil and/or natural gas{,}" and 77.5% calling supply constraints "highly significant." Appx31324. The Dallas Federal Reserve Energy Survey documented 89 percent of oil and gas executives reporting a "shortage" or "significant shortage" of steel tubular goods in June 2022. Appx30369-30370, Appx31379-31396. U.S. energy executives testified before Congress about shortages in their supply chains related to rising oil and gas prices. Appx30369, Appx31358-31370. Finally, the Commission cited U.S. plant closings, shutdowns, and curtailments during the POI, and noted the majority of U.S. producers reported supply constraints since 2019. Appx206. These facts are consistent with "the principle that imported volumes may not be significant if the imported quantities fill demand that the domestic industry is unable to meet 'either because of incapability or lack of viability.'" *OCP*, 658 F. Supp. 3d at 1320 (citation omitted).

On remand in *Tenaris II*, the CIT did not address the case law or arguments regarding the statutory meaning of "significant" that Tenaris had advanced. Tenaris argued in its CIT opening and reply briefs that the Commission must consider conditions of competition in determining whether subject import volume is "significant" and, in this case, the Commission needed to have considered that U.S. producers could not supply the surging demand in 2021, and imports were needed.

Appx38922-38923; Appx39075-39076. The CIT did not address these specific arguments, nor discuss any of the precedent requiring consideration of market context to find volume "significant" in the cases cited by Tenaris (*i.e.*, *Altx; Angus Chem; Arlanxeo; Nippon Steel*). Yet, the CIT recognized that "{t}he Commission determined that 'the volume of cumulated subject imports, and the increase in that volume, are significant in absolute terms and relative to consumption in the United States,' and did not address the conditions of competition that were raised by Plaintiffs in its analysis of the volume of subject imports." *Tenaris II*, Appx040. That failure warrants remand.

## III. The Commission's finding that the domestic industry was materially injured by reason of subject imports was not supported by substantial evidence and was contrary to law

### A. The Commission failed to evaluate causation and impact in the context of market conditions distinctive to the domestic industry

The Commission found a "causal nexus between cumulated subject imports and the domestic industry's weak performance relative to the strong growth in apparent U.S. consumption from 2020 to 2021" and that this causal nexus was confirmed because the industry's performance significantly improved in interim 2022 (January-June 2022) relative to interim 2021 (January-June 2021), as subject imports competed less aggressively and lost market share. Appx227; Appx34263-34265. The factual record does not support a causal nexus between subject imports and the domestic industry's performance during 2020-2021 or during the interim

2022 period, when subject import volume continued to increase and the domestic industry's condition dramatically improved.  Appx38927-38944.

Following the collapse of OCTG demand in 2020, market supply constraints – not subject imports – prevented domestic production from meeting the rising demand.  Coinciding with easing of market supply constraints at the end of 2021, and first-half 2022, the U.S. industry's financial condition improved dramatically, as subject import volume increased and market share declined, thus confirming that subject imports were not the cause of any harm to the domestic industry.

The Commission declared that "{d}eclining demand earlier in the POI obviously could not explain injury later in the POI, which occurred as demand increased" and "the very nature of this injury was that the industry's performance was weaker than would have been expected in light of the strong increase in demand."  Appx39055.  These statements reveal a failure to consider the whole record, which supported the exact condition the Commission considered it "obviously could not."  Appx39055.  The Commission has "responsibility to explain or counter salient evidence that militates against its conclusions" and generic references to data cannot act "as a shield against examination of the Commission's failure to present required analysis of the record evidence."  *Usinor v. United States*, 26 C.I.T. 767, 783 (Ct. Int'l Trade 2002).  The evidence of supply constraints impeding the ability of U.S. producers to meet the increasing demand "militates

against" the Commission's conclusions that "{d}eclining demand earlier in the POI obviously could not explain injury later in the POI, which occurred as demand *increased*." Appx39055 (emphasis in original).

The fact that the Commission's Final Determination contains a background section that describes certain conditions of competition at the start of its injury analysis does not mean that the Commission complied with its statutory obligations or that it robustly engaged with the evidence before it:

> The Commission "does not comply with its statutory mandate by simply describing various conditions of competition in isolation," but rather the Commission must apply its findings regarding the conditions of competition to its analysis of the three statutory factors: subject import volume, price effects, and impact on the domestic industry.

*OCP*, 658 F. Supp. 3d at 1312 (citations omitted).

**B.  The historic demand collapse and supply constraints impeded U.S. producers from meeting the increasing demand**

**1.  OCTG demand collapsed and then surged**

The remarkable demand conditions during the POI, from historic low demand due to the Russia-Saudi oil price war and COVID-19 to surging demand that domestic producers could not supply, are critical to analyzing the source of any harm to the U.S. industry.

The Commission's omission of the Russia/Saudi oil price war is striking given it contributed to oil prices being "well below $40 per barrel" and "negative for a period of time." Appx31362. The Commission's failure to engage with evidence of

oil trading below zero $USD/barrel is confirmed by remarkable understatement: "U.S. oil and gas prices fell irregularly from January 2019 to mid-2020, and then increased irregularly through the end of the POI." Appx205. The Commission "must address significant arguments and evidence which seriously undermines its reasoning and conclusions{.}" *Altx*, 167 F. Supp. 2d. at 1374. Nor can it be argued that mere references in different parts of the report to various isolated factors is tantamount to addressing the effects of such factors. Where a "Final Determination merely cites to record evidence containing data on subject import indicators throughout the POI" the "reference to annual data cannot, by itself, constitute an acknowledgment of Plaintiffs' arguments, much less a reasoned explanation for discounting them, as the statute requires." *Altx,* 167 F. Supp. 2d at 1359.

The Commission also failed to explain the different treatment of COVID-19 demand shocks here versus in contemporaneous cases. *See, e.g.*, *Steel Nails from India, Oman, Sri Lanka, and Turkey*, Inv. Nos. 701-TA-673-675 and 677 (Final), USITC Pub. 5370 at 32, 34, 36-37, 40-41, 57 n.225 (Oct. 2022) (negative determination noting "changes in supply and demand as affected by the COVID-19 pandemic"); *Emulsion Styrene-Butadiene Rubber from Czechia and Russia*, Inv. Nos. 731-TA-1575 and 731-TA-1577 (Final), USITC Pub. 5392 at 33, 43 (Jan. 2023).

Although the Commission recognized that demand subsequently increased, it

did not consider the implications of this sudden, significant increase. Rather, it merely speculated that the domestic industry should have done better given the demand increase. The Commission noted in the Final Determination that the domestic industry's capacity, capacity utilization, employment, and hours worked all remained nearly identical in 2021, when demand significantly improved, as in 2020, when demand had collapsed. Appx227. This demonstrates that market conditions – not subject imports – explain these data points. The Commission must not attribute to subject imports injury caused by other factors. SAA at 851-52. Additionally, the Commission must "analyze compelling arguments that purport to demonstrate the comparatively marginal role of subject imports in causing that injury." *Hynix Semiconductor, Inc. v. United States*, 431 F. Supp. 2d 1302, 1317 (Ct. Int'l Trade 2006).

### 2. High OCTG inventory levels and subsequent destocking delayed ramp up

The first critical supply factor is the significant inventory buildup by distributors and the subsequent drawdown of that inventory. That delayed new orders during the rise in demand and this delayed the ramp up of U.S. production. The Commission Staff reported that months-on-hand inventory rose from [ No. ] months in January 2019 to [ No. ] months in August 2020. Appx33976. Although this is a [ No. ] percent increase in the months of supply of inventory, the Commission downplayed this buildup: "{i}nventories may have had some effect on delaying

domestic producers' resumption of production and shipments." Appx230-231. The destocking caused OCTG inventories to [ Change in number ] tons in September 2020 to [ Number ] tons in September 2021, the [ Description of number ]. Appx30365-30366, Appx30967. The Commission found that "inventories, or inventories alone, cannot explain why additional demand in 2021 was satisfied by increased subject imports, rather than domestic producers and nonsubject imports." Appx231. Tenaris has emphasized that no single factor, but rather a combination of three factors – inventories, HRC prices, and labor shortages – constrained domestic OCTG supply. Indeed, additional supply constraints – the meteoric price rise of the key input for welded OCTG and worker shortages – emerged as inventory levels decreased relative to surging demand. Appx30362, Appx30943, Appx31327. The Commission's determination shows no attempt to evaluate the impact of these supply constraints.

### 3. High HRC prices reduced welded OCTG production

The second critical supply factor is high HRC prices. From August 2020 through August 2021, the price of HRC rose dramatically, sometimes even eclipsing the price of welded OCTG, and remained elevated throughout the POI. Appx30362-30363; Appx32327; Appx34098. The Commission failed to address the implications of the high HRC prices that constrained welded OCTG production.

The Final Determination notes that "the domestic industry reported substantial

unused capacity throughout the POI, including a capacity utilization rate of 27.6 percent and excess capacity of 4.8 million short tons in 2021, when the market share loss occurred." Appx229. The Commission ignored the impact of HRC prices on the operations of welded OCTG producers, and then speculated about seamless OCTG producers. The evidence confirmed the production constraints on welded OCTG producers from high HRC costs. Welded Petitioners conceded they could not pass on increasing HRC costs to their OCTG customers. Appx33626 ("being unable to pass along our cost increases, we decided not to produce more tons and sell them at prices that end up losing money on every sale"). "A practice that is uneconomical will not be adopted by an industry as part of its conditions of competition." *OCP,* 658 F. Supp. 3d at 1317. The evidence shows several welded OCTG producers halted production. Appx30364.

The Commission speculated that domestic seamless producers were fully capable of compensating for any constraint in the supply of domestic welded OCTG. Appx232. This speculation conflicts with evidence of supply constraints, such as ramp up delays and worker shortages affecting U.S. welded *and* seamless mills. Appx38906-38914; Appx33973-33974. "Industry conditions that are hypothetical, theoretical, or speculative are not part of the conditions of competition distinctive to the affected industry; and Commission findings that have been premised on such conjectures are legally deficient." *OCP,* 658 F. Supp. 3d at 1314-15.

### 4. Labor shortages impeded ramp up

The third critical supply factor preventing U.S. producers from supplying increased demand is labor shortages. The Commission improperly relied solely on unsubstantiated information to find no labor constraints and ignored contemporaneously corroborated contradictory evidence. Appx232. The Commission "must address significant arguments and evidence which seriously undermines its reasoning and conclusions{.}" *Altx*, 167 F. Supp. 2d at 1374.

U.S. OCTG producers idled operations and laid off workers in 2020 due to the demand collapse. Appx34015-34016. When demand increased in 2021, U.S. market participants confirmed the difficulties U.S. producers faced fulfilling orders because of the challenge of hiring OCTG workers. Appx33973-33974. The largest OCTG producer, Tenaris, suspended certain operations and reduced employees when demand fell, but as market conditions improved "{Tenaris'} challenge {was} hiring enough qualified workers to ramp up U.S. production quickly enough to meet the increased demand for OCTG of {its} U.S. customers." Appx33771; *see also* Appx32215-32216, Appx32222-32223, Appx32339-32351. Tenaris documented its hiring challenges, including the [Description] in [ Specifics of staffing

]. Appx32215-32216.

The Commission instead relied on unsubstantiated assertions about Petitioners' ability to hire employees. Appx232 (citing Appx33973, Appx34011-34015; Appx33661-33662). "Commission findings that have been premised on such conjectures are legally deficient." *OCP*, 658 F. Supp. 3d at 1314. The Commission's failure to engage with detracting evidence of reduced capacity and labor shortages that prevented U.S. mills from restoring their capacity "seriously undermines its reasoning and conclusions." *Altx,* 167 F. Supp. 2d at 1374. The courts have explained that when "considered individually every discrepancy discussed here might not rise to the level of requiring reconsideration of the overall disposition, but taken as a whole" may compel a finding that "the ITC decision is not substantially supported and explained." *Altx,* 167 F. Supp. 2d at 1374.

### 5. Tenaris' $10 billion investment in U.S. OCTG production

In 2007, the Commission considered that Tenaris would not harm what was *then characterized as* a "substantial investment" in U.S. production assets after Tenaris' purchase of Maverick. *Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico*, Inv. Nos. 731-TA-711 and 713-716 (Second Review), USITC Pub. 3923 at 34 (June 2007). Since then, Tenaris' investment in U.S. OCTG production as grown to more than $10 billion (including the POI acquisition of IPSCO) – far exceeding what the Commission considered a "substantial investment" in 2007. Yet, nearly 15 years later and many billions more invested by Tenaris, the

Commission did not address Tenaris' argument that the largest U.S. OCTG producer had no incentive to harm its U.S. investments or the U.S. industry. The Commission being "unpersuaded" by intra-industry competition arguments does not address this issue.

**C.** **The domestic industry was already recovering before the petitions were filed and the data for first half of 2022 confirmed domestic industry's full recovery**

During 2020-2021 – the sliver of the POI on which the Commission based its material injury finding – there were several improvements to the domestic industry as measured by multiple metrics. Appx34263-34265. During the first half of 2022, the evidence demonstrated that the domestic industry's performance improved dramatically by every relevant metric in terms of output, employment, and financial indicators, even as the volume of subject imports also increased. Appx34263-34265. The domestic industry's complete recovery, as shown in the interim 2022 data, was corroborated by the public statements by members of the domestic industry that they were experiencing "best ever" financial results involving "continued improvements in profitability." Appx34263-34265; Appx30359-30361, Appx31010-31082.

- U.S. *production* increased by 16.9% from 2020 to 2021 and by 84.4% from interim 2021 to 2022. Appx34264.

- The domestic industry's *net sales* increased by 2.2% from 2020 to 2021, and then by 69.2% from interim 2021 to 2022. Appx34265.

- The domestic industry expanded its *market share* during the interim period. Appx34263.

- And *capital expenditures* increased from interim 2021 to interim 2022. Appx34265.  OCTG prices in the U.S. had been increasing for more than a year before the filing of the application.

- The *average unit value* ("AUV") of domestic net sales increased by 69.8% during the interim period.  Appx34265.

- Its *gross profits* in interim 2022, at $700.2 million, were almost five times those of full year 2019 (at $146.6 million).  Appx34265.

Similarly, "{c}onsistent with the trend in the domestic industry's production over the POI," the Commission also found "the domestic industry's employment indicia generally declined from 2019 to 2020, increased somewhat from 2020 to 2021, and were significantly higher in interim 2022 than in interim 2021" and further noted that "{t}he industry's employment, hours worked, and wages paid all followed this pattern." Appx224.

These positive trends occurred as subject import volume was increasing, and as demand (measured by rig count) and prices remained on a steadily increasing trend that began before the October 2021 petitions.  These trends, punctuated by the parallel increasing profitability of the domestic industry, confirm the lack of any causal link between subject imports and injury to the domestic industry.

**D.     The Commission's conclusions regarding the interim 2022 data and post-petition effects evidence are unsupported by substantial evidence and not in accordance with law**

Subject import volume increased by [ No. ] percent from interim 2021 to 2022. Appx212.  This occurred as the condition of the domestic industry had improved by nearly every production, financial, and employment metric.   The Commission

arbitrarily switched its causation rationale, however, when it considered this increasing subject import volume (and increasing market share gains) during 2020-2021 to confirm a causal link between subject imports and injury, *but then declined to find a lack of causal nexus in interim 2022 when subject import volume also increased (but subject import market share declined) as the condition of the domestic industry also dramatically improved*. Despite the volume increase, the Commission concluded the data confirmed the causal nexus between subject imports and injury because "subject imports competed less aggressively" and lost market share. Appx227. The Commission switched its rationale to reach this conclusion. However, "{*h*}*aving employed a rationale to interpret data from* {*one*} *... part of the POI in such a manner as to support its conclusion, the Commission may not ignore the fact that the same rationale applied to data from* {*another*} *... part of the POI weakens its conclusion*." *Altx,* 167 F. Supp. 2d at 1363 (emphasis added). This arbitrary switch undermines the causation finding, is unsupported by substantial evidence, and inconsistent with practice.

The volume of subject imports increased in interim 2022 while the financial condition of the domestic industry significantly improved. *See, e.g*., Appx34263-34265, Appx34081, Appx34143. In assessing the effects of the filing of the petition, the Commission considered only that import *market share* decreased, ignoring the increased import volume. The Commission's decision not to consider the change in

import volume is contrary to the statute and inconsistent with the Commission's normal practice of finding that a post-petition increase in the volume of subject imports justifies relying on post-petition data in the injury analysis. The Commission improperly accorded less weight to post-petition data confirming the positive state of the domestic industry and demonstrating the lack of a causal link between subject imports and the condition of the industry.

### 1. The statute refers to changes in "volume," not market share, in assessing post-petition effects

The statute requires that the Commission consider whether "any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition … is related to the pendency of the investigation{.}" 19 U.S.C. § 1677(7)(I). If the Commission finds a "change" is related to the investigation, it "may reduce the weight accorded to the data for the period after the filing of the petition in making its determination of material injury, threat of material injury, or material retardation of the establishment of an industry in the United States." 19 U.S.C. § 1677(7)(I). The statute refers to "change in the volume" and does not reference market share. The SAA confirms the statutory mandate to consider changes in import *volume* and makes no reference to market share. SAA at 854.

The Commission's "hallmark vectors for evaluating … post-petition effect {are} volume and price," and volume in particular. *CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337, 1353 (2014). The Commission's practice confirms that

it normally considers volume changes when analyzing post-petition effects. *See, e.g.*, *Organic Soybean Meal from India*, Inv. Nos. 701-TA-667 and 731-TA-1559 (Final), USITC Pub. 5321 at 22 n.111 (May 2022) (considering "the volume of subject imports … in interim 2021"); *Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the Netherlands, Saudi Arabia, Taiwan, Turkey, and the United Arab Emirates*, Inv. Nos. 701-TA-646 and 731-TA-1502-1504, 1508-1509, 1512, 1514, and 1516 (Final), USITC Pub. 5153 at 21 n.111 (Jan. 2021).

### 2. The Commission relied solely on market share in assessing post-petition effects

The post-petition volume of subject imports increased in interim 2022 from interim 2021. Appx34264; Appx212 ("cumulated subject import volume was [No. ] percent greater in interim 2022, at [ Number ] short tons, than in interim 2021, at [ Number ] short tons"). Commissioner Kearns stated that the increase in subject imports after the petition was not a strong case for post-petition effects:

> {S}ubject import volumes from Argentina, Mexico, and Russia increased in the first half of 2022 over the first half of 2021. Their market share went down, *but their imports increased, which I wouldn't usually think that that's a really strong case for showing post-petition effects.*

Appx33715 (emphasis added). He and Commissioners Karpel and Schmidtlein requested the parties address the issue. Appx33747, Appx33747-33748, Appx33738.

In a footnote in its volume analysis, the Commission referenced Petitioners' argument that the Commission should consider decreasing market share and Tenaris' argument that the Commission should consider the increase in volume in addressing post-petition effects.  Appx213.  The Commission then relied only on market share:

> {W}e find that the decline in subject import market share in interim 2022 relative to interim 2021 was related to the pendency of the investigations and place less weight on interim 2022 market share data in determining that that the volume of subject imports is significant.

Appx213.  The Commission simply adopted Petitioners' approach.  The Commission should have addressed the subject volume increase and explained how that increase was consistent with its causation rationale for data analyzed during 2020-2021 and its decision to discount the data showing the domestic industry's positive health in interim 2022 as subject volume increased.  *See Chemours Co. FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2020) (remanded Commission's "post-petition analysis" because "it is not clear, based on the Commission's Views, that the Commission considered all of the evidence on the record").

### 3. The post-petition increase in subject import volume confirmed no causal link and justified reliance on post-petition data demonstrating the domestic industry's recovery

In past cases, the Commission has declined to discount post-petition data if the volume of subject imports is higher relative to the year prior, remains unchanged, "was declining prior to the filing of the petition," or only "declined slightly."  *See,*

*e.g.*, *Steel Wheels from China*, Inv. Nos. 701-TA-602 and 731-TA-1412 (Final), USITC Pub. 4892 at 18 n.97 (May 2019) (declining to reduce the weight accorded to post-petition data "in particular due to the nearly unchanged level of shipments of subject imports in interim 2018 compared to interim 2017"); *Large Diameter Welded Pipe from China and India*, Inv. Nos. 701-TA-593-594 and 731-TA-1402 and 1404 (Final), USITC Pub. 4859 at 41 n.287 (Jan. 2019); *Certain Aluminum Plate From South Africa*, Inv. No. 731-TA-1056 (Final), USITC Pub. 3734 at 24 (Nov. 2004); *Emulsion Styrene-Butadiene Rubber from Brazil, Korea, Mexico, and Poland*, Inv. Nos. 731-TA-1334-1337 (Final), USITC Pub. 4717 at 36 n.8. (Aug. 2017).

The Commission relied on the subject imports declining market share rather than the increase in subject import volumes to discount favorable domestic industry performance data in the first half of 2022. The positive data confirming the domestic industry's recovery coincided with rising import volumes and the easing of the market supply constraint that demonstrated that subject imports were not the cause of harm to the domestic industry. The Commission has declined to discount post-petition data if the volume of subject imports is higher relative to the year prior, remains unchanged, "was declining prior to the filing of the petition," or only "declined slightly." Appx38926 (citing past determinations, *see, e.g.*, *Certain Steel Wheels from China*, Inv. Nos. 701-TA-478 and 731-TA-1182 (Final), USITC Pub.

4319 (May 2012) ((1) subject imports increased in the interim period; (2) market share decreased (albeit "marginally"); and (3) the Commission did not reduce the weight given to post-petition information)).

Here, the domestic industry's improved performance – driven by 24 months of increasing prices – occurred despite an increase in subject import volume. The Commission previously has relied on such trends to give full weight to post-petition data and not attribute recovery to the petition. Appx38943-38944; *Certain Aluminum Plate From South Africa* at 27-28 (domestic industry's price increases and accompanying recovery are not "attributable to any significant degree to the filing of the petition" if such changes "were part of a general increase in prices … as demand rose sharply"); *Certain Steel Wire Rod From Canada, Germany, Trinidad & Tobago, and Venezuela*, Inv. Nos. 731-TA-763-766 (Final), USITC Pub. 3087 at 15 n.69, 21 n.101 (March 1998) ("Because the rising price trend and accompanying financial recovery of the domestic industry began … more than half a year before the petitions in these investigations were filed … we conclude that these trends are not related to the pendency of the investigation"). Consistent with this practice, the increasing subject import volume breaks the causal link between subject imports and the domestic industry's performance. The Commission's departure from its practice on this record reflects a *presumption of causation* by the Commission, which is contrary to law and unsupported by substantial evidence.

**E.     The CIT erroneously affirmed the Commission in *Tenaris II***

The CIT uncritically simply accepted the Petitioners' theory of the case that was premised on the subjective standard of a purported "weaker performance" of the industry than would have been expected: "the industry's production, employment, and financial performance remained weaker in 2021 than would have been expected in light of the strong increase in demand." *Tenaris II*, Appx063 (quoting Appx227). The CIT sustained the Commission on that basis. *Tenaris II*, Appx064.

**IV.     The Commission did not properly interpret 19 U.S.C. § 1677(7)(G)(I)**

**A.     The term "compete with" uses the present tense; the Commission failed to give the statute its plain meaning**

The CIT found the Commission's cumulation analysis was not consistent with the terms of the statute ("compete with"), which employs the present tense. *Tenaris I,* Appx138.  The CIT found it "unreasonable" for the Commission "to view the conditions of competition over the 42-month period of investigation {*i.e.*, January 2019 through June 2022} without considering the effects of competition at the end of the investigation and on vote day." *Tenaris I*, Appx138-139.  On remand, the Commission asserted it did not need to consider whether imports from Russia compete with other subject imports and the domestic like product at the end of the investigation up to and including on vote day.  Appx075-081.  The Commission's interpretation of the phrase "compete with" is contrary to the plain meaning of the

statute and rests on flawed reasoning.

First, the Commission dismissed the relevance of a pre-URAA case cited by this Court, *Chaparral Steel Co. v. United States*, 901 F.2d 1097 (Fed. Cir. 1990), where "the Federal Circuit there had deferred to the Commission's interpretation of the pre-URAA cumulation provision, 19 U.S.C. § 1677(7)(C)(iv) (1988)." Appx071, Appx076-078; *see also Tenaris I*, Appx137-138.

Second, relying on the SAA, the Commission stated that, post-URAA, "current Section 771(7)(G)(i) … require{s} cumulation for competing imports when petitions were filed, or the investigations initiated, on the same day." Appx078.

Third, the Commission further asserts "that staggered investigations must be based on the record compiled in leading investigations, so the Commission no longer needs to assess whether imports subject to the earlier investigation have any 'continuing effect' on vote day …." Appx079 (citing SAA at 848).

Finally, the Commission maintains that:

> The Commission's obligation to "cease the collection of information and . . . provide the parties with a final opportunity to comment on the information obtained . . ." prior to making a final determination would be rendered impossible if the Commission was required to collect data on the competitive conditions in the U.S. market up until vote day.

Appx080 (footnote omitted).  These arguments lack merit.  *See* Appx39131-39138.

Although the Commission dismissed *Chaparral* and appeared to favor instead *Steel Authority of India ("SAIL") v. United States*, 146 F. Supp. 2d 900 (Ct. Int'l

Trade 2001), the Commission's references to *SAIL* are limited. *See* Appx074-075. In any event, the Commission improperly dismissed the relevance of *Chaparral*. The CIT has relied on the *Chaparral* decision in other post-URAA cases to find that the Commission appropriately focused on "current" conditions in an investigation because this approach is "in accord with the remedial purpose of duties … to prevent future harm to the domestic industry by reason of unfair imports that are presently causing material injury." *See, e.g.*, *Nucor Corp. v. United States*, 318 F. Supp. 2d 1207, 1223-24 (Ct. Int'l Trade 2004) (noting "this Court has held that the ITC 'may of course permissibly focus its analysis on a specific time frame within the POI'" and citing *Chaparral*, 901 F.2d at 1103 for "upholding the ITC's focus on current unfair imports, versus those earlier in the period of investigation, in its cumulation analysis because such construction was 'in accord with the remedial purpose of duties which are intended merely to prevent future harm to the domestic industry by reason of unfair imports that are presently causing material injury'" (internal citation omitted)).

The *SAIL* Court employed the *Chevron* doctrine to interpret the meaning of the phrase "compete with" and ultimately deferred to the interpretation of the Commission. *SAIL*, 146 F. Supp. 2d at 905-07. *SAIL* does not control after *Loper Bright*. This Court must interpret the phrase "compete with" in 19 U.S.C. § 1677(7)(G)(i), and "must exercise {its} independent judgment in deciding whether

{the Commission} has acted within its statutory authority" and this Court "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright*, 144 S. Ct. at 2273. As the CIT previously recognized in *Tenaris I*, Appx138, the statutory phrase, "compete with" in 19 U.S.C. § 1677(7)(G)(i) uses the present tense of the verb and so the question before this Court now is whether the Commission's interpretation of "compete with" is consistent with the statute.

The present tense is "{a} tense expressing an action now going on or habitually performed, or a condition now existing or considered generally without limitation to any particular time." "Present tense," *Oxford English Dictionary*, https://www.oed.com/dictionary/present-tense_n (last visited Oct. 20, 2025). Congress expressly recognizes that "{i}n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . *words used in the present tense include the future as well as the present*{.}" 1 U.S.C. § 1 (emphasis added); *see also Hyundai Steel Co. v. United States*, 659 F. Supp. 3d 1327, 1334 (Ct. Int'l Trade 2023) (interpreting phrase "foregoing or not collecting revenue that is otherwise due" from 19 U.S.C. § 1677(5)(D)(ii) the court held that "Congress's use of the simple present tense 'is' denotes an existent obligation that is due presently or would be due at some time in the future").

Nor does the SAA support the Commission's position; rather the SAA compels the opposite conclusion. The effect of the timing of a petition filing and/or

initiation of an investigation is separate from the assessment required by the statute of whether imports "compete with" other imports or the domestic like product for them to be cumulated in a manner consistent with the statute. Apart from the threshold requirement in the statute to cumulate imports when petitions are filed on the same date or investigations initiated on the same date, the statute *also mandates* that the Commission determine whether the imports "compete with" each other based on the specific criteria the Commission has relied on in its practice to make that determination. 19 U.S.C. § 1677(7)(G)(i).

The cumulation criteria considered by the Commission based on its practice in determining whether there exists a "reasonable overlap of competition" include: (1) fungibility; (2) channels of distribution; (3) geographic overlap; and (4) simultaneous presence in the market. *Tenaris I*, Appx132-133. The SAA makes clear that post-URAA the competitive relationship of imports potentially subject to a cumulative injury analysis still must be analyzed:

> {N}ew section 771(7)(G)(i) requires imports to compete with each other and with the domestic like product to be eligible for cumulation. The new section will not affect current Commission practice under which the statutory requirement is satisfied if there is a reasonable overlap of competition, based on consideration of relevant factors.

SAA at 848. The SAA itself recognizes that the "requirement of simultaneous filing will promote certainty in antidumping and countervailing duty investigations by defining, at the time of filing, the countries *potentially* subject to cumulative

analysis." SAA at 848 (emphasis added). Accordingly, while there is a threshold mandatory requirement related to the date of the filing of the petitions or initiation of the investigations, *the Commission's cumulation analysis remains subject to the additional and independent statutory requirement that the Commission determine whether the subject imports "compete with" other subject imports and the domestic like product*. This statutory obligation was the basis for the CIT's remand.

Also lacking merit are the Commission's arguments relating to the occasional existence of so called "staggered investigations" and the purported requirement that parties need sufficient time to provide comments on information on the record. Appx079-081. Neither of these arguments support the Commission's position. The occasional existence of a staggered investigation in no way prevents the Commission from following its statutory mandate and giving "compete with" its plain meaning. Nor does the purported need to allow parties to comment on the record prevent the Commission from following the statute. As an initial matter, this case does not even involve a staggered investigation. More importantly, however, the Commission had every opportunity in this investigation to consider the most relevant evidence. Indeed, the Commission could have accessed (without issuing new questionnaires) information regarding subject imports from Russia during the nearly three-month period between the submission of the questionnaire responses (*i.e.*, July 29, 2022) and the filing of final comments (*i.e.*, October 24, 2022).

Nor are so-called staggered investigations an obstacle. The Commission acknowledged the parties' ability to comment on a subsequent Commerce Department determination that follows the Commission's initial determination. Appx079-081. Thus, information can indeed be added to the record, and the Commission's analysis does not end at the conclusion of the first investigation. *See, e.g.*, *Gas Powered Pressure Washers from China*, Inv. Nos. 701-TA-684 and 731-TA-1597 (Final), USITC Pub. 5488 at 4 (Feb. 2024) (acknowledging Commerce's final determination and parties' comments on Commerce's determinations); *Steel Nails from India, Thailand, and Turkey*, Inv. Nos. 731-TA-1580, 1582, and 1583 (Final), USITC Pub. 5404 at 4, 6 (Feb. 2023) (same); *Certain Freight Rail Couplers from Mexico and Parts Thereof*, Inv. No. 731-TA-1593 (Final), USITC Pub. 5470 at 4-6 (Nov. 2023) (same).

By the end of the POI, there was no reasonable overlap of competition based on the four factors relied on by the Commission. Appx33975 ("imports from Russia dropping to zero"). The Plaintiffs-Appellants explained the March 2022 and May 2022 importations; and additional data points and information available thereafter is relevant information to make the assessment about whether subject imports "compete with" other imports and the domestic like product.

**B.** **The Plaintiffs-Appellants never abandoned the argument that the Commission's interpretation of "compete with" is inconsistent with the statute**

To find that an argument has been "abandoned" requires meeting a very high bar. The court must find that the argument was "unambiguously abandoned" or "expressly disavowed"). *In re Walter*, 698 Fed. Appx. 1022, 1026 (Fed. Cir. 2017) ("Mr. Walter did not raise this argument before the Board, however, and expressly abandoned and disavowed it during oral argument before us…. We therefore deem this argument waived"); *Adams v. United States*, 59 F.4th 1349, 1366 (Fed. Cir. 2023) ("At the *en banc* oral argument, however, the government unambiguously abandoned this position").

The CIT committed "clear error" in finding that Plaintiffs-Appellants abandoned their argument that the Commission did not properly interpret 19 U.S.C. § 1677(7)(G)(I). *See, e.g.*, *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948) ("A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed"); *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011) ("factual findings of the Court of International Trade … are reviewed for clear error" and the CAFC found that the CIT "clearly erred" in sustaining CBP's tariff classification, and remanded for further proceedings). Here, the record provides no evidence of abandonment. The record certainly does not demonstrate an express waiver of the argument – let alone "unambiguous abandonment" or an "express disavowal" of the argument. Tenaris

never expressly or implicitly abandoned any of its arguments related to its claim that the Commission failed to properly interpret the phrase "compete with." The CIT's finding of abandonment is inconsistent with the plaintiffs' briefing, the oral argument, and the CIT's initial remand decision and order.

The CIT found that plaintiffs abandoned the argument solely based on a statement during oral argument that plaintiffs were also not seeking to change the POI. The Commission's investigative period is not set by statute or regulation, but its "normal practice is to consider data for the *three most recent calendar years, plus interim periods* where applicable." *Sodium Nitrite from China and Germany*, Inv. Nos. 701-TA-453 (Final) and 731-TA-1136-1137 (Final), USITC Pub. 4029 at 14 and n.84 (Aug. 2008) (emphasis added); *Outboard Engines From Japan*, Inv. No. 731-TA-1069 (Final), USITC Pub. 3752 at 12 (Feb. 2005) (same).

The CIT erroneously conflated the POI with the period during which the Commission could consider information relevant to its decision. The CIT reached its conclusion of abandonment based on an incorrect premise in which it reasoned that the POI was coterminous with the period from which the Commission could consider information relevant to the Commission's cumulation decision can be considered. That is wrong. The Commission will also consider information received onto the record *after* the POI, prior to the record closing. *See, e.g.*, *Tin Mill Products from Canada, China, Germany, Netherlands, South Korea, Taiwan, Turkey, and*

*United Kingdom*, Inv. Nos. 701-TA-685 and 731-TA-1599-1606 (Preliminary), USITC Pub. 5413 at 18 n.74 (March 2023) ("in addition to considering evidence during the POI, we have also considered whether the known current effects of the post-POI earthquake render the cumulation of subject imports from Turkey inappropriate"); *Brass Rod from India*, Inv. No. 701-TA-686 (Final), USITC Pub. 5485 at 95 (Feb. 2024) (separate views) ("for purposes of a making a present injury determination the Commission must address record evidence of 'significant circumstances and events' that occur after the POI and up to the vote day, if that evidence is otherwise reliable" (citing *Usinor*, 26 C.I.T. at 779)).

In this case, final comments were submitted on October 21, 2022 and the Staff Report includes information and data well after the POI. *See, e.g.*, Appx33980 (showing the active rig count *through September 2022, and that the data was "accessed July 19, 2022 and September 22, 2022"*); Appx34277 (Crude oil prices, up to and including August 2022); Appx34015-34017 (noting "Recent developments in the U.S. industry," including in July-August 2022); Appx34098 ("Raw material producer price indexes" up to and including August 2022); Appx34101 (billet prices, up to and including August 2022). The CIT failed to explain or even to rationally connect the POI with its finding that Tenaris abandoned its arguments regarding the correct interpretation of the statute. The CIT also failed to even consider several arguments advanced by Tenaris in support of its statutory interpretation claim. That

was arbitrary and an abuse of discretion. *See Meyer Corp. v. United States*, 123 F.4th 1306, 1314 (Fed. Cir. 2024) (remanded because the CIT "failed to meaningfully evaluate whether Meyer was entitled to rely on first-sale price"); *Altx*, 370 F.3d at 1119 (remanding and stating it "reasonably was troubled by the failure to consider all relevant arguments").

As to the meaning of "compete with" in 19 U.S.C. § 1677(7)(G)(i) – and, more generally, the temporal aspect of the Commission's cumulation determination – the CIT reiterated that "conditions of competition must exist in the present tense at the end of the investigation," and that "{i}t is not enough for the conditions of competition to have existed at some point during the period of investigation." *Tenaris II,* Appx021. While the CIT declined to accord greater weight to the conditions of competition at the end of the POI, it concluded that, "{f}or there to be competition, subject imports from competing countries must be evaluated under similar circumstances and *in the present tense at the end of the investigation*." *Tenaris II*, Appx022 (emphasis added). The CIT offers a three-sentence analysis of the Commission's explanation on remand – that it considered the entire POI – and concludes that "its review of Russian OCTG in the United States market for its material injury determination is reasonable." *Tenaris II*, Appx022.

The CIT failed to address – either entirely, or in any substance – Plaintiffs-Appellants' arguments related to the *Chaparral* decision, the SAA, staggered

investigations, and the Commission's practice and ability to assess information on the record after the POI.

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, this Court should:

(1) Vacate the CIT's judgments in *Tenaris I* and *Tenaris II*.

(2) Find the Commission's finding that the volume of subject imports, and increase in that volume, was "significant" was not supported by substantial evidence and was otherwise not in accordance with law.

(3) Find the Commission's determination that the domestic industry was materially injured by reason of subject imports was not supported by substantial evidence and was otherwise not in accordance with law.

(4) Find that the CIT erred in finding that the Plaintiffs-Appellants abandoned their argument that the Commission did not properly interpret 19 U.S.C. § 1677(7)(G)(i) and the meaning of the phrase "compete with" in the Commission's analysis of the ability of subject imports to compete with other imports and the domestic like product in the U.S. market.

(5) Grant Plaintiffs-Appellants such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Frank J. Schweitzer
Frank J. Schweitzer
Gregory J. Spak
Kristina Zissis
Matthew W. Solomon
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs-Appellants Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corp., Siderca S.A.I.C., Tubos de Acero de Mexico, S.A.

October 20, 2025

## ADDENDUM

| Tab No. | Date | Description | Bates Range |
|---|---|---|---|
| 1 | 6/20/2025 | Judgment for Slip Op. 25-78 | Appx001-002 |
| 2 | 6/20/2025 | CIT Slip Op. 25-78 | Appx003-064 |
| 3 | 8/16/2024 | Views of the Commission on Remand | Appx065-122 |
| 4 | 4/19/2024 | CIT Slip Op. 24-48 | Appx123-170 |
| 5 | 11/18/2022 | USITC Federal Register Notice of Final Determination | Appx171-171 |
| 6 | 11/15/2022 | Views of the Commission (Final) | Appx172-239 |
| 7 | 11/21/2022 | DOC Federal Register Notice of AD Order | Appx240-242 |
| 8 | N/A | 19 U.S.C. § 1677(7)(C)(i) | N/A |
| 9 | N/A | 19 U.S.C. § 1677(7)(C)(iv) (1988) | N/A |
| 10 | N/A | 19 U.S.C. § 1677(7)(G)(i) | N/A |
| 11 | N/A | 19 U.S.C. § 1677(7)(I) | N/A |

1

Judgment for Slip Op. 25-78

6/20/2025

## UNITED STATES COURT OF INTERNATIONAL TRADE

TENARIS BAY CITY, INC., MAVERICK
TUBE CORPORATION, IPSCO
TUBULARS INC., TENARIS GLOBAL
SERVICES (U.S.A.) CORPORATION,
AND SIDERCA S.A.I.C.,

      Plaintiffs,

and

TMK GROUP AND TUBOS DE ACERO
DE MEXICO, S.A.,

      Consolidated Plaintiffs,

and

TENARIS BAY CITY, INC., MAVERICK
TUBE CORPORATION, AND IPSCO
TUBULARS INC.,

      Plaintiff-Intervenors,

v.

UNITED STATES,

      Defendant,

and

UNITED STATES STEEL
CORPORATION, BORUSAN
MANNESMANN PIPE U.S. INC., PTC
LIBERTY TUBULARS LLC, UNITED
STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING,
ENERGY, ALLIED INDUSTRIAL AND
SERVICE WORKERS
INTERNATIONAL UNION, AFL-CIO,
CLC, AND WELDED TUBE USA INC.,

      Defendant-Intervenors.

Before: Jennifer Choe-Groves, Judge

Consol. Court No. 22-00344

## JUDGMENT

This case having been duly submitted for decision, and the Court, after due deliberation, having rendered a decision; now therefore, in conformity with said decision, it is hereby

**ORDERED** that the U.S. International Trade Commission's final determination in <u>Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea</u>, 87 Fed. Reg. 69,331 (ITC Nov. 18, 2022), as amended by the Views of the Commission on Remand, Aug. 16, 2024, ECF Nos. 75, 76, is sustained; and it is further

**ORDERED** that judgment is entered for Defendant United States.

                                             <u>/s/ Jennifer Choe-Groves</u>
                                        Jennifer Choe-Groves, Judge

Dated:   <u>June 20, 2025</u>
             New York, New York

2

CIT Slip Op. 25-78

6/20/2025

Appx003-064

Slip Op. 25-78

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION, AND SIDERCA S.A.I.C.,** | |
| **Plaintiffs,** | |
| **and** | |
| **TMK GROUP AND TUBOS DE ACERO DE MEXICO, S.A.,** | |
| **Consolidated Plaintiffs,** | Before: Jennifer Choe-Groves, Judge |
| **and** | Consol. Court No. 22-00344 |
| **TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, AND IPSCO TUBULARS INC.,** | |
| **Plaintiff-Intervenors,** | |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |

<div style="border: 1px solid black; padding: 10px;">

**UNITED STATES STEEL CORPORATION, BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, AND WELDED TUBE USA INC.,**

        **Defendant-Intervenors.**

</div>

## OPINION AND ORDER

[Sustaining the U.S. International Trade Commission's affirmative material injury determination resulting from the investigation involving oil country tubular goods from Argentina, Mexico, Russia, and South Korea.]

Dated:  June 20, 2025

Gregory J. Spak, Frank J. Schweitzer, Kristina Zissis, and Cristina M. Cornejo, White and Case, LLP, of Washington, D.C., for Plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, and Siderca S.A.I.C., and Consolidated Plaintiff Tubos de Acero de Mexico, S.A.  Colin A. Dilley, Luca Bertazzo, Matthew W. Solomon, and Ron Kendler also appeared.

Michael J. Chapman, Jeffrey M. Winton, and Amrietha Nellan, Winton & Chapman PLLC, of Washington, D.C., for Consolidated Plaintiff TMK Group.  Vi Mai, Ruby Rodriguez, and Jooyoun Jeong also appeared.

Dominic L. Bianchi, General Counsel, Andrea C. Casson, Assistant General Counsel for Litigation, and Madeline R. Heeran, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, D.C., for Defendant United States.

Thomas M. Beline, Myles S. Getlan, James E. Ransdell, and Nicole Brunda, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant-Intervenor United States Steel Corporation.

Roger B. Schagrin, Jeffrey D. Gerrish, and Luke A. Meisner, Schagrin Associates, of Washington, D.C., argued for Defendant-Intervenors Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper, and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA Inc.  Christopher T. Cloutier, Elizabeth J. Drake, Justin M. Neuman, Nicholas J. Birch, Saad Y. Chalchal, and William A. Fennell also appeared.

    Choe-Groves, Judge:  Before the Court is the remand determination from the final affirmative material injury investigation of oil country tubular goods ("OCTG") from Argentina, Mexico, Russia, and South Korea by the U.S. International Trade Commission ("Commission" or "ITC").  Views of the Commission on Remand ("Remand Views"), USITC Pub. 5381, Inv. Nos. 701-TA-671–72, 731-TA-1571–73 (Final) (Aug. 16, 2024), PR 181R; see also Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea, 87 Fed. Reg. 69,331 (ITC Nov. 18, 2022) ("Final Determination"), PR 169; see also Views of the Commission, USITC Pub. 5381, Inv. Nos. 701-TA-671–72, 731-TA-1571–73 (Final) (Nov. 18, 2022), PR 165[1] ("Views"); Final Staff Report (Oct. 14, 2022), PR 161 ("Staff Report").

    Consolidated Plaintiff TMK Group, Plaintiffs Tenaris Bay City, Inc.,

---

[1]  Citations to the administrative record reflect the public administrative record ("PR") and the confidential administrative record ("CR").  ECF Nos. 59, 92.

Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services
(U.S.A.) Corporation, and Siderca S.A.I.C., and Consolidated Plaintiff Tubos de
Acero de Mexico, S.A. (collectively, "Plaintiffs") challenge certain aspects of the
final affirmative material injury determination, such as the Commission's
determinations of cumulation, volume, price effects, and impact, which were
included in the Rule 56.2 motions for judgment on the agency record filed by TMK
Group and Tenaris.  Pl.'s Rule 56 Mot. J. Agency R. Pursuant USCIT Rule
56.2 ("TMK Group's Motion"), ECF No. 42; Rule 56 Mot. J. Agency R. ("Tenaris'
Motion"), ECF No. 46; see also Mem. Supp. Pl.'s Rule 56.2 Mot. J. Agency R.
("TMK Group's Br."), ECF No. 42-1; Mem. Points Authorities Supp. Pls.' Rule
56.2 Mot. J. Agency R. ("Tenaris' Br."), ECF No. 46.  Defendant-Intervenors
Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United States
Steel Corporation, United Steel, Paper, and Forestry, Rubber Manufacturing,
Energy, Allied Industrial and Service Workers International Union, AFL-CIO,
CLC, and Welded Tube USA Inc. (collectively, "Defendant-Intervenors") filed
their response.  Def.-Intervs.' Rule 56.2 Resp. Br. ("Def.-Intervs.' Resp."), ECF
No. 50.  Defendant United States ("Defendant" or "the Government") filed its
Memorandum in Opposition to Plaintiff's Rule 56. 2 Motion for Judgment on the
Agency Record.  Def.'s Mem. Opp'n Pl.'s Rule 56.2 Mot. J. Agency R. ("Def.'s
Resp."), ECF No. 52.  TMK Group and Tenaris filed their reply briefs.  Reply

Supp. Pls.' Rule 56.2 Mot. J. Agency R. ("Tenaris' Reply"), ECF No. 56; Reply

Br. TMK Group ("TMK Group's Reply"), ECF No. 57.

       The Court remanded the <u>Final Determination</u> and deferred its review of the

ITC's determinations on volume, price effects, and impact in the material injury

determination.  <u>See</u> <u>Tenaris Bay City, Inc. v. United States</u> ("<u>Tenaris I</u>"), 48 CIT

__, 698 F. Supp. 3d 1287 (2024).  On remand, the Commission continued to adopt

its determinations on the conditions of competition, volume, price effects, and

impact from the original <u>Views</u>.  <u>Remand Views</u> at 3.  The <u>Remand Views</u> solely

addressed the cumulation issue.

       TMK Group and Tenaris filed their comments in opposition to the <u>Remand</u>

<u>Views</u>.  Pls.' Cmts. USITC's Remand Redetermination ("Tenaris' Remand

Cmts."), ECF Nos. 80, 81; Cmts. TMK Group Opp'n [ITC]'s Remand

Redetermination ("TMK Group's Remand Cmts."), ECF Nos. 82, 83.  Defendant

and Defendant-Intervenors filed their comments in support.  Def. [USITC]'s Cmts.

Remand Redetermination ("Def.'s Remand Cmts."), ECF Nos. 86, 87; Def.-

Intervs.' Cmts. Supp. Remand Results ("Def.-Intervs.' Remand Cmts."), ECF Nos.

89, 90.

       For the following reasons, the Court sustains the Commission's <u>Final</u>

<u>Determination</u>.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural

history of this case and recites the facts relevant to the Court's review of the

Remand Views.  See Tenaris I, 48 CIT at __, 698 F. Supp. 3d at 1292.

Petitions requesting investigations were filed with the U.S. Department of

Commerce ("Commerce") and the ITC on October 6, 2021 by Borusan

Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, U.S. Steel Tubular

Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing,

Energy, Allied Industrial and Service Workers International Union, AFL-CIO,

CLC, and Welded Tube USA, Inc.  Petitions, PR 1.

The Commission initiated an investigation and determined preliminarily that

there was a reasonable indication that the domestic industry was materially injured

or threatened with material injury by reason of subject imports.  Views of the

Commission (Preliminary) ("Preliminary Views"), PR 74.

The Commission published its Final Determination on November 18, 2022,

determining that an industry in the United States was materially injured by reason

of imports of OCTG from Argentina, Mexico, Russia, and South Korea.  See Final

Determination, 87 Fed. Reg. at 69,331.

The Court sustained in part and remanded in part the Final Determination.

The Court sustained the ITC's determination to cumulate subject imports from

Argentina and Mexico as supported by substantial evidence, but remanded the

ITC's determination to cumulate subject imports from Russia and subject and non-

subject imports from South Korea as unsupported by substantial evidence.  Tenaris

I, 48 CIT __, 698 F. Supp. 3d at 1309.  The Court remanded for the Commission to

reconsider its cumulation determinations for subject imports from Russia and non-

subject imports from South Korea, and deferred its analysis of the challenges to the

ITC's additional determinations regarding volume, price effects, and impact in the

material injury determination.  Id., at __, 698 F. Supp. 3d at 1301, 1307, 1309.

The Commission published a notice of remand proceedings on May 29,

2024, and issued supplemental tables concerning imports from South Korea on

June 7, 2024.  Oil Country Tubular Goods from Argentina, Mexico, and Russia, 85

Fed. Reg. 46,419 (May 29, 2024) (notice of remand proceedings); USITC Suppl.

Mem. (June 7, 2024), PR 174R, CR 440R.  The Parties filed comments in response

to the notice of remand proceedings.  TMK Group's Remand Cmts., PR 176R;

Tenaris' Remand Cmts., PR 177R, CR 442R.

The Commission issued its Remand Views on August 16, 2024.  See

Remand Views.  Oral argument was held on March 17, 2025.  Oral Arg. (Mar. 17,

2025), ECF No. 100.

## ISSUES PRESENTED

The Court reviews whether the Commission's determinations of cumulation

of subject imports, volume, price effects, and impact are supported by substantial

evidence and in accordance with law.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and Section

516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C.

§ 1516a(a)(2)(B)(i), which grant the Court authority to review actions contesting

the ITC's final injury determinations following an antidumping or countervailing

duty investigation.  The Court will hold unlawful any determination found to be

unsupported by substantial record evidence or otherwise not in accordance with

law.  19 U.S.C. § 1516a(b)(1)(B)(i); see also Siemens Energy, Inc. v. United

States, 806 F.3d 1367, 1369 (Fed. Cir. 2015).

## DISCUSSION

Tenaris and TMK Group challenge certain aspects of the Commission's final

affirmative material injury determination.  TMK Group challenges only the

Commission's cumulation analysis as unsupported by substantial evidence and not

in accordance with law, whereas Tenaris challenges the Commission's cumulation,

volume, price effects, and impact determinations as unsupported by substantial

evidence and not in accordance with law.  See TMK Group's Br.; Tenaris' Br.  The

Government and Defendant-Intervenors contend that the Commission's material injury determination is supported by substantial evidence and in accordance with law in all aspects of the affirmative determination.  See Def.'s Resp.; Def.-Intervs.' Br.

To make an affirmative material injury determination, the ITC must find that: (1) material injury existed; and (2) the material injury was caused by reason of the subject imports.  See Swiff-Train Co. v. United States, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed. Cir. 1997)).  Material injury is defined by statute as harm that is not inconsequential, immaterial, or unimportant.  19 U.S.C. § 1677(7)(A).  To determine whether a domestic industry has been materially injured or threatened with material injury by reason of unfairly subsidized or less than fair value imports, the Commission considers:

> (I)   the volume of imports of the subject merchandise,
>
> (II)  the effect of imports of that merchandise on prices in the United States for domestic like products, and
>
> (III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States.

Id. § 1677(7)(B)(i).  The Commission may consider other economic factors that are relevant to determining whether there is material injury by reason of

imports.  Id. § 1677(7)(B)(ii).  No single factor is dispositive and the significance

to be assigned to a particular factor is for the ITC to decide.  See S. Rep. No. 96-

249, at 88 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 474.  The statute neither

defines the phrase "by reason of," nor provides the ITC with guidance, on how to

determine whether the material injury is by reason of subject imports.  The U.S.

Court of Appeals for the Federal Circuit ("CAFC") has interpreted the statutory

language "by reason of" to require the Commission to consider the volume of

subject imports, their price effects, their impact on the domestic industry, and to

establish whether there is a causal connection between the imported goods and the

material injury to the domestic industry.  See Swiff-Train Co., 793 F.3d at

1361; see also S. Rep. No. 96-249, at 57–58, 74–75 (1979), reprinted in 1979

U.S.C.C.A.N. 381, 443–44, 460–61.

## I.    The Commission's Cumulation of Subject Imports

The Commission cumulated subject imports from Argentina, Mexico,

Russia, and South Korea, determining that the cumulation factors of fungibility,

channels of distribution, geographic overlap, and simultaneous presence in the

market showed a "reasonable overlap of competition" among subject imports and

the domestic like product.  Views at 16–23.  On remand, the Commission

continued to adopt its determinations on the conditions of competition, volume,

price effects, and impact from the original Views.  Remand Views at 3.

### A.    Legal Standard

In evaluating material injury, the Commission must "cumulatively assess the volume and effect of imports of the subject merchandise from all countries," if such imports compete with each other and with domestic like products.  19 U.S.C. § 1677(7)(G)(i)(I), (II).  The ITC refers to this requirement as "cumulation."  The Statement of Administrative Action to the Uruguay Round Agreements Act ("SAA") states that the statutory requirement is satisfied if there is a reasonable overlap of competition.  See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 848 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4190.  Because the Commission need only find that a "reasonable overlap" of competition exists, a finding of "'complete overlap' of competition" is not required to support a cumulation decision.  Mukand Ltd. v. United States, 20 CIT 903, 909, 937 F. Supp. 910, 916 (1996) (quoting Wieland Werke, AG v. United States, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989)); see also Goss Graphics Sys., Inc. v. United States, 216 F.3d 1357, 1362 (Fed. Cir. 2000) (stating that the ITC's inquiry is "whether 'reasonable overlap' of competition exists").

To determine whether imports compete with each other and with the domestic like product, or if there is a "reasonable overlap" of competition, the Commission analyzes four factors:

    (1)    the degree of fungibility between subject imports from different countries and between subject imports and the domestic like product, including consideration of specific customer requirements and other quality related questions;

    (2)    the presence of sales or offers to sell in the same geographic markets of subject imports from different countries and the domestic like product;

    (3)    the existence of common or similar channels of distribution for subject imports from different countries and the domestic like product; and

    (4)    whether the subject imports are simultaneously present in the market

Int'l Indus., Ltd. v. United States, 42 CIT __, __, 311 F. Supp. 3d 1325, 1329–30 (2018) (citation omitted).

The Commission's use of these criteria for determining whether competition exists between and among subject imports and the domestic like product have been approved by the U.S. Court of International Trade ("CIT") and the CAFC. See Goss Graphics Sys., Inc. v. United States, 22 CIT 983, 985, 33 F. Supp. 2d 1082, 1085 (1998), aff'd sub nom., 216 F.3d 1357 (Fed. Cir. 2000); see also Fundicao Tupy S.A. v. United States, 12 CIT 6, 10–11, 678 F. Supp. 898, 902 (1988) (summarizing the factors as "the fungibility and similar quality of the imports, the similar channels of distribution, the similar time period involved, and the geographic overlap of the markets"), aff'd, 859 F.2d 915 (Fed. Cir. 1988).  No

one factor in the Commission's analysis is dispositive.  Noviant OY v. United States, 30 CIT 1447, 1461, 451 F. Supp. 2d 1367, 1379 (2006).

The Commission must "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry" when considering the impact of subject imports on the domestic industry.  19 U.S.C. § 1677(7)(C)(iii).  The ITC's determinations regarding competition and market conditions must be supported by substantial record evidence.  See 19 U.S.C. § 1615a(b)(1)(B)(i); see also Siemens Energy, Inc., 806 F.3d at 1369.  When the Commission makes a determination on volume, price, or impact that is premised on speculation about industry conditions, that determination has not been "evaluate[d] . . . within the context of the business cycle and the conditions of competition that are distinctive to the affected industry."  19 U.S.C. § 1677(7)(C)(iii); see also Catfish Farmers of Am. v. United States, 37 CIT 717, 733 (2013) ("[S]peculation does not amount to reasonable inference, as it provides no factually-grounded basis for sustaining an agency's determination.").

### B.    OCTG from Russia

In Tenaris I, the Court remanded the ITC's determination to cumulate subject imports from Russia as not supported by substantial evidence or in accordance with law due to: (1) the ITC's timeframe for evaluating cumulation; (2)

the ITC's failure to consider potentially contrary evidence on the record for its

cumulation determination; and (3) the ITC's failure to file the Responses to

Commission Questions with the Court.  Tenaris I, 48 CIT at __, 698 F. Supp. 3d at

1298.

### 1.    Timing of Assessment

In their Rule 56.2 motions, Tenaris and TMK Group challenged the ITC's

cumulation of subject imports from Russia, arguing that the ITC's determination

was not in accordance with law because the timeframe for evaluating cumulation

of Russian OCTG was improper and vote day should have been the appropriate

timeframe to assess conditions of competition.  See TMK Group's Br. at 5–25;

Tenaris' Br. at 8–23.

In both the Views and Remand Views, the ITC cumulated Russian OCTG

based on the period of investigation, explaining on remand that the assessment of

competitive overlap for cumulation purposes should not be made at the time of the

Commission's vote.  Remand Views at 11–17.  The Commission clarified that

Commerce, rather than the Commission itself, determined that subject imports

from the four countries at issue were unfairly traded before the time of the

Commission's vote on October 26, 2022, and contended that Chaparral Steel Co. v.

United States ("Chaparral Steel"), 901 F.2d 1097 (Fed. Cir. 1990), was

distinguishable from this case, and relied on Steel Auth. of India, Ltd. v. United

States ("Steel Authority of India" or "SAIL"), 25 CIT 472, 478, 146 F. Supp. 2d

900, 906–07 (2001) in its cumulation determination.  Id.

Tenaris contests the ITC's reliance on Steel Authority of India because the

case was dependent on Chevron, U.S.A., Inc. v. Natural Resources Defense

Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and argues

that the Court must instead independently interpret the term "compete with" in 19

U.S.C. § 1677(7)(G)(i) under Loper Bright Enters. v. Raimondo ("Loper Bright"),

603 U.S. 369, 144 S. Ct. 2244 (2024).  Tenaris' Remand Cmts. at 11–15.[2]  Tenaris

contends that the ITC's interpretation of the statute and its cumulation analysis

continue to be inconsistent with the plain meaning of the statutory phrase "compete

with," which uses the present tense and thus denotes that the subject imports

---

[2]  Defendant contends that the Parties' argument regarding Loper Bright is waived
under the doctrine of administrative exhaustion because Tenaris did not raise this
argument in its administrative remand comments filed prior to the issuance of
Loper Bright.  See Tenaris' Remand Cmts.  Parties are excused from the
exhaustion requirement when an intervening judicial decision materially affects an
issue before the Court.  See Siemens Gamesa Renewable Energy v. United States,
621 F. Supp. 3d 1337, 1348 (2023) (citing Hormel v. Helvering, 312 U.S. 552,
558–59 (1941)); Gerber Food (Yunnan) Co. v. United States, 33 CIT 186, 196, 601
F. Supp. 2d 1370, 1380 (2009); cf. Papierfabrik Aug. Koehler AG v. United States,
36 CIT 1632, 1635 (2012) ("the intervening judicial decision exception applies
because there was a change in the controlling law on the use of zeroing").  Tenaris'
argument is not waived because Loper Bright is an intervening judicial decision
that would "materially alter the result" of the case.  See Gerber Food (Yunnan)
Co., 33 CIT at 196, 601 F. Supp. 2d at 1380.

should be evaluated during the months leading up to and including vote day.  Id. at

7.

During oral argument, however, Plaintiffs apparently abandoned their

argument that vote day should be the proper timeframe of assessment, framing the

issue instead as greater weight that the ITC should have accorded to the last few

months of the period of investigation when sanctions were imposed against

Russian imports and prevented reasonable competition with other subject imports.

Oral Arg. at 2:00:00–2:00:31 ("Just to be clear, we are not asking to change the

[period of investigation].  We are asking the Court to consider whether the

Commission reasonably determined present material injury during the [period of

investigation].").  Because Plaintiffs no longer assert that vote day is the

appropriate time for assessing competition of imports, the Court focuses here on

the assessment of competition through the end of the period of investigation rather

than vote day.

Under Loper Bright, courts exercise their "independent judgment" about the

correctness of an agency's statutory interpretation.  See Lashify, Inc. v. Int'l Trade

Comm'n, 130 F.4th 948, 957 (Fed. Cir. 2025) (citing Loper Bright, 603 U.S. at

412).  Previously, under Chevron deference, "ambiguous" statutes were treated as

"implicit" delegations of authority to agencies, which had authority to "fill any

gap[s]" in the statute with "reasonable" interpretations.  Chevron, 467 U.S. at 843–

44 (quotation omitted).  However, <u>Loper Bright</u> held that statutory ambiguity "is

not a delegation to anybody," and courts should not "defer" to an agency's

interpretation when faced with an unclear statute.  <u>Loper Bright</u>, 603 U.S. at 400.

The statutory language is the starting point for analysis and typically

controls the outcome.  <u>See, e.g.</u>, <u>Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.</u>, 469

U.S. 189, 194 (1985).  At issue is the "compete with" provision in section

1677(7)(G)(i).  <u>See</u> 19 U.S.C. § 1677(7)(G)(i) (stating that the ITC may cumulate

subject imports to determine material injury "if such imports compete with each

other and with domestic like products in the United States market").

The Court must "use[] every tool at their disposal to determine the best

reading of the statute and resolve the ambiguity [in the statute]."  <u>Loper Bright</u>,

603 U.S. at 373.  The Court must apply "all relevant interpretative tools" to

determine which meaning is best—"'the reading the court would have reached' if

no agency were involved."  <u>Id.</u>

Section 1677(7)(G)(i) states:

For purposes of clauses (i) and (ii) of subparagraph (C), and subject to
clause (ii), the Commission shall cumulatively assess the volume and
effect of imports of the subject merchandise from all countries with
respect to which—

> (I)     petitions were filed under section 1671a(b) or 1673a(b) of
>         this title on the same day,

> (II)    investigations    were    initiated    under section
>         1671a(a) or 1673a(a) of this title on the same day, or
>
> (III)   petitions were filed under section 1671a(b) or 1673a(b) of
>         this title and investigations were initiated under section
>         1671a(a) or 1673a(a) of this title on the same day,
>
> if such imports compete with each other and with domestic like
> products in the United States market.

19 U.S.C. § 1677(7)(G)(i).

Section 1677(7)(G)(i) is silent as to the precise time period that the Commission must consider in making its cumulation determination.  The phrase "compete with" is not defined, with the only statutory mandate to cumulate subject imports in cases when "imports compete with each other and with domestic like products" in the United States market.  19 U.S.C. § 1677(7)(G)(i).  What Congress intended by the phrase "compete with," or the timeframe that the Commission may use to assess competition, is also not immediately clear from the legislative history of section 1677(G)(i), which was first added to the law in the Trade and Tariff Act of 1984, Pub.L. No. 98–573, § 612, 98 Stat. 2948, 3033.[3]  Cumulation was mandated "for purposes of assessing injury if such imports compete with each other and with like products of domestic industry in the U.S. market."  House

---

[3]  This provision was added as clause (i) to Paragraph (7)(C).  Trade and Tariff Act of 1984, Pub. L. No. 98-573, § 612(a)(2)(A).

Comm. on Ways and Means, Trade Remedies Reform Act of 1984, H.R. Rep. No.

98–725, at 37 (1984), reprinted in 1984 U.S.C.C.A.N. 5127, 5134.

Congress did not include statutory language regarding the timeframe that the

Commission should use for its cumulation analysis in the Customs and Trade Act

of 1990.  See Customs and Trade Act of 1990, Pub. L. No. 101-382, § 224(a);

Uruguay Round Agreements Act, Pub. L. No. 103-465, § 222(b)(2) & (e)(2).  The

legislative history only includes guidance that cumulation is designed to take into

account "simultaneous unfair imports."  Neither the statutory language nor the

legislative history conclusively establishes the intended time frame in which

imports are to be considered for competition in the cumulation analysis.

As noted in Tenaris I, the statutory language is written in the present tense: if

"such imports compete with each other and with domestic like products in the

United States market."  19 U.S.C. § 1677(7)(G)(i).  The Court reiterates that

conditions of competition must exist in the present tense at the end of the

investigation.  It is not enough for the conditions of competition to have existed at

some point during the period of investigation.  The Court also concludes that the

statutory language does not support Plaintiffs' contention that the ITC should

accord greater weight to the conditions of competition at the end of the period of

investigation.  The Court also considers the present tense of the word "compete

with."  "Compete" in the context of firms is defined as each firm "tr[ying] to get

people to buy its own goods in preference to those of the other firm or country."

Collins Dictionary, Merriam-Webster Dictionary, available at

https://www.collinsdictionary.com/us/dictionary/english/compete (last visited June

20, 2025).  For there to be competition, subject imports from competing countries

must be evaluated under similar circumstances and in the present tense at the end

of the investigation.

On remand, the Commission explained that it made its determination based

on the entire period of investigation.  In light of Plaintiffs' abandonment of the

argument that the conditions of competition should exist on vote day, and the lack

of statutory support for the argument that the ITC was required to weigh the

conditions of competition more heavily at the end of the period of investigation

due to the sanctions imposed against Russia, the Court concludes that the ITC's

assessment of competition throughout the 42-month period of investigation was in

accordance with law.

The Commission's determination that imports from Russia "compete with

each other and with domestic like products" within the meaning of Section 771 of

the Tariff Act of 1930, as amended, and its review of Russian OCTG in the United

States market for its material injury determination is reasonable.

Therefore, the Court sustains the ITC's determination on the issue of imports

from Russia competing with each other and with domestic like products.

### 2.    Cumulation Factors

TMK Group challenged the ITC's cumulation determination as not
supported by substantial evidence, arguing that all four cumulation factors were
not met because: (1) the loss of American Petroleum Institute ("API")-certification
for Russian subject imports rendered subject imports not fungible with other
subject imports; and (2) the sanctions imposed on Russia (aside from the loss of
API-certification) and Section 232 duties affected subject Russian OCTG from
sharing simultaneous presence, channels of distribution, and geographic overlap
with other subject imports.  See TMK Group's Br. at 6–24.

Regarding the fungibility of Russian OCTG, the ITC first acknowledged that
the impact of loss of API-certification "is not yet clear, particularly in light of
continued subject imports from Russia after March 2022."  Views at 23.  The
Court noted that this statement seemed contradictory because it showed that the
ITC was not clear about the impact from such a loss, but proceeded to predict and
discuss the effect of this sanction.  Tenaris I, 48 CIT at __, 698 F. Supp. 3d at
1298.

The Court remanded for the ITC to further explain "the lag of the sanction
measures taking place or the impact of the loss of API-certification services on
Russian OCTG's competitiveness" and "the potential contrary evidence regarding

the competitiveness of imports from Russian OCTG relative to the other subject imports from Argentina, Mexico, and South Korea." Id. at 1301.

On remand, the ITC clarified that the suspension of API-certification did not render Russian OCTG non-fungible with domestic and imported OCTG, as the loss of API-certification did not prevent Russian green tube from being fungible and competing with domestic or imported green tube, either in limited-service environments or after being processed in the United States, because the quality of Russian OCTG remained competitive despite lacking certification. Remand Views at 28–35.

The ITC addressed the "potentially contrary evidence" previously cited by TMK Group in its Rule 56.2 brief regarding the competitiveness of Russian OCTG, such as the hearing testimony of Luca Zanotti, President of Tenaris USA, and a letter from the API. See Tenaris I, 48 CIT at __, 698 F. Supp. 3d at 1299; Remand Views at 30–35. The ITC explained on remand that Zanotti's testimony that the suspension of API-certification services would be a "major setback for Russia" did not reflect the actual views of domestic and global purchasers on this issue as it was Zanotti's own personal assumptions, and the API letter in its entirety demonstrated that Russian OCTG would still be competitive when sold in the United States because the products' quality would not decline despite the lack of certification. See Remand Views at 30–35. The ITC also addressed the

testimony of Adam Lange, Vice President of Drilling for Tap Rock Operating,

which the ITC explained was evidence showing that the quality of Russian OCTG

would not be affected by the loss of certification and would continue to remain

competitive in the United States market.  See Tenaris' Remand Cmts. at 12; TMK

Group's Remand Cmts. at 8; Remand Views at 32–33 (citing USITC Hearing Tr.

at 249–50, PR 136).

    The ITC cited to additional evidence on remand demonstrating that API-

certification was not the sole consideration for purchasers when qualifying

suppliers or assessing the quality of OCTG, especially when Russian OCTG was

produced to API specification.  Remand Views at 30–35 (citing Staff Report at

Table II-12; Blank U.S. Importer Questionnaire (June 14, 2022) at III-22, III-25,

PR 92)).  For example, the ITC cited Table II-12, which showed the number of

purchasers' responses regarding the ability of suppliers to meet minimum quality

specifications and indicated that a majority of responding purchasers reported that

Russian OCTG "always" or "usually" met minimum quality specifications.  Id. at

30–35 (citing Staff Report at II-30).  The Court agrees that this evidence

demonstrates that purchasers believed that Russian OCTG were able to meet

minimum qualification specifications, with or without API-certification.

    Regarding the simultaneous presence of Russian OCTG in the United States

market due to the imposition of sanctions, the ITC addressed the Court's concern

that the <u>Views</u> did not accurately reflect the effects of sanctions, given the alleged

lag of the sanctions taking effect from March 2022 to May 2022 on Russian

subject imports.  <u>Tenaris I</u>, 48 CIT at __, 698 F. Supp. 3d at 1299.  On remand, the

Commission explained that the sanctions did not prevent subject Russian OCTG

from being simultaneously present in the United States market during the period of

investigation, including the post-invasion months.  <u>Remand Views</u> at 26–39 (citing

Staff Report at Tables IV-18, C-1, C-2, and G-4).

     The ITC cited Tables IV-18, C-1, C-2, and G-4 to demonstrate that subject

imports entered the United States market in the second quarter of 2022 in relatively

high volumes, were shipped into the United States market in interim 2022, and

were held in importers' inventory at the end of interim 2022.  <u>Id.</u> (citing Staff

Report at Tables IV-18, C-1, C-2, and G-4).  The ITC cited Table IV-18 to show

monthly United States import data during the entire period of investigation,

January 2019 through June 2022.  <u>Id.</u> (citing Staff Report at IV-34–IV-37).  The

ITC cited Table IV-18 to support its determination that OCTG from Russia were

imported in February 2022, March 2022, and May 2022.  <u>Id.</u> (citing Staff Report at

IV-35).  There is no import data for April 2022 and June 2022.  <u>Id.</u>  The ITC cited

Table C-1 to show summary data concerning the United States market, by item and

period, and Table C-2 to show summary data concerning the United States market,

excluding one United States producer, by item and period.  <u>Id.</u> (citing Staff Report

at App'x C).  The ITC cited Table G-4 to show the domestic importers' shipments

of imports from Russia into the United States, by end-finish and grade, with

quantity in short tons.  Id. (citing Staff Report at G-12).  The Court agrees with the

ITC that this evidence shows that subject Russian imports entered the United

States market in the second quarter of 2022 in higher volumes than they did in the

first half of 2021.  Id.

Referring to the specific sanctions on Russian OCTG, the ITC explained

that: (1) the Section 232 duties were in place since 2018; (2) the combination of the

Section 232 duties and the suspension of the API-certification (as of March 17,

2022) did not prevent Russian OCTG from entering into the United States in

March 2022 in volumes that were 69% higher than in March 2021; and (3) these

sanctions, together with the revocation of Russia's MFN status (as of April 18,

2022) and ban on Russian ships from entering United States ports (as of April

2022) did not prevent Russian OCTG from entering the domestic market in May

2022 in volumes 25% higher than in May 2021.  Id. at 37–38.  The ITC explained

that the combined volume of subject imports from Russia was 47.5% higher in

March and May 2022, after the imposition of these sanctions, than in March and

May 2021.  Id.

The Court concludes that the Commission adequately explained on remand

the impact of the sanctions on Russian OCTG with respect to the cumulation

analysis.  The Court also concludes that record evidence cited by the ITC on

remand supports its determination that subject Russian imports remained in the

United States market and in the final four months of the period of investigation and

did not affect these imports from sharing simultaneous presence, channels of

distribution, and geographic overlap with other subject imports.

The ITC complied with the remand instructions for this issue.[4]  The

Commission's determination to cumulate Russian OCTG is sustained as in

accordance with law and supported by substantial evidence.

### C.    OCTG from South Korea

Plaintiffs challenged the Commission's determination to cumulate OCTG

from South Korea as not in accordance  with law and not supported by substantial

evidence because the ITC included: (1) non-subject imports from South Korea; and

---

[4]  On remand, the ITC filed the Responses to Commission Questions, which
previously was not placed in its in entirety on the record with the Court, only
including three pages of the document, pages II-29–II-32, which did not pertain to
any information about the loss of API-certification or green tubes.  The ITC cited
to the Responses to Commission Questions, stating that the loss of API-
certification to Russian OCTG producers would not prevent Russian-produced
OCTG from being sold in the United States market with the certification because
Russian producers could still send green tubes to API-certified processors and then
sell the processed tubes in the United States market.  Id. (citing Petitioners' Post-
Hearing Br. (Sept. 29, 2022) at Ex. 1 ("Responses to Commission Questions")
at II-55–II-56, PR 143, CR 419).  The Court now observes that pages II-55–II-56
of the document has been filed with the Court.  Resps. Commission Questions
at II-55–II-56.

(2) subject imports from South Korea that were under an antidumping order and not fungible with subject imports from Argentina and Mexico.  See TMK Group's Br. at 25–26; Tenaris' Br. at 23–24.

### 1.    Exclusion of Non-Subject Imports from South Korea

In their Rule 56.2 motions, Plaintiffs asserted that the Commission's cumulation determination was not in accordance with law because the ITC's inclusion of non-subject imports violated 19 U.S.C. § 1677(7)(G)(i) through its reliance on Tables II-16, II-19, and IV-7 of the Staff Report.  See TMK Group's Br. at 25–26; Tenaris' Br. at 23–24.

In the original Views, the ITC relied on Staff Report tables that contained non-subject imports from South Korea and tables for its cumulation determination for findings of fungibility, geographic overlap, and simultaneous presence in the market.  The ITC determined that there was a sufficient degree of fungibility between the subject imports from South Korea and those from Argentina and Mexico, even though there were differences in the average unit values between these countries, based on data that showed interchangeability between all subject imports.  See Views at 27 (citing Staff Report at Tables II-15–II-17).  In addition to citing Tables II-16, II-19, and IV-17, the ITC cited to Tables II-1, II-15, II-18, and II-20 to support its cumulation determination.  Id.

Previously, the Court concluded that the ITC's determination to cumulate both subject and non-subject South Korean imports was neither supported by substantial evidence nor in accordance with law.  Tenaris I, 48 CIT at __, 698 F. Supp. 3d at 1307.  The Court remanded the ITC's determination on South Korean OCTG because non-subject imports may not be included in the ITC's cumulation determination.  Id.

On remand, the ITC revised the tables that it had relied on in the Staff Report, issuing a supplemental memorandum with 11 corresponding tables.  Suppl. Mem.  The ITC stated on remand that "nothing in this record indicated that there were meaningful producer-specific differences among imports of OCTG from South Korea," but retabulated data to ensure that it was not including non-subject Hyundai OCTG in its analysis of competitive overlap, which are contained in the Supplemental Tables 1 to 11.  Remand Views at 44.

In its remand brief, Tenaris argues that the original and new tables used by the ITC failed to reliably exclude non-subject imports from South Korea and that reliance on these tables for the ITC's fungibility determination violates the statute and does not comply with the remand order.  Tenaris' Remand Cmts. at 23–32. Tenaris argues that the ITC could have issued new questionnaires to the purchasers and importers to confirm that they only considered subject imports when responding to the questions.  Id. at 29.

The Government contends that the ITC's remand redetermination with respect to non-Hyundai imports[5] from South Korea was supported by substantial evidence and in accordance with law because the ITC stated that the record evidence did not indicate "meaningful producer-specific differences among imports of OCTG from South Korea" and respondents had continuously referred to South Korean imports as a whole, without making a distinction between subject and Hyundai imports.  Def.'s Remand Cmts. at 24–26.

Defendant-Intervenor asserts that the ITC excluded any data with an evidentiary basis for suspecting connection to non-subject South Korean OCTG and the Court should sustain the remand redetermination based on the revised tables.  Def.-Intervs.' Remand Cmts. at 30–33.

The ITC described the supplemental tables as follows:

Tables 1 and 2 present geographic and monthly official import statistics adjusted using proprietary, Census edited Customs records to reclassify imports from Hyundai as "nonsubject imports" (corresponding to CR Tables II-17 and II-18).  Tables 3 and 5 present importer questionnaire responses regarding interchangeability and the significance of differences other than price, and separate and exclude responses by importer Hyundai (corresponding to CR Tables II-16 and II-19).  Tables 4 and 6 present purchaser questionnaire responses regarding interchangeability and the significance of differences other than price, and separate and exclude responses by firms that purchased, or might have purchased, OCTG imported by Hyundai Steel USA (corresponding to CR Tables II-17 and II-20).  Tables 7 through 11

---

[5]  The non-subject South Korean imports were from Hyundai's imports.  See Views.

present purchaser questionnaire responses comparing 15 characteristics of OCTG from South Korea and other sources, and separate and exclude responses by firms that purchased, or might have purchased, OCTG imported by Hyundai (corresponding to CR Table II-14).

Remand Views at 44 n.191.

The ITC stated that each table in the supplemental memorandum, from the least stringent exclusion 1 to the most stringent exclusion 3, continued to support the Commission's original fungibility, geographic overlap, and simultaneous presence determinations. Id. at 46. The ITC explained that the adjustment of data in the supplemental document "eliminate[d] from the pool of responses impressions of purchasers who may have had Hyundai's OCTG in mind when furnishing responses on interchangeability, comparability, and the importance of non-price factors," and the ITC adjusted geographic and monthly official import statistics to distinguish between subject imports from South Korea and non-subject imports from South Korea for its geographic overlap and simultaneous presence analyses. Id. at 45 (citing Suppl. Mem., cover note). The ITC explained that each exclusion removed from the dataset the responses of domestic purchasers who reported purchasing South Korean OCTG from Hyundai Steel or a customer of Hyundai Steel. Id. at 45 n.193. For example, Exclusion 1 excluded from the data set the response of a domestic producer who reported purchasing specifically from

Hyundai Steel in its list of top suppliers in the domestic purchasers' questionnaire response.  Id. at 45.

The ITC explained that "the data for interchangeability, comparability, and the significance of differences other than price show three different permutations, removing to varying degrees responses from U.S. purchasers that reported purchasing from Hyundai, U.S. purchasers that Hyundai reported selling to, or U.S. purchasers that reported purchasing from a distributor who purchased from Hyundai."  Id.

The Court concludes that the ITC reasonably excluded non-subject South Korean imports from its cumulation analysis, based on its further explanations on remand and the record documents that support the ITC's determination.  Therefore, the Court sustains the ITC's cumulation determination with respect to South Korean imports as in accordance with law and supported by substantial evidence.

## 2. Impact of the Existing Antidumping Order on Subject Imports from South Korea

In their Rule 56.2 motions, Plaintiffs contested the ITC's inclusion of subject merchandise from South Korea that had already been used to support a finding of material injury to the domestic OCTG industry in 2014 in a different proceeding and was subject to an existing antidumping order, which Plaintiffs contended artificially inflated the cumulated volume of imports while adding little or no

impact to the potential harm suffered by the domestic industry.  TMK Group's Br. at 4–5; Tenaris' Br. at 23–24.

The Court remanded the <u>Final Determination</u> as to the cumulation of South Korean imports because the ITC did not address the possible effect resulting from the subject imports from South Korea that were under an antidumping order in its final determination.  <u>Tenaris I</u>, 48 CIT at __, 698 F. Supp. 3d at 1307.

In its remand brief, Tenaris argues that the ITC failed to address the impact of the existing antidumping order as a condition of competition affecting subject imports from South Korea.  Tenaris' Remand Cmts. at 23–32.  Tenaris argues that the ITC did not meaningfully address the disciplining impact of the existing antidumping order as a condition of competition affecting subject imports from South Korea and the ITC's failure to consider the commercial and competitive impact of such an antidumping order arguably rendered the ITC's cumulation determination unsupported by substantial evidence.  <u>Id.</u> at 31–32.

The Government contends that the ITC addressed the effects of the existing antidumping order on subject imports and the Court did not instruct the ITC to consider the impact of the antidumping order.  Def.'s Remand Cmts. at 26.

Defendant-Intervenors assert that the ITC complied with the Court's remand order and the SAA undermines Tenaris' theory regarding the impact of the

antidumping order on the subject imports from South Korea.  Def.-Intervs.'

Remand Cmts. at 33–34.

The Court observes that the ITC addressed on remand the potential impact

of the existing antidumping order on subject imports and explained that its analysis

of the four factors would support its cumulation analysis notwithstanding the

antidumping order.

In the Remand Views, the Commission stated:

> As an initial matter we note that, notwithstanding an order remedying the dumping of OCTG imports from South Korea, Commerce found the non-Hyundai imports from South Korea to still be unfairly traded through subsidization at above de minimis levels.  The dumping order would not address injury resulting from the subsidization of these imports, and the dumping order is only capable of discipling the level of dumping not the level of subsidization.  In addition, the existence of the [antidumping] order did not result in differences in the way these imports competed in the U.S. market to render cumulation inappropriate based on the Commission's four cumulation factors.  As reviewed below, analysis of the four factors used in the Commission cumulation analysis show that subject imports from South Korea were fungible with imports from other subject countries, sold in overlapping channels of distribution and in overlapping geographic markets, and simultaneously present in the U.S. market.  Furthermore, the record shows that, even while under the discipline of the [antidumping] order, subject imports from South Korea *** the domestic like product in the *** of quarterly price comparisons and Respondents put forward no evidence in support of their assertion to the contrary.

Remand Views at 52.  Because the ITC adequately discussed the antidumping

order and its effect on the cumulation analysis, it complied with the remand

instructions for this issue.

Accordingly, the ITC's cumulation of OCTG from Russia, South Korea, Mexico, and Argentina is in accordance with law and supported by substantial evidence.[6]

## II.   The Commission's Determinations of Volume, Price Effects, and Impact

To determine whether subject imports caused material injury to a domestic industry in the United States, the Commission considers three statutory factors—the volume of subject imports, the effect of such imports on prices, and the economic impact of subject imports on the domestic industry.  See 19 U.S.C. § 1677(7)(C)(i)–(iii).  Because the Court holds that the Commission's cumulation determination is supported by substantial evidence and in accordance with law, the Court now addresses the additional determinations regarding volume, price effects, and impact in the material injury determination that were not addressed in Tenaris I.  On remand, the Commission continued to make an affirmative material injury determination and adopt its previous determinations on the conditions of

---

[6] Previously, the Court held the ITC's determination to cumulate subject imports from Argentina and Mexico was supported by substantial evidence.  Tenaris I, 48 CIT at __, 698 F. Supp. 3d at 1307–09.

competition, volume, price effects, and impact from the original <u>Views</u>.[7]  <u>See</u>
<u>Remand Views</u> at 3.

     Tenaris contends that the Commission failed to conduct its injury analysis
within the context of unprecedented conditions of competition prevailing during
the period of investigation, which led to erroneous volume, price, and impact
determinations.  Tenaris' Br. at 9–17.  Tenaris articulated these conditions of
competition as including: (1) severely reduced demand for petroleum (and
therefore OCTG) resulting from both the Russia/Saudi oil price/supply war and the
global pandemic; (2) market factors suppressing domestic production, including
high inventory levels held by United States distributors, de-stocking of those
inventories, a meteoric rise in prices for hot-rolled coil ("HRC") (the major input
for welded OCTG production), and labor shortages; (3) Tenaris' emergence as the
largest domestic OCTG producer after investment of more than $10 billion in
United States production facilities, including its acquisition of IPSCO during the
period of investigation, that coincided with the period of investigation demand and
supply shocks; (4) Tenaris' innovative approach to domestic supply through its Rig
Direct program, featuring long-term contracts with sales at "one price" bidding in
the United States market, regardless of whether the OCTG was produced at

---

[7]  The <u>Remand Views</u> solely addressed the cumulation issue on remand, and did
not address the Commission's determinations of volume, price effects, and impact.

Tenaris' domestic mills or imported; and (5) twenty-four consecutive months of

increasing OCTG prices (including for over a year in advance of the filing of the

petition).  See id.

### A.    The Commission's Volume Determination

Tenaris challenges as not in accordance with law the Commission's

determination that the volume of subject imports was "significant in absolute terms

and relative to the consumption in the United States," arguing that the volume of

such imports was not considered significant under the conditions of competition,

which showed that after a historic demand collapse, United States producers could

not supply the surging demand in 2021 and imports were needed.  Tenaris' Br. at

25–30.  Tenaris also contends that the Commission also failed to consider the post-

petition increase in the volume of subject imports (improperly accorded less weight

to post-petition data).  Tenaris' Reply at 6–8.

### 1.    Conditions of Competition

19 U.S.C. § 1677(7)(C)(iii) states that:

In examining the impact required to be considered under subparagraph
(B)(i)(III), the Commission shall evaluate all relevant economic factors
which have a bearing on the state of the industry in the United States,
including, but not limited to—

(I)    actual and potential decline in output, sales, market share, gross
       profits, operating profits, net profits, ability to service debt,
       productivity, return on investments, return on assets, and
       utilization of capacity,

(II)    factors affecting domestic prices,

(III)   actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,

(IV)    actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(V)     in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.

The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.

19 U.S.C. § 1677(7)(C)(iii).

Tenaris contends that the Commission's volume analysis must consider conditions of competition in finding subject imports to be "significant," citing to several cases in support of its proposition.  Tenaris' Br. at 25–26 (citing Altx, Inc. v. United States, 26 CIT 709 (2002), aff'd, 370 F.3d 1108 (Fed. Cir. 2004); Angus Chem. Co. v. United States, 944 F. Supp. 943 (1996), aff'd, 140 F.3d 1478 (Fed. Cir. 1998); Arlanxeo USA LLC v. United States, 389 F. Supp. 3d 1330 (2019), aff'd, 819 Fed. App'x 925 (Fed. Cir. 2020)); Tenaris' Reply at 5–6 (citing OCP S.A. v. United States, 658 F. Supp. 3d 1297 (2023); OCTAL Inc. v. United States, 539 F. Supp. 3d 1291 (2021)).

Defendant-Intervenors argue that the Commission is not statutorily required to consider the conditions of competition and Tenaris' cited cases are inapplicable for the volume determination analysis. Def.-Intervs.' Resp. at 24–25.

Defendant interprets Tenaris' argument as requiring the Commission to consider whether subject imports were "needed" and asserts that the Commission can make significance of volume determinations based on the volume data alone. Def.'s Resp. at 26–27.

The Commission determined that "the volume of cumulated subject imports, and the increase in that volume, are significant in absolute terms and relative to consumption in the United States," and did not address the conditions of competition that were raised by Plaintiffs in its analysis of the volume of subject imports. See Views at 32–33.

Defendant-Intervenors distinguish between 19 U.S.C. § 1677(7)(C) and 19 U.S.C. § 1677(7)(C)(iii) to argue that conditions of competition are only relevant to the impact analysis, rather than the volume analysis.

> Section 1677(7)(C)(iii) elucidates the economic factors pertaining to the Commission's assessment of the impact on the affected domestic industry and mandates consideration of "conditions of competition" for economic factors within "this clause" (*i.e.*, 1677(7)(C)(iii)), as opposed to "this subparagraph" (*i.e.*, 1677(7)(C)). This provision was added by the Omnibus Trade and Competitiveness Act of 1988, Pub.L. 100-418, § 1328(2)(C) (1988), and like the statute itself, the conference report makes clear that the "conditions of competition" mandate applied only to the Commission's evaluation of impact. See H. Conf. Rep. 100-576

> (1988) at 617 (subsection c); <u>see also</u> S. Rep. 100-71 (1987) at 117
> (describing the "third change" as relating to "examin{ation of} the
> impact of imports on domestic producers").

Def.-Intervs.' Resp. at 24.

The Court agrees that the last section of 19 U.S.C. § 1677(7)(C)(iii)

regarding "conditions of competition" should be read to apply only to the "impact

on affected domestic industry" section of the statute.  The legislative history

expresses Congressional intent that the conditions of competition requirement

should apply only to the ITC's evaluation of impact, and the statutory language

"relevant economic factors" appears in both the "impact" section and the

"conditions of competition" section, supporting the interpretation that these clauses

should be read together.  The "volume" language in section 1677(7)(C)(i) does not

mention "relevant economic factors," supporting the interpretation that the

"conditions of competition" requirement was intended to apply only to "impact"

and not to "volume."

When the Commission evaluates the volume of imports of merchandise, it

must consider "whether the volume of imports of the merchandise, or any increase

in that volume, either in absolute terms or relative to production or consumption in

the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  Under subsection

(iii), which pertains to the impact on the affected domestic industry, the

Commission must consider "all relevant economic factors described in this clause

within the context of the business cycle and conditions of competition that are distinctive to the affected industry." Id. § 1677(7)(C)(iii)(V).

Here, the ITC examined whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, was significant, in compliance with 19 U.S.C. § 1677(7)(C)(i). Views at 43. The Court concludes that the ITC's volume determination followed the statutory requirements and was in accordance with law.

The ITC cited record evidence in support of its volume determination, including Tables IV-19 and C-1, showing that cumulated subject import volume in absolute terms increased overall. Id. at 42 (citing Staff Report at Tables IV-19 and C-1). The ITC cited record evidence demonstrating that the volume and the increase in volume of cumulated subject imports were significant relative to United States consumption. Id. at 42–43 (citing Staff Report at Tables IV-19 and C-1). Thus, the Court sustains the ITC's volume determination because it is in accordance with law and supported by substantial evidence.

## 2.    Post-Petition Data

Tenaris argues that the post-petition data provision, 19 U.S.C § 1677(7)(I), only allows for the Commission to discount data based on post-petition changes in import volumes in absolute terms, rather than volume relative to consumption, such as market share. Tenaris' Br. at 27. Tenaris asserts that the Commission's

focus on market share, rather than import volume, led to the discounting of

favorable domestic industry performance data in interim 2022, which was data that

coincided with rising import volumes and changing market conditions to

demonstrate that subject imports were not the cause of harm to the domestic

injury.  Id. at 29.

Defendant and Defendant-Intervenors contend that legislative history does

not support such a strict interpretation of the term "volume" under the post-petition

data provision.  Def.'s Resp. at 27–30; Def.-Intervs.' Resp. at 27–28.  Defendant-

Intervenors contend that the Commission's determination to give less weight to

post-petition market share data was reasonable and comports with 19 U.S.C.

§ 1677(7)(C)(i) and its discretion pursuant to 19 U.S.C § 1677(7)(I).  Def.-Intervs.'

Resp. at 27.

The post-petition data provision states:

The Commission shall consider whether any change in the volume,
price effects, or impact of imports of the subject merchandise since the
filing of the petition in an investigation under part I or II of this subtitle
is related to the pendency of the investigation and, if so, the
Commission may reduce the weight accorded to the data for the period
after the filing of the petition in making its determination of material
injury, threat of material injury, or material retardation of the
establishment of an industry in the United States.

19 U.S.C. § 1677(7)(I) (emphasis added).

Legislative history, specifically the SAA, provides guidance as to the

legislative intent behind 19 U.S.C. § 1677(7)(I):

> Section 222(f) of the bill amends section 771(7) to address the probative value of post-petition data by adding section 771(7)(I). The new statutory provision emphasizes that the Commission should consider whether changes in the volume of imports, their price effects, and their impact on the domestic industry occurring since the filing of the petition are related to the pendency of the investigation. Courts have repeatedly recognized that the initiation of antidumping and countervailing duty proceedings can create an artificially low demand for subject imports, thereby distorting post-petition data compiled by the Commission. See Metallverken Nederland, B.V. v. United States, 744 F. Supp. 281. 284 (Ct. Int'l Trade 1987); USX Corp. v. United States, 655 F. Supp 487, 492 (Ct. Int'l Trade 1987). The imposition of provisional duties, in particular, can cause a reduction in import volumes and an increase in prices of both the subject imports and the domestic like product. Similarly, improvements in the domestic industry's condition during an investigation can be related to the pendency of the investigation.

> The provision also is intended to make clear that, when the Commission finds evidence on the record of a significant change in data concerning the imports or their effects subsequent to the filing of the petition or the imposition of provisional duties, the Commission may presume that such change is related to the pendency of the investigation. In the absence of sufficient evidence rebutting that presumption and establishing that such change is related to factors other than the pendency of the investigation, the Commission may reduce the weight to be accorded to the affected data. To the extent that the decision of the Court of International Trade in Chr. Bjelland Seafood/A/S v. United States, slip op. 92-196 (Ct. Int'l Trade Oct. 23, 1992), could be interpreted as requiring the Commission to demonstrate that the change is not related to other factors, it is disapproved.

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.

No. 103-316, vol. 1, at 843 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4186.

Considering the language of the SAA, the Court agrees that if the Commission cannot consider if market share changes are related to the pendency of antidumping and countervailing duty investigations, then the Commission's ability to identify and discount data that have been "distorted" by such investigation would be hindered.  See Def.'s Resp. at 29.

Further, the definition of "volume" under 19 U.S.C. § 1677(7)(C)(i) does not support Plaintiff's interpretation of the statutory intent to restrict the Commission's consideration to absolute volume.  As mentioned above, the Commission evaluates the volume of imports of merchandise and "shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  The post-petition data provision of 19 U.S.C. § 1677(7)(I) only mentions "volume" and does not have any restrictions or limitations, and thus it is reasonable to conclude that the post-petition data statutory provision applies to volume of imports in absolute terms or relative to production or consumption in the United States.  19 U.S.C. § 1677(7)(C)(i); 19 U.S.C. § 1677(7)(I).

Accordingly, the Commission's volume determination followed the statutory requirements in 19 U.S.C. § 1677(7)(C)(i) and 19 U.S.C. § 1677(7)(I) and is in accordance with law.

### B.    The Commission's Price Effects Determination

Tenaris asserts that the Commission's determination that subject imports had significant adverse effects was unsupported by substantial evidence and otherwise not in accordance with law because the Commission did not make a finding regarding price suppression, failed to consider record evidence concerning Petitioners' lost sales and lost revenue claims; and failed to account for price lags resulting from Tenaris' long-term contracts.  Tenaris' Br. at 30–37.

The Government and Defendant-Intervenor argue that the Commission's price effects determination was supported by substantial evidence and in accordance with law.  Def.'s Resp. at 31–38; Def.-Intervs.' Resp. at 28–36.

### 1.    Legal Standard

In evaluating the effect of imports on prices, the statute directs the Commission to consider whether:

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

## 2.    The Commission's Determination

The ITC stated that there is a moderate-to-high degree of substitutability between the domestic like product and cumulated subject imports, <u>Views</u> at 29 (citing Staff Report at Table II-12), and that price is an important factor in OCTG purchasing decisions, among other important factors.  <u>Id.</u> at 33.  The ITC had collected quarterly pricing data from U.S. producers and importers for nine pricing products.  <u>Id.</u> at 34 (citing Staff Report at V-12–V-13).  The Commission determined that "[g]iven the significant underselling and the market share shift, we do not reach a conclusion as to whether the domestic producers would have been able to further increase prices to a significant degree than they did for subject imports."  <u>Id.</u> at 39.

## 3.    Alternative Price Comparison Methodology

In the <u>Views</u>, the ITC addressed Tenaris' argument regarding the possible price lags resulting from Tenaris' long-term contracts.  The ITC rejected Tenaris' argument to adopt an alternative price comparison methodology, which asked the ITC to depart from its normal price comparison and "lag by one quarter" its comparisons of subject import prices to domestic prices, comparing domestic prices in a given quarter to subject imports in the following quarter.  <u>Id.</u>  The record evidence supports the ITC's determination to not apply an alternative methodology.

First, the ITC reasoned that the basis for Tenaris' proposed adjustments to the Commission's quarterly price comparisons would largely be limited to subject imports from Argentina and Mexico, and although these limited subject imports accounted for the vast majority of Tenaris' U.S. shipments of subject imports during the POI, the ITC stated that it must consider the significance of underselling by cumulated subject imports. Id. at 35 (citing Staff Report at Table III-24). Table III-24 shows U.S. producers' purchases of imports from subject sources as being mainly Russian OCTG. Staff Report at III-31.

Second, the ITC asserted that the percentage of Tenaris' U.S. shipments subject to contracts containing a time lag is unclear, even as to subject imports from Argentina and Mexico. Id. (citing Tenaris' Pre-Hearing Br. at Exh. 63 ("Prusa Analysis"), CR 405, PR 128). The Prusa Analysis supports the ITC's assertion. See Prusa Analysis.

Third, the ITC stated that Tenaris' argument wrongly assumes that domestic OCTG is generally sold at spot market prices, allegedly creating the appearance of underselling, when these market prices rose while subject import contract prices remain unchanged for another quarter. Views at 35 (citing Staff Report at Table V-5). Table V-5 demonstrates that U.S. producers sold a plurality of their OCTG under short-term contracts, with most of the rest of their sales under long-term contracts or spot sales, and importers sold mostly under long-term contracts,

followed by spot sales, and then short-term contracts.  Staff Report at V-10.  The

ITC stated that a high percentage of the domestic industry's sales were made

pursuant to contracts in 2021, with some including pricing mechanisms similar to

those in Tenaris' contracts.  Views at 35 (citing Petitioners' Post-Hearing Br. at

Exh. 3 ("Declaration of Robert J. Beltz") & Exh. 4 ("Declaration of Brett

Mendenhall")).[8]  Both declarations indicate that there were contracts made in 2021

in the domestic industry.  Decl. Robert J. Beltz; Decl. Brett Mendenhall.

  Fourth, the ITC reasoned that Tenaris' time lag argument is inconsistent

with other record evidence.

> Under Tenaris'[] time lag argument, underselling by cumulated subject
> imports should have decreased earlier in the period, when spot market
> prices fell, and significantly increased later in the period, when market
> prices increased dramatically.  Instead, the record shows that the rate of
> cumulated subject import underselling was fairly consistent from 2019
> to 2021, rising only slightly from 55.9[%] of quarterly comparisons in
> 2019 to 57.1[%] of quarterly comparisons in 2020 and to 60.4[%] of
> quarterly comparisons in 2021.  For all these reasons we do not view
> Tenaris' time lag methodology as a reliable means of analyzing price
> competition by cumulated subject imports in the U.S. market.

Views at 35 (citing Prusa Analysis; Staff Report at Tables V-6–V-14).  Tables V-6

to V-14 provide price data for products 1 to 9 and demonstrate that for most

---

[8]  The declarations state that Robert J. Beltz is employed by the United States Steel
Corporation, a domestic producer of OCTG products, and Brett Mendenhall serves
as the President and CEO of P2 Energy Services, a domestic OCTG distributor.
Decl. Robert J. Beltz; Decl. Brett Mendenhall.

products, prices for OCTG fell in early 2020 when oil and gas prices fell, and then

rose in 2021 and 2022 as oil and gas prices rose.  Staff Report at Tables V-6–V-14.

### 4.     Lost Sales

Tenaris argues that the Commission ignored contrary record evidence that

detracted from the probative value of the market share table on which it relied

when the ITC stated that it found "some evidence that domestic producers lost

sales to subject imports on the basis of price."  Tenaris' Br. at 32.

The ITC stated:

> We also find some evidence that domestic producers lost sales to
> subject imports on the basis of price.  Twenty of 28 responding
> purchasers reported that they had purchased subject imports instead of
> the domestic like product during the [period of investigation].  Eight of
> those 20 reported that subject imports were priced lower than the
> domestic like product, and five of those eight reported that price was a
> primary reason for purchasing of *** short tons of subject OCTG over
> the domestic like product.

Views at 48; see also id. at 48 n.203, 204 (citing Staff Report at Table V-19).

Tenaris argues that the Government attempts to "cure" the ITC's failure to

consider lost sales arguments and evidence with post hoc rationalizations, arguing

that the Government is now claiming to only have relied on Table V-19, rather

than both Table V-18 and Table V-19.  Tenaris' Reply at 11–12.

The ITC's discussion of the evidence regarding lost sales cited to both

footnote 203 and footnote 204 of the <u>Views</u>.  Footnote 203 addressed Tenaris'

concerns regarding the market share table, or Table V-19:

> Tenaris argues that two of the five purchasers reporting that they
> purchased subject imports instead of the domestic like product due to
> price . . . have contradicted this reporting elsewhere in their
> questionnaire responses. . . .  However, their questionnaire responses
> generally corroborate their lost sales reporting.  <u>See</u> *** purchaser
> questionnaire responses at III-23 and III-24 (showing that this firm
> listed price as among its top three purchasing factors, and that it
> characterized price as very important in its purchasing decisions); and
> *** purchaser questionnaire response at III-23 (showing that this firm
> listed "cost" as a factor that is very important in its purchasing
> decisions).

<u>Id.</u> at 48 n.203.  Footnote 204 discussed Table V-18, noting that responding

purchasers reported that between January 2019 and June 2022, the domestic

industry's share of their purchases declined, while the subject import share

of their purchases increased, reflecting a shift in purchases from the

domestic industry to subject imports.  <u>Id.</u> at 48 n.204.

The Government did not address Table V-19 in its brief, and asserts that the

ITC did not focus on the "warning note" in footnote 203 in its lost sales analysis,

but rather on the data in Table V-19, to which no equivalent note was attached.

Def.'s Resp. at 35.  The Government also states that "to the extent that this

footnote reference could be said to render the Commission's lost sales analysis

partially based on a table potentially containing double counting, the

Commission's lost sales finding was tempered appropriately" because of the inclusion of the word "some" evidence.  Id.

The Court agrees with the Government that the ITC considered the evidence of lost sales and reasonably determined the adverse price effect of the subject OCTG.  Table V-18 shows U.S. purchasers' reported purchases and imports, by firm and source, from January 2019 to June 2022.  Staff Report at V-39.  Table V-19 shows purchasers' responses to purchasing subject imports instead of domestic product, by firm, and demonstrates that five purchasers had confirmed buying a certain amount of short tons of subject OCTG over the domestic like product based on their lower prices. Despite the potential double counting, the data relied on by the Commission in both tables support the ITC's determination.

## 5.    Price Suppression Finding

Tenaris argues that the ITC failed to make a price suppression finding under 19 U.S.C. § 1677(C)(ii), so its price effects analysis is contrary to law and unsupported by substantial evidence, and should be remanded with instructions for the Commission to make a price suppression finding.  Tenaris' Br. at 30–31.

The Government contends that the CAFC has held that the Commission's "consideration" of a statutory factor does not encompass an obligation to make any ultimate finding regarding that factor.  Def.'s Resp. at 36.

Defendant-Intervenors also assert that there is no statutory requirement to make a price suppression finding.  Def.-Intervs.' Resp. at 33.

Regarding the evaluation of price, 19 U.S.C. § 1677(C)(ii) states that:

In evaluating the effect of imports of such merchandise on prices, the Commission shall *consider* whether—

(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(C)(ii) (emphasis added).

The Court concludes that the statute does not require the ITC to make a price suppression finding for its price effects determination.  See, e.g., OCTAL Inc. v. United States, 45 CIT at __, 539 F. Supp. 3d 1291, 1301–16 (2021) (affirming the Commission's finding of significant adverse price effects due to underselling, without a finding that there was significant price depression or suppression); Nucor Corp. v. United States, 414 F.3d 1331, 1339 (Fed. Cir. 2005) (affirming that the Commission complied with statutory requirements of 19 U.S.C. § 1677(C)(ii) even though the Commission did not make a price suppression finding).

The Court agrees with Defendant-Intervenors that Swiff-Train Co. v. United States, 904 F. Supp. 2d 1336 (2013), is distinguishable from this case.  In Swiff-

Train, the Commission did not make an explicit finding of significant price depression and no finding at all regarding price suppression. Swiff-Train, 904 F. Supp. 2d at 1344. The Court directed the Commission to "make explicit findings on the *effect of the subject imports* on the price suppression and depression factors, discussing not only the factors cited in the Commission's Views," but did not specifically ask the Commission to make a price suppression finding. Id.

Further, in the Views, the Commission considered whether subject imports had significantly suppressed prices for the domestic like product by analyzing the industry's [cost of goods sold]-to-net-sales. See Views at 38–39. Because the Commission properly considered whether subject imports had significantly suppressed prices for the domestic like product pursuant to the relevant statutory authority, the Commission's determination was in accordance with law.

Accordingly, the Court sustains the Commission's price effects determination as in accordance with law and supported by substantial evidence. Based on the record evidence, it was reasonable for the Commission to conclude that the significant volume of subject imports undersold the domestic like product causing significant adverse price effects and to not view Tenaris' time lag methodology as a reliable means of analyzing price competition by cumulated subject imports in the U.S. market.

## C.    The Commission's Impact Determination

Tenaris asserts that the Commission's determination that the domestic industry was injured by reason of subject imports was unsupported by substantial evidence and not in accordance with law because the Commission failed to evaluate impact within the context of conditions of competition distinctive to the U.S. OCTG industry, the domestic industry began to recover before the petitions were filed, and the Commission relied on qualitative information that included non-subject imports from South Korea.  Tenaris' Br. at 37–48.

The Government and Defendant-Intervenors argue that the Commission's impact determination was supported by substantial evidence and in accordance with law.  Def.'s Resp. at 25–31; Def.-Intervs.' Resp. at 36–48.

### 1.    Legal Standard

The statute directs the Commission to consider several enumerated factors, "among other relevant economic factors," when determining whether an industry in the United States is threatened with material injury by reason of imports of subject merchandise.  <u>See</u> 19 U.S.C. § 1677(F)(i).  Those factors are:

    i.   if a countervailable subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement), and whether imports of the subject merchandise are likely to increase,

   ii.   any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,

   iii.  a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,

   iv.  whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,

   v.  inventories of the subject merchandise,

   vi.  the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,

   vii.  in any investigation under this subtitle which involves imports of both a raw agricultural product (within the meaning of paragraph (4)(E)(iv) ) and any product processed from such raw agricultural product, the likelihood that there will be increased imports, by reason of product shifting, if there is an affirmative determination by the Commission under section 1671d(b)(1) or 1673d(b)(1) of this title with respect to either the raw agricultural product or the processed agricultural product (but not both),

   viii.  the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

   ix.  any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale

for importation) of the subject merchandise (whether or not it is
actually being imported at the time).

Id. The Commission shall consider the factors as a whole when making its

determination, and the "presence or absence of any factor . . . shall not necessarily

give decisive guidance with respect to the determination." Id. at § 1677(F)(ii).

### 2.    Conditions of Competition

Tenaris argues that the Commission: (1) failed to evaluate the impact of

subject imports within the context of conditions distinctive to the U.S. OCTG

industry, as required by statute; and (2) erroneously attributed the positive health of

the industry in interim 2021 to post-petition effects and placed less weight on the

interim period data that showed the domestic industry had recovered and was

performing well consistent with the changing market conditions. Tenaris' Br. at

37. Tenaris contends that the Commission found a "causal nexus between

cumulated subject imports and the domestic industry's weak performance relative

to the strong growth in apparent U.S. consumption from 2020 to 2021," and failed

to account for conditions of competition during the period of investigation in

assessing the cause of any harm to the domestic industry and its improvement in

interim 2022. Id. at 38. Tenaris argues that the record evidence does not support a

causal nexus between the subject imports and the domestic industry's performance

because of: (1) the impact of the Russia/Saudi oil supply war and COVID-19

pandemic; (2) supply constraints, such as inventory overhead, HRC prices, and

labor shortages; and (3) Tenaris' role in the U.S. OCTG market and intra-industry

competition.  Id. at 38–44.

The Government states that substantial evidence supports the Commission's

determination that cumulated subject imports had a significant impact on the

domestic industry.  Def.'s Resp. at 38–47.  Defendant-Intervenors assert that the

Commission's Views reasonably addressed and rejected all three arguments.  Def.-

Intervs.' Resp. at 36.

### a.    Supply and Demand

Tenaris contends that the Commission failed to address the Russia/Saudi oil

supply war and de-emphasized COVID-19 in assessing the impact of subject

imports, dismissed evidence of supply constraints, and erroneously considered only

inventories, rather than the combination of inventories, high HRC prices, and labor

shortages, in supply constraint.  Tenaris' Br. at 38–39.

The Government argues that the Commission comprehensively addressed

the effects of all factors, including the Russia/Saudi price war on U.S. OCTG

demand during the period of investigation, by evaluating the trends throughout the

period of investigation in each of the following OCTG demand indicators: (1)

apparent U.S. consumption, (2) active U.S. rig count, and (3) U.S. oil and gas

prices.  Def.'s Resp. at 39.

The ITC discussed the conditions of competition to inform its analysis of whether there was material injury of subject imports, such as supply and demand considerations.  Views at 27–29.

Regarding demand considerations, the ITC stated that "demand for OCTG is driven by oil and gas prices as well as exploration and production" and "[t]he active U.S. rig count, an indicator of oil and gas production in the United States, decreased from January 2019 to an historic low in August 2020."  Id. at 27 (citing Staff Report at II-19, Table II-5 and Figure II-2).  On Page II-19 of the Staff Report, the Commission recognized the dispute over oil prices and production between Saudia Arabia and Russia, as well as the COVID-19 pandemic, as demand determinants.  Staff Report at II-19.

> Over the course of 2019, OCTG demand declined due to a dispute over oil prices and production between Saudi Arabia and Russia.  Then, at the onset of the COVID-19 pandemic in early 2020, oil and gas production plummeted as oil prices even briefly turned negative. . . . However, multiple factors (including rising inflation and U.S. sanctions due to the Russian-Ukraine war) led to rising oil and natural gas prices in late 2021 and early 2022, in turn leading to more oil and gas exploration and production.

Id.  The Commission also discussed that the active oil and gas rig count generally decreased from January 2019 to August 2020, when it reached historic lows, and then began to recover through the summer of 2022 while remaining more than 25% below early 2019 levels.  Id.

Regarding inventory overhang, Tenaris argues that record evidence confirmed that the significant inventory held by U.S. distributors prevented them from placing orders with U.S. producers and impeded the domestic industry's ability to recover.  Tenaris' Br. at 39.  The ITC addressed this argument and was unpersuaded by Tenaris' argument that the market share shift was caused as distributors drew down their "inventory overhangs" in lieu of placing orders with domestic mills during the period of investigation and thus delayed the "re-activation of domestic OCTG production."  Views at 45.  Further, the ITC explained that:

> [A]ny such inventory overhang would not explain why the 32.2 percent increase in apparent consumption from 2020 to 2021, unmet by existing inventories, was satisfied by increased subject imports rather than domestic producers.  Second, inventory data . . . indicates that monthly inventory levels of OCTG—which include sourcing from both domestic producers and importers—were relatively constant between January 2019 and March 2021, with small fluctuations above and below a level of about *** net tons.  Thus, these data suggest no "massive" draw down of inventories in 2020, as Tenaris describes.

Id.

Regarding HRC prices, Tenaris contends that the Commission ignored the effect of high HRC prices on welded producers.  Tenaris' Br. at 41.  The ITC acknowledged Tenaris' argument that the rising domestic HRC prices and labor shortages constrained domestic supply and necessitated increased subject imports in 2021.  Views at 46.  The ITC explained that:

> Tenaris has also argued that rising domestic HRC prices and labor shortages constrained domestic supply and necessitated increased subject imports in 2021. Yet, even if increasing HRC prices helped reduce domestic production of welded OCTG, domestic producers of seamless OCTG, which utilize steel billets as their raw material input, were unaffected by changes in HRC prices. Domestic producers of seamless OCTG were fully capable of serving the increase in OCTG demand from 2020 to 2021 in light of their low rate of capacity utilization . . . .

Id.

Regarding labor shortages, Tenaris asserts that the Commission dismissed Tenaris' evidence regarding its struggles to hire workers during the period of investigation and instead relied on Petitioner's self-serving statements regarding their ability to hire employees. Tenaris' Br. at 41. The Court observes that the ITC reasonably relied on witness testimony, rather than "self-serving" statements to make its determination. In the Views, the ITC stated that:

> Contrary to Tenaris' argument that labor shortages significantly constrained domestic production, responding domestic producers and domestic industry witnesses at hearing indicated that they were capable of hiring as warranted by increased demand for domestic OCTG, and the domestic industry sharply expanded employment in interim 2022, after the filing of the petitions caused subject imports to compete less aggressively in the U.S. market.

Views at 46–47 (citing Staff Report at II-13; USITC Hearing Tr. at 67–68).

### b.    Investment and Intra-Industry Competition

Tenaris argues that the Commission failed to consider Tenaris' role in the

U.S. OCTG market and intra-industry competition, such as its Rig Direct program,

and failed to address record evidence when discussing intra-industry competition.

Tenaris' Br. at 43–44.

The ITC did not fail to consider Tenaris' role in the U.S. market and

sufficiently addressed record evidence.  In the <u>Views</u>, the ITC was unpersuaded by

Tenaris' argument that intra-industry competition explains any injury to the

domestic industry and stated that intra-industry competition could not explain the

domestic industry's loss of market share to subject imports from 2020 to 2021.

<u>Views</u> at 47.  Further, in <u>Tenaris I</u>, this Court addressed Tenaris' "Rig Direct"

program, which Tenaris argued as the reason for the shift in market share and the

increase in Tenaris' market share.  <u>Tenaris I</u>, 48 CIT at __, 698 F. Supp. 3d at

1308; <u>see</u> Tenaris' Br. at 22–23.  The Court held that, based on the record

evidence, the ITC considered Tenaris' "Rig Direct" program in assessing possible

factors that attributed to the shift in market share toward cumulated subject imports

and that the ITC's determination that the "Rig Direct" program was not a cause of

the loss of domestic market share was supported by substantial evidence.

### 3.    Domestic Industry's Recovery

Tenaris also argues that the Commission should have given full weight to

the evidence of the domestic industry's recovery, rather than ignoring record

evidence that improvements in the domestic industry's condition occurred before

the filing of the petition.  Tenaris' Br. at 44–47.

The Commission did not fail to fully consider the evidence of the domestic

industry's recovery.  In the <u>Views</u>, the ITC stated that:

> We find it instructive that the domestic industry was able to improve its
> performance markedly in interim 2022 compared to interim 2021 after
> the filing of the petitions in October 2021.  As discussed above, subject
> imports competed less aggressively in the U.S. market after the filing
> of the petitions, losing *** percentage points of market share as the
> domestic industry gained 0.6 percentage points of market share in
> interim 2022 compared to interim 2021.  Consequently, the domestic
> industry was able to more fully capitalize on the 70.6 percent increase
> in apparent U.S. consumption in interim 2022 compared to interim
> 2021 and improved its performance by nearly every measure between
> the interim periods.

<u>Views</u> at 43.  Further, the ITC considered 2021 trends and observed that "the

industry's production, employment, and financial performance remained weaker in

2021 than would have been expected in light of the strong increase in demand."

<u>Id.</u>  The Court also does not find Tenaris' prior determinations for the proposition

that improvements in industry performance across interim periods support a

finding of no adverse impact to be persuasive.  <u>See</u> Tenaris' Br. at 47 (citing

<u>Silicomanganese from Australia</u>, USITC Pub. 4600, Inv. No. 731-TA-1269 (Final)

(Apr. 1, 2016); <u>Greenhouse Tomatoes From Canada</u>, USITC Pub. 3499, Inv. No.

731-TA-925 (Final) (Apr. 1, 2002)).  These prior determinations do not provide

that the Commission has an established practice to always treat interim period

improvements as evidence of adverse impact.

Therefore, the Commission's impact determination was in accordance with law and supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the Court concludes that the ITC's determinations regarding the cumulation of subject imports, volume, price effects, and impact are in accordance with law and supported by substantial evidence.  Therefore, the Commission's <u>Final Determination</u> is sustained.

Judgment will be entered accordingly.

<div align="right">

  /s/  Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

</div>

Dated:   June 20, 2025
         New York, New York

3

Views of the Commission on Remand

8/16/2024

Appx065-122

**Public Version**

**Views of the Commission on Remand**

By decision and order dated April 19, 2024, the U.S. Court of International Trade ("CIT") remanded the Commission's determinations regarding Argentina, Mexico, and Russia in the final oil country tubular goods ("OCTG") investigations, as set out in *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381 (Nov. 2022) ("*Original Views*").[1]  Upon consideration of the remand order and based on the evidence in the record of these investigations, the Commission determines again that an industry in the United States is materially injured by reason of imports of OCTG from Argentina, Mexico, and Russia that have been found by the U.S. Department of Commerce ("Commerce") to be sold in the United States at less than fair value ("LTFV") and by reason of OCTG from Russia that have been found by Commerce to be subsidized by the government of Russia.[2]

I.    **BACKGROUND**

The petitions in the underlying investigations were filed on October 6, 2021, by Borusan Mannesmann Pipe U.S., Inc.; PTC Liberty Tubulars LLC; U.S. Steel Tubular Products, Inc.; Welded Tube USA, Inc.; and the United States Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (collectively, "Petitioners").[3]  The investigations were instituted and initiated on October 6, 2021 and

---

[1] *Tenaris Bay City et al v. United States*, Court No. 22-00344, Slip Op. 24-48 (Ct. Int'l Trade April 19, 2024) ("Slip Op. 24-48").

[2] As discussed below, the Commission's determinations with respect to South Korea were not appealed.

[3] Confidential Staff Report, INV-UU-100 (October 14, 2022) ("CR") at I-1.

1

**Public Version**

October 26, 2021, respectively.[4]  The Commission issued affirmative preliminary determinations on November 22, 2022.[5]

On October 26, 2022, the Commission unanimously voted to find that the domestic industry producing OCTG was materially injured by reason of subject imports of OCTG from Argentina and Mexico found to have been sold in the United States at LTFV; by reason of subject imports of OCTG from Russia found to have been sold in the United States at LTFV and subsidized by the government of Russia; and by reason of subject imports of OCTG from South Korea that have been found to be subsidized by the government of South Korea.[6]  In November 2022, the Commission published its Final Views explaining its determinations.[7]

Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc. (domestic producers of OCTG), Tenaris Global Services (U.S.A.) Corporation (a U.S. importer of OCTG), Siderca S.A.I.C. (a producer of OCTG in Argentina), and Tubos de Acero de Mexico, S.A. (a producer of OCTG in Mexico) (collectively "Tenaris") and TMK Group ("TMK") (a producer of OCTG from Russia), appealed the Commission's final affirmative determinations with respect to Argentina, Mexico, and Russia on December 16, 2022.  After briefing and oral argument, the Court, on April 19, 2024, remanded the Commission's determination for further consideration of certain issues.  In particular, the Court remanded certain aspects of the Commission's assessment of whether there existed a reasonable overlap of competition between and among

---

[4] CR at I-1.
[5] CR Table I-1.
[6] *Original Views*, USITC Pub. 5381 at 3.
[7] *Original Views*, USITC Pub. 5381 at 3. The Commission transmitted its determinations to be published effective November 14, 2022.  *Oil Country Tubular Goods From Argentina, Mexico, Russia, and South Korea*, 87 Fed. Reg. 69331 (Nov. 18, 2022).

2

subject imports from each source and the domestic like product warranting a cumulative assessment of the effects and impact of subject imports on the domestic industry.[8]

## II.    ADOPTION OF FINDINGS FROM OUR ORIGINAL DETERMINATIONS

We have considered the record as a whole in light of the Court's remand instructions. The Commission notes that it is adopting its original findings, analysis, and conclusions in their entirety with respect to those issues that were not appealed or not addressed by the Court on appeal. Consistent with our cumulation findings on remand below, we continue to adopt our findings on the conditions of competition, volume, price effects, and impact from our original determinations. We also note that the Court has sustained certain aspects of our findings concerning cumulation[9] and causation,[10] and we again adopt the original findings that have been sustained. Regarding the findings remanded by the Court, we also incorporate our original findings, as supplemented and furthered explained in this remand determination.

## III.    CUMULATION

### A.  The Court's Instructions

The Court remanded several aspects of the Commission's determinations, all of which relate to the Commission's assessment of whether subject imports from each source and the domestic like product shared a reasonable overlap of competition so as to require cumulation.

First, addressing the timing of the Commission's assessment of a reasonable overlap of competition, the Court found that the Commission unlawfully failed to address whether subject

---

[8] *See* Slip Op. 24-48.
[9] *See* Slip Op. 24-48 at 43 (sustaining the Commission's finding that subject imports from all four countries were sold through overlapping channels of distribution as supported by substantial evidence).
[10] *See* Slip Op. 24-48 at 47 (sustaining the Commission's finding that the Rig Direct program was not the cause of the domestic industry's loss of market share as supported by substantial evidence).

3

**Public Version**

imports from Russia "were unfair and had a continuing impact during the full period of investigation, including vote day."[11]  Specifically, the Court found that the Commission erred in assessing whether a reasonable overlap of competition existed during the full 42-month period of investigation ("POI") given the measures which arose later in the POI in response to Russia's invasion of Ukraine in February 2022, including:  the suspension of Russian Producers' ability to American Petroleum Institute ("API")-certify its products as of March 17, 2022, the loss of Russia's most-favored-nation ("MFN") status in April 2022, the prohibition of Russian vessels from entering U.S. ports as of April 2022, and the imposition of tariff increases applicable to Russian merchandise from 1.0 percent to 35 percent starting in June 2022.[12]

Second, the Court held that the Commission "did not consider contrary evidence on the record pertaining to the effects of the sanctions on Russian OCTG, especially the suspension of API-certification on Russian OCTG . . . ."[13]  This potentially contrary evidence highlighted by the Court consisted of a letter from the API stating, in part, [ ███████████████████████ ███████████████ ] and a piece of testimony from the President of Tenaris USA, stating that the suspension of API certification services would be a "major setback" for Russian producers of OCTG.[14]

---

[11] Slip Op. 24-48 at 17.
[12] Slip Op. 24-48 at 13–17.
[13] Slip Op. 24-48 at 22–23.
[14] Slip Op. 24-48 at 22 (citing Hearing Transcript ("Hr'g Tr.") at 248 and TMK Pre-Hearing Br. at Ex. 2 ("API Letter")).  The Court refers to testimony from "a witness from API", yet Dr. Dean Foreman, Chief Economist for API, did not opine on the potential effects of the suspension of API certifications in his testimony. Hr'g Tr. at 187–190 (Foreman).

**Public Version**

Third, the Court held that "cumulation of non-subject South Korean imports is a violation of 19 U.S.C. §1677(7)(G)(i) and is not in accordance with law."[15]

Fourth, the Court instructed the Commission to reconsider certain factual aspects of the Commission's cumulation analysis concerning fungibility and geographic overlap, which the Court found were unsupported by substantial evidence because the Commission did not exclude nonsubject (*i.e.*, Hyundai's) imports from South Korea from its consideration in certain aspects of its fungibility, geographic overlap, and simultaneous presence analyses.[16]

Fifth, the Court held that the Commission failed to address party arguments concerning the existing AD order on subject imports from South Korea.[17]

On May, 29, 2024, the Commission published a notice of remand proceedings, inviting interested parties to file comments on how to best comply with the Court's instructions.[18]  The Commission also issued supplemental tables, on June 7, 2024, in which it reformulated the data concerning imports from South Korea in response to the Court's remand instructions.[19]  On June 26, 2024, Petitioners – United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Borusan Mannesmann

---

[15] Slip Op. 24-48 at 37.

[16] Slip Op. 24-48 at 38–40.

[17] Slip Op. 24-48 at 41.

[18] *Oil Country Tubular Goods From Argentina, Mexico, and Russia:  Notice of Remand Proceedings*, 89 Fed. Reg. 46419 (May 29, 2024).

[19] Confidential Supplemental Memorandum, INV-WW-060 (June 7, 2024) ("Supplemental Memorandum").

5

**Public Version**

Pipe USA, Inc., PTC Liberty Tubulars LLC, U. S. Steel Tubular Products, Inc., and Welded Tube

USA, Inc. – filed comments,[20] as did Respondents TMK[21] and Tenaris.[22]

### B. Timing of the Commission's Cumulation Analysis

The Court instructed the Commission to "reassess the timing {of competitive overlap

concerning imports from Russia} and determine whether the imports under investigation were

proven unfair and had a continuing impact during the full period of investigation, including on

vote day."[23]

*Petitioners' Arguments*.  Petitioners argue that vote day is not the operative

timeframe for assessing whether subject imports and the domestic like product share a

competitive overlap.[24]  Petitioners contend that the statutory language, the Statement of

Administrative Action ("SAA") to the Uruguay Round Agreements Act ("URAA"),[25] and Federal

Circuit precedent demonstrate the "Commission has broad discretion with respect to the

period of investigation that it selects for purposes of making a material injury

determination{,}" clarifies that a reasonable overlap of competition must be assessed based

on the POI, which in these investigations ran from January 2019 to June 2022.[26]  They also

---

[20] Petitioners' Confidential Remand Comments, EDIS Doc. 824503 (June 26, 2024) ("Petitioners' Comments").

[21] TMK's Public Remand Comments, EDIS Doc. 824514 (June 26, 2024) ("TMK's Comments").

[22] Tenaris's Confidential Remand Comments, EDIS Doc. 824504 (June 26, 2024) ("Tenaris's Comments").

[23] Slip Op. 24-48 at 19.

[24] Petitioners' Comments at 11–12.

[25] H.R. Doc 103-316, Vol. 1 (1994).

[26] Petitioners' Comments at 12–13, citing 19 U.S.C. § 1677(7)(G)(i); SAA at 847; and *Nucor Corp. v. United States*, 414 F.3d 1331, 1337 (Fed. Cir. 2005) (quoting *Kenda Rubber Indus. Co. v. United States*, 630 F. Supp. 354, 359 (Ct. Int'l Trade 1986)); *see also, e.g., Chemours Co. FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1331 (Ct. Int'l Trade 2020) ("Determining the appropriate period of investigation is within the discretion of the Commission."); *Mexichem Fluor Inc. v. United States*, 179 F. Supp. 3d 1238, 1254

6

highlight that the CIT has held that "there is no requirement to include . . . post-POI data, as the POI is the centerpiece of the investigation's time frame."[27]  Petitioners assert that the Commission applied its "its normal practice of considering data for the three most recent calendar years plus applicable interim periods," and that no party to the proceeding proposed gathering data beyond June 2022 – the final month of the POI.[28]

Additionally, Petitioners point out that the Court's remand instruction relied on outdated and factually distinct case law.[29]  Petitioners explain that, in *Chaparral Steel Co. v. United States*, 901 F.2d 1097 (Fed. Cir. 1990, the Federal Circuit there had deferred to the Commission's interpretation of the pre-URAA cumulation provision, 19 U.S.C. § 1677(7)(C)(iv) (1988).[30] Petitioners note that the provision addressed in *Chaparral Steel* was superseded in 1994 by the post-URAA cumulation provision currently in effect at 19 U.S.C. § 1677(7)(G).[31]

Regarding the provision that was applicable at the time of *Chaparral Steel*, Petitioners explain that the Commission had interpreted § 1677(7)(C)(iv) as requiring subject imports to compete with other subject imports and the domestic like product, be subject to investigation,

---

(Ct. Int'l Trade 2016) ("{T}he ITC's broad discretion in choosing the time frame for its investigation and analysis has consistently been upheld ....") (quoting *Nitrogen Solutions Fair Trade Comm. v. United States*, 358 F. Supp. 2d. 1314, 1325 (Ct. Int'l Trade 2005)) (alteration in *Mexichem*).

[27] Petitioners' Comments at 13 (*quoting AWP Indus., Inc. v. United States*, 35 C.I.T. 774, 790 (2011)).

[28] Petitioners' Comments at 13 (*quoting Swiff-Train Co. v. United States*, 999 F. Supp. 2d 1334, 1351 (Ct. Int'l Trade 2014), *aff'd*, 793 F.3d 1355 (Fed. Cir. 2015)).

[29] Petitioners' Comments at 15–19.

[30] Petitioners' Comments at 15.  19 U.S.C. § 1677(7)(C)(iv) states:

(iv) CUMULATION. — For purposes of clauses (i) and (ii), the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market.

[31] Petitioners' Comments at 17–18.

**Public Version**

and be marketed within a reasonably coincidental period.[32]  Summarizing the various

investigations that were at issue in *Chapparal*, Petitioners note that the countervailing duty

("CVD") investigations were initiated against steel products from South Africa and Spain in

February and March 1982, respectively, and CVD orders were subsequently imposed in

September 1982 (South Africa) and January 1983 (Spain).[33]  More than a year later, AD

investigations were initiated against steel products from Spain (March 1984), Norway

(December 1984), and Poland (December 1984).[34]  Poland and Spain entered into voluntary

restraint agreements ("VRAs") in early 1985, resulting in the termination of the investigations

before Commerce rendered any final findings of dumping.[35]  The CVD order against South Africa

was revoked for lack of interest, retroactive to October 1984, but the investigation of Norway

continued.[36]  Petitioners explain that the Commission declined to cumulate dumped imports

from Poland and Spain as they were no longer "subject to . . . investigation" on vote day.[37]

Petitioners further explain that the Commission declined to cumulate subject imports from

South Africa and Spain (already subject to CVD orders due to investigations initiated in February

and March 1982, respectively) because they "did not enter the U.S. market reasonably

coincident in time with the {Norwegian} imports currently under investigation" and did not

"contemporaneously compete" with Norwegian imports.[38]  Petitioners maintain that nothing in

---

[32] Petitioners' Comments at 15–17; *see Chaparral Steel Co. v. United States*, 698 F. Supp. 254, 257 (Ct. Int'l Trade 1988), *rev'd*, 901 F.2d 1097 (Fed. Cir. 1990); *see also Carbon Steel Structural Shapes from Norway*, Inv. No. 731-TA-234 (Final), USITC Pub. 1785 (November 1985) at 7–9.

[33] Petitioners' Comments at 15.

[34] Petitioners' Comments at 15–16.

[35] Petitioners' Comments at 16.  Spain's CVD order was also revoked because of the VRA.  *Id*.

[36] Petitioners' Comments at 16.

[37] Petitioners' Comments at 16.

[38] Petitioners' Comments at 16–17 (*quoting Chaparral*, 901 F.2d at 1100–01, 1106).

8

**Public Version**

*Chaparral* requires the Commission to focus its assessment of an overlap of competition on vote day.[39]

Petitioners argue that the URAA amendments, contained in 19 U.S.C. § 1677(7)(G)(i, negated these *Chaparral*-type issues by tethering candidates for cumulation to the date of the filing of the petitions.[40]  Thus, Petitioners argue that the South African and Spanish imports could not have been cumulated with the imports from Norway under the current statute because those petitions were not filed on the same day as the Norway petition.[41]

Petitioners also cite to the SAA, arguing that it confirms that Congress did not intend the Commission to consider post-POI activity, regardless of when "vote day" occurs.[42] Petitioners claim that, "because the post-URAA provision limits cumulation to same-day petitions and initiations, only a staggered investigation could present the situation discussed in *Chaparral*, wherein one of the countries considered for cumulation was already subject to an AD/CVD order on 'vote day.'"[43]  They argue that the SAA's tethering of the trailing

---

[39] Petitioners' Comments at 16.
[40] Petitioners' Comments at 17–18.  The "subject to investigation" clause was replaced by 19 U.S.C. § 1677(7)(G)(i), which states:
For purposes of clauses (i) and (ii) of subparagraph (C), and subject to clause (ii), the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which—
(I) petitions were filed under section 1671a(b) or 1673a(b) of this title on the same day,
(II) investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day, or
(III) petitions were filed under section 1671a(b) or 1673a(b) of this title and investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day,
if such imports compete with each other and with domestic like products in the United States market.
[41] Petitioners' Comments at 18.
[42] Petitioners' Comments at 19 (*citing* SAA, H.R. Doc 103-316, Vol. 1 (1994) at 848).
[43] Petitioners' Comments at 19.

9

**Public Version**

investigation's determination to the leading investigation's record eliminates the need to adopt a "vote day" framework.[44]

Additionally, Petitioners argue that 19 U.S.C. § 1677(7)(G)(i) is written in the simple present tense and therefore does not require a vote day cumulation assessment.[45] They cite to what they believe is the better reasoning previously set out in *Steel Authority of India* ("*SAIL*").[46] In that case, the CIT deferred to the Commission's reading that the term "compete" was used in the simple present tense and therefore refers to a state rather than an ongoing action.[47]

**Respondent Tenaris's Arguments**. Tenaris argues that the Commission must reopen the record to include monthly import data from June 2022 (the end of the POI) to October 26, 2022 (the day of the Commission's final vote).[48] It claims that the Court found it was unreasonable for the Commission to "to view the conditions of competition over the 42-month period of investigation (*i.e.*, January 2019 – June 2022) without considering the effects of competition at the end of the investigation and on vote day."[49] Tenaris contends that the statute uses "compete" in the present tense and that the Commission had previously confirmed this

---

[44] Petitioners' Comments at 19.

[45] Petitioners' Comments at 14.

[46] In *Steel Authority of India*, the POI ran from January 1996 through June 1999, and the plaintiff had "voluntarily withdr{awn} from the market from July 1998 through June 1999." Petitioners' Comments at 20 (*quoting SAIL*, 146 F. Supp. 2d 900, 908 (Ct. Int'l Trade 2001)).

[47] Petitioners' Comments at 14, 19–20 (*citing SAIL*, 146 F. Supp. 2d at 907). The CIT rejected the plaintiff's "interpretation of the statute us{ing} the present continuous tense, *i.e.*, as contemplating an action that is not completed or finished at the time," which "would limit the ITC's cumulation to ongoing competition that will end in the future." Petitioners' Comments at 20 (*quoting SAIL*, 146 F. Supp. 2d at 905 n.9).

[48] Tenaris's Comments at 2, 6–9.

[49] Tenaris's Comments at 7.

**Public Version**

interpretation in *SAIL* ("{t}he ITC determined that 'compete' {in 19 U.S.C. 1677(7)(G)(i)} was to be used in the simple present tense").[50]

    ***Respondent TMK's Arguments.***  TMK argues that the Commission must assess whether a reasonable overlap of competition existed between subject imports from Russia, subject imports from other sources, and the domestic product on vote day.[51]  TMK relies on the Court's opinion to support this position.

    ***Analysis***.  As an initial matter, we answer the fundamental first question posed by the Court:  "*whether the imports under investigation were proven unfair* and had a continuing impact during the full period of investigation."[52]  In this respect, we clarify that Commerce determined whether subject imports were unfairly traded, not the Commission.[53]  In these investigations, Commerce determined that subject imports from all four sources were unfairly traded before the time of the Commission's vote on October 26, 2022.[54]

---

[50] Tenaris's Comments at 8 (*quoting SAIL*, 146 F. Supp. 2d at 907)).  Tenaris's argument appears to be premised on "present tense" and "present perfect" tenses having the same meaning, overlooking that the CIT addressed their distinct meanings in *SAIL*:  The CIT rejected the plaintiff's "interpretation of the statute us{ing} the present continuous tense; *i.e.*, as contemplating an action that is not completed or finished at the time," which "would limit the ITC's cumulation to ongoing competition that will end in the future."  *Id*.

[51] TMK's Comments at 6.

[52] Slip Op. 24-48 at 19 (emphasis added).

[53] *See* 19 U.S.C. § 1671(a)(1) (allowing Commerce to impose CVD duties *after* it determines the merchandise is unfairly subsidized); *see also* 19 U.S.C. § 1673(1) (allowing Commerce to impose AD duties *after* it determines the merchandise is dumped); *United States Steel Corp. v. United States*, 97 F.4th 1364, 1366 (Fed. Cir. 2024) ("{T}he Department of Commerce is authorized to administer the antidumping statute. . . . In administering the statute, the agency will conduct investigations and assess antidumping duties where it determines that foreign goods are being sold in the United States at less-than-fair value.") (internal citations omitted).

[54] *Oil Country Tubular Goods From the Republic of Korea: Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 87 Fed. Reg. 14248 (March 14, 2022); *Oil Country Tubular Goods From the Russian Federation: Preliminary Affirmative Countervailing Duty Determination, Preliminary Negative Critical Circumstances*

**Public Version**

Further to the Court's inquiry, we emphasize that the Commission's approach of assessing whether imports subject to recent orders were candidates for cumulation with imports currently under investigation if they enter the market "reasonably coincident" in time, employed in *Chaparral*, was a function of the pre-URAA cumulation provision[55] – an approach that is no longer applicable as of 1994 under the amended URAA cumulation provision.

       ***Factual Background of* Chaparral.**  In *Chaparral* the U.S. Court of Appeals for the Federal Circuit affirmed the Commission's determination to not cumulate allegedly dumped subject imports from Poland and Spain with subject imports from Norway, because the Commission concluded that the imports from Poland and Spain "were not subject to a pending investigation and thus did not fall under the {1988} cumulation provision."[56]

       The Commission had based its determination not to include imports from Poland and Spain on the fact that those imports were no longer subject to investigation, as the United

---

*Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 87 Fed. Reg. 14249 (March 14, 2022); *Oil Country Tubular Goods From Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28801 (May 11, 2022); *Oil Country Tubular Goods From the Russian Federation: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Critical Circumstances Determination, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28804 (May 11, 2022); *Oil Country Tubular Goods From Mexico: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28808 (May 11, 2022).

    [55] *See Chaparral*, 901 F.2d at 1099.

    [56] *Chaparral*, 901 F.2d at 1099.  The cumulation provision of the statute, 19 U.S.C. § 1677(7)(C)(iv) (1988), stated at that time:

               (iv) CUMULATION. — For purposes of clauses (i) and (ii), the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products *subject to investigation* if such imports compete with each other and with like products of the domestic industry in the United States market. (emphasis added)

**Public Version**

States had entered into VRAs with these countries – resulting in the termination of those AD

investigations.[57]  As the Federal Circuit stated:

> In this case the ITC interpreted "subject to investigation" to include
> only imports still under investigation on "vote day" and imports
> which were proven "unfair" and to have continuing impact as of
> vote day. The ITC did not cumulate imports from Poland and Spain
> because they were no longer subject to a pending investigation and
> due to the VRAs there was no possibility of being found to be
> unfairly traded. With respect to the subsidized imports from Spain
> and South Africa, the imports made before the CVD duties were
> imposed were not cumulated because they were not marketed
> reasonably coincident with the Norwegian imports.
>
> In this appeal the LTFV investigations of steel imports from Poland
> and Spain ended prior to the Norway investigation vote day. The
> ITC interprets the withdrawal of the petitions due to a VRA as
> meaning that no unfair value determination could be made for
> imports entered during the ITC investigation's time frame. Thus,
> the ITC could reasonably exclude these imports.[58]

Additionally, the Commission did not cumulate previously subsidized imports from Spain

and South Africa, which were now subject to CVD orders, with imports from Norway as they did

not enter the market "reasonably coincident" in time:[59]

> The ITC could also exclude the pre-CVD order imports from Spain
> and South Africa even though they had been found to be unfairly
> traded, because those imports did not contemporaneously
> compete with the Norwegian imports. The ITC views the imports
> from Spain and South Africa, that entered after the CVD orders, as

---

[57] *Chaparral*, 901 F.2d at 1097, 1098–99.  The VRA with Poland resulted in the withdrawal of the petitions while the VRA with Spain occurred after Commerce's final affirmative antidumping determinations and during the pendency of the Commission's final injury investigations.  *Id*.  Under the current statute, 19 U.S.C. § 1677(7)(G)(i), the Commission would not even be permitted to cumulate the imports that were subject to a prior investigation initiated on a different day, as was the case with the imports from Spain and South Africa.

[58] *Chaparral*, 901 F.2d at 1099.

[59] *Chaparral*, 901 F.2d at 1099.

not "unfair" inasmuch as they are not marketed at unfair prices because of the imposition of duties.[60]

Thus, as the Federal Circuit found, the Commission had "construed the statutory scheme to require cumulation only of *currently* unfair imports, not those corrected by VRAs or the assessment of duties."[61]  Thus, to the extent that one aspect of *Chaparral* relied on by the Court is arguably still operative (in mandating that the Commission only cumulate subject imports that are determined to be unfairly traded on vote day), as discussed above, imports from all four sources including Russia, were in fact determined by Commerce to be "proven unfair" as of vote day.[62]

***Currently Applicable Law Post-URAA.***  In *Chaparral*, the Federal Circuit noted the Congressional silence regarding the relevant timeframe for assessing whether cumulation was appropriate, and therefore deferred to the Commission's interpretation.[63]  Congress, however, subsequently addressed this issue when it passed the URAA and amended the statute with current Section 771(7)(G)(i) to require cumulation for competing imports when petitions were filed, or the investigations initiated, on the same day.[64]  Thus, the candidates for cumulation are no longer determined based on whether they are marketed reasonably coincident in time and

---

[60] *Chaparral*, 901 F.2d at 1104–05 (internal citations omitted).

[61] *Chaparral*, 901 F.2d at 1103 (emphasis in original).

[62] *See* Slip Op. 24-48 at 17.

[63] *Chaparral*, 901 F.2d at 1104 ("Because neither the statute nor the legislative history *conclusively* establishes the time frame for cumulation, we assess the agency's interpretation of the provision to determine whether it is reasonable and in accordance with legislative purposes.") (emphasis in original); *id*. at 1105 (the ITC's interpretation not to cumulate Spanish, South African and Polish imports was "consistent with the statutory language, legislative history, and congressional purpose" and was not overturned by subsequent congressional action, although Congress was squarely presented with the opportunity to do so").  *id*. at 1106.

[64] 19 U.S.C. § 1677(7)(G)(i).  *See* SAA, H.R. Doc 103-316, Vol. 1 (1994) at 848.

**Public Version**

are having a continuing impact on vote day but instead are based on the date the petitions are

filed.  As the SAA accompanying the URAA explains:

> In conformity with the Agreements, new section 771(7)(G)(i) provides that the Commission cumulate imports only from countries as to which investigations under sections 702 or 732 were filed or self-initiated on the same day. The requirement of simultaneous filing will promote certainty in antidumping and countervailing duty investigations by defining, at the time of filing, the countries potentially subject to cumulative analysis.[65]

The SAA further explains that staggered investigations must be based on the record

compiled in leading investigations, so the Commission no longer needs to assess whether

imports subject to the earlier investigation have any "continuing effect" on vote day:

> New section 771(7)(G)(iii) provides that the Commission will make its determination in each of the staggered investigations based upon the record compiled in the first final investigation in which it makes a determination. This eliminates the need for the Commission to consider whether imports from the first-decided investigation that are subject to antidumping or countervailing duty orders have a "continuing effect" on "vote day" of each subsequent investigation. *Compare Chaparral Steel Co. v United States*, 901 F.2d 1097 (Fed. Cir. 1990), with *Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608 (Ct. Int'l Trade 1993).[66]

While the instant case does not involve staggered investigations, this passage provides

further indication that "vote day" is not the operative timeframe for assessing the cumulation

factors.  Indeed, static assessment of both cumulation and material injury on vote day (or even

at the close of the record in the trailing case) would be inconsistent with Congressional intent,

as the leading record would necessarily have closed prior to the vote, or close of the record, in

the trailing investigations.  That is, cumulation in a trailing investigation must be based strictly

---

[65] SAA, H.R. Doc 103-316, Vol. 1 (1994) at 848.
[66] SAA, H.R. Doc 103-316, Vol. 1 (1994) at 848.

Appx079

**Public Version**

on facts established well before vote day because the record of the leading investigation has already closed, and very little can be added to that record for purposes of the trailing investigation.[67]

Furthermore, assessing competitive overlap for purpose of cumulation on vote day would be inconsistent with the Commission's statutory obligation to provide the parties with an opportunity for final comment on the record evidence under 19 U.S.C. § 1677m(g).  This provision states:

> Information that is submitted on a timely basis to the administering authority or the Commission during the course of a proceeding under this subtitle shall be subject to comment by other parties to the proceeding within such reasonable time as the administering authority or the Commission shall provide. The administering authority and the Commission, before making a final determination under section 1671d, 1673d, 1675, or 1675b of this title shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the administering authority or the Commission (as the case may be) upon which the parties have not previously had an opportunity to comment. Comments containing new factual information shall be disregarded.

The Commission's obligation to "cease the collection of information and . . . provide the parties with a final opportunity to comment on the information obtained . . ." prior to making a final determination would be rendered impossible if the Commission was required to collect data on the competitive conditions in the U.S. market up until vote day.[68]  Had the Commission

---

[67] *See* 19 U.S.C. § 1677(7)(G)(iii) (only allowing the record of trailing investigations to be supplemented with Commerce's final determinations and parties' comments on those determinations).

[68] Commerce's preliminary CVD determinations were rendered on March 14, 2022.  *Oil Country Tubular Goods From the Russian Federation: Preliminary Affirmative Countervailing Duty Determination, Preliminary Negative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 87 Fed. Reg. 14249 (March 14, 2022); *Oil Country Tubular Goods From the Republic of Korea: Preliminary Negative Countervailing Duty Determination and Alignment of*

16

collected data up to and on vote day, October 26, 2022, parties to the underlying investigations

would have been deprived of their reasonable opportunity to submit comments "on the

information obtained" as the Commission would have never "ceas{ed} the collection of

information" prior to rendering a final determination.[69]  Thus, while, as the Court found, any

imports considered in the Commission's analysis must still be considered to be unfairly traded

on vote day, the data upon which the Commission relies in its analyses, by nature must cover a

time period prior to vote day.  Any other approach would conflict with the Commission's

statutory obligation to examine the impact of subject imports on the domestic industry through

an analysis of data obtained during the course of a proceeding, and with the comment

requirement contained in 19 U.S.C. § 1677m(g).

---

*Final Determination With Final Antidumping Duty Determination*, 87 Fed. Reg. 14248 (March 14, 2022).
In its preliminary negative CVD determination with respect to OCTG from South Korea, Commerce
calculated below de minimis subsidy rates for all individually examined producers/exporters, including
Hyundai Steel Corporation.  *Id*.  Commerce's preliminary AD determinations were rendered on May 11,
2022.  *Oil Country Tubular Goods From Argentina: Preliminary Affirmative Determinations of Sales at
Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of
Provisional Measures*, 87 Fed. Reg. 28801 (May 11, 2022); *Oil Country Tubular Goods From the Russian
Federation: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative
Critical Circumstances Determination, Postponement of Final Determination, and Extension of
Provisional Measures*, 87 Fed. Reg. 28804 (May 11, 2022); *Oil Country Tubular Goods From Mexico:
Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances,
Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28808 (May
11, 2022).

[69] The notice scheduling the Commission's final-phase investigations was published on May 11, 2022. *See* CR Table I-1.  On January 10, 2022, the Commission invited interested parties to submit comments on the Commission's draft questionnaires.  On February 15, 2022, the interested parties returned comments on the draft questionnaires.  The Commission issued Questionnaires to market participants on June 12, 2022.  The Commission received responses to its questionnaires from market participants dated between June 15, 2022, and July 29, 2022.  The post-hearing Confidential Staff Report was issued on October 14, 2022.  Parties then, as required by statute, were permitted to submit their final comments on October 24, 2022, concerning the information the Commission had collected during the course of its investigations.

17

**C. Addressing Contrary Evidence Regarding Sanctions on Subject Imports from Russia.**

Notwithstanding our longstanding view that an assessment of the cumulation factors must take into account the behavior of subject imports during the POI as a whole,[70] we have given additional consideration to the potentially contrary evidence and arguments pertaining to the sanctions on Russian OCTG highlighted by the Court and the parties, including during the final four months of the POI.[71]

Specifically, with respect to the Commission's fungibility analysis, the Court held that:

> {T}he ITC's determination "that Russian OCTG were fungible with other subject OCTG {was} not supported by substantial evidence because the ITC did not consider contrary evidence on the record pertaining to the effects of the sanctions on Russian OCTG, especially the loss of API-certification on Russian OCTG, and failed to file with the Court the relevant evidence from the responses to Commission questions that the ITC cited."[72]

The Court highlighted that, while a majority of responding purchasers reported that Russian OCTG was "always" or "usually" comparable to the domestic like product in terms of ability to meet or exceed industry quality standards (Tables II-12 & II-14), these responses did "not reflect responses for quality after the suspension of API-certification . . . nor does this information address the competitive impact that losing API-certification would have on the subject Russian products."[73]

---

[70] *See Original Views*, USITC Pub. 5381 at 19–23; *see also Electrolytic Manganese Dioxide from Australia and China,* Inv. Nos. 731-TA-1124- 1125 (Final), USITC Pub. 4036 (September 2008) at 10 (finding that the permanent closure of the sole subject producer in Australia late in the period of investigation did not warrant departing "from our traditional practice of examining the presence of imports over the entire period of investigation.").

[71] The POI for which the Commission collected data in its questionnaires pertained to January 1, 2019, to June 30, 2022.

[72] Slip Op. 24-48 at 23.

[73] Slip Op. 24-48 at 20.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

***Petitioners' Arguments***.  Petitioners argue that the suspension of API certification did not prevent Russian imports from being fungible with other subject imports and the domestic like product, citing to data showing purchases of "green tube" from Russia in 2019, 2020, and 2021 for processing into finished OCTG.[74]  Petitioners also refute that the cited "potentially contrary evidence" regarding the suspension of API certification actually establishes that Russian OCTG was only fungible if it was API-certified.[75]  They note that the testimony in question is attributable to a representative of Respondent Tenaris USA, and not to an API witness.[76]  They also argue that the API letter cited by the Court primarily confirms what the Commission already acknowledged – [ ███████████████████████████████ ██████████████████ ].[77]  Petitioners also cite to testimonial evidence that they believe confirms that sales of non-API certified OCTG are possible and that practical solutions exist while doing nothing to undermine the feasibility of selling green tube (*i.e.*, unfinished OCTG) for further processing in the United States.[78]

Petitioners argue that the record contains no evidence that Russian OCTG imports were barred from the U.S. market, regardless of whether there was a lag in the sanctions taking effect.[79]  Specifically, they contend that the consideration whether these sanctions "effectively excluded" subject imports from Russia from the U.S. market as of vote day is an inquiry that is not required by law.[80]  To the extent that sanctions arose during the POI, however, Petitioners

---

[74] Petitioners' Comments at 21–25.
[75] Petitioners' Comments at 22–25
[76] Petitioners' Comments at 23 (*citing* Slip Op. 24-48 at 22).
[77] Petitioners' Comments at 24 (*citing* TMK Pre-Hearing Brief, Exh. 2).
[78] Petitioners' Comments at 23–24 (*citing* Hearing Transcript at 249–250 (Chapman and Lange).
[79] Petitioners' Comments at 25–30.
[80] Petitioners' Comments at 25–26.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

claim that the Commission's analysis of an overlap of competition remains valid:  significant volumes of subject imports from Russia were present in two of four of the post-invasion months of the POI, were present in [            ] the volume in interim 2022 than in interim 2021, and were not prohibited from entering into the U.S. market.[81]  Petitioners also highlight that subject imports from Russia accounted for [                  ] of subject imports in interim 2022 than in interim 2021.[82]  They argue that this data reflects that subject imports from Russia were competing aggressively in the U.S. market and should not be disregarded by the Commission, especially given the lack of data pertaining to the period between the end of the POI and vote day indicating otherwise.[83]

They highlight that, even accepting the proposition that there was a lag in sanctions taking effect, the barring of Russian ships, the production of subject merchandise without API certification, and the revocation of the MFN status in April 2022 did not prevent the importation of a quantity of OCTG from Russia in May 2022, greater than the volume of subject imports from Argentina and Mexico, combined, for both May and June 2022.[84]  Petitioners contend that it would be unreasonable to assume, given the increase in import and sale quantities of Russian OCTG between interim periods, that the last remaining sanction – the elimination of a tariff gap in May 2022 – would completely change the competitive landscape.[85]

---

[81] Petitioners' Comments at 26–27.

[82] Petitioners' Comments at 28.

[83] Petitioners' Comments at 28–29.  Petitioner argues that, while TMK's Post-Hearing Brief provided import data through July 2022, this data was incomplete as data for Russia was limited to 6 HTSUS ten-digit subheadings while 51 HTSUS ten-digit subheadings were reflected in the Commission's import data.  Petitioners' Comments at 29 (*citing* TMK's Post-Hearing Brief, Exh. 2; CR at IV-7).

[84] Petitioners' Comments at 29.

[85] Petitioners' Comments at 29.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED
**Public Version**

Petitioners claim this is especially true given that all sanctions combined for Russian OCTG (*i.e.*, combining the 25 percent Section 232 tariffs, 35 percent sanction tariff, 1.59 percent highest CVD duties, and 12.84 percent highest non-AFA AD duties), was still less than the AD margin applicable to Argentinian OCTG.[86]

Finally, Petitioners note that TMK's assertions that these sanctions would prevent it from selling OCTG into the U.S. market do not reflect future plans of the entire Russian OCTG industry.[87]  They also argue that TMK's claims are incongruent with its continued efforts to overturn the AD order for access to a market into which they do not intend to sell their product.[88]

*Respondent Tenaris's Arguments*.  Tenaris argues that, given the sanctions imposed on subject imports from Russia following the February 2022 invasion of Ukraine, the Commission should not cumulate subject imports from Russia with those from Argentina and Mexico.[89] Tenaris argues that the Commission "did not consider contrary evidence on the record pertaining to effects of sanctions on Russian OCTG, especially the suspension of API certification on Russian OCTG" and must seek additional information from the parties regarding the suspension of API certification, including on vote day.[90]  Tenaris claims that the Commission's cumulation finding cannot rely on a majority of purchaser questionnaire responses reporting that subject imports from Russia always or frequently met minimum quality specifications and

---

[86] Petitioners' Comments at 29–30.  Petitioners' point appears to be that all of the sanctions, combined, did not create an insurmountable obstacle to selling in the U.S. market.
[87] Petitioners' Comments at 27 (*citing* CR at VII-7, identifying nine Russian OCTG producers and exporters and estimating that TMK accounts for [          ] percent of U.S. imports of OCTG in 2021).
[88] Petitioners' Comments at 27–28.
[89] Tenaris's Comments at 4–6.
[90] Tenaris's Comments at 9–10 (*quoting* Slip Op. 24-48 at 22–23)

is comparable to the domestic like product because these questionnaire responses pertain to

January – June 2022 and therefore "do not reflect responses for quality after the suspension of

API-certification for Russian subject imports, nor does this information address the competitive

impact that losing API certification would have on the subject Russian products."[91]  Tenaris

claims that, even after the relevant pages of Petitioners' posthearing brief are placed on the

record, Petitioners' argument that "Russian producers could still send green tubes to API-

certified processors and then sell the processed tubes in the U.S. market" is mere speculation

as there is no indication that purchasers would choose to purchase non-API certified green

tubes rather than API-certified green tubes, especially given the other sanctions in place.[92]

      Tenaris points to, and discusses the "contrary evidence" that the Court faulted the

Commission for failing to consider:  (1) a letter from API indicating that API certification services

ceased effective March 17, 2022;[93] (2) an end user witness who testified that the suspension of

API certification was a "very difficult obstacle" to selling OCTG from Russia in the United

States;[94] (3) a Tenaris witness that testified "no reasonable operator or end user would ever run

the risk of running casing or tubing into their wells without an API monogram";[95] and data

indicating that 28 of 29 purchaser responses identifying "quality meets industry standards" as a

"very important" purchasing factor.[96]  With respect to the API letter, Tenaris highlights specific

language:

---

[91] Tenaris's Comments at 11 (*quoting* Slip Op. 24-48 at 21).
[92] Tenaris's Comments at 11 (*quoting* Slip Op. 24-48, at 21).
[93] Tenaris's Comments at 12 (*citing* TMK Prehearing Brief at Exhibit 2).
[94] Tenaris's Comments at 12 (*citing* Hr'g Tr. at 249 (Lange)).
[95] Tenaris's Comments at 12 (*citing* Hr'g Tr. at 248 (Zanotti)).
[96] Tenaris's Comments at 12 (*citing* CR Table II-11).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**



[ ]⁹⁷

The end-user witness, specifically, Adam Lange, Vice president of Drilling for Tap Rock

Operating, LLC, testified:

> {F}rom an engineering part of it, {using uncertified OCTG} would be a very difficult obstacle to overcome because it is something that we have become very comfortable with knowing, that something has an API stamp and what comes along with it. Perhaps the company that could do their own review of the internal QC and stuff and things of that nature.⁹⁸

Finally, the Tenaris witness, Luca Zanotti, President of Respondent Tenaris USA,

testified:

> {The suspension of API certification} is a major setback for Russia because while in some domestic market, maybe in Russia, they could keep on selling the price, even without the monogram, in the rest of the world, this would not be possible. I have to assume that in the United States and in the rest of international market, no reasonable operator or end user would ever run the risk of running casing or tubing into their wells without an API monogram.⁹⁹

---

⁹⁷ Tenaris's Comments at 12 (*citing* TMK Prehearing Brief at Exhibit 2).
⁹⁸ Hr'g Tr. at 249 (Lange)).
⁹⁹ Hr'g Tr. at 248 (Zanotti).

Appx087

**Public Version**

Tenaris argues that the Commission must also address the effects of the suspension of API certification in addition to the Section 232 duties beyond stating that "{t}hese measures did not prevent such imports from entering and being sold in the United States in significant quantities from February 2022 to the end of the POI."[100]  Additionally, they imply that the Commission must address that the share of apparent U.S. consumption for subject imports from Russia was 0.7 percentage points lower in interim 2022 compared to interim 2021.[101]

Tenaris also contends that the Commission must address the argument that the post-invasion sanctions may have had a delayed effect and were therefore not reflected in the import data showing entries of Russian OCTG in March and May 2022.[102]  Similarly, it claims that the Commission must address the argument that the imports in March and May "took advantage of an anomaly in the Column 2 duty rates that imposed almost no duty," which was eliminated in June 2022 with the imposition of 35 percent duties on all products from Russia.[103]  Tenaris argues that the Commission must address the record evidence explaining that the March and May 2022 subject imports were temporary.[104]

*Respondent TMK's Arguments*.  TMK argues that the 42-month POI comprised two competitive environments – the first which existed from the time of the filing of the petitions and persisted for most of the POI and the second which began to emerge in February 2022, as

---

[100] Tenaris's Comments at 13 (*quoting* USITC Pub. 5381 at 22–23).

[101] Tenaris's Comments at 13 (*citing* CR Table C-1).  The Commission discounted volume data in interim 2022, as it found that declines in cumulated subject imports' share of apparent U.S. consumption was due to the pendency of the investigations.  *Original Views*, USITC Pub. 5381 at 32 n.184.

[102] Tenaris's Comments at 13–14

[103] Tenaris's Comments at 14.

[104] Tenaris's Comments at 14.  Tenaris provides no citation to the record for the proposition that imports in March and May 2022 were temporary.

**Public Version**

various sanctions were imposed on Russian products.[105]  TMK claims that this second

competitive environment included:

> (1) the revocation of Russian producers' ability to API-certify its products on March 17, 2022,14 (2) the withdrawal of most-favored-nation ("MFN") status for Russia by the United States on April 18, 2022,15 (3) the prohibition by the U.S. Government of Russia-affiliated vessels from entering U.S. ports on April 21, 2022, (4) the imposition of an across-the-board increase in tariffs applicable to Russian merchandise imported into the United States to 35 percent on June 27, 2022, and (5) the imposition of private sector shipping boycotts and significant banking sanctions. It should be noted that these trade barriers were added on top of a 25 percent tariff imposed on Russia prior to the start of the investigation period that was not applicable to imports from the other subject countries.[106]

TMK contends that the suspension of API certification services on March 17, 2022, put Russian

OCTG at a substantial competitive disadvantage as supported by the testimony of the Vice

President of Tap Rock Resources, LLC:

> {F}rom an engineering part of it, {using uncertified OCTG} would be a very difficult obstacle to overcome because it is something that we have become very comfortable with knowing, that something has an API stamp and what comes along with it. Perhaps the company that could do their own review of the internal QC and stuff and things of that nature.
>
> But that is part of it is that the API does a lot of that legwork for the E&P (phonetic) industry so that smaller companies, particularly for whom it would be a larger cost, do not have to, you know, do as many inspections don't have to inspect every mill for everything. They can depend on API for that.[107]

Similarly, TMK highlights the testimony of the President of Tenaris USA:

---

[105] TMK's Comments at 6–7.  TMK seems to misapprehend that the petitions underlying these investigations were not filed at the beginning of the POI.  The petitions were filed on October 6, 2021. CR Table I-1.

[106] TMK's Comments at 7.

[107] TMK's Comments at 7 (*quoting* Hr'g Tr. at 283 (Lange)).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

> I would say that, with few exceptions maybe in Russia or China, I
> would not consider, based on the knowledge, that these materials
> or the Russian material without the API monogram can be a
> valuable solution for any operation. Not small, not big. Probably
> even a big operator would be even more sensible, or, say, attentive
> to the API monogram issue for the quality issue that Adam was
> mentioning.[108]

TMK claims that this evidence supports that purchaser's perceptions of and willingness to

purchase Russian OCTG was altered by the suspension of API certification services, rendering

subject imports from Russia non-fungible with other subject imports and the domestic like

product.[109] TMK contends that other record evidence demonstrates subject imports from

Russia had ceased and had no meaningful presence in the U.S. marketplace as of vote day.[110]

TMK argues that the absence of Russian OCTG from the U.S. market on vote day means that

these products do not satisfy any of the Commission's four competitive overlap factors.[111]

TMK also argues that the existence of post-February imports of Russian OCTG does not

support a finding that these imports were competing in the U.S. market on vote day.[112]  First,

TMK claims that subject imports from Russia in March 2022 occurred while only the 25 percent

Section 232 duties and private restrictions were in place and, due to the time needed to ship

merchandise from Russia to the United States, before the suspension of API certification had

---

[108] TMK Comments at 8 (*quoting* Hr'g Tr. at 283–284 (Zanotti)).

[109] TMK Comments at 8–9.

[110] TMK Comments at 9 (*citing* CR at II-12 (indicating that sanctions were imposed in 2022); CR Table VII-28 (indicating that TMK reported no arranged imports after July 2022); TMK Foreign Producer Questionnaire Table II-8 (indicating that TMK reported [ ███████████████████████████████████ ]); TMK Prehearing Br. at Exh.1 ([ ████████████████████████████████████████ ████████████████████████████████████████████████████████ ] ).

[111] TMK Comments at 9.  TMK did not submit or cite to any supporting documentation that showed that Russian OCTG was absent from the U.S. market in October 2022.

[112] TMK Comments at 9–14.

26

**Public Version**

any effect.[113]  Second, they argue that virtually all Russian imports that entered into the United

States in March and May 2022 entered under HTSUS code 7306.29.2000, which was associated

with a 1.0 percent duty rate.[114]  Third, TMK argues that the May 2022 imports of subject

merchandise occurred after the suspension of API certification, the U.S. ban on Russian ships

entering its harbors, and the revocation of the MFN status , but that the gap in tariff code

7306.29.2000 persisted until June 27, 2022, when the gap was closed and replaced with a 35.0

percent duty rate.[115]  Thus, in effect, TMK argues that neither the March or May 2022 imports

of Russian OCTG occurred under the full effect of all sanctions – of which the last of the

specified sanctions, the replacement of the 1.0 percent tariff rate with a 35.0 percent tariff rate,

occurred on June 27, 2022.[116]

  ***Supplemental Analysis of Fungibility Given the Suspension of API Certification***.  In the

underlying investigations, U.S. purchaser questionnaire responses were issued on June 13, 2022

and were returned to the Commission by July 29, 2022, subsequent to the suspension of API-

certification on March 17, 2022, and therefore does reflect purchasers' impressions of Russian

OCTG following the revocation of API certification services.[117]  Because importers sold a

---

[113] TMK Comments at 13–14.

[114] TMK Comments at 12.  TMK does not argue that these import volumes were not appropriately considered by the Commission, but characterized this importation of subject merchandize as utilizing an unintended "gap" in the tariff schedule before the Commission.

[115] TMK Comments at 13.

[116] TMK Comments at 13.

[117] *See* Blank U.S. Purchaser Questionnaire.  U.S. Purchaser Questionnaire, question III-26 asks, "{h}ow often does OCTG from the following countries meet minimum quality specifications for your uses or your customers' uses?"  U.S. Purchaser Questionnaire, question IV-3 asks, "{f}or the factors listed below, please rate how OCTG produced in each country you identified in your response to the first question in Part IV compares with OCTG produced in each of the other countries you identified?"  *See* Blank U.S. Purchaser Questionnaire at questions III-26 and IV-3.  Thus, nothing in the relevant questions nor the timing of the responses implies that the responses on OCTG from Russia's ability to meet

majority of their subject OCTG produced-to-order and because produced-to-order subject OCTG had lead times of 111 days, TMK argues that these responses reflected impressions of API-certified OCTG from Russia held in inventories in the U.S. market or shipped to the U.S. market prior to the suspension of certification services.[118]  Even *assuming arguendo* that this is true for questionnaire coverage concerning a portion of total imports of OCTG from Russia, this only confirms that the suspension of API certification services did not prevent these imports from competing in the U.S. market, alongside other subject imports and the domestic product, during the final months of the POI.

In the Commission's Original Views, the Commission noted party arguments on the potential future effects of the suspension of API certification without adopting either parties' position.[119]  On remand, we have given additional consideration to this argument and find that because Russian-produced green tubes can still be sold to API-certified processors in the United States, the suspension of API certification did not render Russian OCTG non-fungible with domestic and imported OCTG.  In addition to Petitioners' responses to Commissioner questions originally cited by the Commission,[120] other evidence also indicates that the suspension of API

---

minimum quality specifications and on comparability pertain only to Russian OCTG prior to March 17, 2022.

[118] TMK Comments at 13–14; CR at II-19.

[119] *See Confidential Views* at 23–24; *Original Views*, USITC Pub. 5381 at 18 ("Of particular note, according to TMK, is that, as of March 2022, [ ████████████████████████████ ████████████████████████████████████████ ].");  *see also Confidential Views* at 30 n.116; *Original Views*, USITC Pub. 5381 at 23, n.116 ("We also note Petitioners' argument that the [ ████████ ████████████ ] would not eliminate Russian-produced OCTG from being sold in the U.S. market with the [ ████████████████████ ].  According to Petitioners, Russian producers can still sell green tubes to API-certified processors in the United States or a third country, and once those green tubes are processed, the finished OCTG can be stenciled with the [ ████████████ ] by the processor and sold in the U.S. market.").

[120] *See* Petitioners' Posthearing Br., Exh. 1 (Answers to Commissioner Questions) at II-56–57.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

certification services would not prevent sales of green tubes from Russia from being further

processed [███████████████████████] in the United States.  Specifically, API 5CT

specification instructs that processors who heat treat green tubes "shall remove any identity

that is not indicative of the new condition of the product as a result of heat treatment (for

example, prior grade identity and original pipe manufacturer's name or logo.)"[121]  Thus, Russian

OCTG producers could sell non-API certified green tube into the U.S. market and have any

indication that it was previously not API-certified, or even that it was produced in Russia,

removed by the U.S. processor – in essence, the processed product would be indistinguishable

from other API-certified OCTG competing in the U.S. market.  Moreover, subject imports from

Russia were sold to processors during each year of the POI and in interim 2022, allowing these

processors to have existing relationships with suppliers of Russian OCTG.[122]  For example,

domestic producer [███████████], reported buying subject imported green tube from Russia

for processing into finished OCTG.[123]

　　　Additionally, the record reflects that limited service OCTG (*i.e.*, OCTG that does not meet

API specifications), can still be used in certain OCTG applications.[124]  Indeed, the scope of these

investigations and the domestic like product were defined to include both API certified and

non-API certified OCTG, and the record indicates that:  (1) non-API certified Russian OCTG

---

[121] Petitioners' Posthearing Br., Exh. 12 (API 5CT Specification (2019 Ed.) at 66.
[122] Petitioners' Posthearing Br., Exh. 1 (Answers to Commissioner Questions) at II-56–57, n.239.
[123] *Confidential Views* at 14, n.45; *Original Views*, USITC Pub. 5381 at 12, n.45; CR at III-30; [███████] U.S. Producer Questionnaire Response at II-19.  Domestic producers reported obtaining unprocessed/green OCTG from domestic sources, imported sources, or both during each year and interim period of the POI and engaging in processing operations.  *See* CR at Tables F-2–3, F-6–10, F-12, F-15, and F-17.
[124] CR at I-20.

imported into the U.S. market could compete with other limited service OCTG and (2) non-API certified OCTG from Russia (still produced to API specification) that could be processed in the United States and affixed with the API monogram.[125]  Therefore, upon further consideration on remand, we find that the cessation of API certification does not prevent Russian green tube from being fungible and competing with domestic or imported green tube – either in limited service environments or after being processed in the United States. Thus, we continue to find that the record supports the Commission's finding that Russian OCTG was fungible with domestic and imported OCTG.[126]

With respect to the Commission's fungibility finding concerning Russian OCTG, as well as its finding of simultaneous market presence, the Court directed the Commission to consider "contrary evidence on the record pertaining to the effects of the sanctions on Russian OCTG, especially the loss of API-certification on Russian OCTG."[127]  Specifically, the Court instructed the Commission to address a letter from API appended to TMK's Prehearing Brief,[128] and the hearing testimony of Luca Zanotti, President of Respondent Tenaris USA, indicating the suspension of API certification services would be "a major setback for Russia."[129]  The API letter states in its entirety:

---

[125] CR at I–10–11, 19–20; Petitioners' Posthearing Br., Exh. 1 (Answers to Commissioner Questions) at II-56–57; Exh. 12 (API 5CT Specification (2019 Ed.)) at 66.

[126] We note inventories of Russian OCTG held in the U.S. and Russia would have been eligible for API certification if produced prior to the suspension and imports of those inventories would directly compete with API certified domestic product.  Russian producers maintained [ ▮ ] short tons of OCTG in inventories in interim 2022.  CR Table VII-15.

[127] Slip Op. 24-48 at 23, 27.

[128] Slip Op. 24-48 at 22 (*citing* TMK Prehearing Brief at Exh. 2)).

[129] Slip Op. 24-48 at 22 (*citing* Hearing Tr. at 248 (Zanotti)).  The Court had identified this testimony as from "a witness from API."  Slip Op. 24-48 at 22.  While Dr. Dean Foreman, the Chief Economist of the API, did testify about demand trends during the POI, he did not discuss the effects of

**Public Version**



Notably, this letter confirms that certification services were [                    ] [                                                ] [              ].[131]

the suspension of API certification on Russian OCTG.  *See* Hearing Tr. at 187–190 (Foreman).  TMK highlights additional testimony from Luca Zanotti on the same point, stating:

> I would say that, with few exceptions maybe in Russia or China, I would not consider, based on the knowledge, that these materials or the Russian material without the API monogram can be a valuable solution for any operation. Not small, not big. Probably even a big operator would be even more sensible, or, say, attentive to the API monogram issue for the quality issue that Adam was mentioning.

TMK's Comments at 8 (*citing* Hearing Tr. at 250 (Zanotti)).
[130] TMK's Prehearing Br., Exh. 2 (emphasis added).
[131] TMK Prehearing Brief at Exhibit 2.

**Public Version**

Second Luca Zanotti, President of Respondent Tenaris USA, testified:

> {The suspension of API certification} is a major setback for Russia because while in some domestic market, maybe in Russia, they could keep on selling the price, even without the monogram, in the rest of the world, this would not be possible. *I have to assume* that in the United States and in the rest of international market, no reasonable operator or end user would ever run the risk of running casing or tubing into their wells without an API monogram.[132]

Thus, this testimony reflects the assumptions of Respondent's President pertaining to how purchasers in the United States and other markets would react to the suspension of API certification, not the actual views of U.S. and global purchasers on this issue.

Tenaris and TMK in their Remand Comments also urge the Commission to consider additional evidence that they assert shows that uncertified Russian products could no longer be sold in the United States. They point to the testimony of Adam Lange, Vice president of Drilling for Tap Rock Operating, LLC, who stated "from an engineering part of it, {using uncertified OCTG} would be a very difficult obstacle to overcome."[133] In context, however, Mr. Lange testified:

> {F}rom an engineering part of it, {using uncertified OCTG} would be a very difficult obstacle to overcome because it is something that we have become very comfortable with knowing, that something has an API stamp and what comes along with it. *Perhaps the company that could do their own review of the internal QC and stuff and things of that nature*.[134]

Notably, Mr. Lange testified that, even absent the API stamp, purchasers could independently review the quality of Russian OCTG to ensure they met their minimum quality specifications.

---

[132] Hr'g Tr. at 248 (Zanotti).
[133] Tenaris's Comments at 12 and TMK's Comments at 8 (*citing* Hearing Tr. at 249 (Lange)).
[134] Hr'g Tr. at 249–250 (Lange).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

Indeed, many purchasers reported having such quality control systems in place, meaning that API certifications were not necessary to qualify as a supplier or singularly critical to purchasers' assessment of quality.  For example, of the 10 purchasers that reported purchasing subject imports from Russia and reported that they require suppliers to undergo a certification process, six ([ ██████████████████████████████████ ████████████████████████████████ ]) reported that they have internal or contracted audit or quality control programs that are done as part of the certification process.[135]  While [ ████████████████ ] reported that it did not require its suppliers to be certified, it clarified that this was because [ ████████████████████ ███████████████████████████████████████████ ███████████████████████████████████ ██████████ ], indicating that well established sources need not go through a pre-qualification process.[136]  [ ████████████ ] reported that the question of whether they require supplier qualification was [ ███████████████████████████████████ ████████████████████████ ], again, indicating that once a supplier's quality is established in the market, certifications are of a lesser concern.[137]

---

[135] See U.S. Purchaser Questionnaire Responses of [ ███████████████████████ ██████████ ] at III-21.

[136] U.S. Purchaser Questionnaire Response of [ ██████████████████ ] at III-21.

[137] See U.S. Purchaser Questionnaire Responses at III-21; see also CR at II-29 ("These processes involved assessing quality and supplier capabilities, as well as meeting API standards.  Multiple purchasers also described supplier relationships as playing a key role in certification.")

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**Public Version**

Given the above, Tenaris's emphasis on purchaser responses rating "quality meets

industry standards" as "very important"[138] would not necessarily mean that purchasers would

cease purchasing Russian OCTG, as there is no indication that the quality of these products

actually declined, as discussed in the API letter.[139] [140]  Indeed, no responding U.S. purchaser

that had purchased subject imports had listed the suspension of API certification as a reason for

refusing to certify a supplier since January 1, 2019.[141]  Additionally, of the 16 U.S. purchasers

that reported purchasing subject imports from Russia during the POI and that responded to

question III-25 ("what characteristics does your firm consider when evaluating the quality of

OCTG?"), seven [



].[142]  Of the remaining nine responding purchasers, six reported that the product [

].[143] but only three

---

138 Tenaris's Comments at 12 (*citing* CR Table II-11).
    139 *See* CR Table II-12 (showing that 15 of purchasers with knowledge of the issue reported that
subject imports from Russia always or usually met minimum quality specifications while only two
indicated that they sometimes met minimum quality specifications, and none reported that they never
met minimum quality specifications.); *see also Original Views*, USITC Pub. 5381 at 20, n.95.
    140 We also consider that four purchasers reported that "the start of the Russia-Ukraine war had
led to imports from Russia dropping to zero." CR at II-15.  These responses fail to indicate the timeframe
of these imports "dropping to zero," nor do they assert that previously shipped OCTG could no longer be
held in inventory and shipped.  More notably, 24 of the 28 purchasers furnishing responses to the
Commission's questionnaire reported no such absence of Russian OCTG entering the U.S. market.
    141 *See* Purchaser Questionnaire Responses at III-22.
    142 *See* Purchaser Questionnaire Responses of [


34

reported that the product must be [          ].[144]  Thus, API certification is not the sole

consideration purchasers consider in qualifying suppliers or in assessing the quality of OCTG,

especially when the OCTG remains produced to API specification, as is the case with Russian

OCTG.[145]

> *Supplemental Analysis of Simultaneous Presence in the U.S. Market Given the*
>
> *Imposition of Sanctions.*  With respect to the Commission's analysis of simultaneous presence

in the U.S. market, the Court held that the Commission failed to address that Russian import

levels during March and May 2022 may not have accurately reflected the effects of sanctions,

given the alleged lag of the sanctions taking effect.[146]  The Court cited to the existence of:  the

April 2022 revocation of Russia's MFN status; the barring of Russian ships in April 2022; and an

unintended gap in Column 2 of the HTSUS tariff tables in May 2022 that imports may have

taken advantage of, which were later eliminated by the President's proclamation 10420 that

raised the tariff rate from 1.0 to 35.0 percent.[147]

As discussed in Section III.B., the Commission is not required to assess competitive

overlap up to and including vote day.  Indeed, the Commission cannot do so in light of its

statutory obligation to provide the parties with an opportunity for final comment.  Thus, to the

extent that these sanctions may have had a lag in having an effect *following* the POI, this is

---

[144] *See* Purchaser Questionnaire Responses of [                                    ] at III-25.
[145] *See Original Views*, USITC Pub. 5381 at 20, n.95.
[146] Slip Op. 24-48 at 26–27.
[147] Slip Op. 24-48 at 26.  The Court had described HTSUS 7306.29.2000 as "not intended for 'Oil or Gas Drilling.'"  *Id*.  We note that the relevant provision under which virtually all of the post-invasion imports of OCTG from Russia were entered was HTSUS 7306.29.2000, which explicitly falls under the superior text of "Casing and tubing of a kind used in drilling for oil or gas."  HTS Chapter 73 (2022 Basic Ed.)

beyond the purview of what the Commission is required to consider.  Additionally, consistent

with our longstanding approach toward addressing the cumulation factors, we assessed and

continue to assess whether there existed a reasonable overlap of competition across the entire

42-month POI, not just the final four months of the period of investigation.  There is no dispute

that both imports and inventories of OCTG from Russia were simultaneously present in the U.S.

market in the vast majority of those months.[148]  Nonetheless, in light of the Court's instructions,

we give additional consideration to whether the sanctions highlighted by the Court and the

parties prevented subject imports from Russia from being simultaneously present in the U.S.

market during the POI, including during the post-invasion portion of the POI.



TMK highlights that in its Foreign Producer Questionnaire, Table II-8, it reported [          ]), and that it has stated it [                                                 ].[149]

Regardless of TMK's stated plans to [                              ] into

the United States during the first quarter of 2022, TMK does not account for the entirety of the

Russian OCTG industry.[150]  Moreover, we observe that official import statistics show that

subject imports from Russia did in fact enter into the United States in interim 2022, despite

---

[148] *See* CR Tables IV-18 and IV-23.

[149] TMK Comments at 9 (*citing* CR at II-12; TMK Foreign Producer Questionnaire Table II-8; TMK Prehearing Br. at Exh. 1.).

[150] CR at VII-17 (indicating that TMK Group's exports to the United States accounted for approximately [      ] percent of U.S. imports of OCTG from Russia in 2021, based on official Commerce import statistics).

36

TMK [█████████████████] to the United States during this period.[151] Similarly, despite the statement contained in Exhibit 1 of TMK's Prehearing Brief, subject imports from Russia also entered into the U.S. market in the second quarter of 2022 in relatively high volumes, as discussed below, were shipped in the U.S. market in interim 2022, and were held in importers' inventory at the end of interim 2022.[152]

On remand, and consistent with the approach we have uniformly taken in other investigations, we continue to base our analysis of a competitive overlap on the totality of evidence reflecting trends throughout the POI – the data the Commission collected covered a three-and-a-half-year period which ended on June 30, 2022. Import data during the final four months of the POI showed that previously imposed sanctions did not eliminate the Russian imports from the U.S. market.[153] First, the Section 232 duties were in place since 2018 and did not prevent subject imports from Russia from competing in the U.S. market throughout the POI.[154] Second, the Section 232 duties (2018) and the suspension of API certification (March 17, 2022), did not prevent subject imports from Russia from entering into the U.S. in March 2022 in volumes that were 69.0 percent higher than in March 2021.[155] Third, all of these sanctions combined, plus the revocation of Russia's MFN status (April 18, 2022) and bans on Russian ships from entering U.S. ports (April 2022) did not prevent subject imports from Russia from entering

---

[151] *See* CR Table IV-18. While this may be a function of the lead time required for [█████████████], it may also reflect imports from the other [████] percent of the Russian OCTG industry. [████] Foreign Producer Questionnaire at II-8.

[152] *See* CR Tables IV-18, C-1, C-2, and G-4.

[153] *Original Views*, USITC Pub. 5381 at 22–23.

[154] *See* CR at I-12.

[155] *Calculated from* CR Table IV-18. We note that the volume of subject imports from Russia was 40.0 percent higher in interim 2022 than in interim 2021, prior to the imposition of any sanctions with the exception of the Section 232 duties. CR Table C-1.

into the U.S. market in May 2022 in volumes 25.0 percent higher than in May 2021.[156] In

particular, the combined volume of subject imports from Russia was 47.5 percent higher in

March and May 2022, after the imposition various sanctions, than in March and May 2021.[157]

     In Tenaris's Remand Comments, Tenaris emphasizes data that we have already

discussed in the Commission's Original Views, specifically that subject imports from Russia

accounted for a lower share of apparent U.S. consumption in interim 2022 than in interim

2021.[158] As explained in the Original Views, the Commission determined to give less weight to

volume data for interim 2022 based on its finding that declines in cumulated subject imports'

share of apparent U.S. consumption were due to the filing of the petitions.[159] Even then,

notwithstanding the decline in the share of apparent U.S. consumption for *all* cumulated

subject imports between interim periods, the share of subject imports and shipments of subject

imports from Russia accounted for [              ] respectively of subject imports as

well as importers' U.S. shipments of subject merchandise in interim 2022 than in interim

2021.[160] Specifically, Russian OCTG accounted for [   ] percent of U.S. importers' shipments

of subject OCTG in interim 2022 compared to [   ] percent in interim 2021.[161] Likewise,

imports from Russia accounted for [   ] percent of subject imports in interim 2022 compared

to [   ] percent of subject imports in interim 2021.[162] Thus, while the market share of all

---

[156] *Calculated from* CR Table IV-18.  We also note that other subject imports and the domestic product compete not with just post-sanction imports of Russian OCTG, but also with imports of these products already entered into the United States and held in U.S. inventories.  *See* CR Table VII-27.

[157] *Calculated from* CR Table IV-18.

[158] Tenaris's Comments at 13 (*citing* CR Table C-1).

[159] *Original Views*, USITC Pub. 5381 at 32, n.184; see 19. U.S.C. § 1677(7)(I).

[160] *See* CR Table C-1.

[161] *Calculated from* CR Tables G-4 and G-6.

[162] *Calculated from* CR Table IV-3.

subject imports declined due to the effect of the filing of the petitions, the volume of subject imports from Russia and shipments of these imports remained high relative to those of subject imports from other sources, further corroborating that, during the POI, the sanctions did not affect whether of Russian OCTG competed with other subject imports or the domestic like product.

    **D.  The Commission's Consideration of Nonsubject Imports from South Korea.**[163]

The Court remanded aspects of the Commission's cumulation analysis relating to its consideration of OCTG from South Korea.  Specifically, it held that the Commission's consideration of data relating to non-subject imports (*i.e.*, Hyundai imports) from South Korea in its cumulation analysis was not in accordance with law.[164]

The Court found that this affected the Commission's analysis of two of the cumulation factors, specifically:  responses on interchangeability and comparability contained in Tables II-15–II-17 (utilized in the Commission's fungibility analysis);[165] responses relating to the importance of factors other than price in purchasing decisions Tables II-18–II-20 (also utilized in the Commission's fungibility analysis);[166] and official import data on borders of entry in Table IV-17 (relating to the Commission's geographic overlap analysis).[167]  Although not identified by the Court, the Commission also cited to Table II-14 (comparability across purchasing factors) in

---

[163] For the purposes of these remand determinations, this section discusses points 3 and 4 of the Court's remand instruction.
[164] Slip Op. 24-48 at 37.
[165] Slip Op. 24-48 at 38–39.
[166] Slip Op. 24-48 at 39–40.
[167] Slip Op. 24-48 at 39–40.

**Public Version**

its fungibility analysis and to Table IV-18 in its simultaneous presence analysis, which provides

monthly import data by country and includes data relating to nonsubject imports.[168]

*Petitioners' Arguments*.  As an initial matter, Petitioners clarify that the Commission

never cumulated nonsubject imports with subject imports in material injury analysis.[169]  They

contend that the tables contained in the Commission's Supplemental Memorandum continue

to support [ ███ ] the Commission's original fungibility, geographic overlap, and simultaneous

presence conclusions.[170]

They explain that, with respect to its fungibility finding, the Commission relied in part on

market participant responses regarding interchangeability, the importance of factors other than

price in purchasing decisions, and purchaser responses on comparably across purchasing

factors.[171]  Petitioners argue that Supplemental Table 3 reflects that [ ████████ ] of

importers reported that subject imports from South Korea are always or frequently

interchangeable with OCTG from all other sources, regardless of the level of exclusion

utilized.[172]  Similarly, they argue that Supplemental Table 4 reflects that [ █████ ] of

purchasers consider subject South Korean imports as always or frequently interchangeable with

[ ███████ ], regardless of the level of exclusion.[173]  They also note that Supplemental

---

[168] *See Original Views*, USITC Pub. 5381 at 20, n.99 and 22, n.112; *see also* Table IV-18 at note. Although the Court stated it was remanding for further consideration of the "ITC's determination to cumulate non-subject imports from Korea" we clarify that in neither our Original Views nor in this remand determination did we include the non-subject imports from Korea in our assessment of the volume, price effects, and impact of the cumulated subject imports on the domestic industry.

[169] Petitioners' Comments at 2, n.8.

[170] Petitioners' Comments at 2–6.  The Commission did not consider nonsubject imports in its channels of distribution analysis, so the Supplemental Memorandum does not supplement this discussion.

[171] *Original Views*, USITC Pub. 5381 at 19.

[172] Petitioners' Comments at 3.

[173] Petitioners' Comments at 3.

**Public Version**

Tables 5 and 6 reflect that [          ] importers and purchasers reported that factors other than price are sometime or never significant in purchasing decisions in every comparison.[174]

Finally, Petitioners claim that Supplemental Tables 7 through 11 reflect that [          ] of responding purchasers rated South Korean imports as comparable in all comparisons across [      ] purchasing factors, regardless of the level of exclusion utilized.[175]

While highlighting that the supplemental tables continue to support the Commission's original findings, Petitioners caution against utilizing exclusion 3, which excludes responses from U.S. purchasers that reported purchases of South Korean OCTG from [          ] that was listed as a customer of Hyundai Steel; [      ] also was listed [          ] [          ].[176]  They argue that exclusion 3 is too attenuated to reasonably be characterized as reflecting the exclusion of nonsubject imports from South Korea and may improperly exclude subject imports from the Commission's analysis as well.[177]  They emphasize that the Commission is not required to rely on perfect data and, in situations where it is not possible to precisely delineate which data reflects subject and nonsubject imports, their preferred approach would not be to disregard the source entirely – especially in instances where [          ].[178]

***Respondent Tenaris's Arguments***.  Tenaris argues that both the Commission's original tables and the tables contained in the Supplemental Memorandum fail to reliably exclude

---

[174] Petitioners' Comments at 4–5.
[175] Petitioners' Comments at 5.
[176] Petitioners' Comments at 5; *see e.g.*, Supplemental Memorandum Table 4, note.
[177] Petitioners' Comments at 5–6.
[178] Petitioners' Comments at 6.

41

**Public Version**

nonsubject imports from South Korea for the purposes of its fungibility analysis, and reliance on these tables will not comply with the Court's order.[179]  Tenaris, however, concedes that Supplemental Tables 1 (relating to the Commission's assessment of geographic overlap) and 2 (relating to the Commission's assessment of simultaneous presence) separate data concerning nonsubject imports from subject imports from South Korea.[180]

Tenaris argues that the remaining tables (relating to the Commission's assessment of fungibility) utilize qualitative information that does not ensure that nonsubject imports are eliminated and therefore do not satisfy the Court's order.[181]  First, Tenaris claims that separation of Hyundai's response in Supplemental Tables 3 (importer responses on interchangeability) and 5 (importer responses on the significance of differences other than price) do not ensure that the remaining responding importers were only referring to subject imports in furnishing their responses and any attempt to review questionnaire responses to ascertain whether this is the case would be speculative.[182]  Second, Tenaris argues that Supplemental Tables 4 (importer responses on interchangeability), 6 (purchaser responses on the significance of differences other than price), and 7–11 (purchaser responses on comparability by purchasing factor) suffer from the same flaw in that, regardless of whether a purchaser purchased imports from Hyundai or a distributor Hyundai sold to, its responses still

---

[179] Tenaris's Comments at 15–25.
[180] Tenaris's Comments at 17–18.
[181] Tenaris's Comments at 18.
[182] Tenaris's Comments at 19–20.  Tenaris implies, inapposite to the arguments it advanced before the CIT, that exclusion of Hyundai's importer responses in Supplemental Tables 3 and 5 may be inappropriate, as its responses cannot conclusively be determined to only correspond to only its own OCTG.  *Id*.

**Public Version**

might reflect their impressions of Hyundai's OCTG.[183]  Third, for each exclusion contained in Supplemental Tables 4, 6, and 7–11, Tenaris claims that it is not possible to know if the excluded responses covered only nonsubject imports from South Korea or if they also exclude subject imports from South Korea.[184]  Fourth, Tenaris argues that when responses are excluded from the tally of total responses, the number of responses supporting the Commission's fungibility finding declines (*e.g.*, "when all three exclusions apply, the number of U.S. purchasers reporting OCTG from South Korea is 'always' interchangeable with OCTG Argentina or Mexico reduces from 5 to 2, and the number reporting OCTG from South Korea is 'frequently' interchangeable reduces from 5 to 3 for Argentina and 6 to 4 for Mexico.")[185] Finally, Tenaris contends that other record evidence shows that subject imports from Argentina and Mexico primarily or exclusively consist of seamless OCTG while subject imports from South Korea consists of welded OCTG, limiting their fungibility.[186]  They also cite to differences in AUVs between OCTG from South Korea and OCTG from Argentina and Mexico as limiting fungibility.[187]  According to Tenaris, this Commission should rely on this other record evidence, rather than the qualitative tables and find that the imports from Argentina and Mexico are not fungible with imports from Russia and Korea.[188]

    *Respondent TMK's Arguments*.  TMK does not advance arguments concerning the Commission's consideration of nonsubject imports from South Korea.

---

[183] Tenaris's Comments at 20–23.
[184] Tenaris's Comments at 22–23.
[185] Tenaris's Comments at 23–24.
[186] Tenaris's Comments at 25.
[187] Tenaris's Comments at 25.
[188] Tenaris's Comments at 25.

43

**Public Version**

*Analysis*.  We continue to emphasize that nothing in this record indicated that there were meaningful producer-specific differences among imports of OCTG from South Korea. Indeed, despite Commerce's negative preliminary determinations with respect to imports from South Korea, no party requested that the Commission examine distinctions in products exported from different Korean producers in its draft questionnaires.[189]  Moreover, Respondents continuously referred to South Korean imports, as a whole, making no distinction between subject and Hyundai imports.[190]

Nonetheless, in order to comply with the Court's instructions, the Commission retabulated the data to assure that it was not including non-subject Hyundai OCTG in its analysis of competitive overlap.  The Commission segregated South Korean data in various different permutations contained in the Supplemental Tables 1–11.[191]  As explained in this

---

[189] *See* Tenaris's Comment on draft Questionnaires, EDIS Doc. 763299 (February 15, 2022).  As discussed in Section I, above, Commerce's preliminary negative CVD determinations with respect to South Korea were rendered on March 14, 2022, and the Commission issued Questionnaires to market participants on June 12, 2022.  Commerce did not render its final CVD determinations until September 29, 2022, finding a *de minimis* rate for only Hyundai.  Given this timing, which would be the case for nearly all investigations, it would be impossible for the Commission to anticipate *de minimis* rates for any specific producer/exporter.  Thus, absent any request or argument from parties to the contrary distinguishing products from specific producers/exporters, the Commission generally asks market participants on their impressions of in-scope merchandise from whole countries subject to investigation.

[190] *See e.g.*, *Original Views*, USITC Pub. 5381 at 18 ("Tenaris argues that imports from Argentina and Mexico should not be cumulated with imports from South Korea.  Imports from Argentina and Mexico, it contends, primarily comprise seamless OCTG sold to end users, while imports from South Korea primarily comprise welded OCTG sold to distributors.").

[191] Supplemental Memorandum.  Tables 1 and 2 present geographic and monthly official import statistics adjusted using proprietary, Census edited Customs records to reclassify imports from Hyundai as "nonsubject imports" (corresponding to CR Tables II-17 and II-18).  Tables 3 and 5 present importer questionnaire responses regarding interchangeability and the significance of differences other than price, and separate and exclude responses by importer Hyundai (corresponding to CR Tables II-16 and II-19).  Tables 4 and 6 present purchaser questionnaire responses regarding interchangeability and the significance of differences other than price, and separate and exclude responses by firms that purchased, or might have purchased, OCTG imported by Hyundai Steel USA (corresponding to CR Tables II-17 and II-20).  Tables 7 through 11 present purchaser questionnaire responses comparing 15

44

supplemental remand document, geographic and monthly official import statistics were

adjusted to distinguish between subject imports from South Korea and nonsubject imports

from South Korea for its geographic overlap and simultaneous presence analyses.[192] Similarly,

the data for interchangeability, comparability, and the significance of differences other than

price show three different permutations, removing to varying degrees responses from U.S.

purchasers that reported purchasing from Hyundai, U.S. purchasers that Hyundai reported

selling to, or U.S. purchasers that reported purchasing from a distributor who purchased from

Hyundai.[193] Thus, these exclusions eliminate from the pool of responses impressions of

purchasers who may have had Hyundai's OCTG in mind when furnishing responses on

interchangeability, comparability, and the importance of non-price factors.  Hyundai's importer

---

characteristics of OCTG from South Korea and other sources, and separate and exclude responses by firms that purchased, or might have purchased, OCTG imported by Hyundai (corresponding to CR Table II-14).

[192] Supplemental Memorandum, cover note.

[193] Supplemental Memorandum, cover note.  **Exclusion 1** excludes from the dataset the response of the U.S. purchaser that reported purchasing specifically from Hyundai in its list of top suppliers in the U.S. purchasers' questionnaire response (question II-6), [ ▮▮▮▮ ].

**Exclusion 2** excludes from the datasets the responses of the U.S. purchaser in Exclusion 1 and the U.S. purchasers besides [ ▮▮▮▮ ] that the U.S. importer Hyundai listed in its list of top U.S. customers in its U.S. importers' questionnaire response (question III-23):  [ ▮▮▮▮▮▮ ].  While [ ▮▮ ] was listed by Hyundai Steel as a customer, [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ] (U.S. purchasers' questionnaire, question II6).

**Exclusion 3** excludes from the datasets responses from the U.S. purchasers in Exclusions 1 and 2, and U.S. purchasers that reported purchasing South Korean OCTG from [ ▮▮▮▮▮▮▮▮▮▮▮ ] that was listed as a customer of Hyundai:  [ ▮▮▮▮▮▮▮▮▮▮▮▮ ].  The [ ▮▮▮▮▮▮▮ ], however, also was listed [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ].  *See e.g.*, Supplemental Memorandum Table 6 note.

These exclusions only apply to purchaser responses in Supplemental Memorandum Tables 4, 6-11.

questionnaire response was also separated from the U.S. importer responses in the

Supplemental Tables.[194]

Each table in the supplemental memorandum, from the least stringent exclusion 1 to

the most stringent exclusion 3, continues to support the Commission's original fungibility,

geographic overlap, and simultaneous presence findings.[195]

As stated in the Commission's original analysis of fungibility, "{m}ajorities of responding

domestic producers, importers, and purchasers, when comparing the domestic like product

with imports of OCTG from each subject country and when comparing imports from the subject

countries with each other, reported that these products are always or frequently

interchangeable."[196]  This remains true even after excluding the response of Hyundai from

importer responses[197] and regardless of the level of exclusion applied to purchaser

responses.[198]  The Commission also stated that, "majorities of responding domestic producers,

importers, and purchasers reported that factors other than price are only sometimes or never

significant in purchasing decisions between and among imports from each subject country and

the domestic like product.[199]  Again, this remains accurate even after excluding the response of

Hyundai from importer responses[200] and regardless of the level of exclusion applied to

purchaser responses.[201]  Finally, the Commission stated that, "majorities or pluralities of

---

[194] *See e.g.*, Supplemental Memorandum Tables 3 and 5.
[195] The exclusions are applied cumulatively. Thus, the responses taken into account under exclusion 3 includes responses from all purchasers less those excluded in exclusions 1, 2 and 3.  *See e.g.*, Supplemental Memorandum Table 4.
[196] *Original Views*, USITC Pub. 5381 at 19.
[197] *See* Supplemental Memorandum Table 3.
[198] *See* Supplemental Memorandum Table 4.
[199] *Original Views*, USITC Pub. 5381 at 19.
[200] *See* Supplemental Memorandum Table 5.
[201] *See* Supplemental Memorandum Table 6.

responding purchasers rated imports from each source as comparable with both each other and the domestic like product with respect to at least 14 of 15 purchasing factors."[202]  Yet again, this remains true regardless of the level of exclusion applied to purchaser responses.[203]  Thus, we find that by any permutation, after the exclusion of importer and purchaser responses that may relate to nonsubject imports from South Korea, the remaining questionnaire responses continue to support the Commission's original finding of fungibility between subject imports from South Korea and each other subject country, as well as with the domestic like product.

With respect to the analysis of geographic overlap, the Commission stated in its Original Views that "nearly all subject imports from all four sources entered the United States through the Southern border of entry."[204]  Supplemental Table 1 shows that, even if Hyundai imports are excluded, the vast majority ([ ▮ ] percent) of subject imports entered into the U.S. market through the southern border.[205]  Thus, we find that this table corroborates the Commission's original finding that imports from each subject country and domestically produced OCTG were sold in overlapping geographical areas.

With respect to its analysis of simultaneous market presence, the Commission stated in its Original Views that , "{t}he domestic like product and subject imports from all subject countries were simultaneously present throughout almost the entire POI."[206]  We find that

---

[202] *Original Views*, USITC Pub. 5381 at 19.
[203] *See* Supplemental Memorandum Tables 7–10.  Responses in these table actually reflect comparability across all 15 purchasing factors.  *Id*.
[204] *Original Views*, USITC Pub. 5381 at 22.
[205] *See* Supplemental Memorandum Table 1.
[206] *Original Views*, USITC Pub. 5381 at 22.

47

**Public Version**

Supplemental Table 2, adjusted to exclude Hyundai's nonsubject imports, shows that subject imports from South Korea were present in the U.S. market in [ ▮ ] of [ ▮ ] months of the POI, thereby supporting the Commission's original simultaneous presence finding.[207]

To the extent the Court appeared to agree with the Commission that the record supported a reasonable overlap of competition between OCTG from Mexico and Argentina and OCTG from South Korea if non-subject imports are excluded from the cumulation analysis,[208] Supplemental Tables 3 and 4 also continue to support this conclusion, with majorities of importers and purchasers reporting that subject imports were "always" or "frequently" interchangeable in every comparison, regardless of the level of exclusion applied.[209]  Likewise, Supplemental Table 1 remedies the Court's concern that the Commission's finding of a geographic overlap supporting cumulation was supported by evidence on the record but for Table IV-7's inclusion of nonsubject imports.[210]

Tenaris argues that, when responses are excluded from the tally of total responses, the number of responses supporting the Commission's fungibility finding declines.[211]  While the total number of responses supporting and detracting from its fungibility decline as progressively restrictive exclusions are applied, the proportion of these responses supporting the Commission's original fungibility findings remains consistent with the original

---

[207] *See* Supplemental Memorandum Table 2.
[208] Slip Op. 24-48 at 39.  In the underlying investigations, Respondents had argued that subject imports from Argentina and Mexico were not fungible with other subject imports and the domestic like product because: (1) subject imports from South Korea primarily consist of welded OCTG, whereas subject imports from Argentina and Mexico primarily or exclusively consist of seamless OCTG and (2) subject imports from Argentina and Mexico hid higher average unit values ("AUVs") compared to the AUVs of subject imports from Russia and South Korea.  *See Original Views*, USITC Pub. 5381 at 20–21.
[209] Supplemental Memorandum Tables 3 and 4.
[210] Slip Op. 24-48 at 40.
[211] Tenaris's Comments at 23–24.

48

investigations.  In relevant part, "{m}ajorities of responding . . . importers, and purchasers . . . reported that these products are always or frequently interchangeable{,}" "majorities of responding . . . importers, and purchasers reported that factors other than price are only sometimes or never significant in purchasing decisions{,}" and "majorities or pluralities of responding purchasers rated imports from each source as comparable with both each other and the domestic like product with respect to at least 14 of 15 purchasing factors."[212]  While Tenaris focuses on the impossibility of knowing precisely what responding firms were thinking when responding,[213] this would be the case for any qualitative question utilized in any investigation.  As discussed above, these supplemental tables and associated exclusions are aimed at increasing the likelihood that qualitative responses only refer to subject imports by excluding the response of Hyundai from importer responses, by excluding the responses of any purchaser who listed Hyundai as a supplier or vice versa, and by excluding the responses of any purchaser that may have purchased OCTG from a distributor that purchased from Hyundai.[214]

### E.  Addressing Arguments on the Effects of the Existing AD Order on Subject Imports from South Korea.

The Court directed the Commission to address party arguments concerning "the possible effects resulting from subject imports from South Korea that were under an antidumping {duty} order in its final determination."[215]

---

[212] *Original Views*, USITC Pub. 5381 at 19.
[213] Tenaris's Comments at 15–25.
[214] As noted above, Petitioners argue that exclusion three is *too stringent.*  Petitioners' Comments at 6.  Yet, even so, this Table also corroborates our findings of overlap of competition.
[215] Slip Op. 24-48 at 41.

**Public Version**

*Petitioners' Arguments*.  Petitioners argue that nothing on the record supports that the existing AD order on subject imports from South Korea prevented such imports from sharing a reasonable overlap of competition with other subject imports and the domestic like product.[216] Petitioners dispute Respondents' assertion that, because dumping for subject imports from South Korea has already been remedied by the imposition of an AD order, any "harm to the U.S. industry attributable to South Korean imports would have to be based solely on underselling caused by subsidies, but these subsidies were found to be a *de minimis* {sic} amount of 1.33% on a portion of South Korean imports."[217]  They argue that it was inaccurate to characterize the 1.33 percent CVD margin as *de minimis*, as Congress fixed the *de minimis* threshold at 1.0 percent, and "neither the Commission nor the Court can raise the bar to redress this actionable subsidization."[218]  They also argue that the AD duties applicable to these imports remedy dumping but do not preclude cumulation to analyze the effects of and address the unremedied subsidization.[219]  Petitioners maintain that the cumulation provision explicitly contemplates cumulation under 19 U.S.C. § 1671a(b) and § 1673a(b), the CVD and AD sections of the statute

---

[216] Petitioners' Comments at 6–11.  Petitioners also dispute Respondents' earlier allegations that cumulation under these circumstances is inconsistent with the WTO Antidumping Agreement and Subsidies and Countervailing Measures Agreement.  Petitioners' Comments at 7–8, (*quoting Corus Staal BV v. Dep't of Com*., 395 F.3d 1343, 1348 (Fed. Cir. 2005)); *see also* 19 U.S.C. § 2504(a) ("No provision of any trade agreement ... nor the application of any such provision to any person or circumstance, which is in conflict with any statute of the United States shall be given effect under the laws of the United States.").  The Commission need not address these arguments, since its determination must be based on U.S. law, not the WTO Agreements.  Likewise, Tenaris's discussion of the WTO Agreements in its Comments are not pertinent to the Commission's remand determination.  *See* Tenaris's Comments at 26.

[217] Petitioners' Comments at 7 (*quoting* Slip Op. 24-48 at 34). We note that Commerce did not find that the subsidization rate for subject imports from South Korea were *de minimis*, as 1.33 is above the 1.0 percent *de minimis* threshold.

[218] Petitioners' Comments at 8 (*citing* 19 U.S.C. §§ 1671b(b)(4)(A), 1671d(a)(3)).

[219] Petitioners' Comments at 9.

**Public Version**

and "promote{s} certainty in antidumping and countervailing duty investigations by defining, at

the time of filing, the countries potentially subject to cumulative analysis."[220]  Finally,

Petitioners highlight that Respondents' sole support for the proposition that a low subsidization

margin is relevant to any aspect of the Commission's analysis is a citation to dissenting views in

*Pads For Woodwind Instrument Keys From Italy*, a single-country case in which the majority

found that the domestic industry was materially injured by imports with a 1.09 percent

dumping margin.[221]

    ***Respondent Tenaris's Arguments.***  On this issue, Tenaris largely relies on arguments

made by TMK during the preliminary and final investigations.  Specifically, Tenaris states that

the Commission failed to address the implications of the existing AD order, imposed years prior

to the current investigations on subject imports from South Korea.[222]  Tenaris insists that the

Commission must "finally address" the argument that subject imports from Korea are subject to

different conditions of competition due to the disciplining effect of the AD order on prices for

subject imports from South Korea.[223]

    ***Respondent TMK's Arguments.***  TMK does not advance arguments concerning the

existing AD order on South Korean imports.

---

[220] Petitioners' Comments at 9 (*citing* 19 U.S.C. § 1677(7)(G)(i)(I) and *quoting SAA*, H.R. Doc 103-316, Vol. 1 (1994) at 848).

[221] Petitioners' Comments at 10–11 (*citing Pads For Woodwind Instrument Keys From Italy*, Inv. No. 731-TA-152 (Final), USITC Pub. 1566 (Aug. 1984) at 20 (minority Views of Chairwoman Paula Stern and Vice Chairman Liebler).  Petitioners argue that TMK had presented these views as the views of the Commission majority before the CIT.  TMK Rule 56.2 Brief at 29.

[222] Tenaris's Comments at 25–27.

[223] Tenaris's Comments at 27.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED
**Public Version**

*Analysis*.  As an initial matter we note that, notwithstanding an order remedying the dumping of OCTG imports from South Korea, Commerce found the non-Hyundai imports from South Korea to still be unfairly traded through subsidization at above *de minimis* levels.[224]  The dumping order would not address injury resulting from the subsidization of these imports, and the dumping order is only capable of discipling the level of dumping not the level of subsidization.  In addition, the existence of the AD order did not result in differences in the way these imports competed in the U.S. market to render cumulation inappropriate based on the Commission's four cumulation factors.  As reviewed below, analysis of the four factors used in the Commission cumulation analysis show that subject imports from South Korea were fungible with imports from other subject countries, sold in overlapping channels of distribution and in overlapping geographic markets, and simultaneously present in the U.S. market.  Furthermore, the record shows that, even while under the discipline of the AD order, subject imports from South Korea [          ] the domestic like product in the [          ] of quarterly price comparisons and Respondents put forward no evidence in support of their assertion to the contrary.[225]

**F.  Summary of Our Four-Factor Analysis of Competitive Overlap, Supplemented by the Commission's Additional Findings on Remand.**

In our original determinations, we found it was appropriate to cumulate subject imports from all four countries because, in relevant part, there was "a reasonable overlap of

---

[224] 19 U.S.C. § 1671d(a)(3) (setting the *de minimis* threshold at 1.0 percent as defined in 19 U.S.C. § 1671b(b)(4)(A)).

[225] CR Table V-17.

Appx116

**Public Version**

competition between subject imports from Argentina, Mexico, Russia, and South Korea, and among subject imports from each source and the domestic like product."[226]

> *Fungibility*. The Commission originally found that:

>> **(1)** Majorities of responding domestic producers, importers, and purchasers, when comparing the domestic like product with imports of OCTG from each subject country and when comparing imports from the subject countries with each other, reported that these products are always or frequently interchangeable. **(2)** Likewise, majorities of responding domestic producers, importers, and purchasers reported that factors other than price are only sometimes or never significant in purchasing decisions between and among imports from each subject country and the domestic like product. **(3)** Moreover, majorities or pluralities of responding purchasers rated imports from each source as comparable with both each other and the domestic like product with respect to at least 14 of 15 purchasing factors. **(4)** Consistent with these responses, the record shows that there was a substantial degree of overlap between U.S. shipments of subject imports from each source and domestically produced OCTG in terms of end finish, grade, and product type in 2021, and that all OCTG, regardless of source, is generally produced in accordance with API standards. **(5)** We also note that there were imports of seamless OCTG from each subject source throughout the POI, and that the domestic industry produced seamless OCTG throughout this period.[227]

In Section III.D., we gave additional consideration to importer and purchaser responses, excluding data from Hyundai and various iterations of purchasers who purchased from Hyundai, directly or indirectly. With respect to point one, we found that importer responses excluding Hyundai continued to show that majorities of importers reported that subject imports from South Korea imports were always or frequently interchangeable with subject imports from

---

[226] *Original Views*, USITC Pub. 5381 at 19.
[227] *Original Views*, USITC Pub. 5381 at 19–20 (internal citations omitted and numbers added). Point five was not challenged before the Court and did not include consideration of nonsubject imports.

**Public Version**

Argentina, Mexico, and Russia and with the domestic like product.[228]  We also found that responses of majorities of U.S. purchasers continued to show that subject imports from South Korea imports were always or frequently interchangeable with subject imports from Argentina, Mexico, and Russia and with the domestic like product, regardless of the level of exclusion applied.[229]  Thus, even when excluding responses from its analysis so as to increase the likelihood that qualitative responses only refer to subject imports and not nonsubject imports from South Korea, point one of the Commission's fungibility analysis is supported by importer and purchaser responses.

    We also gave additional consideration to purchaser and importer responses regarding the relative importance of non-price factors using the same methodology.  With respect to point two, We found that majorities of importer responses continued to show that non-price factors were sometimes or never significant, even when excluding the response of Hyundai.[230]  Similarly, we found that majorities of purchasers reported the same, regardless of the level of exclusion applied.[231]  Accordingly, the record continues to support point two underpinning the Commission's fungibility finding, even when excluding responses from its analysis so as to increase the likelihood that qualitative responses only refer to subject imports and not to nonsubject imports from South Korea.

    On remand, we also considered purchaser responses on the comparability of subject imports from all sources and the domestic product across 15 purchasing factors.  With respect

---

[228] *See* Supplemental Memorandum Table 3.
[229] *See* Supplemental Memorandum Table 4.
[230] *See* Supplemental Memorandum Table 5.
[231] *See* Supplemental Memorandum Table 6.

54

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED
**Public Version**

to point three, we found that regardless of the level of exclusion applied, majorities or

pluralities of purchasers reported that subject imports from South Korea were comparable to

imports from each other source and the domestic like product across at all 15 purchasing

factors.[232]  Therefore, the record continues to support point three of the Commission's

fungibility finding, even when excluding responses so as to increase the likelihood that

qualitative responses only refer to subject imports and not nonsubject imports from South

Korea.

　　　　Finally, we gave additional consideration to the effects of the sanctions imposed on

subject OCTG from Russia in the final four months of the POI, including the suspension of API

certification services, in Section III.C., above.  We found that, regardless of whether it was

stamped with an API monogram, Russian OCTG remained fungible with subject imports from

other sources and the domestic product in the context of limited service environments, which

do not require API certified OCTG.  We also found that non-API certified unfinished (*i.e.*, green

tube) Russian OCTG remained fungible and competed with other unfinished subject imports

and the domestic like product in that they could be processed in the United States and affixed

with the API monogram.  Beyond these contexts, we did not speculate on the future impact,

beyond the POI, of the suspension of API certification.  The record continues to support that

Russian OCTG is *produced to API specification* and that it remained fungible with the domestic

like product and other subject imports during the POI.

　　　　***Channels of Distribution***.  The Commission originally found that:

　　　　　　Domestic producers and importers of subject merchandise from
　　　　　　Russia and South Korea primarily sold OCTG to [ ▮▮▮▮▮ ] over

---

[232] *See* Supplemental Memorandum Table 7–10.

the POI while also selling a smaller amount to [ ███████ ]. Importers of subject merchandise from Argentina and Mexico primarily sold OCTG to [ ███████ ] while also selling a smaller amount to [ ███████ ]. Thus, the domestic like product and subject imports from each country source were sold through overlapping channels of distribution during the POI.[233]

The Court has already affirmed this aspect of the Commission's cumulation analysis.[234]

Accordingly, there is no reason to give additional consideration to or otherwise supplement these findings.

*Geographic Overlap*.  The Commission originally found that:

Domestically produced OCTG and subject imports from both Argentina and Mexico were sold in all geographic areas of the United States over the POI. Subject imports from Russia were sold in the Mountain and Central Southwest regions, and subject imports from South Korea were sold in the Northeast, Midwest, Southeast, Central Southwest, and Mountain regions during the period. The record also shows that nearly all subject imports from all four sources entered the United States through the Southern border of entry. The record thus shows that imports from each subject country and domestically produced OCTG were sold in overlapping geographical areas.[235]

In Section III.D., above, we gave additional consideration to the borders of entry for subject imports from South Korea, as the Commissions original analysis of borders of entry data included both subject and non-subject imports.  Using customs data to isolate the borders of entry for subject imports from South Korea, we found that nearly all of these imports entered into the United States through the Southern border of entry, alongside subject imports from

---

[233] *Confidential Views* at 28; *Original Views*, USITC Pub. 5381 at 21–22 (internal citations omitted).

[234] *See* Slip Op. 24-48 at 41–43 (rejecting Tenaris's argument "that OCTG from Argentina and Mexico did not sufficiently share channels of distribution with subject imports from Russia or South Korea to warrant 'a reasonable overlap of competition.'").

[235] *Original Views*, USITC Pub. 5381 at 22 (internal citations omitted).

each other source.  Thus, the record continues to support this aspect of the Commission's finding of a geographic overlap.

*Simultaneous Presence in Market*.  The Commission originally found that "{t}he domestic like product and subject imports from all subject countries were simultaneously present throughout almost the entire POI."[236]  In Section III.D., above, we gave additional consideration to the presence of subject imports from South Korea, using customs data to exclude any imports from Hyundai.  We found that subject imports from South Korea were present in the U.S. market in [ █ ] of [ █ ] months of the POI.[237]  Thus, the record continues to support that subject imports from each source were present in the U.S. market for nearly the entire POI.

Because our findings concerning the fungibility of all subject imports and the domestic like product, their channels of distribution, their geographic overlap, and their simultaneous presence in the market continue to be supported by the record, we continue to find that there existed a sufficient degree of competitive overlap to require the cumulative assessment of subject imports.  As noted, we adopt in full our analysis and findings from our Original Views concerning all other aspects of our determinations.[238]

## IV.    CONCLUSION

For the foregoing reasons, we again determine that an industry in the United States is materially injured by reason of subject OCTG from Argentina and Mexico that have been found

---

[236] *Original Views*, USITC Pub. 5381 at 22.

[237] Imports from South Korea, prior to this exclusion, were present in 42 of 42 months of the POI.  *Original Views*, USITC Pub. 5381 at 22, n.112.

[238] We also note, that even aside from the cumulation analysis, the Court has already sustained our non-attribution analysis pertaining to the Rig Direct program.  *See* Slip Op. 24-48 at 44–47 (upholding the Commission's "determination that the 'Rig Direct' program was not a cause of the loss of domestic market share" as supported by substantial evidence.).

**Public Version**

by Commerce to be sold in the United States at LTFV and by reason of imports of OCTG from

Russia that have been found by Commerce to be sold in the United States at LTFV and

subsidized by the government of Russia.

4
CIT Slip Op. 24-48
4/19/2024
Appx123-170

**Slip Op. 24-48**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION, AND SIDERCA S.A.I.C.,** | |
| **Plaintiffs,** | |
| **and** | |
| **TMK GROUP AND TUBOS DE ACERO DE MEXICO, S.A.,** | |
| **Consolidated Plaintiffs,** | **Before: Jennifer Choe-Groves, Judge** |
| **and** | **Consol. Court No. 22-00344** |
| **TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, AND IPSCO TUBULARS INC.,** | |
| **Plaintiff-Intervenors,** | |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |

> **UNITED STATES STEEL CORPORATION, BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, AND WELDED TUBE USA INC.,**
>
> **Defendant-Intervenors.**

## OPINION AND ORDER

[Remanding the U.S. International Trade Commission's affirmative material injury determination resulting from the investigations involving oil country tubular goods from Argentina, Mexico, Russia, and South Korea.]

Dated:  April 19, 2024

Gregory J. Spak, Frank J. Schweitzer, Kristina Zissis, and Matthew W. Solomon, White and Case, LLP, of Washington, D.C., for Plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, and Siderca S.A.I.C., and Consolidated Plaintiff Tubos de Acero de Mexico, S.A.

Michael J. Chapman, Jeffrey M. Winton, Amrietha Nellan, Vi Mai, Ruby Rodriguez, and Jooyoun Jeong, Winton & Chapman PLLC, of Washington, D.C., for Consolidated Plaintiff TMK Group.

Andrea C. Casson, Assistant General Counsel for Litigation, and Noah A. Meyer, U.S. International Trade Commission, of Washington, D.C., argued for Defendant United States.  With them on the brief were Dominic L. Bianchi, General Counsel, and Jason F. Miller, Attorney-Advisor, Office of the General Counsel.

Thomas M. Beline, Myles S. Getlan, James E. Ransdell, and Nicole Brunda,

Cassidy Levy Kent, of Washington, D.C., for Defendant-Intervenor United States
Steel Corporation.

Luke A. Meisner and Saad Y. Chalchal, Schagrin Associates, of Washington, D.C.,
argued for Defendant-Intervenors Borusan Mannesmann Pipe U.S. Inc., PTC
Liberty Tubulars LLC, United Steel, Paper, and Forestry, Rubber Manufacturing,
Energy, Allied Industrial and Service Workers International Union, AFL-CIO,
CLC, and Welded Tube USA Inc.  With them on the brief were Roger B. Schagrin
and Jeffrey D. Gerrish.

     Choe-Groves, Judge:  This appeal from the final affirmative material injury

determination by the U.S. International Trade Commission ("Commission" or

"ITC") investigating oil country tubular goods ("OCTG") from Argentina, Mexico,

Russia, and South Korea includes unique issues on the impact on competitiveness

of sanctions imposed due to Russia's invasion of Ukraine.  See Oil Country

Tubular Goods from Argentina, Mexico, Russia, and South Korea, 87 Fed. Reg.

69,331 (ITC Nov. 18, 2022) ("Final Determination"), PR 169; see also Views of

the Commission, USITC Pub. 5381, Inv. Nos. 701-TA-671–72, 731-TA-1571–73

(Final) (Nov. 18, 2022), PR 165[1] ("Views"); Final Staff Report (Oct. 14, 2022), PR

161 ("Staff Report").

     Consolidated Plaintiff TMK Group, Plaintiffs Tenaris Bay City, Inc.,

Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services

(U.S.A.) Corporation, and Siderca S.A.I.C., and Consolidated Plaintiff Tubos de

---

[1]  Citations to the administrative record reflect the public administrative record
("PR") document numbers.  ECF No. 59.

Acero de Mexico, S.A. (collectively, "Plaintiffs") contest certain aspects of the

final affirmative material injury determination.

Before the Court are USCIT Rule 56.2 motions for judgment on the agency

record filed by TMK Group and filed by Tenaris Bay City, Inc., Maverick Tube

Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation,

Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A. (collectively, "Tenaris").

Pl.'s R. 56 Mot. J. Agency R. Pursuant to USCIT R. 56.2 ("TMK Group's

Motion"), ECF No. 42; R. 56 Mot. J. Agency R. ("Tenaris' Motion"), ECF No. 46;

see also Mem. Supp. Pl.'s R. 56.2 Mot. J. Agency R. ("TMK Group's Br."), ECF

No. 42-1; Mem. Points Authorities Supp. Pls.' R. 56.2 Mot. J. Agency R.

("Tenaris' Br."), ECF No. 46.

Defendant-Intervenors Borusan Mannesmann Pipe U.S. Inc., PTC Liberty

Tubulars LLC, United States Steel Corporation, United Steel, Paper, and Forestry,

Rubber Manufacturing, Energy, Allied Industrial and Service Workers

International Union, AFL-CIO, CLC, and Welded Tube USA Inc. (collectively,

"Defendant-Intervenors") filed Defendant-Intervenors' Rule 56.2 Response Brief

("Def.-Intervs.' Resp."), ECF No. 50.  Defendant ITC ("Defendant" or "the

Government") filed its Memorandum in Opposition to Plaintiff's Rule 56. 2

Motion for Judgment on the Agency Record.  Def.'s Mem. Opp'n Pl.'s R. 56.2

Mot. J. Agency R. ("Def.'s Resp."), ECF No. 52.  TMK Group and Tenaris filed

their reply briefs.  Reply Supp. Pls.' R. 56.2 Mot. J. Agency. R. ("Tenaris'

Reply"), ECF No. 56; Reply Br. TMK Group ("TMK Group's Reply"), ECF No.

57.  Oral argument was held on January 25, 2024.  Oral Arg. (Jan. 25, 2024), ECF

No. 69.

     For the following reasons, the Court remands the Commission's <u>Final</u>

<u>Determination</u>.

## BACKGROUND

     Petitions requesting investigations were filed with the U.S. Department of

Commerce ("Commerce") and the ITC on October 6, 2021 by Borusan

Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, U.S. Steel Tubular

Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing,

Energy, Allied Industrial and Service Workers International Union, AFL-CIO,

CLC, and Welded Tube USA, Inc.  Petitions (Oct. 6, 2021), PR 1.

     The Commission initiated an investigation and determined preliminarily that

there was a reasonable indication that the domestic industry was materially injured

or threatened with material injury by reason of subject imports.  Views of the

Commission (Preliminary) (Dec. 1, 2021) ("Preliminary Views"), PR 74.

     The Parties filed their respective administrative briefs.  Tenaris' Pre-Hearing

Br. (Sept. 14, 2022), PR 128; TMK Group's Pre-Hearing Br. (Sept. 14, 2022), PR

122; TMK Group's Post-Hearing Br. (Sept. 29, 2022), PR 143; Tenaris' Post-

Hearing Br. (Sept. 29, 2022), PR 144.

The Commission published its <u>Final Determination</u> on November 18, 2022,

determining that an industry in the United States was materially injured by reason

of imports of oil country tubular goods ("OCTG") from Argentina, Mexico,

Russia, and South Korea.  See <u>Final Determination</u>, 87 Fed. Reg. at 69,331.

TMK Group and Tenaris initiated proceedings to contest various aspects of

the Commission's <u>Final Determination</u>, such as the Commission's cumulation of

subject imports and findings of volume, price effects, and impact.  The Court held

oral argument on January 25, 2024.  Oral Arg. (Jan. 25, 2024), ECF No. 69.

## ISSUES PRESENTED

The Court reviews the following issues:

1.  Whether the Commission's cumulation of subject imports is supported by

    substantial evidence and in accordance with law;

2.  Whether the Commission's volume determination is supported by

    substantial evidence and in accordance with law;

3.  Whether the Commission's price effects determination is supported by

    substantial evidence and in accordance with law; and

4.  Whether the Commission's impact determination is supported by

    substantial evidence.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and Section

516A(a)(2)(B)(ii) of the Tariff Act of 1930, as amended, 19 U.S.C.

§ 1516a(a)(2)(B)(ii), which grant the Court authority to review actions contesting

the ITC's final injury determinations following an antidumping or countervailing

duty investigation.  The Court will uphold the ITC's determinations, findings, or

conclusions unless they are unsupported by substantial evidence on the record, or

are otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i); see

also Siemens Energy, Inc. v. United States, 806 F.3d 1367, 1369 (Fed. Cir. 2015).

The possibility of drawing two inconsistent conclusions from the evidence does not

prevent the Court from holding that the Commission's determinations, findings, or

conclusions are supported by substantial evidence.  See Nippon Steel Corp. v.

United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citing Am. Silicon Techs. v.

United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001)); see also Consolo v. Fed.

Mar. Comm'n, 383 U.S. 607, 620 (1966).

## DISCUSSION

### I.    Legal Framework

To make an affirmative material injury determination, the ITC must find that

(1) material injury existed and (2) the material injury was caused by reason of the

subject imports.  See Swiff-Train Co. v. United States, 793 F.3d 1355, 1359 (Fed.

Cir. 2015) (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed.

Cir. 1997)).  Material injury is defined by statute as harm that is not

inconsequential, immaterial, or unimportant.  19 U.S.C. § 1677(7)(A).  To

determine whether a domestic industry has been materially injured or threatened

with material injury by reason of unfairly subsidized or less than fair value

imports, the Commission considers:

> (I)    the volume of imports of the subject merchandise,
>
> (II)   the effect of imports of that merchandise on prices in the United
>        States for domestic like products, and
>
> (III)  the impact of imports of such merchandise on domestic
>        producers of domestic like products, but only in the context of
>        production operations within the United States.

Id. § 1677(7)(B)(i).  The Commission may consider other economic factors that are

relevant to determining whether there is material injury by reason of

imports.  Id. § 1677(7)(B)(ii).  No single factor is dispositive and the significance

to be assigned to a particular factor is for the ITC to decide.  See S. Rep. No. 96-

249, at 88 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 474.  The statute neither

defines the phrase "by reason of," nor provides the ITC with guidance, on how to

determine whether the material injury is by reason of subject imports.  The Court

of Appeals for the Federal Circuit ("CAFC") has interpreted the "by reason of"

statutory language to require the Commission to consider the volume of subject

imports, their price effects, their impact on the domestic industry, and to establish

whether there is a causal connection between the imported goods and the material

injury to the domestic industry.  See Swiff-Train Co., 793 F.3d at 1361; see also S.

Rep. No. 96-249, at 57–58, 74–75 (1979), reprinted in 1979 U.S.C.C.A.N. 381,

443–44, 460–61.

## II.    The Commission's Cumulation of Subject Imports

The Commission cumulated subject imports from Argentina, Mexico,

Russia, and South Korea because it determined that the cumulation factors of

fungibility, channels of distribution, geographic overlap, and simultaneous

presence in the market showed a "reasonable overlap of competition" among

subject imports and the domestic like product.  Views at 16–23.

Plaintiffs contend that there was no "reasonable overlap of competition"

among subject imports and the domestic like product, and that the Commission's

cumulation determination was not supported by substantial evidence or in

accordance with law.  See TMK Group's Br. at 15–30; Tenaris' Br. at 18–25.

### A.    Legal Standard

In evaluating material injury, the Commission must "cumulatively assess the

volume and effect of imports of the subject merchandise from all countries," if

such imports compete with each other and with domestic like products.  19 U.S.C.

§ 1677(7)(G)(i)(I), (II).  The ITC refers to this requirement as "cumulation."  The

Statement of Administrative Action to the Uruguay Round Agreements Act

("SAA") states that the statutory requirement is satisfied if there is a reasonable

overlap of competition.  See Uruguay Round Agreements Act, Statement of

Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 848 (1994), reprinted in

1994 U.S.C.C.A.N. 4040, 4190.  Because the Commission need only find that a

"reasonable overlap" of competition exists, a finding of "'complete overlap' of

competition" is not required to support a cumulation decision.  Mukand Ltd. v.

United States, 20 CIT 903, 909, 937 F. Supp. 910, 916 (1996) (quoting Wieland

Werke, AG v. United States, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989)); see

also Goss Graphics Sys., Inc. v. United States, 216 F.3d 1357, 1362 (Fed. Cir.

2000) (stating that the ITC's inquiry is "whether 'reasonable overlap' of

competition exists.").

     To determine whether imports compete with each other and with the

domestic like product, or if there is a "reasonable overlap" of competition, the

Commission analyzes four factors:

> (1)    the degree of fungibility between subject imports from different
> countries and between subject imports and the domestic like
> product, including consideration of specific customer
> requirements and other quality related questions;
>
> (2)    the presence of sales or offers to sell in the same geographic
> markets of subject imports from different countries and the
> domestic like product;

> (3)    the existence of common or similar channels of distribution for subject imports from different countries and the domestic like product; and
>
> (4)    whether the subject imports are simultaneously present in the market

Int'l Indus., Ltd. v. United States, 42 CIT __, __, 311 F. Supp. 3d 1325, 1329–30 (2018) (citation omitted).

The Commission's use of these criteria for determining whether competition exists between and among subject imports and the domestic like product have been approved by the U.S. Court of International Trade ("CIT") and the CAFC. See Goss Graphics Sys., Inc. v. United States, 22 CIT 983, 985, 33 F. Supp. 2d 1082, 1085 (1998), aff'd sub nom., 216 F.3d 1357 (Fed. Cir. 2000); see also Fundicao Tupy S.A. v. United States, 12 CIT 6, 10–11, 678 F. Supp. 898, 902 (1988) (summarizing the factors as "the fungibility and similar quality of the imports, the similar channels of distribution, the similar time period involved, and the geographic overlap of the markets"), aff'd, 859 F.2d 915 (Fed. Cir. 1988).  No one factor in the Commission's analysis is dispositive.  Noviant OY v. United States, 30 CIT 1447, 1461, 451 F. Supp. 2d 1367, 1379 (2006).

The Commission must "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry" when considering the impact of subject imports on the domestic industry.  19 U.S.C. § 1677(7)(C)(iii).  The statute does not provide

further guidance, giving the ITC discretion to assess the conditions of competition

in a particular industry.  The ITC's determinations regarding competition and

market conditions must be supported by substantial record evidence.  See 19

U.S.C. § 1615a(b)(1)(B)(i); see also Siemens Energy, Inc., 806 F.3d at 1369.

When the Commission makes a determination on volume, price, or impact that is

premised on speculation about industry conditions, that determination has not been

"evaluate[d] . . . within the context of the business cycle and the conditions

of competition that are distinctive to the affected industry."  19 U.S.C.

§ 1677(7)(C)(iii); see also Catfish Farmers of America v. United States, 37 CIT

717, 733 (2013) ("[S]peculation does not amount to reasonable inference, as it

provides no factually-grounded basis for sustaining an agency's determination.").

### B.    OCTG from Russia

The ITC stated that it was "unpersuaded by Tenaris'[] and TMK [Group]'s

argument that measures taken in response to Russia's February 2022 invasion of

Ukraine have prevented subject imports from Russia from competing in the U.S.

market such that cumulation of these imports is inappropriate."  Views at 22.

Tenaris argues that:

> Record evidence demonstrates the obvious: subject imports from
> Russia competed differently in the U.S. market than other subject
> imports and should not have been cumulated with other subject imports.
> Remarkably, the Commission was "unpersuaded by Tenaris'[] and
> TMK [Group]'s argument that measures taken in response to Russia's
> February 2022 invasion of Ukraine have prevented subject imports

> from Russia from competing in the U.S. market such that cumulation
> of these imports is inappropriate."

Tenaris' Br. at 24.  Tenaris states that these measures targeting Russia
included the loss of API-certification for OCTG produced in Russia, the
revocation of permanent normal trade relations status for Russia, Section
232 duties, and sanctions imposed on Russian entities and individuals.  Id.

   Plaintiffs challenge the ITC's cumulation of subject imports from Russia,
arguing that the ITC's determination was (1) not in accordance with law because
the timing of cumulation was improper and (2) not supported by substantial
evidence because Russian steel companies did not compete in the same manner in
the U.S. market as subject merchandise from the other countries due to sanctions
imposed on Russia during the last four months of the period of investigation
(referred to as the "second competitive environment" by TMK Group) from
February 2022 to June 2022.  See TMK Group's Br. at 3–5; Tenaris' Br. at 24–25;
TMK Group's Reply at 4–5.

### 1.     Timing of Assessment

   The ITC established the period of investigation as January 2019 to June
2022.  Views at 12.  Russia invaded Ukraine in February 2022.  Sanctions were
imposed against Russian companies, which Plaintiffs argue significantly reduced
the ability of Russian OCTG to compete during the last four months of the period
of investigation.  TMK Group's Br. at 3, 9–11; Tenaris' Br. at 6.  These sanctions

included: (1) the revocation of Russian producers' ability to API-certify its products beginning on March 17, 2022; (2) the withdrawal of most-favored-nation status for Russia by the United States in April 2022; (3) the prohibition of Russia-affiliated vessels from entering U.S. ports in April 2022; and (4) the imposition of an across-the-board increase in tariffs applicable to Russian merchandise imported into the United States to 35 percent in June 2022.  See TMK Group's Reply at 3.

In summary, the ITC determined that the sanctions had no significant effect on the Russian products' ability to compete over the course of the entire 42-month period of review.  TMK Group contends that the ITC's cumulation of Russian subject imports with other subject imports was not in accordance with law because the ITC based its determination on competitive conditions that existed during the initial part of the period of investigation (before the sanctions due to Russia's invasion of Ukraine were imposed), and there was no "reasonable overlap of competition" of these subject imports at the end of the period of investigation when the Commission took its final vote.  Id. at 8.  TMK Group argues that Russian subject imports were effectively excluded from competing in the market from February 2022 to June 2022, and thus Russian imports had no competitive overlap with subject imports from Argentina, Brazil, Mexico, or domestic producers at the end of the period of investigation.  Id. at 3.

TMK Group asserts that the language of 19 U.S.C. § 1677(7)(G)(i),

providing for cumulation "if such imports compete with each other and with

domestic like products in the United States market," suggests that the assessment

of competitive overlap for cumulation purposes should be made at the time of the

Commission's vote.  19 U.S.C. § 1677(7)(G)(i); TMK Group's Reply at 7 (citing

Chaparral Steel Co. v. United States ("Chaparral Steel"), 901 F.2d 1097 (Fed. Cir.

1990)).  "Vote day" is the day that the ITC determines whether subsidized or

dumped imports actually cause, or threaten, significant injury to the domestic

industry for the time period under investigation.  Chaparral Steel, 901 F.2d at 1104

n.6.

The Government argues that it was reasonable for the Commission to assess

cumulation of the subject imports over the full 42 months of the period of

investigation to develop the competitive relationship between Russian OCTG and

other subject imports and the domestic like product, rather than relying on a

"snapshot of data on or around [vote] day."  Def.'s Resp. at 25.

The Commission is required to "cumulatively assess the volume and effect

of imports of the subject merchandise from all countries" if "such imports compete

with each other and with domestic like products in the United States market."  19

U.S.C. § 1677(7)(G)(i).  The CAFC has upheld the ITC's interpretation of the

clause "subject to investigation" to include only imports that are still under

investigation on "vote day" and imports that were proven "unfair" and have a

continuing impact on vote day.  <u>Chaparral Steel</u>, 901 F.2d at 1104.  TMK Group

argues that the conditions of competition essentially ceased to exist after the

sanctions due to the Ukraine war took effect in February 2022, the conditions

arguably did not exist during the latter part of the period of investigation on vote

day, and the ITC's determination that a reasonable overlap of competition existed

is not in accordance with law.  <u>See</u> TMK Group's Br. at 8–9, 22.  The CAFC stated

that, "[e]ven when the Commission makes a determination of 'threat of material

injury' it assesses the 'threat of the specific indicia of *present* material injury.'"

<u>Chaparral Steel</u>, 901 F.2d at 1104 (citing <u>Rhone Poulenc, S.A. v. United States</u>, 8

CIT 47, 50, 592 F. Supp. 1318, 1322 (1984)).

     The Court observes that the statutory language is written in the present

tense: if "such imports compete with each other and with domestic like products in

the United States market."  19 U.S.C. § 1677(7)(G)(i).  Consequently, the Court

concludes that it is reasonable to require the ITC's determination to be made in the

present tense on vote day, meaning that the conditions of competition must exist in

the present tense, not in the past tense.  It is not sufficient if the conditions of

competition leading to an unfair determination existed at some point during the

period of investigation.  The unfair condition must continue to exist on vote day.

The Court holds that it was unreasonable for the ITC to view the conditions of

competition over the 42-month period of investigation without considering the

effects of competition at the end of the investigation and on vote day.  Moreover, it

was unreasonable for the ITC to not address potentially contrary evidence on the

record suggesting that competition was severely curtailed during the last four

months of the period of investigation and that competition by Russian OCTG was

effectively eliminated by vote day.  If the conditions leading to the assessment that

subject imports of Russian OCTG were "unfair" or otherwise threatened material

injury did not exist on the vote day of October 26, 2022, the Commission's

determination to make a cumulation assessment for the full period of investigation

was not in accordance with law.  Consequently, the Court remands for the

Commission to reassess the timing and determine whether the imports under

investigation were proven unfair and had a continuing impact during the full period

of investigation, including on vote day.

### 2.    Cumulation

The ITC considered subject imports from Argentina, Mexico, Russia, and

South Korea on a cumulated basis because "the statutory criteria for cumulation

[were] satisfied."  Views at 19.  The ITC explained that it was "unpersuaded by

Tenaris'[] and TMK [Group]'s argument that measures taken in response to

Russia's February 2022 invasion of Ukraine have prevented subject imports from

Russia from competing in the U.S. market such that cumulation of these imports is inappropriate." Id. at 22.

In addition to challenging the timing as discussed above, TMK Group challenges the ITC's cumulation determination as not supported by substantial evidence. TMK Group contests the determinations of all four cumulation factors, arguing that (1) the loss of American Petroleum Institute ("API")-certification for Russian subject imports rendered subject imports not fungible with other subject imports; and (2) the sanctions imposed on Russia (aside from the loss of API-certification) and Section 232 duties affected subject Russian OCTG from sharing simultaneous presence, channels of distribution, and geographic overlap with other subject imports. See TMK Group's Br. at 6–24.

First, TMK Group contests the ITC's fungibility determination. TMK Group argues that because Russian producers lost the ability to certify their OCTG as meeting the relevant API standards required by other subject countries, Russian OCTG were not fungible with OCTG from Argentina, Mexico, and South Korea that were not subject to the API sanction. Id. at 16. TMK Group explains that the API revoked the license that permitted Russian producers of subject merchandise to certify their pipe by applying the API monogram to products. Id. at 12. TMK Group contends that the API-certification:

> is critical to most U.S. consumers of OCTG as an indication of quality
> and reliability, especially in oil and gas applications operating under

high pressure.  Consequently, the loss of Russian producers' ability to provide API[-]certification for its subject merchandise changed the conditions of competition faced by Russian producers of subject merchandise and created a substantial competitive disadvantage for Russian producers relative [to] Argentinian, Mexican, South Korean, and domestic producers of subject OCTG products.

Id.

The Commission did not focus on the impact that a loss of API-certification would have on competition, but rather determined that "all OCTG, regardless of source, is generally produced in accordance with API standards," except for "limited service" OCTG, which can still be used in certain OCTG applications even without meeting API specifications, and certain types of "green tube" OCTG that is not sold as meeting any particular API grade.  Views at 19–20; id. at 20 n.94.

The ITC acknowledged the potential effect of Russian producers' loss of API-certification on the fungibility of Russian OCTG, but continued to determine that Russian OCTG were fungible with other subject imports.  Id. at 20, 22–23. The ITC cited to the Staff Report, stating that Russian OCTG can still be manufactured with API standards because a majority of responding purchasers reported that "OCTG from Russia always or usually meets minimum quality specifications" and "rated OCTG from Russia as comparable to the domestic like product—which is generally produced to API specifications—with respect to

quality meets industry standards."  Id. at 20 n.95 (citing Staff Report at Tables II-12 and II-14).

Table II-12 of the Staff Report provides a count of purchasers' responses regarding suppliers' ability to meet minimum quality specifications.  Staff Report at II-30.  Purchasers were asked how often domestically produced or imported OCTG meets minimum quality specifications for their own or customers' uses, with purchasers referring to API specifications or another quality management system as the basis for quality.  Id.  The table indicates that a majority of responding purchasers reported that Russian suppliers "always" or "usually" met minimum quality specifications.  Id.  Table II-14 shows a count of purchasers' responses comparing U.S.-produced and imported product by factor and country pair.  Id. at II-32.  Purchasers were asked to compare OCTG produced domestically and OCTG produced in subject and non-subject countries.  Id. at II-31–II-39.  This table indicates that a majority of responding purchasers reported that Russian OCTG were "comparable" to the domestic product for quality meeting or exceeding industry standards.  Id. at II-33.  While this information pertains to the quality of Russian OCTG as compared to other countries, these responses do not reflect responses for quality after the loss of API-certification for Russian subject imports, nor does this information address the competitive impact that losing API-certification would have on the subject Russian products.

In determining whether Russian subject imports should be cumulated, the ITC also seemed to make contradictory statements.  The ITC stated that the impact of loss of API-certification "is not yet clear, particularly in light of continued subject imports from Russia after March 2022," but it proceeded to predict and discuss the effect of this sanction.  Views at 23.  The ITC cited to the Responses to Commission Questions, stating that the loss of API-certification to Russian OCTG producers would not prevent Russian-produced OCTG from being sold in the U.S. market with the certification because Russian producers could still send green tubes to API-certified processors and then sell the processed tubes in the U.S. market.  Id. (citing Petitioners' Post-Hearing Br. (Sept. 29, 2022) at Ex. 1 ("Responses to Commission Questions") at II-55–II-56, PR 143)).  The Court observes that the Responses to Commission Questions was not placed in its entirety on the record filed with the Court.  The record only includes three pages of the document, pages II-29–II-32, which do not pertain to any information about the loss of API-certification or green tubes.  The ITC cited to pages II-55–II-56 of the document, but the Court is unable to review these pages or the entire document.

In addition, the Commission failed to address potentially contrary evidence on the record cited by TMK Group as to the fungibility of Russian OCTG.  For example, TMK Group argues that the Russian products' inability to provide API-certification altered U.S. consumers' willingness to purchase Russian OCTG,

making these products no longer able to compete with other subject imports that

were able to be certified.  TMK Group's Br. at 12 (citing USITC Hearing

Transcript (Oct. 11, 2022) at 248, PR 149, and TMK Group's Pre-Hearing Br. at

Ex. 2 ("Letter from American Petroleum Institute")).  The API ceased its

certification services within the Russian Federation "in response to restrictions on

financial and business activities imposed by the U.S. and Russian governments" on

March 17, 2022.  Letter from American Petroleum Institute.  During the

administrative hearing, a witness from API testified about the practical impact of

TMK Group's inability to apply the API monogram or license number to their

products.  USITC Hearing Tr. at 248.  The witness testified that the loss of API-

certification would be a "major setback" for Russia and it would not be possible

for Russia to sell its OCTG to international markets.  Id.  At oral argument before

this Court, TMK Group explained that OCTG products without an API-

certification cannot be sold, and the lack of an API-certification essentially put the

Russian OCTG companies out of business.  See Oral Arg. at 14:08–15:13, 24:29–

24:45.

     The Court holds that the ITC's determination that Russian OCTG were

fungible with other subject OCTG is not supported by substantial evidence because

the ITC did not consider contrary evidence on the record pertaining to effects of

the sanctions on Russian OCTG, especially the loss of API-certification on Russian

OCTG, and failed to file with the Court the relevant evidence from the Responses to Commission Questions that the ITC cited.

Second, TMK Group contends that other sanctions against Russia, in addition to the loss of API-certification, effectively excluded Russian OCTG from the U.S. marketplace after February 2022.  TMK Group's Br. at 6–14.  The ITC addressed the following two sanctions: the suspension of normal trade relations in Russia that resulted in high "Column 2" duties on Russian OCTG and the prohibition of Russia-affiliated vessels from entering the United States ports on April 21, 2022 with the issuance of Presidential Proclamation 10371.  Views at 18–19; Staff Report at VII-17 n.19.  The ITC determined that the domestic like product and subject imports from all subject countries were simultaneously present throughout almost the entire period of investigation, with subject imports from Russia present in 38 of 42 months.  Views at 22.

The ITC rejected TMK Group's and Tenaris' arguments during the administrative proceedings that these measures prevented Russian OCTG from competing in the U.S. market during the period of investigation because Russian OCTG were not prohibited entry or sale in the U.S. market and significant volumes of Russian OCTG entered in two out of the four post-invasion months, March 2022 and May 2022.  Id. at 22–23 (citing Staff Report at Tables IV-18, IV-2, and G-4; Raw in-Shell Pistachios from Iran, USITC Inv. No. 731-TA-287 (June 1, 2017)

(determination that the revocation of the antidumping duty order on raw in-shell

pistachios from Iran would likely lead to continuation or recurrence of material

injury to an industry in the United States within a reasonably foreseeable time and

that the existence of financial sanctions would not prevent Iranian exporters from

supplying the U.S. market in the event of revocation)).

TMK Group also contends that the imposition of Section 232 duties on

Russian OCTG, when combined with the other sanctions, affected the Russian

subject imports' ability to compete with the other subject imports.  TMK Group's

Br. at 22–23.  The ITC determined that the Section 232 duties of 25% on Russian

OCTG did not make it uncompetitive with other subject imports, citing to Tables

IV-3 and IV-18 of the Staff Report.  Views at 22 n.113 (citing Staff Report at

Tables IV-3 and IV-18).  The ITC reasoned that the duties did not prevent subject

Russian OCTG from entering the U.S. market in significant volumes throughout

the period of investigation or from being present in the U.S. market for 38 months

of the 42 months, "even though responding domestic producers, importers, and

purchasers reported that the section 232 duties had effects in the U.S. market."  Id.

The ITC cited to Tables IV-3, IV-18, IV-2, and G-4 in the Staff Report to

show that the volume of subject imports from Russia increased in 2022 compared

to 2021 and that subject imports entered in the U.S. market during the post-

invasion months of March 2022 and May 2022.  Table IV-18 presents monthly

U.S. import data during the entire period of investigation, January 2019 through June 2022. Staff Report at IV-34–IV-37. This table shows OCTG from Russia were imported in February 2022, March 2022, and May 2022. Id. at IV-35. There is no import data for April 2022 and June 2022. Id. Tables IV-2 and Tables G-4 demonstrate that the volume of subject imports from Russia, as well as the U.S. shipments from these imports, were higher in interim 2022 than in 2021. Table IV-2 provides information on the firms of responding U.S. importers of OCTG from Argentina, Mexico, Russia, South Korea, their headquarter locations, and their shares of total imports (subject and non-subject) by source in 2021. Tables IV-1 and IV-2 show the share of total subject imports from Russia in 2021. Id. at IV-2–IV-3. The Court observes that these tables do not show, however, the total market share of subject imports in 2022 for a comparison of the shares in 2021 versus 2022.

Table G-4 shows the domestic shipments of imports from Russia by domestic importers, by end finish and grade, and indicates that Russian OCTG imports from January 2022 to June 2022 were higher than the amount of imports from January 2021 to June 2021. Id. at G-12. Table IV-3 provides data for U.S. imports of OCTG from Argentina, Mexico, Russia, South Korea, and all other sources and provides the import volume for each of the six months in 2022. Id. at IV-4–IV-5. Table IV-3 indicates that a significant number of short tons of Russian

OCTG were entered from January 2022 to June 2022.  Table IV-18, as noted

above, indicates that OCTG from Russia were imported in February 2022, March

2022, and May 2022 and no OCTG from Russia were imported in April 2022 or

June 2022.  Id. at IV-35.

TMK Group challenges the ITC's cumulation of Russian subject imports

because the imports from March 2022 and May 2022 do not accurately reflect the

effects of the sanctions.  TMK Group asserts that: (1) virtually all of such imports

were made under another Harmonized Tariff Schedule of the United States

("HTSUS") code that is not intended for "Oil or Gas Drilling"; (2) the March 2022

importation was made before the revocation of Russia's most-favored-nation status

on April 18, 2022, the barring of Russian ships on April 2022, and the production

of subject merchandise without API-certification; and (3) the May 2022 imports

had taken advantage of an unintended gap in Column 2 of the HTSUS tariff tables

that permitted some unfinished subject merchandise to enter with a tariff rate of

1%, which no longer exists because of the President's Proclamation 10420 that

eliminated this gap by raising the rates of duty on all products of the Russian

Federation by 35%.  TMK Group's Br. at 21–22 (citing Letter from American

Petroleum Institute and TMK Group's Pre-Hearing Br. at Ex. 3 ("Suspending

Normal Trade Relations with Russia and Belarus Act" or "H.R. 7018")).  The ITC

did not address these possibilities in its cumulation analysis, which is relevant to

the effect of Russian sanctions on subject OCTG from competing fairly with other subject imports during the post-invasion months.

While record evidence shows the import of some Russian subject merchandise in two post-invasion months, the ITC did not provide an adequate explanation to account for the lag of the sanction measures taking place or the impact of the loss of API-certification services on Russian OCTG's competitiveness.  The ITC must address the potential contrary evidence regarding the competitiveness of imports from Russian OCTG relative to the other subject imports from Argentina, Mexico, and South Korea.  See 19 U.S.C. § 1677(7)(G) (requiring the ITC to "cumulatively assess the volume and effect of imports of the subject merchandise from all countries," if such imports *compete with each other* and with domestic like products).

Accordingly, the Court concludes that the ITC's determination to cumulate subject imports from Russia is not supported by substantial evidence.  The ITC's timing of cumulation is improper, and the ITC failed to consider potentially contrary evidence on the record for its cumulation determination and file the Responses to Commission Questions with the Court.  The Court remands this issue for further explanation or reconsideration by the ITC.

### C.    OCTG from South Korea

Plaintiffs challenge the Commission's determination to cumulate OCTG from South Korea as not in accordance with law and not supported by substantial evidence.  Plaintiffs argue that the ITC's cumulation determination was not in accordance with law because the ITC included non-subject imports from South Korea.  Plaintiffs also contend that this determination was not supported by substantial evidence because the ITC included subject imports from South Korea that were under an antidumping order and not fungible with subject imports from Argentina and Mexico.

### 1.    Subject Imports from South Korea

Plaintiffs allege two arguments regarding the ITC's inclusion of subject imports from South Korea in the cumulation analysis.  First, Tenaris argues that subject imports from Argentina and Mexico are not fungible with South Korean imports.  Tenaris contends that the ITC ignored record evidence when it determined that "welded and seamless OCTG can be used interchangeably in most if not all other applications" because subject imports from Argentina and Mexico during the period of investigation were "essentially all seamless," whereas the OCTG imports from South Korea were "nearly all welded" and the average unit values ("AUVs") for seamless OCTG were consistently higher than welded OCTG.  Tenaris' Br. at 18–21.

Second, Plaintiffs contest the ITC's inclusion of subject merchandise from South Korea that had already been used to support a finding of material injury to the domestic OCTG industry in 2014 in a different proceeding and was subject to an existing antidumping order, which Plaintiffs contend artificially inflated the cumulated volume of imports while adding little or no impact to the potential harm suffered by the U.S. industry.  TMK Group's Br. at 4–5; Tenaris' Br. 23–24.

### a.    Waiver of Seamless/Welded Argument

The Court first discusses Tenaris' argument that subject imports from Argentina and Mexico were not fungible with South Korean imports.  Defendant-Intervenors assert that part of Tenaris' argument, which concerns the difference between seamless and welded subject imports, is waived because such argument rests on Tenaris' contention that seamless and welded OCTG are not alike.  Def.-Intervs.' Resp. at 12–13 (citing Preliminary Views); see also Def.'s Resp. at 18 n.5.  Defendant-Intervenors reason that Tenaris, by failing to raise that seamless and welded OCTG are separate like products in the final phase of the administrative proceedings, is precluded from bringing its argument and has conceded the interchangeability of seamless and welded products.  Id.

Tenaris counters that it is not precluded from raising its argument because the Commission had in a previous investigation found that the single like product and the subject imports were not fungible.  Tenaris' Reply at 3 (citing Grain-

Oriented Silicon Electrical Steel from Italy and Japan, Inv. Nos. 701-TA-355 and

731-TA-660 (Final), USITC Pub. 2778 at I-8, I-13 (May 1994)).

    In challenging final agency actions, such as the underlying material injury

determination by the ITC at issue here, litigants generally must exhaust

administrative remedies.  See 28 U.S.C. § 2637(d).  The Court "generally takes a

'strict view' of the requirement that parties exhaust their administrative remedies."

Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1381 (Fed.

Cir. 2013) (citations omitted).  There are limited exceptions to the exhaustion

requirement, such as futility of raising an argument at the administrative level.  See

Pakfood Pub. Co. v. United States, 34 CIT 1122, 1145–48, 724 F. Supp. 2d 1327,

1351–53 (2010); see also Holmes Prod. Corp. v. United States, 16 CIT 1101, 1104

(1992) ("[E]xhaustion may be excused if the issue was raised by another party, or

if it is clear that the agency had an opportunity to consider it.").  The CIT has

discretion as to whether exhaustion is required in its cases.  Corus Staal BV v.

United States, 502 F.3d 1370, 1381 (Fed. Cir. 2007) ("[T]he decision whether to

require exhaustion in a particular case is a matter committed to the discretion of the

trial court; in particular, we have held that applying exhaustion principles in trade

cases is subject to the discretion of the judge.").

    The ITC had preliminarily determined that, "in light of the preponderance of

similarities between seamless and welded OCTG, and in the absence of any

contrary argument, we define seamless and welded OCTG as a single domestic like

product." Preliminary Views at 12. The ITC recognized that "[a]lthough subject

imports from South Korea primarily comprise welded OCTG, whereas subject

imports from other countries primarily comprise seamless OCTG, the record shows

that these differences do not limit the fungibility between these subject imports."

Id. at 25. The ITC also noted that "while the parties disagree on the degree, they

do not dispute that welded OCTG can be substituted for seamless OCTG in many

applications, or that seamless OCTG can be substituted for welded OCTG in all

applications." Id. at 26.

Tenaris raised its concerns about the interchangeability of welded and

seamless OCTG in the preliminary phase of the investigation. Specifically, the

ITC recognized that, "[w]hile Tenaris disputes Petitioners' estimation of a 99-

percent overlap in end-use applications, and contends that there are 'important

limitations' on the interchangeability of welded and seamless OCTG, it does not

dispute that welded OCTG is interchangeable with seamless OCTG in less-

demanding applications, or that seamless OCTG is interchangeable with welded

OCTG in all applications." Id. at 11 n.49 (citing Tenaris' Post-Conference Br.

(Nov. 1, 2021) at 11, PR 41). The ITC noted that, "Tenaris does not argue or

suggest that these customer testimony and reporting establish that welded and

seamless OCTG cannot be used interchangeably in other applications." Id.

Because Tenaris disputed the interchangeability of seamless and welded products during the preliminary phase of the administrative proceedings, Tenaris did not fail to exhaust its administrative remedies regarding this issue and is therefore not precluded from raising this argument on appeal before the Court.

### b.    Waiver of Antidumping Order Argument

The Court now turns to Tenaris' argument that the ITC improperly included subject imports from South Korea that were previously under an antidumping order.  Defendant-Intervenors assert that Plaintiffs did not sufficiently raise this issue—specifically, the implications of the antidumping order on South Korean imports regarding the cumulation analysis—in their final phase briefing, and thus Plaintiffs failed to exhaust their administrative remedies.  Def.-Intervs.' Resp. at 20–21.

TMK Group contends that this issue was raised before the ITC during both the preliminary and final phases of the investigation.  TMK Group's Reply at 14 (citing TMK Group's Post-Conference Br. (Nov. 1, 2021) at 6–7, PR 39, and Tenaris' Final Comments (Oct. 21, 2022), PR 167).  TMK Group argues that even if the doctrine of administrative exhaustion applies, it should be allowed to expand on an argument based on the final record before the Court.  Id. at 14–15 (citing Juancheng Kangtai Chem. Co. v. United States, Slip Op. 15-93, 2015 WL 4999476

(CIT Aug. 21, 2015) (holding that the doctrine of exhaustion does not prevent a

plaintiff from expanding on an argument based on the final record before the court

and that an argument below does not need to be exactly worded to the court)).

The Court observes that both TMK Group and Tenaris raised the issue of

subject imports from South Korea affected by an antidumping order during

different phases of the investigation.

In the preliminary phase of the investigation, TMK Group discussed the

implications of the South Korean antidumping order on the cumulation analysis as

follows:

> [T]he Commission must consider the fact that subject imports from
> South Korea have already been found to be injurious and are
> consequently already under an [antidumping] order as a relevant
> additional factor beyond its "general{}" "framework" that compels de-
> cumulation of South Korea from Argentina, Mexico, and Russia in this
> particular instance.  To do otherwise would result in cumulation when
> not "appropriate in light of the conditions of competition"—again,
> South Korea already being under an [antidumping] order while the
> other subject countries are not—inconsistent with Article 3.3 of the
> [Agreement on Implementation of Article VI of the General Agreement
> on Tariffs and Trade 1994 ("AD Agreement")] and Article 15.3 of the
> [WTO Agreement on Subsidies and Countervailing Measures ("SCM
> Agreement")].

TMK Group's Post-Conference Br. at 6–7.  The Commission rejected this

argument, asserting:

> TMK [Group] does not explain how these considerations [regarding the
> antidumping duty order on OCTG from Korea] could detract from a
> finding that there is a reasonable overlap of competition between the

subject imports from South Korea and the other subject imports under the factors considered by the Commission.

Preliminary Views at 27 n.152.

In the final phase of the investigation, Tenaris referenced this issue by stating that, "[c]umulating imports from Korea was always questionable given they are subject to an injury finding that resulted in an [antidumping duty order]." Tenaris' Final Comments at 9 (citing Preliminary Views at 23–24 (noting TMK Group's arguments that the Commission should not cumulate subject imports because imports from Korea are subject to an antidumping duty order)).

Both TMK Group and Tenaris put forth administrative arguments regarding the effect of the antidumping duty order on South Korean OCTG.  TMK Group contended, for example, that the effect of the antidumping order on the impact determination was its inconsistency with the AD Agreement and SCM Agreement. See TMK Group's Post-Conference Br. at 6–7.  Now before the Court, TMK Group argues that the effect of the antidumping order on South Korean imports, which placed a "discipline" on pricing designed to ensure that the sales of South Korea subject merchandise would not cause material injury due to dumping results, would mean that harm to the U.S. industry attributable to South Korean imports would have to be based solely on underselling caused by subsidies, but these subsidies were found to be a *de minimis* amount of 1.33% on a portion of South Korean imports.  TMK Group's Br. at 28–29; TMK Group's Reply at 12–13.

Plaintiffs' argument that the antidumping order would result in a "discipline" on

pricing is a reasonable expansion of Plaintiffs' previous administrative arguments

regarding the effects of the antidumping duty order on the South Korean imports.

The Court deems Plaintiffs' argument not waived.

## 2.    Non-Subject Imports from South Korea

In addition to challenging the inclusion of subject imports from South

Korea, Plaintiffs assert that the Commission's cumulation determination is not in

accordance with law because the ITC's inclusion of non-subject imports violated

19 U.S.C. § 1677(7)(G)(i) through its reliance on Tables II-16, II-19, and IV-7 of

the Staff Report.  See TMK Group's Br. at 25–26; Tenaris' Br. at 23–24.  Plaintiffs

request a remand to ensure that the inclusion of non-subject imports did not affect

the material injury determination, citing Celanese Chemicals Ltd. v. United States,

31 CIT 279, 293 (2007).  Id.

The Court first turns to whether the ITC violated its statutory obligations

under 19 U.S.C. § 1677(7)(G)(i) by including non-subject imports from South

Korea.

Pursuant to 19 U.S.C. § 1677(7)(G)(i), "the Commission shall cumulatively

assess the volume and effect of *imports of the subject merchandise* from all

countries . . . if *such imports* compete with each other and with domestic like

products in the United States market." 19 U.S.C. § 1677(7)(G)(i) (emphasis added).

Record evidence establishes that the ITC included non-subject imports of South Korean OCTG in the Commission's cumulation determination. For example, Tables II-16, II-19, and IV-17 include data on non-subject South Korean OCTG. See TMK Group's Br. at 25–26; Tenaris' Br. at 23–24. The ITC relied on these tables for its fungibility and geographic overlap determinations. See Views at 19–22. The Government argues that the ITC properly considered Tables II-16 and II-19 because responses from South Korean OCTG importer Hyundai Steel USA concerned the fungibility of OCTG from whole countries, including both subject and non-subject data, and had probative value for the ITC's fungibility determination. Def.'s Resp. at 22 (citing Blank U.S. Importer Questionnaire (June 14, 2022) at III-21–III-22, PR 92). The Government also contends that the ITC properly considered Table IV-17 in finding a geographic overlap of the subject imports because the table reflected 99.9% of all imports from South Korea. Id.

The Court observes that the ITC included data that included both non-subject and subject imports from South Korea. See Staff Report at Tables II-16, II-19, and IV-17. The inclusion of non-subject imports could not be separated because Hyundai Steel USA was asked questions about the interchangeability of domestic OCTG and OCTG produced in other countries. These questions did not

distinguish between subject imports or non-subject imports.  See Blank U.S.
Importer Questionnaire.  The ITC included non-subject imports due to the nature
of responses solicited from Hyundai Steel USA.  The Government emphasizes that
"given that Hyundai Steel USA's responses compiled in these tables did not tend to
support cumulation, if there was any error in considering them—which there was
not—it was in Plaintiffs' favor and was, at most, harmless."  Def.'s Resp. at 23.

    Regardless of whether the ITC believes that the inclusion of non-subject
imports was harmless error, the statute is clear that only subject imports shall be
included in the cumulation analysis and does not allow for the cumulation of non-
subject imports.  The Court holds that the ITC's cumulation of non-subject South
Korean imports is a violation of 19 U.S.C. § 1677(7)(G)(i) and is not in accordance
with law.  Therefore, the Court remands the ITC's determination to cumulate non-
subject imports from South Korea for further consideration in accordance with this
Opinion.

### 3.    Cumulation

    The Court now turns to the question of whether the ITC's determination to
cumulate South Korean OCTG is supported by substantial evidence.

    Tenaris argues that subject imports from South Korea should not have been
cumulated because they were not fungible with subject imports from Argentina and

Mexico, which had higher AUVs than those from South Korea and Russia.
Tenaris' Br. at 18–21.

The ITC determined that there was a sufficient degree of fungibility between
the subject imports from South Korea and those from Argentina and Mexico, even
though there were differences in the AUVs between these countries, based on data
that showed interchangeability between all subject imports. See Views at 27
(citing Staff Report at Tables II-15–II-17).

In addition to looking at Tables II-16, II-19, and IV-17, the ITC cited to
Tables II-1, II-15, II-18, and II-20 to support its cumulation determination.

Tables II-15 through II-17 of the Staff Report demonstrates the
interchangeability between subject imports from Argentina and Mexico and subject
imports from Russia and South Korea. Tables II-15 through II-17 provide
information on the responses of U.S. producers, importers, and purchasers
reporting the interchangeability between domestic OCTG and OCTG from other
countries, by country pair. Staff Report at II-40. Table II-15 pertains to responses
from U.S. producers, Table II-16 pertains to responses from producers, and Table
II-17 pertains to purchasers. See id. at II-40–II-41. All three tables demonstrate
the interchangeability between subject imports from Argentina and Mexico and
subject imports from Russia and South Korea by indicating that a majority of U.S.
producers, importers, and purchasers responded that OCTG from both Argentina

and Mexico are "always" or "frequently" interchangeable with subject imports

from both Russia and South Korea.  See id.  Because the interchangeability

between these subject imports seems to be demonstrated in the responses, the

record evidence could support a "reasonable overlap" of competition between

OTCG from Mexico and Argentina and OCTG from South Korea in theory, if any

non-subject imports are excluded from the cumulation analysis.

      The ITC rejected Tenaris' administrative argument that imports from

Argentina and Mexico were not fungible with imports from Russia or South Korea

and determined that there was a substantial degree of overlap between U.S.

shipments of subject imports from all four subject imports in terms of end finish,

grade, and product type because: (1) "majorities of responding domestic producers,

importers, and purchasers reported that subject imports from both Argentina and

Mexico are always or frequently interchangeable with subject imports from both

Russia and South Korea,"  Views at 20; id. at 20 n.97 (citing Staff Report at Tables

II-15–II-17); (2) "majorities of responding domestic producers, importers, and

purchasers reported that differences other than price are only sometimes or never

significant when choosing between and among subject imports from the four

sources," id. at 20; id. at 20 n.98 (citing Staff Report at Tables II-18–II-20); and (3)

"majorities or pluralities of responding purchasers rated subject imports from both

Argentina and Mexico as comparable with subject imports from both Russia and

South Korea with respect to at least 14 of 15 purchasing factors," id. at 20; id. at 20

n.99 (citing Staff Report at Table II-14).

 The ITC also determined that there was a geographic overlap of the subject

imports because nearly all subject imports from all four sources entered the United

States through the Southern border of entry.  Views at 22 (citing Staff Report at

Tables II-1, IV-17).  Table IV-17 presents data on U.S. imports of OCTG by

source and border of entry, based on official Commerce import statistics in 2021,

indicating a geographic overlap in the Southern border of entry.  Staff Report at

IV-33.

 Only a finding of "reasonable overlap" is required for cumulation, although

record evidence shows that the ITC's determination impermissibly cumulated both

subject and non-subject imports from South Korea.  The Staff Report tables cited

by the ITC seem to support the fungibility and geographic overlap determinations,

except for the statutory problem that the ITC's cumulation determination included

non-subject imports from South Korea.  Three tables cited by the ITC included

non-subject imports: Tables II-16 and II-19 included responses for whole

countries, including both subject and non-subject data, and Table IV-17 reflected

99.9% of all imports from South Korea.  The ITC cited to additional evidence that

related to subject imports, such as Tables II-1, II-15, II-18, and II-20.

The Government points out that the use of this data, which included non-subject imports, was in Plaintiffs' favor.  <u>See</u> Def.'s Resp. at 23.  Plaintiffs do not contest that the result of this data was in their favor.  <u>See</u> TMK Group's Reply; Tenaris' Reply.  The fact that such data may have weighed in Plaintiffs' favor does not excuse the ITC from complying with its statutory obligation under 19 U.S.C. § 1677(7)(G)(i) that "the Commission shall cumulatively assess the volume and effect of imports of the *subject merchandise*."  19 U.S.C. § 1677(7)(G)(i) (emphasis added).  It is clear to this Court that the statute does not permit non-subject merchandise to be included in the Commission's cumulation analysis.

Accordingly, the ITC's determination to cumulate both subject and non-subject South Korean imports is neither supported by substantial evidence nor in accordance with law.  The Court remands the ITC's determination to cumulate South Korean OCTG because non-subject imports from South Korea may not be included in the ITC's cumulation determination.  Further, the ITC did not address the possible effect resulting from the subject imports from South Korea that were under an antidumping order in its final determination.

### D.    OCTG from Argentina and Mexico

Tenaris challenges the ITC's determination to cumulate subject imports from Argentina and Mexico as unsupported by substantial evidence.  Tenaris argues that OCTG from Argentina and Mexico did not sufficiently share channels of

distribution with subject imports from Russia or South Korea to warrant a

"reasonable overlap of competition."  Tenaris' Br. at 21–23.  Tenaris contends that

the Commission did not consider representative data from the period of

investigation as a whole or record evidence that Tenaris sold subject imports from

Argentina and Mexico and its U.S.-produced OCTG to its U.S. customers mainly

using its unique "Rig Direct" program.  Id.

     The ITC determined that the domestic like product and subject imports from

each country source were sold through overlapping channels of distribution during

the period of investigation because importers from Argentina and Mexico

primarily sold OCTG to customers while also selling a smaller amount to

distributors.  Views at 22; id. at 22 n.108 (citing Staff Report at Tables II-1–II-2).

The ITC also rejected Tenaris' administrative argument that subject imports from

Argentina and Mexico did not share common channels of distribution because a

substantial share of subject imports from Mexico and a lesser share of subject

imports from Argentina were sold to distributors, as were most subject imports

from both Russia and South Korea.  Id. (citing Staff Report at Table II-1).

     Tenaris first contends that the ITC relied on a "small overlap," rather than a

"reasonable overlap," and that the Commission's reliance on 2021 data overstated

the overlap.  Tenaris' Br. at 22.  The ITC cited to Tables II-1 and II-2 to support its

channels of distribution determination.  Views at 22.  Table II-1 presents data for

channels of distribution for OCTG in the U.S. market, by share and by quantity, for
the entire period of investigation, showing that importers from Argentina and
Mexico primarily sold OCTG to similar customers.  Staff Report at II-5–II-8.
Table II-2 shows a count of U.S. producers' and U.S. importers' geographic
markets, indicating that every responding producer and importer reported selling
OCTG in the Central Southwest.  Id. at II-9.  Table II-1 shows that for the share of
subject imports sold for 2019 through interim 2021, the typical share of subject
imports from Mexico sold to end users was a fairly significant percentage and the
typical share of subject imports from Argentina sold to end users was a higher
percentage.  Id. at II-5–II-8.  The share of subject imports sold to end users from
South Korea was a very small percentage in comparison.  Id.  Based on these two
tables in the Staff Report, the ITC's determination that there was a "reasonable
overlap" is supported by substantial evidence, even though there were varying
degrees of shares of sales in each country.

       Second, Tenaris asserts that the ITC's determination to cumulate subject
imports from Argentina and Mexico is not supported by substantial evidence
because the ITC did not consider Tenaris' "Rig Direct" program as the reason for
the shift in market share and the increase in Tenaris' market share.  See Tenaris'
Br. at 22–23.  Tenaris contends that the record demonstrates that the "distributor"
model for sales of subject imports from South Korea using unaffiliated producers,

processors, and distributors is not the same as Tenaris' "Rig Direct" program for sales of Tenaris' domestic and imported OCTG using affiliated parties to provide OCTG and services on a "fully integrated" basis.  Tenaris' Reply at 4.

The Government and Defendant-Intervenors argue that the "Rig Direct" program is Tenaris' rebranding of standard services performed by affiliated entities, and the Commission should not have weighed this differently.  See Def.-Intervs.' Resp. at 16; Def.'s Resp. at 20.

The ITC considered whether other factors may have had an adverse impact on the domestic industry not attributable to subject imports alone.  Views at 44. The ITC rejected Tenaris' administrative argument that the shift in market share toward cumulated subject imports was caused by Tenaris' "Rig Direct" program, which allegedly provided "superior availability and technical assistance."  Id. at 45–46; id. at 46 n.258 (citing Table C-1 (summary data concerning the U.S. market for the period of investigation)).

The ITC did not view the "Rig Direct" program as a factor for the shift in market share because: (1) "large majorities of purchasers rated domestically produced OCTG as superior or comparable to subject imports with respect to both availability and technical support/service"; (2) signed declarations with supporting documentation corroborated that domestic producers in combination with their distributors provided the same services as the "Rig Direct" program; and (3) the

domestic industry also lost market share to subject imports from Russia and South

Korea that were not sold via the "Rig Direct" program.  Id. at 46.

The ITC cited to Table II-14 in the Staff Report and documents attached to

Petitioners' Post-Hearing Brief to show that Tenaris' "Rig Program" was not a

unique model, but other OCTG producers implemented similar strategies in selling

subject imports.  See Staff Report at Table II-14; Petitioners' Post-Hearing Br. at

Ex. 3 ("Declaration of Robert J. Beltz"), Ex. 4 ("Declaration of Brett

Mendenhall").  As noted above, Table II-14 shows the number of purchasers'

responses comparing U.S.-produced and imported product by factor and country

pair.  Staff Report at II-32.  This evidence demonstrates that for the factors of

availability and technical support/service, a majority of responding purchasers

reported that Russian OCTG merchandise were "superior" or "comparable" to the

domestic product.  Id. at II-33.  There is no record evidence demonstrating the use

of the "Rig Direct" model by Russian OCTG producers or importers.

The Petitioners' Post-Hearing Brief included the Declaration of Robert J.

Beltz and the Declaration of Brett Mendenhall.  Both declarations indicate that the

services provided by Tenaris' "Rig Direct" program is not unique to Tenaris but is

a strategy offered by other domestic producers and manufacturers.  The

Declaration of Robert J. Beltz, who is employed as the general manager for U.S.

Steel Tubular Products ("USSTP") by United States Steel Corporation, a domestic

producer of OCTG, discussed USSTP's services and stated that Tenaris' "Rig

Direct" model only differs in its reliance on an affiliated distributor that primarily

supplies Tenaris-produced OCTG products, but does not differ in terms of the

nature of services provided to end users.  Decl. of Robert J. Beltz at 1–2.  The

Declaration of Brett Mendenhall, who is the President and CEO of P2 Energy

Services ("P2"), a domestic distributor of OCTG, stated that the services provided

by Tenaris' "Rig Direct" were not unique to Tenaris because P2 typically enters

program agreements in combination with an OCTG manufacturer, and just as in

the Tenaris "Rig Direct" model, the end user received the full range and distributor

services required under the model.  Decl. of Brett Mendenhall at 1.  He also

attached portions of a business presentation from an OCTG manufacturer that

discussed similar services to those in Tenaris' "Rig Direct" program.  Id. at 2.

        The Staff Report also supported the ITC's determination that "superior

availability and service" was not exclusive to Tenaris' "Rig Direct" program and

thus could not account for the loss of market share for domestic producers.  The

ITC cited to Table IV-19 to show that the domestic industry also lost market share

to subject imports from Russia and South Korea that were not sold via the "Rig

Direct" program.  Views at 46.  Table IV-19 provides data on apparent U.S.

consumption and market shares based on quantity for OCTG, by source and

period, showing that subject imports from Russia and South Korea contributed to

the total market share of OCTG in the U.S. market.  Staff Report at IV-41.  Based on the record evidence, the ITC considered Tenaris' "Rig Direct" program in assessing possible factors that attributed to the shift in market share toward cumulated subject imports.  Therefore, the ITC's determination that the "Rig Direct" program was not a cause of the loss of domestic market share is supported by substantial evidence.  The Court holds that the ITC's determination to cumulate subject imports from Argentina and Mexico is supported by substantial evidence.

Because the Court remands the final determination to reconsider the ITC's determination to cumulate subject imports from Russia, non-subject imports from South Korea, and subject imports from South Korea under an antidumping order, as explained above, the Court defers its analysis of the challenges to the ITC's additional determinations regarding volume, price effects, and impact in the material injury determination at this time.

## CONCLUSION

For the foregoing reasons, the Court concludes that the Commission's cumulation determination is not supported by substantial evidence and not in accordance with law.  Accordingly, it is hereby

**ORDERED** that the Commission's Final Determination is remanded for reconsideration consistent with this Opinion; and it is further

**ORDERED** that this case shall proceed according to the following schedule:

(1) The Commission shall file its remand redetermination on or before

    August 16, 2024;

(2) The Commission shall file the administrative record on or before August

    30, 2024;

(3) The Parties shall file any comments on the remand redetermination on or

    before September 27, 2024;

(4) The Parties shall file replies to the comments on the remand

    redetermination on or before October 25, 2024; and

(5) The joint appendix shall be filed on or before November 22, 2024.


                                            /s/  Jennifer Choe Groves
                                        Jennifer Choe-Groves, Judge


Dated:   April 19, 2024
         New York, New York

5

USITC Federal Register Notice of Final Determination

11/18/2022

Appx171-171



comment. BOEM makes all comments, including the names and addresses of respondents, available for public review online and during regular business hours. Individual respondents may request that BOEM withhold their names, addresses, or any other personal identifiable information (PII) included in their comment from the public record; however, BOEM cannot guarantee that it will be able to do so. If you wish your name, address, or other PII to be withheld, you must state your request prominently in a cover letter and explain the harm that you fear from its disclosure, such as unwarranted privacy invasion, embarrassment, or injury. Even if BOEM withholds your information in the context of this notice, your submission is subject to the Freedom of Information Act (FOIA) and any relevant court orders. If your submission is requested under the FOIA or such court order, your information will only be withheld if a determination is made that one of the FOIA's exemptions to disclosure applies or if such court order is challenged. Such a determination will be made in accordance with the Department's FOIA regulations and applicable law.

Please label privileged or confidential information as "Contains Confidential Information," and consider submitting such information as a separate attachment. Information that is not labeled as privileged or confidential may be regarded by BOEM as suitable for public release.

All submissions from organizations or businesses and from individuals identifying themselves as representatives or officials of organizations or businesses will be made available for public inspection in their entirety.

*Authority:* 42 U.S.C. 4231 *et seq.* (NEPA, as amended) and 40 CFR 1506.6.

Dated: November 11, 2022.

**Karen Baker,**

*Chief, Office of Renewable Energy Programs, Bureau of Ocean Energy Management.*

[FR Doc. 2022–25034 Filed 11–17–22; 8:45 am]

**BILLING CODE 4340–98–P**

---

**INTERNATIONAL TRADE COMMISSION**

**[Investigation Nos. 701–TA–671–672 and 731–TA–1571–1573 (Final)]**

**Oil Country Tubular Goods From Argentina, Mexico, Russia, and South Korea**

**Determinations**

On the basis of the record [1] developed in the subject investigations, the United States International Trade Commission ("Commission") determines, pursuant to the Tariff Act of 1930 ("the Act"), that an industry in the United States is materially injured by reason of imports of oil country tubular goods from Argentina and Mexico provided for in subheadings 7304.29, 7305.20, and 7306.29 of the Harmonized Tariff Schedule of the United States, that have been found by the U.S. Department of Commerce ("Commerce") to be sold in the United States at less than fair value ("LTFV"); by reason of imports of oil country tubular goods from Russia that have been found by Commerce to be sold in the United States at LTFV and subsidized by the government of Russia; and by reason of imports of oil country tubular goods from South Korea that have been found by Commerce to be subsidized by the government of South Korea.[2][3]

**Background**

The Commission instituted these investigations effective October 6, 2021, following receipt of petitions filed with the Commission and Commerce by Borusan Mannesmann Pipe U.S., Inc., Baytown, Texas; PTC Liberty Tubulars LLC, Liberty, Texas; U.S. Steel Tubular Products, Inc., Pittsburgh, Pennsylvania; Welded Tube USA, Inc., Lackawanna, New York; and the United States Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC, Pittsburgh, Pennsylvania. The final phase of the investigations was scheduled by the Commission following notification of a preliminary determination by Commerce that imports of oil country tubular goods from Russia were subsidized within the

meaning of section 703(b) of the Act (19 U.S.C. 1671b(b)) and preliminary determinations by Commerce that imports of oil country tubular goods from Argentina, Mexico, and Russia were sold at LTFV within the meaning of 733(b) of the Act (19 U.S.C. 1673b(b)).[4] Notice of the scheduling of the final phase of the Commission's investigations and of a public hearing to be held in connection therewith was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the **Federal Register** on June 9, 2022 (87 FR 35246). The Commission conducted its hearing on September 22, 2022. All persons who requested the opportunity were permitted to participate.

The Commission made these determinations pursuant to §§ 705(b) and 735(b) of the Act (19 U.S.C. 1671d(b) and 19 U.S.C. 1673d(b)). It completed and filed its determinations in these investigations on November 14, 2022. The views of the Commission are contained in USITC Publication 5381 (November 2022), entitled *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea: Investigation Nos. 701–TA–671–672 and 731–TA–1571–1573 (Final).*

By order of the Commission.

Issued: November 14, 2022.

**Jessica Mullan,**

*Attorney Advisor.*

[FR Doc. 2022–25109 Filed 11–17–22; 8:45 am]

**BILLING CODE 7020–02–P**

---

**INTERNATIONAL TRADE COMMISSION**

**Summary of Commission Practice Relating to Administrative Protective Orders**

**AGENCY:** International Trade Commission.

**ACTION:** Summary of commission practice relating to administrative protective orders.

**SUMMARY:** Since February 1991, the U.S. International Trade Commission ("Commission") has published in the **Federal Register** reports on the status of its practice with respect to breaches of

---

[1] The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

[2] 87 FR 59041, 59045, 59047, 59054, and 59056 (September 29, 2022).

[3] The Commission also finds that imports subject to Commerce's affirmative critical circumstances determinations are not likely to undermine seriously the remedial effect of the antidumping duty orders on oil country tubular goods from Mexico and Russia.

[4] 87 FR 28801, 28804, and 28808 (May 11, 2022) (antidumping duty preliminary determinations) and 87 FR 14249 (March 14, 2022) (countervailing duty preliminary determination for Russia). Commerce preliminarily determined that countervailable subsidies were not being provided to producers and exporters of oil country tubular goods from South Korea. 87 FR 14248 (March 14, 2022) (countervailing duty preliminary determination for South Korea).

6

Views of the Commission (Final)

11/15/2022

Appx172-239

**List 1, Doc. No. 168 – EDIS No. 784559**
**USITC Publication No. 5381 (Nov. 2022)**

**Views of the Commission**

Based on the record in the final phase of these investigations, we determine that an industry in the United States is materially injured by reason of imports of oil country tubular goods ("OCTG") from Argentina, Mexico, and Russia found by the U.S. Department of Commerce ("Commerce") to be sold in the United States at less than fair value and imports of OCTG from Russia and South Korea found by Commerce to be subsidized by the governments of Russia and South Korea.  We also find that critical circumstances do not exist with respect to imports of OCTG from Mexico and Russia that are subject to Commerce's final affirmative critical circumstances determinations.

## I.    Background

The petitions in these investigations were filed on October 6, 2021, by Borusan Mannesmann Pipe U.S., Inc. ("Borusan"), PTC Liberty Tubulars LLC ("PTC"), U.S. Steel Tubular Products, Inc. ("U.S. Steel"), the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"), and Welded Tube USA, Inc. ("Welded Tube") (collectively, "Petitioners").[1]  Borusan, PTC, U.S. Steel, and Welded Tube are domestic producers of OCTG; USW is a labor union representing U.S. OCTG workers.  Petitioners appeared at the hearing[2] and submitted joint prehearing and posthearing briefs and final comments.[3]

The following respondent parties appeared at the hearing and submitted joint prehearing and posthearing briefs and final comments:  Tenaris Bay City, Inc., Maverick Tube Corporation, and IPSCO Tubulars Inc. ("Tenaris USA"), domestic producers of OCTG; Tenaris Global Services (U.S.A.) Corporation ("TGS USA"), an importer of OCTG; Siderca S.A.I.C. ("Siderca"), a producer and exporter of OCTG in Argentina; and Tubos de Acero de Mexico, S.A.

---

[1] Confidential Report, Memorandum INV-UU-100 (Oct. 14, 2022) ("CR"); Public Report, *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381 (Oct. 2022) ("PR") at I-1.

[2] In light of the restrictions on access to the Commission building due to the COVID-19 pandemic, the Commission conducted its hearing on September 22, 2022, through written witness testimony and video conference, as set forth in procedures provided to the parties and announced on its website.  *See Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea; Scheduling of the Final Phase of Countervailing Duty and Anti-Dumping Duty Investigations*, 87 Fed. Reg. 35246 (Jun. 9, 2022).

[3] *See* EDIS Doc. 780224 ("Petitioners' Prehearing Br."); EDIS Doc. 781297 ("Petitioners' Posthearing Br."); and EDIS Doc. 782798 ("Petitioners' Final Comments").

("TAMSA"), a producer and exporter of OCTG in Mexico.[4]  Each of these firms is a subsidiary of the holding company Tenaris SA.[5]  Unless otherwise specified, we refer to them collectively herein as "Tenaris."

In addition to Tenaris, the Russian OCTG producer TMK Group ("TMK") also appeared at the hearing and submitted prehearing and posthearing briefs and final comments.[6]  The government of Korea ("GOK") and South Korean producer SeAH Steel Corporation submitted separate posthearing statements.[7]

U.S. industry data are based on the questionnaire responses of 19 domestic producers that accounted for the large majority of domestic OCTG production in 2021.[8]  U.S. import data are based on official Commerce import statistics, with adjustments made by Commission staff ***.[9]

The Commission received responses to its questionnaire from five foreign producers of subject merchandise:  one producer/exporter in Argentina, accounting for *** U.S. imports of subject merchandise from Argentina in 2021;[10] one producer/exporter in Mexico, accounting for *** U.S. imports of subject merchandise from Mexico in 2021;[11] one producer/exporter in Russia, accounting for *** percent of U.S. imports of subject merchandise from Russia in 2021;[12] and two producers/exporters in South Korea, accounting for *** percent of U.S. imports of subject merchandise from South Korea in 2021.[13]

---

[4] *See* EDIS Doc. 780231 ("Tenaris's Prehearing Br."); EDIS Doc. 781297 ("Tenaris's Posthearing Br."); and EDIS Doc. 781293 ("Tenaris's Final Comments").

[5] CR/PR at Tables III-2-4; Preliminary Phase Conference Transcript, EDIS Doc. 755274, at 164 (Curá).

[6] *See* EDIS Doc. 780232 ("TMK's Prehearing Br."); EDIS Doc. 781287 ("TMK's Posthearing Br."); and EDIS Doc. 782795 ("TMK's Final Comments").

[7] *See* EDIS Doc. 781274 ("GOK's Posthearing Statement"); EDIS Doc. 781287 ("SeAH Steel Corporation's Posthearing Statement").

[8] CR/PR at I-5 and III-1.

[9] CR/PR at I-5 and IV-1.  After finding *de minimis* subsidy rates for the two individually examined South Korean respondents (Hyundai Steel and SeAH Steel) during the preliminary phase of the investigations, Commerce calculated a *de minimis* rate for only Hyundai Steel in its final determination and so disregarded subsidies to Hyundai Steel in determining countervailing duties.  *See Oil Country Tubular Goods from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 59056 (Sept. 29, 2022).  Thus, OCTG imports from this firm are not subject to these investigations, and Commission staff have accordingly adjusted the import data by *** while other in-scope imports from South Korea are classified as subject imports.

[10] CR/PR at VII-3.

[11] CR/PR at VII-10.

[12] CR/PR at VII-17.

[13] CR/PR at VII-24.  In addition to responses from the two subject producers/exporters, the Commission also received a response from nonsubject producer/exporter Hyundai Steel Company.  *Id.*

## II.    Domestic Like Product

### A.    In General

In determining whether an industry in the United States is materially injured or threatened with material injury by reason of imports of subject merchandise, the Commission first defines the "domestic like product" and the "industry."[14]  Section 771(4)(A) of the Tariff Act of 1930, as amended ("the Tariff Act"), defines the relevant domestic industry as the "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[15]  In turn, the Tariff Act defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation."[16]

By statute, the Commission's "domestic like product" analysis begins with the "article subject to an investigation," *i.e.*, the subject merchandise as determined by Commerce.[17]  Therefore, Commerce's determination as to the scope of the imported merchandise that is subsidized and/or sold at less than fair value is "necessarily the starting point of the Commission's like product analysis."[18]  The Commission then defines the domestic like product in light of the imported articles Commerce has identified.[19]  The decision regarding the appropriate domestic like product(s) in an investigation is a factual determination, and the Commission has applied the statutory standard of "like" or "most similar in characteristics and

---

[14] 19 U.S.C. § 1677(4)(A).

[15] 19 U.S.C. § 1677(4)(A).

[16] 19 U.S.C. § 1677(10).

[17] 19 U.S.C. § 1677(10).  The Commission must accept Commerce's determination as to the scope of the imported merchandise that is subsidized and/or sold at less than fair value.  *See*, *e.g.*, *USEC, Inc. v. United States*, 34 Fed. App'x 725, 730 (Fed. Cir. 2002) ("The ITC may not modify the class or kind of imported merchandise examined by Commerce."); *Algoma Steel Corp. v. United States,* 688 F. Supp. 639, 644 (Ct. Int'l Trade 1988), *aff'd*, 865 F.3d 240 (Fed. Cir.), *cert. denied*, 492 U.S. 919 (1989).

[18] *Cleo Inc. v. United States,* 501 F.3d 1291, 1298 (Fed. Cir. 2007); *see also Hitachi Metals, Ltd. v. United States*, Case No. 19-1289, slip op. at 8-9 (Fed. Cir. 2020) (the statute requires the Commission to start with Commerce's subject merchandise in reaching its own like product determination).

[19] *Cleo*, 501 F.3d at 1298 n.1 ("Commerce's {scope} finding does not control the Commission's {like product} determination."); *Hosiden Corp. v. Advanced Display Mfrs.,* 85 F.3d 1561, 1568 (Fed. Cir. 1996) (the Commission may find a single like product corresponding to several different classes or kinds defined by Commerce); *Torrington Co. v. United States*, 747 F. Supp. 744, 748–52 (Ct. Int'l Trade 1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991) (affirming the Commission's determination defining six like products in investigations where Commerce found five classes or kinds).

uses" on a case-by-case basis.[20]  No single factor is dispositive, and the Commission may consider other factors it deems relevant based on the facts of a particular investigation.[21]  The Commission looks for clear dividing lines among possible like products and disregards minor variations.[22]

### B.    Product Description

Commerce defined the imported merchandise within the scope of the investigations as:
{C}ertain OCTG, which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (*e.g.*, whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of the investigations also covers OCTG coupling stock.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise processed in a third country, including by performing any heat treatment, cutting, upsetting, threading, coupling, or any other finishing, packaging, or processing that would not otherwise remove the

---

[20] *See, e.g., Cleo Inc. v. United States,* 501 F.3d 1291, 1299 (Fed. Cir. 2007); *NEC Corp. v. Dep't of Commerce*, 36 F. Supp. 2d 380, 383 (Ct. Int'l Trade 1998); *Nippon Steel Corp. v. United States,* 19 CIT 450, 455 (1995); *Torrington Co. v. United States,* 747 F. Supp. 744, 749 n.3 (Ct. Int'l Trade 1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991) ("every like product determination 'must be made on the particular record at issue' and the 'unique facts of each case'").  The Commission generally considers a number of factors, including the following:  (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions of the products; (5) common manufacturing facilities, production processes, and production employees; and, where appropriate, (6) price.  *See Nippon,* 19 CIT at 455 n.4; *Timken Co. v. United States,* 913 F. Supp. 580, 584 (Ct. Int'l Trade 1996).

[21] *See, e.g.,* S. Rep. No. 96-249 at 90-91 (1979).

[22] *Nippon*, 19 CIT at 455; *Torrington*, 747 F. Supp. at 748-49; *see also* S. Rep. No. 96-249 at 90-91 (Congress has indicated that the like product standard should not be interpreted in "such a narrow fashion as to permit minor differences in physical characteristics or uses to lead to the conclusion that the product and article are not 'like' each other, nor should the definition of 'like product' be interpreted in such a fashion as to prevent consideration of an industry adversely affected by the imports under consideration.").

6

merchandise from the scope of the investigations if performed in the country of manufacture of the OCTG.

Excluded from the scope of the investigations are: casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.[23]

OCTG are tubular steel products used in oil and gas wells and consist primarily of casing and tubing.[24] OCTG are manufactured by a seamless process or a welded process.[25] Both seamless OCTG and welded OCTG are used in drilling and conveyance applications, although seamless OCTG generally is required for use in high-pressure or sour service environments.[26] Casing is a circular pipe that serves as the structural retainer for the walls of the well with an outside diameter ("OD") ranging from 4.5 to 20 inches. Casing is used in the well to provide a firm foundation for the drill string by supporting the walls of the hole to prevent caving in both during drilling and after the well is completed. After the casing is set, concrete is usually pumped between the outside of the casing and the wall of the hole to provide a secure anchor. Casing also serves as a surface pipe designed to prevent contamination of the recoverable oil and gas by surface water, gas, sand, or limestone.[27]

Tubing is a smaller-diameter pipe (between 1.050 and 4.500 inches in OD) installed inside a larger-diameter casing that is used to conduct the oil or gas to the surface either through natural flow or pumping. Tubing must be strong enough to support its own weight, that of the oil or gas, and that of any pumping equipment suspended on the string. Both tubing

---

[23] *Oil Country Tubular Goods from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 59056, 59057 (Sept. 29, 2022); *Oil Country Tubular Goods from the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 87 Fed. Reg. 59047, 59049 (Sept. 29, 2022); *Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg. 59054, 59055 (Sept. 29, 2022); *Oil Country Tubular Goods from Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 87 Fed. Reg. 59041, 59042 (Sept. 29, 2022); *Oil Country Tubular Goods from the Russian Federation: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances Determination, in Part*, 87 Fed. Reg. 59045, 59047 (Sept. 29, 2022).
[24] CR/PR at I-13.
[25] CR/PR at I-14.
[26] CR/PR at I-14. A sour service well contains hydrogen sulfide gas which can potentially result in sulfide stress cracking in the welded seam of welded OCTG. *Id*.
[27] CR/PR at I-18.

and casing are usually produced in accordance with American Petroleum Institute ("API") standard 5CT.[28]

In addition, coupling stock is a seamless tubular product used to make coupling blanks which, in turn, are used to produce couplings. Couplings are thick-walled internally threaded cylinders that are used for joining two lengths of threaded OCTG and typically account for 2-3 percent of the weight of end-finished tubing or casing. Couplings are produced and certified to the same API grade and type as the OCTG to which the couplings are joined.[29]

### C.    Arguments of the Parties

Petitioners argue that the Commission should define a single domestic like product coextensive with the scope, as it did in the preliminary phase of the investigations.[30] Petitioners note that the scope encompasses both seamless and welded OCTG, and both finished and unfinished OCTG.[31]  Respondents do not address the issue.

### D.    Analysis

In its preliminary determinations, the Commission found that no clear lines divided seamless and welded OCTG and defined them as a single domestic like product, based on an analysis of its traditional like product factors.[32]  The Commission also defined finished and unfinished OCTG as a single domestic like product, based on its semi-finished products

---

[28] CR/PR at I-18.

[29] CR/PR at I-20.

[30] Petitioners' Prehearing Br. at 12-13.

[31] Petitioners' Prehearing Br. at 13.

[32] *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Preliminary), USITC Pub. 5248 (Nov. 2021) ("Preliminary Determinations") at 9-12.  Specifically, the Commission found that seamless and welded OCTG share basic physical characteristics and are both used in oil and gas wells, and that they share identical channels of distribution.  *Id*. at 9-10.  While the Commission acknowledged that the processes used in the initial formation of seamless and welded OCTG differ, it found that the processes used in finishing them are the same.  *Id*. at 10.  While the Commission further acknowledged that seamless OCTG may be required for certain more demanding applications, it observed that seamless and welded OCTG are otherwise interchangeable in a large number of applications, as reflected by producer and customer perceptions.  *Id*. at 10-11.  Finally, the Commission found that, while seamless OCTG is generally more expensive than welded OCTG, this price premium diminished over the preliminary phase period of investigation.  *Id*. at 12.  In light of the preponderance of similarities between seamless and welded OCTG, the Commission included them within a single domestic like product.  *Id*.

8

analysis.[33]  Accordingly, the Commission defined a single domestic like product consisting of OCTG, coextensive with the scope of the investigations.[34]

   The record in the final phase of the investigations contains no new information or party argument that would warrant the Commission's reconsideration of its domestic like product definition from the preliminary phase of the investigations.  We accordingly again define a single domestic like product consisting of all domestically produced OCTG, coextensive with Commerce's scope of the investigations.

## III.    Domestic Industry

   The domestic industry is defined as the domestic "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[35]  In defining the domestic industry, the Commission's general practice has been to include in the industry producers of all domestic production of the like product, whether toll-produced, captively consumed, or sold in the domestic merchant market.

   These investigations raise two separate domestic industry issues.  The first concerns whether processors that heat treat OCTG engage in sufficient production-related activities to qualify as domestic producers.[36]  The second concerns whether appropriate circumstances exist to exclude any U.S. producers from the domestic industry pursuant to the related parties provision.

### A.    Sufficient Production-Related Activities

   In deciding whether a firm qualifies as a domestic producer of the domestic like product, the Commission generally analyzes the overall nature of a firm's U.S. production-related

---

[33] Preliminary Determinations at 12-14.  Specifically, the Commission found that unfinished OCTG is dedicated to the production of finished OCTG, that there is no separate market for unfinished OCTG, and that unfinished OCTG imparts essential characteristics to finished OCTG.  *Id*. at 13.  While acknowledging that there are differences in the costs and physical characteristics of unfinished and finished OCTG, and that the process of transforming the former into the latter is capital and labor intensive, the Commission found that, on balance, the record supported defining unfinished and finished OCTG as a single domestic like product.  *Id*. at 14.

[34] Preliminary Determinations at 14.

[35] 19 U.S.C. § 1677(4)(A).

[36] Heat treatment enhances certain physical characteristics of OCTG, including yield and tensile strengths.  Generally, as the depth and pressure in a well increases, heat treated OCTG would be required because of its higher strength.  CR/PR at I-19.

9

activities, although production-related activity at minimum levels could be insufficient to constitute domestic production.[37]

### 1.    Arguments of the Parties

Petitioners argue that processors that heat treat OCTG engage in sufficient production-related activities to be considered part of the domestic industry.[38]  They submit that defining the domestic industry to include heat treaters in addition to OCTG mills would be "consistent with the Commission's definition of the domestic industry in prior OCTG proceedings."[39] Respondents do not address the issue.

### 2.    Analysis

In its preliminary determinations, the Commission found that heat treaters engage in sufficient production-related activities to be considered domestic producers.[40]  The record of the final phase of the investigations contains no new information or argument that would warrant the Commission's reconsideration of its sufficient production-related activities analysis

---

[37] The Commission generally considers six factors:  (1) source and extent of the firm's capital investment; (2) technical expertise involved in U.S. production activities; (3) value added to the product in the United States; (4) employment levels; (5) quantity and type of parts sourced in the United States; and (6) any other costs and activities in the United States directly leading to production of the like product.  No single factor is determinative and the Commission may consider any other factors it deems relevant in light of the specific facts of any investigation.  *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. Nos. 701-TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 at 12-13 (Nov. 2012), *aff'd, Changzhou Trina Solar Energy Co. v. USITC,* 879 F. 3d 1377 (Fed. Cir. 2018).

[38] Petitioners' Prehearing Br. at 13-14.

[39] Petitioners' Prehearing Br. at 14 and n.39 (citing several past OCTG investigations and reviews).

[40] Preliminary Determinations at 15-18.  Specifically, while noting the differences in the hourly wages paid by heat treaters and OCTG mills, the Commission observed that heat treaters still rated their production-related activities as highly complex, indicating that heat treatment requires a significant degree of technical expertise.  *Id*. at 16.  Likewise, the Commission observed that heat treaters reported substantial levels of capital investment and employment, and that the value added by their operations was significant. *Id*. at 16-17.  While acknowledging that U.S. mills reported higher capital investment, employment, and value added than did heat treaters, the Commission found that several responding mills in fact integrated heat treatment into their operations, which would account for a portion of their reported capital investments, employment, and value added.  *Id*. at 17.  Finally, the Commission found that heat treaters reported the value of their domestically sourced raw materials as being substantial. *Id*. at 17-18.  Based on these considerations, the Commission found that heat treaters engage in sufficient production-related activities to qualify for inclusion in the domestic industry.  *Id*. at 18.

from the preliminary phase of the investigations.[41]  We accordingly find that heat treaters engage in sufficient production-related activities to qualify for inclusion in the domestic industry.

### B.    Related Parties

We next determine whether any producer of the domestic like product should be excluded from the domestic industry pursuant to section 771(4)(B) of the Tariff Act.  This provision allows the Commission, if appropriate circumstances exist, to exclude from the domestic industry producers that are related to an exporter or importer of subject merchandise or which are themselves importers.[42]  Exclusion of such a producer is within the Commission's discretion based upon the facts presented in each investigation.[43]

---

[41] No party requested the collection of data pertinent to a sufficient production-related activities analysis in their comments on the draft final phase questionnaires, and no such data were collected.
Heat treaters have been considered to qualify for inclusion in the domestic industry in several prior OCTG investigations.  *See, e.g., Certain Oil Country Tubular Goods from China*, Inv. No. 701-TA-463 (Final), USITC Pub. 4124 (Jan. 2010) at 6; *Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. 4489 (Sept. 2014) at 14.

[42] *See Torrington Co. v. United States*, 790 F. Supp. 1161, 1168 (Ct. Int'l Trade 1992), *aff'd without opinion*, 991 F.2d 809 (Fed. Cir. 1993); *Sandvik AB v. United States*, 721 F. Supp. 1322, 1331-32 (Ct. Int'l Trade 1989), *aff'd mem.*, 904 F.2d 46 (Fed. Cir. 1990); *Empire Plow Co. v. United States*, 675 F. Supp. 1348, 1352 (Ct. Int'l Trade 1987).

[43] The primary factors the Commission has examined in deciding whether appropriate circumstances exist to exclude a related party include the following:
    (1) the percentage of domestic production attributable to the importing producer;
    (2) the reason the U.S. producer has decided to import the product subject to investigation (whether the firm benefits from the LTFV sales or subsidies or whether the firm must import in order to enable it to continue production and compete in the U.S. market);
    (3) whether inclusion or exclusion of the related party will skew the data for the rest of the industry;
    (4) the ratio of import shipments to U.S. production for the imported product; and
    (5) whether the primary interest of the importing producer lies in domestic production or importation.  *Changzhou Trina Solar Energy Co. v. USITC*, 100 F. Supp.3d 1314, 1326-31 (Ct. Int'l. Trade 2015), *aff'd*, 879 F. 3d 1377 (Fed. Cir. 2018); see *also Torrington Co.  v. United States*, 790 F. Supp. at 1168.

Two U.S. firms (***) are subject to the related parties provision because they imported subject merchandise during the January 2019 – June 2022 period of investigation ("POI").[44] [45] In addition, three firms, ***, are or may be subject to the related parties provision because they potentially control, or are controlled by, exporters or importers of subject merchandise, or because they are related to exporters or importers of subject merchandise through common

---

[44] CR/PR at III-27; *** U.S. producer questionnaire response at III-21.

[45] CR/PR at III-27. Domestic producer *** did not itself import subject merchandise, but purchased subject merchandise from *** from various importers throughout the POI, and purchased subject imports from *** from importer *** in 2020. CR at Table III-23. A domestic producer shall be considered to be a related party if it directly or indirectly controls an exporter, importer, or third party. 19 U.S.C. § 1677(4)(B). A domestic producer that does not itself import subject merchandise or does not share a corporate affiliation with an importer may nonetheless be deemed a related party if it controls large volumes of subject imports. *See* SAA at 858. The Commission has found such control to exist, for example, where the domestic producer's purchases were responsible for a predominant proportion of an importer's subject imports and the importer's subject imports were substantial. *See, e.g.*, *Iron Construction Castings from Brazil, Canada, and China*, Inv. Nos. 701-TA-248, 731-TA-262-263, 265 (Fourth Review), USITC Pub. 4655 at 11 (Dec. 2016); *Chlorinated Isocyanurates from China and Spain*, Inv. Nos. 731-TA-1082-1083 (Second Review), USITC Pub. 4646 at 12 (Nov. 2016).

***, which buys subject imported "green tube" (*i.e.*, unfinished OCTG) for processing into finished OCTG, purchased *** short tons in 2019, *** short tons in 2020, and *** short tons in 2021 of subject imports from ***, identifying ***. In addition *** imported *** short tons of subject imports from *** from importer *** in 2020 alone. CR/PR at Table III-23 and at III-30. None of the identified importers provided a response to the Commission's U.S. importer questionnaire. Thus, we are unable to determine whether *** purchases were responsible for a predominant proportion of the individual subject importers' subject imports. As a ratio of *** purchases to overall subject imports from ***, the purchases accounted for only *** percent in 2019, *** percent in 2020, and *** percent in 2021. Purchases of subject imports from *** in 2020 accounted for *** percent of overall subject imports from ***. *See* CR/PR at Table III-23. In 2020, *** percent of total subject imports. *Derived* from Tables III-23 and C-1. Based on the record, and in the absence of any contrary argument, we find that *** is not subject to the related parties provision because it does not control large volumes of subject imports. Moreover, even if it were, appropriate circumstances would not exist to exclude it from the domestic industry. While ***, a comparison of the quantity of subject imports that *** purchased from *** and *** during the POI to the total volume of imports that it processed indicate that *** primarily processed nonsubject imports. *Compare* CR/PR Tables III-23 and F-10 (showing that *** 2021 purchases of subject imports from *** accounted for *** percent of the total volume of imports it processed that year, and that its 2020 purchases of subject imports from *** accounted for *** percent of the total volume of imports it processed that year). Thus, *** imports of subject merchandise are unlikely to skew the data for the rest of the domestic industry.

ownership and control.[46]  *** is also subject to the related parties provision based on the purchases of subject imports by its affiliated importer, ***.[47]

### 1.      Arguments of the Parties

Petitioners argue that the Commission should define the domestic industry to include all domestic producers of OCTG, as it did in the preliminary phase of the investigations.[48]

Tenaris argues that Tenaris USA should not be excluded from the domestic industry.[49] Conversely, it contends that "there are grounds to consider whether" Borusan and Welded Tube should be excluded from the domestic industry, due to the former's *** and the latter's importation of nonsubject merchandise.[50]

---

[46] *** is a member of the same corporate group as ***, which exports subject merchandise to the United States.  *See* CR/PR at Table III-4; *** U.S. producer questionnaire response.  It is unclear whether *** controls ***, or vice versa, or whether these two firms are under common control. Irrespective of whether *** is subject to the related parties provision due to a requisite control relationship, it is subject to this provision due to its importation of subject merchandise, as discussed previously.

*** is affiliated through the *** with ***, which exports subject merchandise to the United States, and with ***.  *See* CR/PR at Tables III-3-4; *** U.S. producer questionnaire response.  *** is *** percent owned by ***, and *** percent owned by ***.  CR/PR at Table III-2.  Deciding whether these relationships indicate a requisite control relationship is unnecessary since even assuming that *** is subject to the related parties provision, we do not find that appropriate circumstances would exist to exclude it from the domestic industry, as discussed below.

*** is a sister company of *** and ***, both of which export subject merchandise to the United States.  *See* CR at Table III-4; *** foreign producer questionnaire response; *** foreign producer questionnaire response.  *** and both *** and *** are subsidiaries of ***.  *See* CR/PR at Tables III-2-4; Preliminary Phase Conference Transcript, EDIS Doc. 755274, at 164 (Curá).  Thus, the record indicates that *** and both *** and *** are under common control.

[47] *** and importer *** are subsidiaries of ***, indicating they are under common control.  *** reported that *** purchased subject imports from *** from importer *** in quantities of *** short tons in 2020, *** short tons in 2021, and *** short tons in interim 2022, compared to *** short tons in interim 2021.  CR/PR at Table III-24.  These purchases accounted for *** to *** percent of *** reported imports during these periods, and *** was responsible for *** to *** percent of total imports from *** during the periods.  *See id.*  Because these purchases were responsible for a predominant proportion of *** subject imports from *** and those imports were substantial, we find that *** is subject to the related parties provision based on its affiliate's, ***, control of large volumes of *** subject imports from *** through those purchases.

[48] Answers to Commissioner Questions appended to Petitioners' Posthearing Br. at II-51-52.

[49] Exhibit I to Tenaris's Posthearing Br. at 7.

[50] Exhibit I to Tenaris's Posthearing Br. at 9.  The related parties provision of the statute allows the Commission, if appropriate circumstances exist, to exclude from the domestic industry producers that are related to an exporter or importer of subject merchandise, or which are themselves importers of subject merchandise.  19 U.S.C. § 1677(4)(B).  That Welded Tube is ***, and that Borusan is an importer of *nonsubject merchandise,* does not make either firm subject to the related parties provision.

13

2.      **Analysis**

Based on the following analysis, we find that appropriate circumstances do not exist to exclude any domestic producer from the domestic industry under the related parties provision.[51]

***.  *** accounted for *** percent of U.S. mill production in 2021, making it the *** largest domestic producer of OCTG.[52]  *** imported subject merchandise from *** in 2019 and in January – June 2022 ("interim 2022").[53]  The ratio of its subject imports to U.S. mill production was *** percent in 2019 and *** percent in interim 2022.[54]  *** indicated that ***.[55]

In view of the fact that *** importation of subject merchandise was small in relation to its domestic production, its primary interest appears to be in domestic production. Accordingly, we find that appropriate circumstances do not exist to exclude *** from the domestic industry.

***.  In 2019, the last year prior to its acquisition by ***, *** share of domestic mill production was *** percent, making it the *** largest domestic OCTG producer that year.[56] ***.[57]  Although *** reported importing OCTG from *** in 2019, it reported the volume of its imports from all sources, subject and nonsubject.[58]  The ratio of its imports from all sources to U.S. mill production was *** percent in 2019.[59]  *** operating income to net sales ratio was *** the industry average in 2019.[60]

During the 2019 period in which ***, its primary interest appears to have been in domestic production, given that its ratio of imports from all sources to domestic production was *** and its ratio of subject imports to domestic production would have been ***.  In light

---

[51] In its preliminary determinations, the Commission found that appropriate circumstances did not exist to exclude any domestic producer, and defined the domestic industry as all U.S. producers of OCTG.  *See* Preliminary Determinations at 18-21.
[52] CR/PR at Table III-1.
[53] CR/PR at Table III-19.
[54] CR/PR at Table III-19.
[55] CR/PR at Table III-22.
[56] *Derived from* *** U.S. producer questionnaire response at II-7 and CR/PR Table III-7.
[57] *** U.S. producer questionnaire response at I-4.
[58] *** U.S. producer questionnaire response at II-21.  In the final phase of the investigations, *** has clarified that ***.  *See Id.*
[59] *Derived from* *** producer questionnaire response at II-7 and II-21.  *** did not report its reasons for importing subject merchandise.
[60] *Derived from* *** U.S. producer questionnaire response at III-9a and CR/PR Table VI-7.  As a ratio to net sales, *** operating income was *** percent in 2019.  *Id.*

of this, we find that appropriate circumstances do not exist to exclude \*\*\* from the domestic industry.

    \*\*\*.  \*\*\* accounted for \*\*\* percent of U.S. mill production in 2021, making it the \*\*\* largest domestic producer of OCTG.[61]  It \*\*\*.[62]  \*\*\* imports of subject merchandise from \*\*\* were \*\*\* short tons in 2019, \*\*\* short tons in 2020, and \*\*\* short tons in 2021; they were \*\*\* short tons in interim 2022, compared to \*\*\* short tons in January – June 2021 ("interim 2021").[63]  The ratio of its affiliate's subject imports to \*\*\* U.S. mill production was \*\*\* percent in 2019, \*\*\* percent in 2020, and \*\*\* percent in 2021; it was \*\*\* percent in interim 2022, compared to \*\*\* percent in interim 2021.[64]  \*\*\* indicated that \*\*\*.[65]  \*\*\* operating income to net sales ratio was \*\*\* the industry average in interim 2022, but was otherwise \*\*\* the industry average.[66]

    \*\*\* ratio of subject imports to \*\*\* domestic production was high and increasing during the full years of the POI.  However, \*\*\* made substantial capital expenditures in the United States during the POI, particularly in 2019 (\*\*\*),[67] to \*\*\*.[68]  This reflects a certain level of commitment to domestic production.  Although the question is a close one, in the absence of any arguments to the contrary, and because \*\*\* inclusion would not change the overall trends or skew the data for the domestic industry during the POI, on balance we find that appropriate circumstances would not exist to exclude it from the domestic industry.

    \*\*\*.  \*\*\* accounted for \*\*\* percent of U.S. mill production in 2021, and is the \*\*\* largest domestic producer of OCTG.[69]  \*\*\*.[70]  \*\*\* imports of subject merchandise from \*\*\* were \*\*\* short tons in 2019, \*\*\* short tons in 2020, and \*\*\* short tons in 2021; they were \*\*\* short tons in interim 2022, compared to \*\*\* short tons in interim 2021.[71]  The ratio of \*\*\* subject imports to \*\*\* U.S. mill production was \*\*\* percent in 2019, \*\*\* percent in 2020, and \*\*\* percent in 2021; it was \*\*\* percent in interim 2022, compared to \*\*\* percent in interim

---

[61] CR/PR at Table III-1.

[62] \*\*\* U.S. producer questionnaire response at I-4.

[63] CR/PR at Table III-20.

[64] CR/PR at Table III-20.

[65] CR/PR at Table III-22.

[66] CR/PR at Table VI-7.  As a ratio to net sales, \*\*\* operating income was \*\*\* percent in 2019, \*\*\* percent in 2020, and \*\*\* percent in 2021; it was \*\*\* percent in interim 2022, compared to \*\*\* percent in interim 2021.  *Id*.

[67] \*\*\* capital expenditures were $\*\*\* in 2019, $\*\*\* in 2020, and $\*\*\* in 2021; they were $\*\*\* in interim 2022, compared to $\*\*\* in interim 2021.  CR/PR at Table VI-16.

[68] CR/PR at Table VI-17.

[69] CR/PR at Table III-1.

[70] \*\*\* producer questionnaire response at I-4.

[71] CR at Table III-21.

15

2021.[72]  As discussed above, *** is also subject to the related parties provision via its *** purchases of subject imports from ***.[73]  The ratio of its affiliated importer's subject imports and purchases combined to *** U.S. mill production was *** percent in 2019, *** percent in 2020, and *** percent in 2021; it was *** percent in interim 2022, compared to *** percent in interim 2021.[74]  *** indicated that ***.[75]  ***[76] operating income to net sales ratio was *** the industry average throughout the POI.[77]

    *** ratio of subject imports and purchases to *** domestic production increased irregularly from 2019 to 2021.  However, *** is *** U.S. producer and *** made *** capital expenditures in the United States throughout the POI, including by ***.[78]  This reflects a certain level of commitment to domestic production.  Moreover, as *** is *** U.S. producer, its exclusion would risk creating an incomplete picture of the U.S. industry during the POI.  Additionally, as noted above, no party argued to exclude it from the domestic industry.  For these reasons, we find on balance that appropriate circumstances do not exist to exclude *** from the domestic industry.

    In sum, based on the foregoing and in the absence of contrary argument, we find that appropriate circumstances do not exist to exclude any firm from the domestic industry under the related parties provision.  Accordingly, based on our definition of the domestic like product, we define the domestic industry to include all U.S. producers of OCTG.

## IV.    Cumulation[79]

    For purposes of evaluating the volume and effects for a determination of material injury by reason of subject imports, section 771(7)(G)(i) of the Tariff Act requires the Commission to

---

[72] CR/PR at Table III-21.

[73] CR/PR at Table III-24.

[74] *Derived from* CR/PR at Tables III-21 and III-24.

[75] CR/PR at Table III-22.

[76] ***.  CR/PR at VI-1, n.3.  To analyze the financial data from *** over the POI with more consistency, these data have been combined.  *Id*.

[77] CR/PR at Table VI-7.  As a ratio to net sales, *** operating income was *** percent in 2019, *** percent in 2020, and *** percent in 2021; it was *** percent in interim 2022, compared to *** percent in interim 2021.  *Id*.

[78] CR/PR at Table VI-17.  *** capital expenditures were $*** in 2019, $*** in 2020, and $*** in 2021.  They were $*** in interim 2022, compared to $*** in interim 2021.  *Id*. at Table VI-16.

[79] Pursuant to Section 771(24) of the Tariff Act, imports from a subject country of merchandise corresponding to a domestic like product that account for less than 3 percent of all such merchandise imported into the United States during the most recent 12 months for which data are available preceding the filing of the petition shall be deemed negligible.  19 U.S.C. §§ 1673d(b), 1677(24)(A)(i). (Continued...)

cumulate subject imports from all countries as to which petitions were filed and/or investigations self-initiated by Commerce on the same day, if such imports compete with each other and with the domestic like product in the U.S. market.  In assessing whether subject imports compete with each other and with the domestic like product, the Commission generally has considered four factors:

    (1)    the degree of fungibility between subject imports from different countries and between subject imports and the domestic like product, including consideration of specific customer requirements and other quality related questions;

    (2)    the presence of sales or offers to sell in the same geographic markets of subject imports from different countries and the domestic like product;

    (3)    the existence of common or similar channels of distribution for subject imports from different countries and the domestic like product; and

    (4)    whether the subject imports are simultaneously present in the market.[80]

While no single factor is necessarily determinative, and the list of factors is not exclusive, these factors are intended to provide the Commission with a framework for determining whether the subject imports compete with each other and with the domestic like product.[81]  Only a "reasonable overlap" of competition is required.[82]

---

During the most recent 12-month period preceding the filing of the petitions in these investigations (October 2020 through September 2021), subject imports from Argentina accounted for 8.4 percent of total imports, subject imports from Mexico accounted for 18.7 percent of total imports, subject imports from Russia (both for the antidumping and countervailing duty investigations) accounted for 7.1 percent of total imports, and subject imports from South Korea accounted for \*\*\* percent of total imports.  CR/PR at Table IV-8.  Because imports for all subject countries exceed the negligibility threshold, we find that imports for each subject investigation are not negligible.

[80] *See Certain Cast-Iron Pipe Fittings from Brazil, the Republic of Korea, and Taiwan*, Inv. Nos. 731-TA-278-280 (Final), USITC Pub. 1845 (May 1986), *aff'd, Fundicao Tupy, S.A. v. United States*, 678 F. Supp. 898 (Ct. Int'l Trade), *aff'd*, 859 F.2d 915 (Fed. Cir. 1988).

[81] *See, e.g.*, *Wieland Werke, AG v. United State*s, 718 F. Supp. 50 (Ct. Int'l Trade 1989).

[82] The Statement of Administrative Action (SAA) to the Uruguay Round Agreements Act (URAA), expressly states that "the new section will not affect current Commission practice under which the statutory requirement is satisfied if there is a reasonable overlap of competition."  H.R. Rep. No. 103-316, Vol. I at 848 (1994) (*citing Fundicao Tupy, S.A. v. United States*, 678 F. Supp. at 902; *see Goss* (Continued...)

### A.    Arguments of the Parties

Petitioners argue that the Commission should cumulate imports from all subject countries as it did in the preliminary determinations because the petitions were filed on the same day and there is a reasonable overlap of competition between and among the domestic like product and imports from each subject country.  Specifically, Petitioners contend that subject imports from each source and the domestic like product are fungible, share common channels of distribution, are sold in overlapping geographic regions, and were simultaneously present throughout the POI.[83]

Tenaris argues that imports from Argentina and Mexico should not be cumulated with imports from South Korea.  Imports from Argentina and Mexico, it contends, primarily comprise seamless OCTG sold to end users, while imports from South Korea primarily comprise welded OCTG sold to distributors.[84]  Tenaris further argues that the higher average unit values ("AUVs") for imports from Argentina and Mexico relative to other subject imports reflect a lack of fungibility between imports from Argentina and Mexico and other subject imports.[85]

Tenaris and TMK argue that imports from Russia should not be cumulated, as "regulations, sanctions, and other obstacles … prevent such products from meaningfully competing with subject merchandise from Argentina, Mexico, and South Korea and with domestically produced {OCTG}."[86]  Of particular note, according to TMK, is that, as of March 2022, ***.[87]  TMK also emphasizes that the United States' suspension of normal trade relations

---

*Graphic Sys., Inc. v. United States*, 33 F. Supp. 2d 1082, 1087 (Ct. Int'l Trade 1998) ("cumulation does not require two products to be highly fungible"); *Wieland Werke, AG*, 718 F. Supp. at 52 ("Completely overlapping markets are not required.").

[83] Petitioners' Prehearing Br. at 15-22.

[84] Petitioners' Prehearing Br. at 35-40.  Tenaris contends that only seamless and not welded OCTG can be used in certain more demanding applications, such as in high-pressure or sour service environments.  *See* Petitioners' Prehearing Br. at 37.

[85] Petitioners' Prehearing Br. at 38.

[86] *See* TMK's Prehearing Br. at 3; *See also* Tenaris's Prehearing Br. at 40-41.  While conceding that these obstacles to competition arose only late in the POI – *i.e.*, subsequent to Russia's February 2022 invasion of Ukraine – TMK asserts that the relevant time period for assessing whether a reasonable overlap of competition exists for imports from Russia is from February 2022 onwards, as "consideration of the competitiveness of Russian subject merchandise in the U.S. marketplace prior to February 2022 provides little guidance" as to the current conditions of competition for these imports.  *Id*. at 3-4.  We disagree with TMK that we should focus our assessment of whether there is a reasonable overlap of competition from February 2022 onward and disregard data covering the majority of the POI.  As discussed below, based on the record in these investigations, we find that there is a reasonable overlap of competition between subject imports from Russia and other subject countries.

[87] *See* TMK's Prehearing Br. at 5-6; *See also* CR/PR at VII-17, n.19.

with Russia has resulted in high "Column 2" duties on OCTG from Russia, whereas OCTG from other subject sources enjoy lower general duty rates.[88]

## B.    Analysis

We consider subject imports from Argentina, Mexico, Russia, and South Korea on a cumulated basis because the statutory criteria for cumulation are satisfied.  As an initial matter, Petitioners filed the antidumping and countervailing duty petitions on the same day, October 6, 2021.[89]  There also is a reasonable overlap of competition between subject imports from Argentina, Mexico, Russia, and South Korea, and among subject imports from each source and the domestic like product, as discussed below.

*Fungibility*.  Majorities of responding domestic producers, importers, and purchasers, when comparing the domestic like product with imports of OCTG from each subject country and when comparing imports from the subject countries with each other, reported that these products are always or frequently interchangeable.[90]  Likewise, majorities of responding domestic producers, importers, and purchasers reported that factors other than price are only sometimes or never significant in purchasing decisions between and among imports from each subject country and the domestic like product.[91]  Moreover, majorities or pluralities of responding purchasers rated imports from each source as comparable with both each other and the domestic like product with respect to at least 14 of 15 purchasing factors.[92]  Consistent with these responses, the record shows that there was a substantial degree of overlap between U.S. shipments of subject imports from each source and domestically produced OCTG in terms of end finish, grade, and product type in 2021,[93] and that all OCTG, regardless of source, is

---

[88] TMK's Prehearing Br. at 5-8.  TMK also argues that OCTG from Russia is unable to compete with other subject imports because it is subject to 25 percent *ad valorem* duties under Section 232 of the Trade Expansion Act of 1962 ("Section 232"), whereas subject imports from Argentina and South Korea are subject to absolute quotas under Section 232, and subject imports from Mexico are exempted from such duties and quotas.  *Id*. at 8-9.

[89] None of the statutory exceptions to cumulation apply.

[90] CR/PR at Tables II-15-17.

[91] CR/PR at Tables II-18-20.

[92] CR/PR at Table II-14.

[93] CR/PR at Tables IV-14-16.

generally produced in accordance with API standards.[94] [95]  We also note that there were imports of seamless OCTG from each subject source throughout the POI, and that the domestic industry produced seamless OCTG throughout this period.[96]

We are unpersuaded by Tenaris's argument that imports from Argentina and Mexico are not fungible with imports from Russia or South Korea.  Majorities of responding domestic producers, importers, and purchasers reported that subject imports from both Argentina and Mexico are always or frequently interchangeable with subject imports from both Russia and South Korea.[97]  Likewise, majorities of responding domestic producers, importers, and purchasers reported that differences other than price are only sometimes or never significant when choosing between and among subject imports from the four sources.[98]  Moreover, majorities or pluralities of responding purchasers rated subject imports from both Argentina and Mexico as comparable with subject imports from both Russia and South Korea with respect to at least 14 of 15 purchasing factors.[99]  Consistent with these responses, there was a substantial degree of overlap between U.S. shipments of subject imports from all four sources in terms of end finish, grade, and product type in 2021.[100]

Although subject imports from South Korea primarily consist of welded OCTG, whereas subject imports from Argentina and Mexico primarily or exclusively consist of seamless OCTG,[101] we find that there remains a sufficient degree of fungibility between the imports for purposes of cumulation.  Although certain applications may require seamless OCTG, such as high pressure and many sour service environments, the record indicates that welded and seamless OCTG can be used interchangeably in most if not all other applications.  For example,

---

[94] CR/PR at I-18.  An exception is "limited service" OCTG, which is OCTG that does not meet API specifications, but which can still be used in certain OCTG applications.  *Id*. at I-21.  Additionally, while certain types of "green tube" may meet basic API standards such as diameter and wall thickness, it is not sold as meeting any particular API grade.  *Id.* at I-19-20.

[95] While it may be that ***, this does not mean that these products are not manufactured to API standards.  Indeed, among those purchasers that reported having knowledge of this issue, the vast majority, 15 of 17, reported that OCTG from Russia always or usually meets minimum quality specifications.  CR/PR at Table II-12.  Likewise, the vast majority of responding purchasers, 13 of 15, rated OCTG from Russia as comparable to the domestic like product – which is generally produced to API specifications – with respect to quality meets industry standards.  *Id*. at Table II-14.

[96] CR/PR at Tables III-8 and IV-5.

[97] CR/PR at Tables II-15-17.

[98] CR/PR at Tables II-18-20.

[99] CR/PR at Table II-14.

[100] CR/PR at Tables IV-14-16.

[101] CR/PR at Tables IV-5, IV-6, and IV-13.  Over the POI, subject imports from Mexico primarily comprised seamless OCTG, and subject imports from Argentina exclusively comprised seamless OCTG. *Id*.

both welded and seamless OCTG can meet the specifications for the majority of API grades, suggesting that either form can be used in the majority of applications.[102]  Likewise, a representative of respondent TMK stated that "customers can use either ERW {*i.e.,* welded OCTG} or seamless OCTG for most applications."[103]  Consistent with this evidence, the Commission has found seamless and welded OCTG to be largely fungible and interchangeable in previous investigations and five-year reviews,[104] and the current record does not suggest that the characteristics or uses of seamless and welded OCTG have changed since these prior determinations such that a different conclusion is warranted.[105]

We are also unpersuaded by Tenaris's argument that the higher AUVs of subject imports from Argentina and Mexico compared to the AUVs of subject imports from Russia and South Korea reflect a lack of fungibility.  While we acknowledge there are differences in the AUVs between these countries, the information discussed above indicates that there is a substantial degree of fungibility between and among subject imports from all four sources, notwithstanding such differences.

In light of all the above, we find that imports of OCTG from each subject source are sufficiently fungible with each other and the domestic like product to support a finding of a reasonable overlap of competition.

*Channels of Distribution*.  Domestic producers and importers of subject merchandise from Russia and South Korea primarily sold OCTG to *** over the POI while also selling a

---

[102] CR/PR at Table I-18-19.

[103] Exhibit 1 to TMK's Prehearing Br. at para. 6 (Declaration of Evgeniya Capaeva, Head of Commercial and Industrial Policy at TMK).  "ERW" refers to electric resistance welding, the manufacturing process used to make welded OCTG.  *See* CR/PR at I-21.

[104] *See, e.g., Certain Oil Country Tubular Goods from India, Korea, The Philippines, Saudi Arabia, Taiwan, Thailand, Turkey, Ukraine, and Vietnam,* Inv. Nos. 701-TA-499-500 and 731-TA-1215-1223 (Preliminary), USITC Pub. No. 4422 (Aug. 2013) at 10 ("There is a large degree of interchangeability between the two products, although welded OCTG cannot be used in certain demanding applications."). *See also Oil Country Tubular Goods from Argentina, Austria, Italy, Japan, Korea, Mexico, and Spain,* Inv. Nos. 701-TA-363-364 and 731-TA-711-717 (Preliminary) USITC Pub. No. 2803 (Aug. 1994) at I-9  ("The API specifications for most grades of OCTG provide that either welded or seamless products are acceptable … which indicates that they are interchangeable.  Because of technological developments in the production of welded OCTG, it is now possible for welded OCTG to be made as a higher strength corrosion resistant product and it therefore can be used in many of the same applications as seamless OCTG.").  *See further Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam,* Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. 5090 (Jul. 2020) at 16 ("While the record shows that in 2019 Ukraine was the sole subject source whose imports were principally seamless OCTG, this does not meaningfully limit its fungibility with other subject imports. Although welded and seamless OCTG are not interchangeable for all applications, the record indicates that either form can be used in the most common grades for most applications.").

[105] CR/PR at I-13-28.

smaller amount to ***.[106]  Importers of subject merchandise from Argentina and Mexico primarily sold OCTG to *** while also selling a smaller amount to ***.[107]  Thus, the domestic like product and subject imports from each country source were sold through overlapping channels of distribution during the POI.[108]

   *Geographic Overlap.*  Domestically produced OCTG and subject imports from both Argentina and Mexico were sold in all geographic areas of the United States over the POI.[109] Subject imports from Russia were sold in the Mountain and Central Southwest regions, and subject imports from South Korea were sold in the Northeast, Midwest, Southeast, Central Southwest, and Mountain regions during the period.[110]  The record also shows that nearly all subject imports from all four sources entered the United States through the Southern border of entry.[111]  The record thus shows that imports from each subject country and domestically produced OCTG were sold in overlapping geographical areas.

   *Simultaneous Presence in Market.*  The domestic like product and subject imports from all subject countries were simultaneously present throughout almost the entire POI.[112]

   We are unpersuaded by Tenaris's and TMK's argument that measures taken in response to Russia's February 2022 invasion of Ukraine have prevented subject imports from Russia from competing in the U.S. market such that cumulation of these imports is inappropriate.[113]  These measures did not prevent such imports from entering and being sold in the United States in

---

[106] CR/PR at Table II-1.

[107] CR/PR at Table II-1.

[108] We are unpersuaded by Tenaris's argument that subject imports from Argentina and Mexico do not sufficiently share channels of distribution with subject imports from Russia or South Korea to support a finding of a reasonable overlap of competition.  A *** share of subject imports from Mexico (*** percent in 2021), and *** share of subject imports from Argentina (*** percent in 2021), were sold to distributors, as were *** subject imports from both Russia and South Korea.  CR/PR at Table II-1.

[109] CR/PR at Table II-2.

[110] CR/PR at Table II-2.

[111] CR/PR at Table IV-17.

[112] CR/PR at Tables IV-18 and V-6-14.  Subject imports from Argentina were present in 37 of 42 months, subject imports from Mexico were present in 42 of 42 months, subject imports from Russia were present in 38 of 42 months, and subject imports from South Korea were present in 42 of 42 months.  *Id*. at Table IV-18.  The domestic like product was present throughout the POI.  *Id*. at Tables V-6-14.

[113] We are also unpersuaded by TMK's argument that section 232 duties of 25 percent on OCTG imported from Russia has rendered such imports uncompetitive with other subject imports in the U.S. market.  *See* TMK's Prehearing Br. at 8-9.  Although most responding domestic producers, importers, and purchasers reported that the section 232 duties had effects in the U.S. market, CR/PR at II-4-5, the duties did not prevent subject imports from Russia from entering the U.S. market in significant volumes throughout the POI, or from being present in the U.S. market for 38 months of the 42-month POI.  *See Id*. at Tables IV-3, 18.

significant quantities from February 2022 to the end of the POI.  Indeed, significant volumes of OCTG from Russia entered in two out of the four post-invasion months of the POI (March and May of 2022).[114]  Just as importantly, we observe that none of the additional measures emphasized by Tenaris and TMK prohibit the entry or sale of Russian OCTG,[115] and that the market impact of *** is not yet clear, particularly in light of continued subject imports from Russia after March 2022.[116]

 *Conclusion*.  The record shows that imports from Argentina, Mexico, Russia, and South Korea are fungible with each other and the domestic like product.  The record also shows that imports from each subject country and the domestic like product overlapped with respect to channels of distribution and geographic markets and were simultaneously present throughout nearly the entire POI.  Because the record shows a reasonable overlap of competition between and among domestically produced OCTG and imports from each subject country, we cumulate subject imports from Argentina, Mexico, Russia, and South Korea for purposes of our analysis of whether the domestic industry is materially injured by reason of subject imports.[117]

## V. Material Injury by Reason of Subject Imports

 Based on the record in the final phase of these investigations, we find that an industry in the United States is materially injured by reason of cumulated subject imports of OCTG from Argentina, Mexico, Russia, and South Korea.

---

[114] CR/PR at Table IV-18.  We note that the volume of subject imports from Russia, as well as the U.S. shipments of these imports, were higher in interim 2022 than in interim 2021, by *** percent and *** percent, respectively.  CR/PR at Tables IV-2 and G-4.

[115] In the context of a review of an antidumping duty order on products from Iran, the Commission observed that, while sanctions on that country that did not amount to an absolute embargo on such products "may require some additional efforts by Iranian producers to export to the United States," they were "not likely to preclude exporters of subject merchandise from participating in the U.S. market."  *See Raw In-Shell Pistachios from Iran*, Inv. No. 731-TA-287 (Second Review), USITC Pub. 4701 (Jun. 2017) at 19.

[116] We also note Petitioners' argument that the *** would not eliminate Russian-produced OCTG from being sold in the U.S. market with the ***.  According to Petitioners, Russian producers can still sell green tubes to API-certified processors in the United States or a third country, and once those green tubes are processed, the finished OCTG can be stenciled with the *** by the processor and sold in the U.S. market.  *See* Answers to Commissioner Questions Appended to Petitioners' Posthearing Br. at II-55-56.

[117] Respondents argue that subject import volume from Argentina, Mexico, Russia, and South Korea, considered individually, was not significant for various reasons.  *See, e.g.*, Tenaris's Prehearing Br. at 44-50; TMK's Prehearing Br. at 14-15, and the GOK's Posthearing Statement at 1.  Because we consider subject import volume on a cumulated basis, we do not find these arguments concerning subject imports from specific countries relevant or persuasive.

A. **Legal Standards**

In the final phase of antidumping and countervailing duty investigations, the Commission determines whether an industry in the United States is materially injured or threatened with material injury by reason of the imports under investigation.[118]  In making this determination, the Commission must consider the volume of subject imports, their effect on prices for the domestic like product, and their impact on domestic producers of the domestic like product, but only in the context of U.S. production operations.[119]  The statute defines "material injury" as "harm which is not inconsequential, immaterial, or unimportant."[120]  In assessing whether the domestic industry is materially injured by reason of subject imports, we consider all relevant economic factors that bear on the state of the industry in the United States.[121]  No single factor is dispositive, and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[122]

Although the statute requires the Commission to determine whether the domestic industry is "materially injured or threatened with material injury by reason of" unfairly traded imports,[123] it does not define the phrase "by reason of," indicating that this aspect of the injury analysis is left to the Commission's reasonable exercise of its discretion.[124]  In identifying a causal link, if any, between subject imports and material injury to the domestic industry, the Commission examines the facts of record that relate to the significance of the volume and price effects of the subject imports and any impact of those imports on the condition of the domestic industry.  This evaluation under the "by reason of" standard must ensure that subject imports are more than a minimal or tangential cause of injury and that there is a sufficient causal, not merely a temporal, nexus between subject imports and material injury.[125]

---

[118] 19 U.S.C. §§ 1671d(b), 1673d(b).

[119] 19 U.S.C. § 1677(7)(B).  The Commission "may consider such other economic factors as are relevant to the determination" but shall "identify each {such} factor ... and explain in full its relevance to the determination."  19 U.S.C. § 1677(7)(B).

[120] 19 U.S.C. § 1677(7)(A).

[121] 19 U.S.C. § 1677(7)(C)(iii).

[122] 19 U.S.C. § 1677(7)(C)(iii).

[123] 19 U.S.C. §§ 1671d(b), 1673d(b).

[124] *Angus Chemical Co. v. United States*, 140 F.3d 1478, 1484-85 (Fed. Cir. 1998) ("{T}he statute does not 'compel the commissioners' to employ {a particular methodology}."), *aff'g,* 944 F. Supp. 943, 951 (Ct. Int'l Trade 1996).

[125] The Federal Circuit, in addressing the causation standard of the statute, observed that "{a}s long as its effects are not merely incidental, tangential, or trivial, the foreign product sold at less than (Continued...)

In many investigations, there are other economic factors at work, some or all of which may also be having adverse effects on the domestic industry. Such economic factors might include nonsubject imports; changes in technology, demand, or consumer tastes; competition among domestic producers; or management decisions by domestic producers. The legislative history explains that the Commission must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold.[126] In performing its examination, however, the Commission need not isolate the injury caused by other factors from injury caused by unfairly traded imports.[127] Nor does the "by reason of" standard require that unfairly traded imports be the "principal" cause of

---

fair value meets the causation requirement*." Nippon Steel Corp. v. USITC*, 345 F.3d 1379, 1384 (Fed. Cir. 2003). This was further ratified in *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 873 (Fed. Cir. 2008), where the Federal Circuit, quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 722 (Fed. Cir. 1997), stated that "this court requires evidence in the record 'to show that the harm occurred "by reason of" the LTFV imports, not by reason of a minimal or tangential contribution to material harm caused by LTFV goods.'" *See also Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1357 (Fed. Cir. 2006); *Taiwan Semiconductor Industry Ass'n v. USITC*, 266 F.3d 1339, 1345 (Fed. Cir. 2001).

[126] SAA at 851-52 ("{T}he Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."); S. Rep. 96-249 at 75 (1979) (the Commission "will consider information which indicates that harm is caused by factors other than less-than-fair-value imports."); H.R. Rep. 96-317 at 47 (1979) ("in examining the overall injury being experienced by a domestic industry, the ITC will take into account evidence presented to it which demonstrates that the harm attributed by the petitioner to the subsidized or dumped imports is attributable to such other factors;" those factors include "the volume and prices of nonsubsidized imports or imports sold at fair value, contraction in demand or changes in patterns of consumption, trade restrictive practices of and competition between the foreign and domestic producers, developments in technology and the export performance and productivity of the domestic industry"); *accord Mittal Steel*, 542 F.3d at 877.

[127] SAA at 851-52 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports."); *Taiwan Semiconductor Industry Ass'n*, 266 F.3d at 1345 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports ... . Rather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports." (emphasis in original)); *Asociacion de Productores de Salmon y Trucha de Chile AG v. United States*, 180 F. Supp. 2d 1360, 1375 (Ct. Int'l Trade 2002) ("{t}he Commission is not required to isolate the effects of subject imports from other factors contributing to injury" or make "bright-line distinctions" between the effects of subject imports and other causes.); *see also Softwood Lumber from Canada*, Inv. Nos. 701-TA-414 and 731-TA-928 (Remand), USITC Pub. 3658 at 100-01 (Dec. 2003) (Commission recognized that "{i}f an alleged other factor is found not to have or threaten to have injurious effects to the domestic industry, *i.e.*, it is not an 'other causal factor,' then there is nothing to further examine regarding attribution to injury"), *citing Gerald Metals*, 132 F.3d at 722 (the statute "does not suggest that an importer of LTFV goods can escape countervailing duties by finding some tangential or minor cause unrelated to the LTFV goods that contributed to the harmful effects on domestic market prices.").

injury or contemplate that injury from unfairly traded imports be weighed against other factors, such as nonsubject imports, which may be contributing to overall injury to an industry.[128]  It is clear that the existence of injury caused by other factors does not compel a negative determination.[129]

Assessment of whether material injury to the domestic industry is "by reason of" subject imports "does not require the Commission to address the causation issue in any particular way" as long as "the injury to the domestic industry can reasonably be attributed to the subject imports."[130]  The Commission ensures that it has "evidence in the record" to "show that the harm occurred 'by reason of' the LTFV imports," and that it is "not attributing injury from other sources to the subject imports." [131]  The Federal Circuit has examined and affirmed various Commission methodologies and has disavowed "rigid adherence to a specific formula."[132]

The question of whether the material injury threshold for subject imports is satisfied notwithstanding any injury from other factors is factual, subject to review under the substantial evidence standard.[133]  Congress has delegated this factual finding to the Commission because of the agency's institutional expertise in resolving injury issues.[134]

---

[128] S. Rep. 96-249 at 74-75; H.R. Rep. 96-317 at 47.

[129] *See Nippon Steel Corp.*, 345 F.3d at 1381 ("an affirmative material-injury determination under the statute requires no more than a substantial-factor showing.  That is, the 'dumping' need not be the sole or principal cause of injury.").

[130] *Mittal Steel*, 542 F.3d at 876 &78; *see also id.* at 873 ("While the Commission may not enter an affirmative determination unless it finds that a domestic industry is materially injured 'by reason of' subject imports, the Commission is not required to follow a single methodology for making that determination … {and has} broad discretion with respect to its choice of methodology."), *citing United States Steel Group v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996) and S. Rep. 96-249 at 75.  In its decision in *Swiff-Train v. United States*, 793 F.3d 1355 (Fed. Cir. 2015), the Federal Circuit affirmed the Commission's causation analysis as comporting with the Court's guidance in *Mittal*.

[131] *Mittal Steel*, 542 F.3d at 873 (quoting from *Gerald Metals*, 132 F.3d at 722), 877-79.  We note that one relevant "other factor" may involve the presence of significant volumes of price-competitive nonsubject imports in the U.S. market, particularly when a commodity product is at issue.  In appropriate cases, the Commission collects information regarding nonsubject imports and producers in nonsubject countries in order to conduct its analysis.

[132] *Nucor Corp. v. United States*, 414 F.3d 1331, 1336, 1341 (Fed. Cir. 2005); *see also Mittal Steel*, 542 F.3d at 879 ("*Bratsk* did not read into the antidumping statute a Procrustean formula for determining whether a domestic injury was 'by reason of' subject imports.").

[133] We provide in our discussion below a full analysis of other factors alleged to have caused any material injury experienced by the domestic industry.

[134] *Mittal Steel*, 542 F.3d at 873; *Nippon Steel Corp.*, 458 F.3d at 1350, *citing U.S. Steel Group*, 96 F.3d at 1357; S. Rep. 96-249 at 75 ("The determination of the ITC with respect to causation is … complex and difficult, and is a matter for the judgment of the ITC.").

26

**B.     Conditions of Competition and the Business Cycle**

The following conditions of competition inform our analysis of whether there is material injury by reason of subject imports.

**1.     Demand Considerations**

Demand for OCTG is driven by oil and gas prices as well as exploration and production.[135]  The active U.S. rig count, an indicator of oil and gas production in the United States, decreased from January 2019 to an historic low in August 2020.[136]  After August 2020, the active U.S. rig count recovered through the end of the POI, while remaining below its 2019 levels.[137]  Similarly, U.S. oil and gas prices fell irregularly from January 2019 to mid-2020, and then increased irregularly through the end of the POI.[138]

Most responding U.S. producers and importers reported decreasing or fluctuating demand for OCTG since January 1, 2019, while most responding purchasers reported increasing demand.[139]  Petitioners and Tenaris agree that OCTG demand in the United States, after declining through August 2020 due to the COVID-19 pandemic, recovered thereafter through the end of the POI.[140]

Apparent U.S. consumption of OCTG decreased from 5.3 million short tons in 2019 to 2.7 million short tons in 2020, before increasing to 3.5 million short tons in 2021, a level 33.4 percent lower than in 2019.  It was 70.6 percent higher in interim 2022, at 2.4 million short tons, than in interim 2021, at 1.4 million short tons.[141]

**2.     Supply Considerations**

The domestic industry was the largest supplier of OCTG to the U.S. market throughout the POI.  Its share of the U.S. market decreased by 8.2 percentage points from 2019 to 2021, increasing from 56.7 percent in 2019 to 60.4 percent in 2020, before decreasing to 48.4 percent

---

[135] CR/PR at II-1 and II-19.
[136] CR/PR at II-19, Table II-5, and Figure II-2.
[137] CR/PR at II-19, Table II-5, and Figure II-2.
[138] CR/PR at Tables E-1-2.
[139] CR/PR at Table II-8.
[140] Petitioners' Prehearing Br. at 22-23; Tenaris's Prehearing Br. at 16-17.  Petitioners and Tenaris disagree as to the extent of this demand recovery, with Petitioners emphasizing that the active U.S. rig count was still lower at the end of the POI than at the beginning, and Tenaris emphasizing that a domestic producer reported experiencing "unprecedented demand" in 2022.  *See* Petitioners' Prehearing Br. at 23; Tenaris's Prehearing Br. at 22.
[141] CR/PR at Table IV-19.

in 2021.  Its share was slightly higher, at 51.2 percent, in interim 2022, than in interim 2021, at 50.6 percent.[142]  While several U.S. producers reported plant closings, shutdowns, and curtailments,[143] and eight of 14 responding U.S. producers reported supply constraints since January 1, 2019,[144] most purchasers rated both the availability and the reliability of supply of domestically produced OCTG as superior or comparable to that of subject imports from each source,[145] and domestic producers reported ***.[146]

Cumulated subject imports were the second largest source of supply to the U.S. market in 2021 and the third largest source throughout the remainder of the POI.  Their share of apparent U.S. consumption decreased from *** percent in 2019 to *** percent in 2020, and then increased to *** percent in 2021, a level *** percentage points greater than in 2019.  Their share of apparent U.S. consumption was lower in interim 2022, at *** percent, than in interim 2021, at *** percent.[147]  Cumulated subject imports consisted of both welded and seamless OCTG throughout the POI.[148]  Twenty-two of 27 responding purchasers reported that the availability of subject imports of OCTG had changed, citing factors such as the COVID-19 pandemic and the Russia-Ukraine War.[149]  ***, a domestic producer and importer of subject imports from ***, reported supply constraints due to the COVID-19 pandemic.[150]  ***, an importer of subject merchandise from ***, reported supply constraints due to the unavailability of hot-rolled coil ("HRC").[151]

Nonsubject imports were the third largest source of supply to the U.S. market in 2021 and the second large source throughout the remainder of the POI.  Their share of apparent U.S. consumption declined from *** percent in 2019 to *** percent in 2020, and to *** percent in 2021, a level *** percentage points lower than in 2019.  Their share of apparent U.S. consumption was greater in interim 2022, at *** percent, than in interim 2021, at ***

---

[142] CR/PR at Table IV-19.

[143] CR/PR at Table III-5.

[144] CR/PR at II-12.

[145] CR/PR at Table II-14.  Additionally, certain purchasers reported that supply constraints were experienced "globally" by domestic producers and importers of subject (and nonsubject) merchandise alike.  *See, e.g.*, CR/PR at II-14 (purchaser *** reporting that it had been put on allocation by almost all of its suppliers, both domestic and foreign) and at II-15 (purchaser *** reporting that supply constraints occurred "globally" because of global supply chain issues).

[146] CR/PR at Table III-8.

[147] CR/PR at Table IV-19.

[148] CR/PR at Tables IV-5-6.

[149] CR/PR at II-15.

[150] CR/PR at II-13-14.

[151] CR/PR at II-13.

percent.[152]  The largest sources of nonsubject imports were Austria, Canada, Taiwan, and
***.[153]

### 3.    Substitutability and Other Conditions

We find that there is a moderate-to-high degree of substitutability between the
domestic like product and cumulated subject imports.[154]  We recognize that certain factors may
limit the substitutability between the domestic like product and cumulated subject imports to
some degree.  In particular, the record indicates that certain specific OCTG products, at least at
times, are unavailable from the domestic industry, and that some purchasers reported that
considerations other than price, such as size and heat treatment, influence their purchasing
decisions.[155]

As discussed above, majorities of responding domestic producers, importers, and
purchasers reported that the domestic like product is always or frequently interchangeable
with imports from each of the subject countries.[156]  Likewise, majorities of responding domestic
producers, importers, and purchasers reported that factors other than price are only
sometimes or never significant in purchasing decisions between the domestic like product and
imports from each subject source.[157]  Moreover, majorities or pluralities of responding
purchasers rated the domestic like product as comparable with imports from each subject
source with respect to at least 14 of 15 purchasing factors.[158]  Further, OCTG, regardless of
source, is generally produced to API specifications,[159] and there was a substantial degree of
overlap between U.S. shipments of subject imports from each source and domestically
produced OCTG in terms of end finish, grade, and product type in 2021.[160]

We also find that price is an important factor in OCTG purchasing decisions.  Price/cost,
along with quality/performance, was cited by purchasers most frequently as being among the

---

[152] CR/PR at Table IV-19.
[153] CR/PR at II-12.
[154] CR/PR at II-26.
[155] CR/PR at II-26.
[156] CR/PR at Tables II-15-17.
[157] CR/PR at Tables II-18-20.
[158] CR/PR at Table II-14.
[159] CR/PR at I-18.
[160] CR/PR at Tables IV-14-16.  We also note that the majority of the OCTG that was domestically
produced in 2021, and the majority of the OCTG that was imported from cumulated subject sources that
year, was seamless OCTG.  *See id*. at Table IV-13.

top three factors influencing their OCTG purchasing decisions.[161]  Further, price was a factor that many responding purchasers cited as being very important to their purchasing decisions, although a greater number of purchasers cited availability, delivery time, product consistency, quality meets industry standards, and reliability of supply as very important purchasing factors.[162]  Moreover, as previously discussed, majorities of responding U.S. producers, importers, and purchasers reported that factors other than price are only sometimes or never significant in OCTG purchasing decisions.[163]

U.S. producers sold a plurality of their OCTG in 2021 under short-term contracts, with most of the rest of their sales under long-term contracts or spot sales.  Importers sold most of their OCTG in 2021 under long-term contracts, followed by spot sales, and then short-term contracts.[164]  Most U.S. producers' and importers' short-term contracts did not allow price renegotiation, and fixed quantity, while U.S. producers' and importers' long-term contracts did allow price renegotiation, and usually did not fix quantity.[165]

Other than in 2020, raw material costs accounted for the largest share of the domestic industry's cost of goods sold ("COGS") throughout the POI.[166]  Welded OCTG is made from HRC, while seamless OCTG is made from steel billets.[167]  The U.S. price for HRC decreased irregularly

---

[161] CR/PR at Table II-10.  Twenty firms each cited price/cost and quality/performance as among the top three factors influencing their purchasing decisions.  The next most frequently cited factor was availability (18 firms).  *Id*.

[162] CR/PR at Table II-11.

[163] CR/PR at Tables II-18-20.

[164] CR/PR at Table V-5.

[165] CR/PR at V-11.  Tenaris argues that unlike the rest of the domestic industry, which sells to end users primarily through independent distributors, Tenaris USA sells to end users through its U.S. sales affiliate, TGS USA, a distribution model Tenaris calls its "Rig Direct" program.  *See* Tenaris's Prehearing Br. at 10-11.  Tenaris states that Tenaris USA sells both domestic and subject imported OCTG to end users through its Rig Direct program.  It further suggests that the Rig Direct model is superior to the distribution model used by other U.S. producers, as it "allows Tenaris's customers to forgo maintaining inventory at their wells and allows them to receive delivery of OCTG with 48- or 72-hour notice," and provides them with "technical advice and assistance."  *Id*.

Petitioners argue that "domestic OCTG mills and their distributors provide the same services to end users as Tenaris selling subject imports under the Rig Direct program."  Petitioners' Posthearing Br. at 5.  Petitioners emphasize in this respect that purchasers reported the domestic like product as being superior or comparable to subject imports "in an array of non-price purchasing factors," including delivery terms and technical support/service.  *Id*. at 6.  They also highlight the hearing testimony of an industry witness stating that "Tenaris has not reinvented the OCTG distribution business.  They've simply rebranded it."  *Id*. (*citing* Tr. at 88 (Mendenhall)).

We address this argument in further detail below.

[166] CR/PR at Table VI-1.

[167] CR/PR at I-13 and V-1.

from 2019 to mid-2020, then increased substantially through mid-2021, before falling irregularly to the end of the POI, for an overall increase of *** percent between January 2019 and June 2021.[168]  The U.S. price for scrap (used to make steel billets) followed a directionally similar, but much less pronounced, trend over the same period.[169]  On a per short ton basis, raw material costs for domestically produced OCTG increased irregularly from 2019 to 2021, and were significantly higher in interim 2022 than in interim 2021.[170]

Inventories of OCTG are held domestically by U.S. producers, distributors, importers, and end users.[171]  As reported by ***, after small fluctuations from January 2019 through March 2021, inventories held by end users and distributors began rising, reaching *** net tons in January 2022, and growing at a slower rate thereafter.[172]

Based on data derived from ***, Tenaris provided a chart graphing OCTG inventories over the POI.[173]  This chart indicates that there was an increase in OCTG inventories between March and September of 2020, with inventories decreasing to below March of 2020 levels by December of 2020.[174]

OCTG imports from Russia are subject to 25 percent *ad valorem* duties pursuant to Section 232.[175]  OCTG imports from Argentina and South Korea are subject to annual import quotas pursuant to Section 232.[176]  OCTG imports from Mexico are currently exempted from Section 232 duties and quotas.[177]

---

[168] CR/PR at Table V-1 and Figure V-1.

[169] CR/PR at Table V-1 and Figure V-1.

[170] CR/PR at Table VI-1.

[171] CR/PR at II-16.

[172] CR/PR at II-16.  On a months-on-hand basis, based on *** reporting, this inventory rose from *** months in January 2019 to *** months in August 2020, before declining to *** months in December 2021 and *** months in June 2022.  CR/PR at II-16 at n.18; Months on Hand Inventory Worksheet, EDIS Doc. 781460.

[173] Tenaris's Prehearing Br. at 28.  This chart does not indicate which market participants hold these inventories.

[174] *See* Tenaris's Prehearing Br. at 28 (yellow line graphing U.S. OCTG inventories in chart titled "US OCTG Inventory, Prices, & Months of Supply 2017-2022").

[175] CR/PR at I-12.  Additionally, Tenaris asserts that subject imports from Russian producer *** for most of the POI.  *See* Tenaris's Prehearing Br. at 40-41.

[176] CR/PR at I-12.  The import quota is 163,102 short tons per year for Argentina, and 508,020 short tons per year for South Korea.  *Id*.  OCTG imports from South Korea are also subject to an antidumping duty order.  *See Oil Country Tubular Goods from India, the Republic of Korea, the Republic of Turkey, Ukraine, and the Socialist Republic of Vietnam: Continuation of Antidumping and Countervailing Duty Orders*, 85 Fed. Reg. 48665 (Aug. 12, 2020).

[177] CR/PR at I-12.  Tenaris asserts that OCTG imports from Mexico "were maintained below levels that would trigger the surge mechanism under the United States-Mexico-Canada Agreement." Tenaris's Prehearing Br. at 50.

31

Effective April 9, 2022, imports of all products from Russia became subject to the higher duty rates set forth in column 2 of the HTS.  Effective July 27, 2022, the column 2 rate of duty was raised to 35.0 percent *ad valorem* for certain articles imported from Russia, including OCTG provided for in certain HTS subheadings.[178]  OCTG imported from Russia not provided for in those HTS subheadings is subject to regular column 2 duty rates.[179]

### C.    Volume of Subject Imports

Section 771(7)(C)(i) of the Tariff Act provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."[180]

Cumulated subject import volume increased by *** percent from 2019 to 2021, decreasing from *** short tons in 2019 to *** short tons in 2020, before increasing to *** short tons in 2021; cumulated subject import volume was *** percent greater in interim 2022, at *** short tons, than in interim 2021, at *** short tons.[181]

Cumulated subject imports as a share of apparent U.S. consumption increased by *** percentage points from 2019 to 2021, decreasing from *** percent in 2019 to *** percent in 2020, before increasing to *** percent in 2021; cumulated subject imports as a share of apparent U.S. consumption was *** percentage points lower in interim 2022, at *** percent, than in interim 2021, at *** percent.[182] [183] [184]

---

[178] CR/PR at I-11.  These subheadings include: 7304.29.10, 7304.29.20, 7304.29.31, 7304.29.41, 7304.29.50, 7306.29.20, and 7306.29.60.  *Id.*

[179] CR/PR at I-11.

[180] 19 U.S.C. § 1677(7)(C)(i).

[181] CR/PR at Tables IV-19 and C-1.

[182] Alternatively, taking into account changes in importers' inventories, there remains a clear shift in the overall share of volumes away from the domestic industry to subject imports.  U.S. producers' share slightly increased from *** percent in 2019 to *** percent in 2020 before declining to *** percent in 2021 and subject sources' share steadily increased from *** percent in 2019 to *** percent in 2020 to *** percent in 2021.  CR/PR at Table IV-24.

[183] CR/PR at Tables IV-19 and C-1.  The ratio of cumulated subject imports to U.S. mill production increased overall by *** percentage points from 2019 to 2021, decreasing from *** percent in 2019 to *** percent in 2020, before increasing to *** percent in 2021; the ratio of cumulated subject imports to U.S. mill production was lower in interim 2022, at *** percent, than in interim 2021, at *** percent.  CR/PR at Table IV-3.

[184] The petitions in these investigations were filed in October 2021.  Petitioners contend that the filing of the petitions reduced subject import market penetration in interim 2022 relative to interim 2021, and request that the Commission accord reduced weight to post-petition data in these investigations.  *See* Petitioners' Prehearing Br. at 5 and 9; Answers to Commissioner Questions (Continued...)

Based on the foregoing, we find that the volume of cumulated subject imports, and the increase in that volume, are significant in absolute terms and relative to consumption in the United States.

### D.    Price Effects of the Subject Imports

Section 771(7)(C)(ii) of the Tariff Act provides that, in evaluating the price effects of the subject imports, the Commission shall consider whether

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.[185]

As addressed in Section V.B.3, the record indicates that there is a moderate-to-high degree of substitutability between the domestic like product and cumulated subject imports, and that price is an important factor in OCTG purchasing decisions, among other important factors.

---

appended to Petitioners' Posthearing Br. at II-35.  Tenaris argues that there is no basis for the Commission to accord less weight to post-petition data, noting that, in absolute terms, the volume of cumulated subject imports increased in interim 2022 relative to interim 2021.  *See* Exhibit 1 to Tenaris's Posthearing Br. at 23-31.

    Cumulated subject import market share was \*\*\* percentage points lower in interim 2022, after the filing of the petitions, than in interim 2021, before the filing of the petitions, notwithstanding the 70.6 percent increase in apparent U.S. consumption in interim 2022 relative to interim 2021.  CR/PR at Tables IV-19 and C-1.  These data show a marked decrease in the intensity of subject import competition for market share in the U.S. market compared to the 2020-2021 period, when a 32.2 percent increase in apparent U.S. consumption was accompanied by a \*\*\* percentage point increase in subject import market share.  *Id.*  We also note that during interim 2022, Commerce issued preliminary affirmative antidumping and critical circumstances determinations regarding Argentina and Mexico, and an affirmative antidumping determination with a negative critical circumstances determination regarding Russia. CR/PR at Tables I-5-7 & Appx. A.  Accordingly, we find that the decline in subject import market share in interim 2022 relative to interim 2021 was related to the pendency of the investigations and place less weight on interim 2022 market share data in determining that that the volume of subject imports is significant.

    [185] 19 U.S.C. § 1677(7)(C)(ii).

The Commission collected quarterly pricing data from U.S. producers and importers for nine pricing products.[186]  Eight domestic producers and eight importers provided usable pricing data for sales of the requested products.[187]  Pricing data reported by these firms accounted for approximately 25.0 percent of U.S. shipments of OCTG from U.S. producers, *** percent of U.S shipments of subject imports from Argentina, *** percent of U.S shipments of subject imports from Mexico, *** percent of subject imports from Russia, and *** percent of U.S. shipments of subject imports from South Korea in 2021.[188]

Tenaris provides an alternate price comparison methodology, arguing that the Commission should depart from its normal price comparison methodology and "lag by one quarter" its comparisons of subject import prices to domestic prices, comparing domestic prices in a given quarter to subject import prices in the following quarter.[189]  Tenaris contends that the Commission should do so because the contract prices for its subject imported OCTG are typically adjusted to align with market prices on a quarterly basis, and thus lag U.S. market prices by a quarter.[190]  Consequently, Tenaris asserts, in a time of rising prices, its subject

---

[186] CR/PR at V-12-13.  The nine pricing products are:
**Product 1.**-- Seamless Casing, Grade L-80, 9 5/8" Outer Diameter, .395-.595" Wall Thickness, Threaded & Coupled, Range 3, sold to end users.
**Product 2.**-- Seamless Casing, Grade L-80, 9 5/8" Outer Diameter, .395-.595" Wall Thickness, Threaded & Coupled, Range 3, sold to unrelated distributors.
**Product 3.**-- Seamless Casing, Grade K-55, 9 5/8" Outer Diameter, .352-.395" Wall Thickness, Threaded & Coupled, Range 3, sold to unrelated distributors.
**Product 4.**-- Seamless Casing, Grade K-55, 9 5/8" Outer Diameter, .352-.395" Wall Thickness, Threaded & Coupled, Range 3, sold to end users.
**Product 5.**-- Seamless Casing, Grade P-110, 5 1/2" O.D., 20.0 lbs./ft., Threaded and Coupled, Range 3, sold to end users.
**Product 6.**-- Seamless Casing, Grade P-110, 5 1/2" O.D., 23.0 lbs./ft., Threaded and Coupled, Range 3, sold to end users.
**Product 7.**-- Welded Casing, Grade P-110, 5 ½" Outer Diameter, .304-.415" Wall Thickness, Threaded & Coupled, Range 3, sold to unrelated distributors.
**Product 8.**-- Welded Casing, Grade J-55, 9 5/8" Outer Diameter, .352-.395" Wall Thickness, Threaded & Coupled, Range 3, sold to unrelated distributors.
**Product 9.**-- Welded Tubing, Grade-L-80, 2-7/8" outer Diameter, 0.217" Wall Thickness, Range 2, sold to unrelated distributors.
[187] CR/PR at V-13.  Not all firms reported pricing for all products for all quarters.  *Id.*
[188] CR/PR at V-13.
[189] Tenaris's Prehearing Br. at 54 and Exhibit 63 (Prusa Analysis).  For example, under the lagged approach Tenaris proposes, subject import prices from the fourth quarter of 2021 would be compared to domestic prices from the third quarter of 2021.  *See* Tenaris's Prehearing Br. at Exhibit 63 (Prusa Analysis).
[190] Tenaris's Prehearing Br. at 54 and Exhibit 63 (Prusa Analysis).  Tenaris has provided examples of contracts with purchasers containing quarterly price adjustment formulas.  *See* Tenaris's Posthearing Br. at Exhibits 11-13.

imports will "appear" to undersell the domestic like product, "even though the prices established at the time of the contract were at market."[191]

We are unpersuaded by Tenaris's argument, and decline to adopt its alternative price comparison methodology, for the following reasons. First, the basis for Tenaris's proposed adjustments to the Commission's quarterly price comparisons – that Tenaris's contracts contain a quarterly pricing lag – would largely be limited to subject imports from Argentina and Mexico; although those accounted for the vast majority of Tenaris's U.S. shipments of subject imports during the POI, we must consider the significance of underselling by cumulated subject imports.[192]

Second, even as to subject imports from Argentina and Mexico, the percentage of Tenaris's U.S. shipments subject to contracts containing a time lag is unclear.[193]

Third, Tenaris's argument assumes that domestic OCTG is generally sold at spot market prices, allegedly creating the appearance of underselling when these market prices rise while subject import contract prices remain unchanged for another quarter, when *** percent of the domestic industry's sales were made pursuant to contracts in 2021,[194] some including quarterly pricing mechanisms similar to those in Tenaris's contracts.[195]

Finally, to the extent that Tenaris's time lag argument purports to describe cumulated subject imports, it is inconsistent with other record evidence. Under Tenaris's time lag argument, underselling by cumulated subject imports should have decreased earlier in the period, when spot market prices fell, and significantly increased later in the period, when market prices increased dramatically.[196] Instead, the record shows that the rate of cumulated subject import underselling was fairly consistent from 2019 to 2021, rising only slightly from 55.9 percent of quarterly comparisons in 2019 to 57.1 percent of quarterly comparisons in 2020 and to 60.4 percent of quarterly comparisons in 2021.[197] For all these reasons, we do not view Tenaris's time lag methodology as a reliable means of analyzing price competition by cumulated subject imports in the U.S. market.

---

[191] Tenaris's Prehearing Br. at 54 and Exhibit 63 (Prusa Analysis); Tenaris's Final Comments at 7; Tenaris's Posthearing Br. at Exhibits 11-13.

[192] CR/PR Table III-24; Tenaris Global's Importer questionnaire response at II-7a and II-8a.

[193] *See* Tenaris's Prehearing Br. at Exhibit 63 (Prusa Analysis) (indicating that 25 percent of Tenaris's sales are not by contract, and stating only that Tenaris's contracts "*typically*" have quarterly price adjustments) (emphasis added). Additionally, ***.

[194] CR/PR at Table V-5.

[195] *See* Petitioners' Posthearing Br. at 5 and Exhibits 3 and 4 (and the attachments thereto).

[196] Tenaris's Prehearing Br. at Exhibit 63 (Prusa Analysis).

[197] *Derived from* CR/PR Tables V-6-14.

35

As noted above, the domestic industry lost 12.0 percentage points of market share from 2020 to 2021, while cumulated subject imports gained *** percentage points of market share during the same period.[198]  The entirety of the domestic industry's market share loss over this period was thus attributable to subject imports.[199]

Overall, the pricing data show that cumulated subject imports undersold the domestic like product in *** of 170 quarterly comparisons, or *** percent of the time, at margins ranging between 0.0 and 73.1 percent and averaging 10.8 percent.[200]  In contrast, cumulated subject imports oversold the domestic like product in *** of 170 quarterly comparisons, or *** percent of the time, at margins ranging between 0.2 and 56.4 percent and averaging 13.1 percent.[201] Quarters in which there was underselling accounted for more than two-thirds, *i.e.*, *** percent, of the reported volume of cumulated subject import sales (*** short tons), and quarters in which there was overselling accounted for approximately one-third, *i.e.*, *** percent, of the reported volume of cumulated subject import sales (*** short tons).[202]  Underselling by cumulated subject imports predominated during each year of the POI and interim 2022.

We also find some evidence that domestic producers lost sales to subject imports on the basis of price.  Twenty of 28 responding purchasers reported that they had purchased subject imports instead of the domestic like product during the POI.  Eight of those 20 reported that subject imports were priced lower than the domestic like product, and five of those eight reported that price was a primary reason for purchasing of *** short tons of subject OCTG over

---

[198] CR/PR at Tables IV-19 and C-1.

[199] From 2020 to 2021, nonsubject imports lost *** percentage points of market share.  CR/PR at Tables IV-19 and C-1.

[200] CR/PR at Table V-17.

[201] CR/PR at Table V-17.

[202] CR/PR at Table V-17.  For seamless OCTG sold to distributors (products 2 and 3), there were *** instances of underselling (*** short tons) and *** instances of overselling (*** short tons).  CR/PR at Table V-35.  For seamless OCTG sold to end users (products 1, 4, 5, and 6), there were *** instances of underselling (*** short tons) and *** instances of overselling (*** short tons).  *Id.* For welded OCTG (products 7, 8, and 9), there were *** instances of underselling (*** short tons) and *** instances of overselling (*** short tons).  *Id.*

the domestic like product.[203] [204]  Consistent with purchasers' reporting, Petitioners provided contemporaneous communications indicating that domestic producers (and their distributors) have lost sales to subject imports on the basis of price.[205]

Given the moderate-to-high degree of substitutability between cumulated subject imports and the domestic like product, the importance of price in purchasing decisions, and the predominant underselling by subject imports, both in quarterly comparisons and by volume, we find that subject import underselling was significant during the POI.[206]  Underselling by cumulated subject imports led to subject imports gaining *** percentage points of market share from the domestic industry from 2020 to 2021.[207]

We have also considered price trends during the POI.  Prices for all domestically produced pricing products, except product 9, decreased from the first quarter of 2019 to the third or fourth quarter of 2020, and then increased through the second quarter of 2022 to a level higher than in the first quarter of 2019.[208]  Prices for domestically produced pricing product 9 decreased from the first quarter of 2019 to the fourth quarter of 2020, and then increased through the third quarter of 2021 (the last quarter for which such data are available),

---

[203] CR/PR at Table V-19.  Tenaris argues that two of the five purchasers reporting that they purchased subject imports instead of the domestic like product due to price, *** and ***, have contradicted this reporting elsewhere in their questionnaire responses.  *See* Tenaris's Prehearing Br. at 55; Tenaris's Posthearing Br. at 10.  However, their questionnaire responses generally corroborate their lost sales reporting.  *See* *** purchaser questionnaire response at III-23 and III-24 (showing that this firm listed price as among its top three purchasing factors, and that it characterized price as very important in its purchasing decisions); and *** purchaser questionnaire response at III-23 (showing that this firm listed "cost" as a factor that is very important in its purchasing decisions).

[204] Overall, responding purchasers reported that between January 2019 and June 2022, the domestic industry's share of their purchases declined *** percentage points while the subject import share of their purchases increased *** percentage points, reflecting a shift in purchases of *** short tons from the domestic industry to subject imports.  CR/PR at Table V-18.

[205] With respect to domestic producers, these communications include, for example:  email correspondence from ***; and  email correspondence between ***. *See* Petitioners' Posthearing Br. at Attachment E to Exhibit 3; Petitioners' Posthearing Br. at Exhibit 9.

[206] Tenaris emphasizes that, pursuant to its "one price" approach, its subject imports did not undersell its *own* domestically produced OCTG.  *See* Tenaris's Posthearing Br. at 1.  We base our analysis of subject import underselling, however, on the pricing data reported by and comparisons among all responding importers and domestic producers.

[207] We are unpersuaded by Tenaris's arguments that the market share shift is unrelated to subject imports' lower prices, but is rather explained by non-price factors.  *See infra*.

[208] CR/PR at Tables V-6-13 and Figures V-3-9.  Over the POI, domestic prices increased by:  *** percent for pricing product 1; *** percent for pricing product 2; *** percent for pricing product 3; *** percent for pricing product 4; *** percent for pricing product 5; *** percent for pricing product 6; *** percent for pricing product 7; and *** percent for pricing product 8.  *Id.* at Table V-15.

to a level lower than in the first quarter of 2019.[209]  For all pricing products for which first quarter 2019 to second quarter 2022 price comparisons are available, subject import prices increased over the POI.[210]  Three of seven responding purchasers reported that U.S. producers had lowered their prices during the POI to compete with lower-priced subject imports, with price reductions ranging from 7 to 35 percent.[211]

We have also considered whether subject imports prevented price increases that otherwise would have occurred to a significant degree.  The domestic industry's ratio of COGS-to-net sales increased from 96.8 percent in 2019 to 117.2 percent in 2020, before decreasing to 98.0 percent in 2021, a level 1.2 percentage points greater than in 2019; it was lower in interim 2022, at 77.4 percent, than in interim 2021, at 109.2 percent.[212]  The domestic industry's unit COGS increased from $1,381 in 2019, to $1,427 in 2020, to $1,572 in 2021; net sales AUVs declined from $1,426 in 2019 to $1,218 in 2020, before increasing to $1,605 in 2021.[213]  Even as apparent U.S. consumption increased 32.2 percent from 2020 to 2021,[214] the domestic

---

[209] CR/PR at Table V-14 and Figure V-10.  Domestic prices for product 9 decreased by *** percent from the start of the POI to the third quarter of 2021.  *Id.*

[210] CR/PR at Table V-15.  For product 1, prices for subject imports from Argentina and Mexico increased by *** percent and *** percent, respectively.  *Id.*  For product 5, prices for subject imports from Argentina and Mexico increased by *** percent and *** percent, respectively.  *Id.*  For product 6, prices for subject imports from Argentina and Mexico increased by *** percent and *** percent, respectively.  *Id.*  For product 8, prices for subject imports from South Korea increased by *** percent.  *Id.*  For product 9, prices for subject imports from South Korea increased by *** percent.  *Id.*

[211] CR/PR at Table V-20.  Two of the three firms reporting that U.S. producers lowered their prices to compete with lower-priced subject imports during the POI, ***, are among the largest U.S. purchasers.  *Id.* at I-3 and Table V-20.

[212] CR/PR at Tables VI-1-2 and C-1.  Between 2019 and 2020, the AUV of the domestic industry's net sales decreased by $208, while its unit COGS increased by $46.  *Id.*  Between 2020 and 2021, the AUV of the domestic industry's net sales increased by $387, while its unit COGS increased by $145.  *Id.*  The AUV of the domestic industry's net sales was $954 greater in interim 2022 than in interim 2021, and its unit COGS was $302 greater.  *Id.*

The ratio of raw material costs to net sales increased from 2019 to 2021 for both U.S. welded OCTG producers and U.S. seamless OCTG producers.  For U.S. welded mills, the ratio of raw material costs to net sales increased from 59.7 percent in 2019 to 64.5 percent in 2020 and to 72.2 percent in 2021; the ratio was higher in interim 2022, at 71.0 percent, than in interim 2021, at 70.0 percent.  CR/PR at Table VI-9.  For U.S. seamless mills, the ratio of raw material costs to net sales increased from 39.1 percent in 2019 to 46.7 percent in 2020 and to 47.5 percent in 2021; the ratio was lower in interim 2022, at 37.4 percent, than in interim 2021, at 49.4 percent.  CR/PR at Table VI-10.

[213] CR/PR at Table C-1.  The AUV of the domestic industry's net sales was $954 greater in interim 2022 than in interim 2021, and its unit COGS was $302 greater.  CR/PR at Table VI-2.

[214] CR/PR at Table IV-19.

industry's COGS-to-net-sales ratio remained elevated, at 98.0 percent.[215]  Given the significant underselling and the market share shift, we do not reach a conclusion as to whether the domestic producers would have been able to further increase prices to a significant degree than they did but for subject imports.

Based on the above, we find that cumulated subject imports significantly undersold the domestic like product.  The underselling by subject imports led the domestic industry to lose market share to subject imports.  We therefore find that cumulated subject imports had significant adverse price effects on the domestic industry.

### E.    Impact of the Subject Imports[216]

Section 771(7)(C)(iii) of the Tariff Act provides that examining the impact of subject imports, the Commission "shall evaluate all relevant economic factors which have a bearing on the state of the industry."[217]  These factors include output, sales, inventories, capacity utilization, market share, employment, wages, productivity, gross profits, net profits, operating profits, cash flow, return on investment, return on capital, ability to raise capital, ability to

---

[215] Petitioners argue that domestic like product faced pricing pressure from subject imports and that lower-priced subject imports placed a ceiling on domestic industry price increases.  Specifically, they provide the following communications:  (1) email correspondence from ***"; (2) internal email correspondence *** internal ***, but by its own admission, "TGS USA prices ***."  Tenaris's Prehearing Br. at 15.

[216] The statute instructs the Commission to consider the "magnitude of the dumping margin" in an antidumping proceeding as part of its consideration of the impact of imports.  19 U.S.C. § 1677(7)(C)(iii)(V).  In its final determinations of sales at less than fair value Commerce found dumping margins of 78.30 percent for OCTG from Argentina, 44.93 percent for OCTG from Mexico, and 12.84 percent–184.21 percent for OCTG from Russia.  *Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg. 59054 (Sept. 29, 2022); *Oil Country Tubular Goods from Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 87 Fed. Reg. 59041 (Sept. 29, 2022); and *Oil Country Tubular Goods from the Russian Federation: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances Determination, in Part*, 87 Fed. Reg. 59045 (Sept. 29, 2022).  We take into account in our analysis the fact that Commerce has made final findings that all subject producers in Argentina, Mexico, and Russia are selling subject imports in the United States at less than fair value.  In addition to this consideration, our impact analysis has considered other factors affecting domestic prices.  Our analysis of the significant underselling and price effects of subject imports, described in both the price effects discussion and below, is particularly probative to an assessment of the impact of the subject imports.

[217] 19 U.S.C. § 1677(7)(C)(iii); *see also* SAA at 851 and 885 ("In material injury determinations, the Commission considers, in addition to imports, other factors that may be contributing to overall injury.  While these factors, in some cases, may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.").

service debts, research and development ("R&D"), and factors affecting domestic prices.  No single factor is dispositive and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[218]

Consistent with the substantial decrease in apparent U.S. consumption from 2019 to 2020 due to the effects of the COVID-19 pandemic, the domestic industry's performance significantly weakened during that period.[219]  As apparent U.S. consumption increased 32.2 percent from 2020 to 2021,[220] however, the domestic industry's performance showed little if any improvement, as cumulated subject imports captured market share from the industry and prevented it from fully capitalizing on the strong recovery in demand.

Measures of the domestic industry's output generally declined from 2019 to 2020, increased slightly from 2020 to 2021, and were significantly higher in interim 2022 than in interim 2021.  U.S. mills' capacity decreased overall by 2.4 percent from 2019 to 2021, declining from 6.8 million short tons in 2019 to 6.5 million short tons in 2020, before increasing to 6.6 million short tons in 2021; it was 9.3 percent greater in interim 2022, at 3.6 million short tons, than in interim 2021, at 3.3 million short tons.[221]  U.S. mills' production decreased overall by 39.7 percent from 2019 to 2021, falling from 3.0 million short tons in 2019 to 1.6 million short tons in 2020, before increasing to 1.8 million short tons in 2021; it was 84.4 percent higher in interim 2022, at 1.4 million short tons, than in interim 2021, at 777,294 short tons.[222]  U.S. mills' capacity utilization decreased overall by 17.0 percentage points from 2019 to 2021, declining from 44.6 percent in 2019 to 23.9 percent in 2020, before increasing to 27.6 percent in 2021; it was 16.2 percentage points higher in interim 2022, at 39.7 percent, than in interim 2021, at 23.6 percent.[223]

---

[218] 19 U.S.C. § 1677(7)(C)(iii).  This provision was amended by the Trade Preferences Extension Act of 2015, Pub. L. 114-27.

[219] Apparent U.S. consumption decreased by 49.6 percent between 2019 and 2020.  CR/PR at table IV-19.  As previously discussed, both Petitioners and Tenaris attribute declines in demand earlier in the POI to the COVID-19 pandemic.

[220] CR/PR at Table IV-19.

[221] CR/PR at Table III-8.  U.S. processors' capacity was constant from 2019 to 2020, at 2.0 million short tons a year, before declining slightly to 1.97 million short tons in 2021; it was 20.8 percent higher in interim 2022, at 1.2 million short tons, than in interim 2021, at 968,892 short tons.  *Id*. at Table III-9.

[222] CR/PR at Table III-8.  U.S. processors' production decreased by 24.2 percent overall from 2019 to 2021, declining from 840,044 short tons in 2019 to 426,793 short tons in 2020, before increasing to 636,826 short tons in 2021; it was 34.9 percent greater in interim 2022, at 448,397 short tons, than in interim 2021, at 332,406 short tons.  CR/PR at Table III-9.

[223] CR/PR at Table III-8.  U.S. processors' capacity utilization decreased overall by 9.2 percentage points from 2019 to 2021, declining from 41.4 percent in 2019 to 21.0 percent in 2020, before increasing to 32.2 percent in 2021; it was 4.0 percentage points greater in interim 2022, at 38.3 percent, than in interim 2021, at 34.3 percent.  CR/PR at Table III-9.

Consistent with the trend in the domestic industry's production over the POI, the domestic industry's employment indicia generally declined from 2019 to 2020, increased somewhat from 2020 to 2021, and were significantly higher in interim 2022 than in interim 2021.[224] The industry's employment,[225] hours worked,[226] and wages paid[227] all followed this pattern. Productivity for U.S. mills, as measured in short tons per 1,000 hours, increased by 26.1 percent from 2019 to 2021, from 201.2 in 2019 to 211.4 in 2020 and to 253.8 in 2021; it was 15.4 percent higher in interim 2022, at 264.2, than in interim 2021, at 229.0.[228]

U.S. mills' U.S. shipments decreased overall by 43.1 percent from 2019 to 2021, declining from 3.0 million short tons in 2019 to 1.6 million short tons in 2020, and then increasing to 1.7 million short tons in 2021; they were 72.7 percent higher in interim 2022, at 1.2 million short tons, than in interim 2021, at 719,001 short tons.[229] The domestic industry's share of apparent U.S. consumption decreased by 8.2 percentage points from 2019 to 2021, increasing from 56.7 percent in 2019 to 60.4 percent in 2020, before decreasing to 48.4 percent in 2021; its share of apparent U.S. consumption was 0.6 percentage points greater in interim 2022, at 51.2 percent, than in interim 2021, at 50.6 percent.[230]

U.S. mills' end-of-period inventories declined by 42.5 percent from 2019 to 2021, decreasing from 396,431 short tons in 2019 to 176,106 short tons in 2020, before increasing to 228,092 short tons in 2021; they were 79.4 percent higher in interim 2022, at 334,664 short

---

[224] For purposes of analyzing the domestic industry's employment indicia other than productivity, we examine the combined employment-related data of both U.S. mills and processors. CR/PR at Table III-32.

[225] Employment fell overall by 44.3 percent from 2019 to 2021, declining from 8,581 production and related workers ("PRWs") in 2019 to 4,728 PRWs in 2020, before increasing to 4,779 PRWs in 2021; it was 48.2 percent greater in interim 2022, at 6,118 PRWs, than in interim 2021, at 4,128 PRWs. CR/PR at Table III-32.

[226] Total hours worked fell overall by 46.6 percent from 2019 to 2021, declining from 21.1 million hours in 2019 to 11.0 million hours in 2020, before increasing to 11.3 million hours in 2021. They were 56.2 greater in interim 2022, at 8.3 million hours, than in interim 2021, at 5.3 million hours. CR/PR at Table III-32.

[227] Wages paid fell overall by 41.6 percent from 2019 to 2021, declining from $646.8 million in 2019 to $347.7 million in 2020, before increasing to $378.0 million in 2021. They were 67.7 percent greater in interim 2022, at $276.8 million, than in interim 2021, at $165.1 million. CR/PR at Table III-32.

[228] CR/PR at Table III-26. The productivity of U.S. processors, as measured in short tons per 1,000 hours, was 137.3 in 2019, 116.8 in 2020, and 155.5 in 2021; it was lower in interim 2022, at 156.6, than in interim 2021, at 173.9. *Id*. at Table III-27.

[229] CR/PR at Table III-13. U.S. non-toll processors' U.S. shipments decreased from *** short tons in 2019 to *** short tons in 2020 and to *** short tons in 2021; they were lower in interim 2022, at *** short tons, than in interim 2021, at *** short tons. *Id*. at Table III-14.

[230] CR/PR at Table IV-19.

tons, than in interim 2021, at 192,099 short tons.[231]  As a ratio of total shipments, U.S. mills'
end-of-period inventories declined from *** percent in 2019 to *** percent in 2020, before
increasing to *** percent in 2021, and were higher in interim 2022, at *** percent, than in
interim 2021, at *** percent.[232]

The domestic industry's financial performance declined from 2019 to 2020, improved
somewhat from 2020 to 2021, and improved significantly in interim 2022 relative to interim
2021.[233]  The industry's total net sales revenues declined from $4.6 billion in 2019 to $2.2
billion in 2020, before increasing to $2.9 billion in 2021, a level 36.7 percent lower than in 2019,
and were 187.3 percent higher in interim 2022, at $3.1 billion, than in interim 2021, at $1.1
billion.[234]  The domestic industry's operating losses increased from $221.9 million in 2019 to
$659.3 million in 2020, before decreasing to $254.9 million in 2021; it had an operating income
of $508.3 million in interim 2022, compared to an operating loss of $236.3 million in interim
2021.[235]  The industry's ratio of operating income to net sales worsened from negative 4.8
percent in 2019 to negative 30.6 percent in 2020, before improving to negative 8.8 percent in
2021.[236]  Its ratio of operating income to net sales was 16.4 percent in interim 2022, compared
to negative 21.9 percent in interim 2021.[237]  The domestic industry's return on assets declined
from negative *** percent in 2019 to negative *** percent in 2020, before increasing to
negative *** percent in 2021.[238]  The industry's capital expenditures declined overall by 62.5

---

[231] CR/PR at Table III-17.  U.S. non-toll processors' inventories decreased from *** short tons in
2019 to *** short tons in 2020 and to *** short tons in 2021; they were higher in interim 2022, at ***
short tons, than in interim 2021, at *** short tons.  *Id.* at Table III-18.

[232] CR/PR at Table III-17.  Non-toll processors' end-of-period inventories decreased as a ratio of
total shipments from *** percent in 2019 to *** percent in 2020, before increasing to *** percent in
2021, and were higher in interim 2022, at *** percent, than in interim 2021, at *** percent.  *Id.* at Table
III-18.

[233] For purposes of analyzing the financial results of the domestic industry, we examine the
combined operations of both U.S. mills and non-toll processors.  CR/PR at Table VI-1.

[234] CR/PR at Table VI-1.

[235] CR/PR at Table VI-1.  Gross profit decreased from $146.6 million in 2019 to negative $370.0
million in 2020, before increasing to positive $59.2 million in 2021; the industry had a gross profit of
$700.2 million in interim 2022, compared to a gross loss of $99.6 million in interim 2021.  *Id.*  Net
income worsened from *** in 2019 to *** in 2020, before improving to a *** in 2021; the industry had
a net income of $*** in interim 2022, compared to *** in interim 2021.  *Id.*  The domestic industry's
ratio of net income to net sales decreased from *** percent in 2019 to *** percent in 2020, before
increasing to *** percent in 2021; it was higher in interim 2022, at *** percent, than in interim 2021, at
*** percent.  *Id.*

[236] CR/PR at Table VI-1.

[237] CR/PR at Table VI-1.

[238] CR/PR at Table VI-21.

percent from 2019 to 2021,[239] and were 19.8 percent higher in interim 2021 than in interim 2020.[240] Its R&D expenses declined by *** percent between 2019 and 2021, and were *** percent lower in interim 2022 than in interim 2021.[241] The domestic industry also reported negative effects on investment, growth, and development due to subject imports.[242]

We find a causal nexus between cumulated subject imports and the domestic industry's weak performance relative to the strong growth in apparent U.S. consumption from 2020 to 2021. Subject import volume increased significantly in absolute terms and relative to apparent U.S. consumption from 2020 to 2021, driven by significant subject import underselling, capturing 12.0 percentage points of market share from the domestic industry during the period. Consequently, despite the 32.2 percent increase in apparent U.S. consumption from 2020 to 2021, the industry's production, employment, and financial performance remained weaker in 2021 than would have been expected in light of the strong increase in demand.[243]

We find it instructive that the domestic industry was able to improve its performance markedly in interim 2022 compared to interim 2021 after the filing of the petitions in October 2021. As discussed above, subject imports competed less aggressively in the U.S. market after the filing of the petitions, losing *** percentage points of market share as the domestic industry gained 0.6 percentage points of market share in interim 2022 compared to interim 2021.[244] Consequently, the domestic industry was able to more fully capitalize on the 70.6 percent increase in apparent U.S. consumption in interim 2022 compared to interim 2021 and improved its performance by nearly every measure between the interim periods.[245]

---

[239] CR/PR at Tables VI-16 and C-1. Its capital expenditures decreased from $178.0 million in 2019 to $72.9 million in 2020 and to $66.8 million in 2021. *Id.*

[240] CR/PR at Tables VI-16 and C-1. Its capital expenditures were $36.6 million in interim 2022, compared to $30.5 million in interim 2021. *Id.*

[241] CR/PR at Tables VI-18 and C-1. Its R&D expenses decreased from $*** in 2019 to $*** in 2020 and to $*** in 2021; they were $*** in interim 2022 compared to $*** in interim 2021. *Id.*

[242] CR/PR at Tables VI-23-24.

[243] Notably, in certain respects, the industry's performance in 2021 remained similar to its performance in 2020, when the industry was experiencing a demand collapse due to the COVID-19 pandemic. For example, U.S. mills' capacity and capacity utilization were only 1.3 percent and 3.7 percentage points greater, respectively, in 2021 than in 2020, and U.S. producers' employment and hours worked were only 1.1 percent and 2.2 percent greater, respectively, in 2021 than in 2020. CR/PR at Table C-1. Moreover, the industry's capital expenditures and R&D expenses were each lower in 2021 than in 2020. *Id.*

[244] CR/PR at Table IV-19.

[245] Commissioner Schmidtlein does not join this paragraph. While she agrees that the filing of the petitions and the pendency of the investigations had an effect on the data (and thus she accords less weight to the interim data), she does not find the effect on the data to be evidence of present material injury.

We have also considered whether there are other factors that may have had an adverse impact on the domestic industry during the POI to ensure that we are not attributing injury from such other factors to subject imports.  Nonsubject imports do not explain the injury we have attributed to subject imports.  Nonsubject imports lost *** percentage points of market share from 2020 to 2021, as subject imports captured 12.0 percentage points of market share from the domestic industry.[246]  Furthermore, the AUVs of nonsubject welded and seamless OCTG imports were higher than the AUVs of subject welded and seamless OCTG imports in 2021, when the domestic industry's performance was weaker than would have been expected.[247]  Additionally, when nonsubject imports significantly increased in both absolute terms and relative to apparent U.S. consumption in interim 2022 relative to interim 2021, gaining *** percentage points of market share, the domestic industry's performance substantially improved.[248]

We are unpersuaded by Tenaris's argument that any injury to the domestic industry is explained by the industry's supply constraints and not subject imports.[249]  The record does not indicate that the domestic industry's supply constraints drew subject imports into the U.S. market such that these constraints could account for the industry's market share loss and consequent injury.  Although both the domestic industry and subject imports experienced supply constraints, as discussed in section V.B above, large majorities of purchasers rated the availability of domestically produced OCTG as superior or comparable to that of subject imports from each source.[250]  Further, the domestic industry reported substantial unused capacity throughout the POI, including a capacity utilization rate of 27.6 percent and excess capacity of 4.8 million short tons in 2021, when the market share loss occurred.[251]  Additionally undermining Tenaris's argument that domestic industry supply constraints necessitated increased subject imports in 2021, cumulated subject import underselling remained nearly as

---

[246] CR/PR at Table IV-19.
[247] CR/PR at Tables IV-5-6.  We recognize that AUV comparisons may reflect differences in product mix or changes in product mix over time.
[248] CR/PR at Table C-1.
[249] Tenaris's Prehearing Br. at 4-5.
[250] CR/PR at Table II-14.  Large majorities of purchasers also rated the reliability of supply of domestically produced OCTG as superior or comparable to that of subject imports from each source.  *Id*.
[251] CR/PR at Tables III-7-8.  Even adjusting for U.S. Steel's idling of a welded mill (790,000 short tons) and a seamless mill (380,000 short tons) throughout 2021, and for *** keeping the *** of welded capacity it had acquired from *** offline in 2021, the industry's capacity utilization rate would still be *** percent, and its excess capacity *** short tons, in 2021.  *See Id*. at III-12, n.6 and Table III-8; *** questionnaire response at II-2a, II-3a, and II-3c.

predominant in 2021 as in 2020,[252] whereas subject imports drawn into the U.S. market by short supplies of domestic OCTG would be expected to command higher prices.

We are also unpersuaded by Tenaris's argument that the market share shift was caused as distributors drew down their "inventory overhang{s}" in lieu of placing orders with domestic mills during the POI, thus delaying the "re-activation of domestic OCTG production."[253]  As an initial matter, we note that even Tenaris's preferred inventory data, derived from ***, show that any alleged inventory "bulge" was largely worked down by the end of 2020, prior to the domestic industry's loss of market share to subject imports in 2021.[254]  Thus, any such inventory overhang would not explain why the 32.2 percent increase in apparent consumption from 2020 to 2021, unmet by existing inventories, was satisfied by increased subject imports rather than domestic producers.  Second, inventory data from ***, which includes inventory of OCTG held by end users and distributors, indicates that monthly inventory levels of OCTG – which include sourcing from both domestic producers and importers – were relatively constant between January 2019 and March 2021, with small fluctuations above and below a level of about *** net tons.[255]  Thus, these data suggest no "massive" draw down of inventories in 2020, as Tenaris describes.[256]  As demand increased in 2021, these inventories grew steadily, consistent with the market, for the rest of 2021 and interim 2022.  Finally, to the extent that inventory overhangs were causing supply constraints, this issue would affect domestic OCTG and imports alike, including subject imports.  However, the record indicates otherwise. Inventories may have had some effect on delaying domestic producers' resumption of production and shipments, which only grew 16.9 percent and 6.0 percent, respectively, in 2021, and on nonsubject import volume, which only grew 21.7 percent in 2021.[257]  However, at the same time, cumulated subject import volume grew by 135.6 percent, with significant increases in volume from all subject countries which suggests that inventories, or inventories alone, cannot explain why additional demand in 2021 was satisfied by increased subject imports,

---

[252] *Derived* from CR/PR at Tables V-6-14.

[253] Petitioner's Prehearing Br. at 27.

[254] *See* Tenaris's Prehearing Br. at 28.  This is also supported by industry witnesses at the hearing, who indicated that inventory levels were normalized by the fourth quarter of 2020.  *See* Tr. at 61 (Mendenhall) and 98 (Tait).

[255] *See* CR/PR at II-16 and Table II-4.  We note that the inventory data submitted by Tenaris from ***, like the data from ***, do not distinguish where in the supply chain the inventories are held.  *See* Tenaris's Prehearing Br. Exh. 42 at ***.  Thus, the record does not establish whether inventory increases necessarily affected domestic producers' customers more than they affected Tenaris and its customers.

[256] We note that there was a reduction in "operational consumption," a measure of tonnage of OCTG used, which reached a low point in August 2020 as a result of the COVID-19 pandemic.  *See* CR/PR at II-22 and Table II-6.

[257] CR/PR at Table C-1.

rather than domestic producers and nonsubject imports.[258]  As we found above, the industry's weak production, employment, and financial performance and inability to capitalize on the increase in apparent consumption was driven by significant subject import underselling and the cumulated subject import volume.

Similarly, we are not persuaded by Tenaris's argument that the shift in market share toward cumulated subject imports was caused by superior availability and technical assistance resulting from Tenaris's Rig Direct program.[259]  Contrary to Tenaris's argument, large majorities of purchasers rated domestically produced OCTG as superior or comparable to subject imports with respect to both availability and technical support/service.[260]  Moreover, Petitioners have submitted signed declarations and supporting documentation corroborating that domestic producers in combination with their distributors provide the same services as Rig Direct.[261]  Finally, we note that the domestic industry not only lost market share to subject imports from Argentina and Mexico, primarily imported by Tenaris, but also to subject imports from Russia and South Korea that were not sold via Rig Direct.[262]

Tenaris has also argued that rising domestic HRC prices and labor shortages constrained domestic supply and necessitated increased subject imports in 2021.[263]  Yet, even if increasing HRC prices helped reduce domestic production of welded OCTG, domestic producers of seamless OCTG, which utilize steel billets as their raw material input, were unaffected by changes in HRC prices.  Domestic producers of seamless OCTG were fully capable of serving the increase in OCTG demand from 2020 to 2021 in light of their low rate of capacity utilization, *** percent in 2021, and the interchangeability of seamless OCTG for welded OCTG.[264]  Contrary to Tenaris's argument that labor shortages significantly constrained domestic production, responding domestic producers and domestic industry witnesses at the hearing indicated that they were capable of hiring as warranted by increased demand for domestic OCTG, and the

---

[258] CR/PR at Table C-1.  Tenaris argues that their Rig Direct program allows them to run with a lean inventory volume and therefore the inventory overhang did not impact them in the same way as other domestic producers.  Answers to Commissioner Questions appended to Tenaris's Posthearing Brief at 57-59.  However, any inventory overhang held by distributors would have included subject imports from Russia and South Korea and impacted them in the same manner as domestic producers.

[259] *See* Tenaris's Prehearing Br. 55; Tenaris Posthearing Br. at 11.

[260] CR/PR at Table II-14.

[261] *See* Petitioners' Posthearing Br. at Exhibits 3 and 4 (and attachments thereto).

[262] *See* CR/PR at Table IV-19.

[263] Tenaris's Prehearing Br. at 24-27.

[264] CR/PR at Tables III-7-8.

domestic industry sharply expanded employment in interim 2022, after the filing of the petitions caused subject imports to compete less aggressively in the U.S. market.[265]

Finally, we are unpersuaded by Tenaris's argument that intra-industry competition explains any injury to the domestic industry.[266]  Intra-industry competition cannot explain the domestic industry's loss of market share to subject imports from 2020 to 2021.

In sum, based on the record in the final phase of these investigations, we conclude that cumulated subject imports had a significant impact on the domestic industry.

## VI.    Critical Circumstances

### A.    Legal Standards

In its final antidumping duty determinations concerning OCTG from Mexico and Russia, Commerce found that critical circumstances exist with respect to imports of OCTG from Mexico produced and exported by all Mexican producers and exporters, and with respect to imports of OCTG from Russia produced and exported by Volzhsky Pipe Plant, Joint Stock Company and the TMK Group, but not by other Russian producers and exporters.[267]  Because we have determined that the domestic industry is materially injured by reason of subject imports from Mexico and Russia, we must further determine "whether the imports subject to the affirmative {Commerce critical circumstances} determination ... are likely to undermine seriously the remedial effect of the antidumping {and/or countervailing duty} order{s} to be issued."[268]

The SAA indicates that the Commission is to determine "whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order" and specifically "whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order."[269]  The legislative history for the critical circumstances provision indicates that the provision was designed "to deter exporters whose

---

[265] CR/PR at II-13 ("U.S. producer *** reported adding additional labor as demand increased") and Table III-5 (***); Tr. at 67 (Beltz) ("{w}e had the people.  We had the availability"); *Id.* at 68 (Dorn) ("we started up our electric arc furnace in October of 2020, and we hired 150 people during that time frame . . . and we also hired employees throughout our production facilities through this timeframe").

[266] Tenaris's Prehearing Br. at 61; Tenaris's Posthearing Br. at 2.

[267] *Oil Country Tubular Goods from Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 87 Fed. Reg. 59041 (Sept. 29, 2022); *Oil Country Tubular Goods from the Russian Federation: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances Determination, in Part,* 87 Fed. Reg. 59045 (Sept. 29, 2022).

[268] 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

[269] SAA at 877.

merchandise is subject to an investigation from circumventing the intent of the law by increasing their exports to the United States during the period between initiation of an investigation and a preliminary determination by {Commerce}."[270]  An affirmative critical circumstances determination by the Commission, in conjunction with an affirmative determination of material injury by reason of subject imports, would normally result in the retroactive imposition of duties for those imports subject to the affirmative Commerce critical circumstances determination for a period 90 days prior to the suspension of liquidation.

The statute provides that, in making this determination, the Commission shall consider, among other factors it considers relevant,

> (I) the timing and the volume of the imports,
>
> (II) a rapid increase in inventories of the imports, and
>
> (III) any other circumstances indicating that the remedial effect of the {order} will be seriously undermined.[271]

In considering the timing and volume of subject imports, the Commission's practice is to consider import quantities prior to the filing of the petitions with those subsequent to the filing of the petitions using monthly statistics on the record regarding those firms for which Commerce has made an affirmative critical circumstances determination.[272]

### B.    Party Arguments

Petitioners argue that the Commission must make an affirmative critical circumstances determination with respect to Mexico if it is to provide an effective remedy.  They contend that imports of Mexican OCTG increased 17.8 percent in the post-petition period (October 2021– March 2022) compared to the pre-petition period (April 2021– September 2021).  Petitioners also maintain that, despite increasing apparent U.S. consumption, inventories of Mexican OCTG increased by *** percent in the "immediate aftermath after the petition."[273]  They submit that

---

[270] *ICC Industries, Inc. v United States,* 812 F.2d 694, 700 (Fed. Cir. 1987), *quoting* H.R. Rep. No. 96-317 at 63 (1979), *aff'g* 632 F. Supp. 36 (Ct. Int'l Trade 1986).  *See* 19 U.S.C. §§ 1671b(e)(2), 1673b(e)(2).

[271] 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

[272] *See Lined Paper School Supplies from China, India, and Indonesia,* Inv. Nos. 701-TA-442-443, 731-TA-1095-1097,  USITC Pub. 3884 at 46-48 (Sept. 2006); *Carbazole Violet Pigment from China and India,* Inv. Nos. 701-TA-437 and 731-TA-1060-1061 (Final), USITC Pub. 3744 at 26 (Dec. 2004); *Certain Frozen Fish Fillets from Vietnam,* Inv. No. 731-TA-1012 (Final), USITC Pub. 3617 at 20-22 (Aug. 2003).

[273] Petitioners' Prehearing Br. at 56.

this is the "type of pernicious behavior that the critical circumstances provision is intended to address."[274]

Tenaris argues that critical circumstances do not exist for subject imports from Mexico. It contends that the *** in the imports and inventories of OCTG from Mexico took place as consumption increased, and argues that "an increase in consumption is exactly the context in which the Commission has found that (even significant) increases in imports and inventories will not greatly or insidiously weaken an order, precisely because such increases respond to market growth."[275]  TMK argues that critical circumstances do not exist for subject imports from Russia.[276]

### C.    Analysis

We first consider the appropriate period for comparison of pre-petition and post-petition levels of subject imports from Mexico and Russia.  The petitions in these investigations were filed on October 6, 2021.[277]  In previous investigations, the Commission has relied on a shorter comparison period when Commerce's preliminary determination applicable to the subject imports at issue fell within the six-month post-petition period the Commission typically considers.[278]  That situation does not arise here with respect to subject imports from Mexico, as Commerce's preliminary determination was issued on May 11, 2022,[279] after the last month in the six-month post-petition period of October 2021 through March 2022.  We therefore compare the volume of subject imports in the six months prior to the filing of the petitions (April 2021-September 2021) with the volume of subject imports in the six months after the filing of the petitions (October 2021-March 2022) for purposes of our critical circumstances analysis with respect to subject imports from Mexico subject to Commerce's affirmative critical circumstances finding.

---

[274] Petitioners' Prehearing Br. at 56.

[275] Tenaris's Posthearing Br. at 15 (citing *Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan*, Inv. Nos. 701-TA-561 and 731-TA-1317-1318, 1321-1325, and 1327, USITC Pub. 4691 (May 2017) at 7-9).

[276] TMK's Final Comments at 4-7.

[277] CR at I-1.

[278] *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom,* Inv. Nos. 701-TA-545-547, 731-TA-1291-1297 (Final), USITC Pub. 4638 at 49-50 (Sept. 2016);  *Certain Corrosion-Resistance Steel Products from China, India, Italy, Korea, and Taiwan*, Inv. No. 701-TA-534-537 and 731-TA-1274-1278 (Final), USITC Pub. 4630 at 35-40 (July 2016); *Carbon and Certain Steel Wire Rod from China*, Inv. Nos. 701-TA-512, 731-TA-1248 (Final), USITC Pub. 4509 at 25-26 (Jan. 2015) (using five-month periods because preliminary Commerce countervailing duty determination was during the sixth month after the petition).

[279] *See* CR/PR at Table I-1.

That situation does arise here, however, with respect to subject imports from Russia, as Commerce's preliminary countervailing duty determination was issued on March 14, 2022,[280] before the end of the last month of the applicable six-month post-petition period of October 2021 through March 2022.  We have thus determined to compare the volume of subject imports in the five months prior to the filing of the petitions (May 2021-September 2021) with the volume of subject imports in the five months after the filing of the petitions (October 2021-February 2022) for purposes of our critical circumstances analysis with respect to subject imports from Russia subject to Commerce's affirmative critical circumstances finding.

### 1.    Mexico Investigation

Subject imports from Mexico subject to Commerce's affirmative critical circumstances determination increased from 170,211 short tons in the pre-petition period to 200,527 short tons in the post-petition period, an increase of 17.8 percent, comprising just over one percent of apparent U.S. consumption in interim 2022.[281]  End-of-period inventories of subject merchandise from Mexico held by U.S. importers increased from *** short tons on September 30, 2021 to *** short tons on March 30, 2022, an increase of *** percent.[282]

While we recognize that both the import volume and the inventory level increased in the post-petition period, we observe that this post-petition period corresponds closely with the interim 2022 period, during which time apparent U.S. consumption increased by 70.6 percent relative to the interim 2021 period, which corresponds closely with the pre-petition period.[283]  This suggests that some portion of the increase in imports and inventories from Mexico in the post-petition period relative to the pre-petition period is related to overall changes in market conditions between these periods.  Moreover, we note the increase in import volume from Mexico in the post-petition period continued the upward pre-petition trend that began in August 2021,[284] which does not indicate a "rush" by Mexican producers to export substantial volumes of product to the U.S. market at lower prices before a deposit requirement takes effect.  Indeed, the market share of shipments of imports from Mexico was *** percent in interim 2022, lower than it was in interim 2021 (*** percent) and well within its range during the full years of the POI (*** percent to *** percent).[285]  In light of these considerations, we do

---

[280] *See* CR/PR at Table I-1.
[281] CR/PR at Tables IV-9 and C-1.  We recognize that the interim 2022 period does not perfectly align with the post-petition period of October 2021 to March 2022.
[282] CR/PR at Table IV-10.
[283] CR/PR at Table IV-19.
[284] CR/PR at Figure IV-4.
[285] CR/PR at Table C-1.

not find that subject imports from Mexico are likely to undermine seriously the remedial effect of the antidumping duty order. Consequently, we determine that critical circumstances do not exist with respect to subject imports from Mexico.

### 2. Russia Investigation

Subject imports from Russia subject to Commerce's affirmative critical circumstances determination decreased from *** short tons in the pre-petition period to *** short tons in the post-petition period, a decrease of *** percent.[286] End-of-period inventories of subject merchandise from Russia held by U.S. importers decreased from *** short tons on September 30, 2021 to *** short tons on December 31, 2021, a decrease of *** percent.[287] As both the import volume and the inventory level decreased in the post-petition period, we do not find that subject imports from Russia subject to Commerce's affirmative critical circumstances finding are likely to undermine seriously the remedial effect of the antidumping duty order. Consequently, we determine that critical circumstances do not exist with respect to subject imports from Russia.[288]

---

[286] CR/PR at Table IV-11.

[287] CR/PR at Table IV-12. These inventories all originated from ***, a foreign producer/exporter subject to Commerce's final affirmative critical circumstances finding. *Id*.

[288] Commissioner Kearns and Commissioner Karpel concur that the record in these investigations does not support a finding that the subject imports from Mexico and Russia would undermine seriously the remedial effects of the order. Commissioner Kearns and Commissioner Karpel observe that the statute directs the Commission to consider the following factors in making this determination: "the timing and volume the imports, a rapid increase in the inventories of the imports, and any other circumstances indicating that the remedial effect of the antidumping order will be seriously undermined." 19 U.S.C. §1673d(b)(4)(A)(ii). In their analysis, they would therefore take into account a number of factors as appropriate to a given investigation (as directed by the statute) and do not necessarily give precedence to the pre- and post-petition subject import volumes. Among the factors they may consider, depending on the facts of the investigation and the available data, are the parties' arguments, subject import volumes relative to apparent U.S. consumption or production, monthly changes in subject import volume, subject import inventories (both absolute and relative to imports or shipments of imports), purchaser inventories, pricing, and the domestic industry's performance.

**VII.    Conclusion**

For the reasons stated above, we determine that an industry in the United States is materially injured by reason of subject imports of OCTG from Argentina, Mexico, and Russia that are sold in the United States at less than fair value and imports of the subject merchandise from Russia and South Korea that are subsidized by the governments of Russia and South Korea.  We also find that critical circumstances do not exist with respect to imports of OCTG from Mexico and Russia that are subject to Commerce's final affirmative critical circumstances determinations.

7

DOC Federal Register Notice of AD Order

11/21/2022

Appx240-242



## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–357–824, A–201–856, A–821–833]

### Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the U.S. Department of Commerce (Commerce) and the U.S. International Trade Commission (ITC), Commerce is issuing antidumping duty (AD) orders on oil country tubular goods (OCTG) from Argentina, Mexico, and the Russian Federation (Russia). In addition, Commerce is amending its final determination with respect to OCTG from Russia to correct a ministerial error.

**DATES:** Applicable November 21, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dmitry Vladimirov (Argentina), Yang Chun or Emily Bradshaw (Mexico), and George McMahon or Michael Heaney (Russia), AD/CVD Operations, Offices I and VI, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0665, (202) 482–5760, (202) 482–3986, (202) 482–1167, or (202) 482–4475, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

In accordance with sections 735(d) and 777(i) of the Tariff Act of 1930, as amended (the Act), on October 5, 2022, Commerce published its affirmative final determinations in the less-than-fair-value (LTFV) investigations of OCTG from Argentina, Mexico, and Russia.[1] In the investigation of OCTG from Russia, JSC Vyksa Steel Works (OMK/VSW) submitted a timely allegation that Commerce made a ministerial error in the final AD

determination.[2] We reviewed the allegation and determined that we made a ministerial error in the final AD determination on OCTG from Russia. *See* "Amendment to the Final Determination for Russia" section below for further discussion. On November 14, 2022, the ITC notified Commerce of its final determinations, pursuant to section 735(d) of the Act, that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act by reason of LTFV imports of OCTG from Argentina, Mexico, and Russia.[3]

### Scope of the Orders

The products covered by these orders are OCTG from Argentina, Mexico, and Russia. For a complete description of the scope of these orders, *see* the appendix to this notice.

### Amendment to the Final Determination for Russia

On September 30, 2022, OMK/VSW timely alleged that Commerce made a certain ministerial error in the *Russia Final Determination* with respect to the dumping margin assigned to OMK/VSW.[4] No other party made an allegation of ministerial errors or submitted a rebuttal to OMK/VSW's ministerial error allegation under 19 CFR 351.224(c)(3). Commerce reviewed the record and, on October 26, 2022, agreed that the error alleged by OMK/VSW constituted a ministerial error within the meaning of section 735(e) of the Act and 19 CFR 351.224(f).[5] Specifically, Commerce found that it made an inadvertent error in not converting into U.S. dollars a certification expense reported by OMK/VSW in Russian rubles.[6] Pursuant to 19 CFR 351.224(e), Commerce is amending the *Russia Final Determination* to reflect the correction of the ministerial error, as described in the Ministerial Error Memorandum.[7] Based on the correction, OMK/VSW's final dumping margin changed from 12.84 to 12.01 percent. As a result, we are also revising the all-others rate from 12.84 to 12.01 percent.

The amended estimated weighted-average dumping margins are listed in the "Estimated Weighted-Average Dumping Margins" section below.

### Antidumping Duty Orders

On November 14, 2022, in accordance with section 735(d) of the Act, the ITC notified Commerce of its final determinations in these investigations, in which it found that an industry in the United States is materially injured by reason of imports of OCTG from Argentina, Mexico, and Russia. Therefore, in accordance with section 735(c)(2) of the Act, Commerce is issuing these AD orders. Because the ITC determined that imports of OCTG from Argentina, Mexico, and Russia are materially injuring a U.S. industry, unliquidated entries of such merchandise from Argentina, Mexico, and Russia, entered or withdrawn from warehouse for consumption, are subject to the assessment of ADs.

Therefore, in accordance with section 736(a)(1) of the Act, Commerce will direct U.S. Customs and Border Protection (CBP) to assess, upon further instruction by Commerce, ADs equal to the amount by which the normal value of the merchandise exceeds the export price (or constructed export price) of the merchandise, for all relevant entries of OCTG from Argentina, Mexico, and Russia. With the exception of entries occurring after the expiration of the provisional measures period and before publication of the ITC's final affirmative injury determinations, as further described below, antidumping duties will be assessed on unliquidated entries of OCTG from Argentina, Mexico, and Russia, entered, or withdrawn from warehouse, for consumption, on or after May 11, 2022, the date of publication of the *Preliminary Determinations*.[8]

### Continuation of Suspension of Liquidation and Cash Deposits

Except as noted in the "Provisional Measures" section of this notice, in accordance with section 735(c)(1)(B) of

---

[1] *See Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,* 87 FR 59054 (September 29, 2022); *Oil Country Tubular Goods from Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances,* 87 FR 59041 (September 29, 2022); and *Oil Country Tubular Goods from the Russian Federation: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances Determination, in Part,* 87 FR 59045 (September 29, 2022) (*Russia Final Determination*).

[2] *See* OMK/VSW's Letter, "Oil Country Tubular Goods from the Russian Federation: OMK's Ministerial Error Comments," dated September 30, 2022 (Ministerial Error Allegation).

[3] *See* ITC's Letter, Investigation Nos. 701–TA–671–672 and 731–TA–1571–1573 (Final), dated November 14, 2022.

[4] *See* Ministerial Error Allegation.

[5] *See* Memorandum, "Antidumping Duty Investigation of Oil Country Tubular Goods from the Russian Federation: Allegation of Ministerial Error in the Final Determination," dated October 26, 2022 (Ministerial Error Memorandum).

[6] *See* Memorandum, "Amended Final Analysis Memorandum for JSC Vyksa Steel Works," dated October 26, 2022.

[7] *Id.*

[8] *See Oil Country Tubular Goods from Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,* 87 FR 28801 (May 11, 2022); *Oil Country Tubular Goods from Mexico: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,* 87 FR 28808 (May 11, 2022); and *Oil Country Tubular Goods from the Russian Federation: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Critical Circumstances Determination, Postponement of Final Determination, and Extension of Provisional Measures,* 87 FR 28804 (May 11, 2022) (collectively, *Preliminary Determinations*).

the Act, Commerce will instruct CBP to continue to suspend liquidation on all relevant entries of OCTG from Argentina, Mexico, and Russia. These instructions suspending liquidation will remain in effect until further notice.

Commerce will also instruct CBP to require cash deposits equal to the estimated weighted-average dumping margins indicated in the tables below. Accordingly, effective on the date of publication in the **Federal Register** of the notice of the ITC's final affirmative injury determinations, CBP will require, at the same time as importers would normally deposit estimated duties on subject merchandise, a cash deposit equal to the rates listed in the table below. The all-others rate applies to all producers or exporters not specifically listed, as appropriate.

**Estimated Weighted-Average Dumping Margins**

The estimated weighted-average dumping margins are as follows:

| Exporter or producer | Estimated weighted-average dumping margin (percent) |
|---|---|
| Argentina: | |
| Siderca S.A.I.C ................................................................................................ | 78.30 |
| All Others ....................................................................................................... | 78.30 |
| Mexico: | |
| Tubos de Acero de Mexico, S.A ...................................................................... | 44.93 |
| All Others ....................................................................................................... | 44.93 |

| Exporter or producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offset(s)) (percent) |
|---|---|---|
| Russia: | | |
| JSC Vyksa Steel Works ...................................................................... | 12.01 | 11.70 |
| Volzhsky Pipe Plant, Joint Stock Company; Public Joint-Stock Company Trubnaya Metallurgicheskaya Kompaniya; Sinarsky Pipe Plant, Joint Stock Company; Seversky Pipe Plant, Joint Stock Company; Taganrog Metallurgical Plant, Joint Stock Company; Pervouralsk Pipe Plant, Joint Stock Company; Chelyabinsk Pipe Plant, Joint Stock Company; Orsky Machine Building Plant, Joint Stock Company * ................................................ | 184.21 | 184.21 |
| All Others ........................................................................................... | 12.01 | 11.87 |

\* Rate based on adverse facts available.

**Provisional Measures**

Section 733(d) of the Act states that suspension of liquidation pursuant to an affirmative preliminary determination may not remain in effect for more than four months, except where exporters representing a significant proportion of exports of the subject merchandise request that Commerce extend the four-month period to no more than six months. At the request of exporters that account for a significant proportion of OCTG from Argentina, Mexico, and Russia, Commerce extended the four-month period to six months in each of these investigations. Commerce published the *Preliminary Determinations* on May 11, 2022.[9]

The extended provisional measures period, beginning on the date of publication of the *Preliminary Determinations,* ended on November 6, 2022. Therefore, in accordance with section 733(d) of the Act and our practice,[10] Commerce will instruct CBP to terminate the suspension of

liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of OCTG from Argentina, Mexico, and Russia entered or withdrawn from warehouse, for consumption after November 6, 2022, the final day on which the provisional measures were in effect, until and through the day preceding the date of publication of the ITC's final affirmative injury determinations in the **Federal Register**. Suspension of liquidation and the collection of cash deposits will resume on the date of publication of the ITC's final determinations in the **Federal Register**.

**Establishment of the Annual Inquiry Service Lists**

On September 20, 2021, Commerce published the final rule titled "*Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*" in the **Federal Register**.[11] On September 27, 2021, Commerce also published the notice titled "*Scope Ruling Application; Annual Inquiry Service List; and Informational Sessions*" in the **Federal**

**Register**.[12] The *Final Rule* and *Procedural Guidance* provide that Commerce will maintain an annual inquiry service list for each order or suspended investigation, and any interested party submitting a scope ruling application or request for circumvention inquiry shall serve a copy of the application or request on the persons on the annual inquiry service list for that order, as well as any companion order covering the same merchandise from the same country of origin.[13]

In accordance with the *Procedural Guidance,* for orders published in the **Federal Register** after November 4, 2021, Commerce will create an annual inquiry service list segment in Commerce's online e-filing and document management system, Antidumping and Countervailing Duty Electronic Service System (ACCESS), available *at https://access.trade.gov,* within five business days of publication of the notice of the order. Each annual inquiry service list will be saved in ACCESS, under each case number, and

---

[9] *Id.*

[10] *See, e.g., Certain Corrosion-Resistant Steel Products from India, India, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders,* 81 FR 48390, 48392 (July 25, 2016).

[11] *See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,* 86 FR 52300 (September 20, 2021) (*Final Rule*).

[12] *See Scope Ruling Application; Annual Inquiry Service List; and Informational Sessions,* 86 FR 53205 (September 27, 2021) (*Procedural Guidance*).

[13] *Id.*

under a specific segment type called "AISL-Annual Inquiry Service List." [14]

Interested parties who wish to be added to the annual inquiry service list for an order must submit an entry of appearance to the annual inquiry service list segment for the order in ACCESS within 30 days after the date of publication of the order. For ease of administration, Commerce requests that law firms with more than one attorney representing interested parties in an order designate a lead attorney to be included on the annual inquiry service list. Commerce will finalize the annual inquiry service list within five business days thereafter. As mentioned in the *Procedural Guidance,* the new annual inquiry service list will be in place until the following year, when the *Opportunity Notice* for the anniversary month of the order is published.

Commerce may update an annual inquiry service list at any time as needed based on interested parties' amendments to their entries of appearance to remove or otherwise modify their list of members and representatives, or to update contact information. Any changes or announcements pertaining to these procedures will be posted to the ACCESS website at *https:// access.trade.gov.*

**Special Instructions for Petitioners and Foreign Governments**

In the *Final Rule,* Commerce stated that, "after an initial request and placement on the annual inquiry service list, both petitioners and foreign governments will automatically be placed on the annual inquiry service list in the years that follow." [15] Accordingly, as stated above, the petitioners and foreign governments should submit their initial entry of appearance after publication of this notice in order to appear in the first annual inquiry service list. Pursuant to 19 CFR 351.225(n)(3), the petitioners and foreign governments will not need to resubmit their entries of appearance each year to continue to be included on the annual inquiry service list. However, the petitioners and foreign

governments are responsible for making amendments to their entries of appearance during the annual update to the annual inquiry service list in accordance with the procedures described above.

**Notification to Interested Parties**

This notice constitutes the AD orders with respect to OCTG from Argentina, Mexico, and Russia pursuant to section 736(a) of the Act. Interested parties can find a list of AD orders currently in effect at *https://www.trade.gov/data-visualization/adcvd-proceedings.*

The amended Russia final determination and these AD orders are published in accordance with sections 735(e) and 736(a) of the Act and 19 CFR 351.224(e) and 19 CFR 351.211(b).

Dated: November 16, 2022

**Lisa W. Wang,**

*Assistant Secretary for Enforcement and Compliance.*

**Appendix—Scope of the Orders**

The merchandise covered by these orders is certain OCTG, which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than case iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (*e.g.,* whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of these orders also covers OCTG coupling stock.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise processed in a third country, including by performing any heat treatment, cutting, upsetting, threading, coupling, or any other finishing, packaging, or processing that would not otherwise remove the merchandise from the scope of these orders if performed in the country of manufacture of the OCTG.

Excluded from the scope of these orders are: casing, tubing, or coupling stock containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

The merchandise subject to these orders is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7304.29.1010, 7304.29.1020, 7304.29.1030, 7304.29.1040, 7304.29.1050, 7304.29.1060, 7304.29.1080, 7304.29.2010, 7304.29.2020, 7304.29.2030, 7304.29.2040, 7304.29.2050, 7304.29.2060, 7304.29.2080, 7304.29.3110, 7304.29.3120, 7304.29.3130, 7304.29.3140, 7304.29.3150, 7304.29.3160, 7304.29.3180, 7304.29.4110, 7304.29.4120, 7304.29.4130, 7304.29.4140, 7304.29.4150, 7304.29.4160, 7304.29.4180, 7304.29.5015, 7304.29.5030, 7304.29.5045, 7304.29.5060, 7304.29.5075, 7304.29.6115, 7304.29.6130, 7304.29.6145, 7304.29.6160, 7304.29.6175,

7305.20.2000, 7305.20.4000, 7305.20.6000, 7305.20.8000, 7306.29.1030, 7306.29.1090, 7306.29.2000, 7306.29.3100, 7306.29.4100, 7306.29.6010, 7306.29.6050, 7306.29.8110, and 7306.29.8150.

The merchandise subject to these orders may also enter under the following HTSUS item numbers: 7304.39.0024, 7304.39.0028, 7304.39.0032, 7304.39.0036, 7304.39.0040, 7304.39.0044, 7304.39.0048, 7304.39.0052, 7304.39.0056, 7304.39.0062, 7304.39.0068, 7304.39.0072, 7304.39.0076, 7304.39.0080, 7304.59.6000, 7304.59.8015, 7304.59.8020, 7304.59.8025, 7304.59.8030, 7304.59.8035, 7304.59.8040, 7304.59.8045, 7304.59.8050, 7304.59.8055, 7304.59.8060, 7304.59.8065, 7304.59.8070, 7304.59.8080, 7305.31.4000, 7305.31.6090, 7306.30.5055, 7306.30.5090, 7306.50.5050, and 7306.50.5070.

The HTSUS subheadings and specifications above are provided for convenience and customs purposes only. The written description of the scope of these orders is dispositive.

[FR Doc. 2022–25401 Filed 11–18–22; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**Notice of Scope Rulings**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable November 21, 2022.

**SUMMARY:** The U.S. Department of Commerce (Commerce) hereby publishes a list of scope rulings and circumvention determinations made during the period July 1, 2022, through September 30, 2022. We intend to publish future lists after the close of the next calendar quarter.

**FOR FURTHER INFORMATION CONTACT:**
Marcia E. Short, AD/CVD Operations, Customs Liaison Unit, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: 202–482–1560.

**SUPPLEMENTARY INFORMATION:**

**Background**

Commerce regulations provide that it will publish in the **Federal Register** a list of scope rulings on a quarterly basis.[1] Our most recent notification of scope rulings was published on August 25, 2022.[2] This current notice covers all scope rulings and scope ruling/circumvention determination combinations made by Enforcement and

---

[14] This segment will be combined with the ACCESS Segment Specific Information (SSI) field, which will display the month in which the notice of the order or suspended investigation was published in the **Federal Register**, also known as the anniversary month. For example, for an order under case number A–000–000 that published in the **Federal Register** in January, the relevant segment and SSI combination will appear in ACCESS as "AISL-January Anniversary." Note that there will be only one annual inquiry service list segment per case number, and the anniversary month will be pre-populated in ACCESS.

[15] *See Final Rule,* 86 FR at 52335.

[1] *See* 19 CFR 351.225(o).

[2] *See Notice of Scope Rulings,* 87 FR 52359 (August 25, 2022).

8

19 U.S.C. § 1677(7)(C)(i)

Annex 1 to the Agreement on Agriculture, and that the administering authority determines conform fully to the provisions of Annex 2 to that Agreement, shall be treated as noncountervailable. Upon request by the administering authority, the Trade Representative shall provide advice regarding the interpretation and application of Annex 2.

**(G) Provisional application**

(i) Subparagraphs (B), (C), (D), and (E) shall not apply on or after the first day of the month that is 66 months after the WTO Agreement enters into force, unless the provisions of such subparagraphs are extended pursuant to section 3572(c) of this title.

(ii) Subparagraph (F) shall not apply to imports from a WTO member country at the end of the 9-year period beginning on January 1, 1995. The Trade Representative shall determine the precise termination date for each WTO member country in accordance with paragraph (i) of Article 1 of the Agreement on Agriculture and such date shall be notified to the administering authority.

**(6) Net countervailable subsidy**

For the purpose of determining the net countervailable subsidy, the administering authority may subtract from the gross countervailable subsidy the amount of—

(A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy,

(B) any loss in the value of the countervailable subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and

(C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received.

**(7) Material injury**

**(A) In general**

The term "material injury" means harm which is not inconsequential, immaterial, or unimportant.

**(B) Volume and consequent impact**

In making determinations under sections 1671b(a), 1671d(b), 1673b(a), and 1673d(b) of this title, the Commission, in each case—

(i) shall consider—

(I) the volume of imports of the subject merchandise,

(II) the effect of imports of that merchandise on prices in the United States for domestic like products, and

(III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States; and

(ii) may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.

In the notification required under section 1671d(d) or 1673d(d) of this title, as the case

may be, the Commission shall explain its analysis of each factor considered under clause (i), and identify each factor considered under clause (ii) and explain in full its relevance to the determination.

**(C) Evaluation of relevant factors**

For purposes of subparagraph (B)—

**(i) Volume**

In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

**(ii) Price**

In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—

(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

**(iii) Impact on affected domestic industry**

In examining the impact required to be considered under subparagraph (B)(i)(III), the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices,

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,

(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(V) in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.

The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.

**(iv) Captive production**

If domestic producers internally transfer significant production of the domestic like product for the production of a downstream article and sell significant production of the domestic like product in the merchant market, and the Commission finds that—

19 U.S.C. § 1677(7)(C)(iv) (1988)

**(6) Net subsidy**

For the purpose of determining the net subsidy, the administering authority may subtract from the gross subsidy the amount of—

(A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the subsidy,

(B) any loss in the value of the subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and

(C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the subsidy received.

**(7) Material injury**

**(A) In general**

The term "material injury" means harm which is not inconsequential, immaterial, or unimportant.

**(B) Volume and consequent impact**

In making determinations under sections 1671b(a), 1671d(b), 1673b(a), and 1673d(b) of this title, the Commission, in each case—

(i) shall consider—

(I) the volume of imports of the merchandise which is the subject of the investigation,

(II) the effect of imports of that merchandise on prices in the United States for like products, and

(III) the impact of imports of such merchandise on domestic producers of like products, but only in the context of production operations within the United States; and

(ii) may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.

In the notification required under section 1671d(d) or 1673d(d) of this title, as the case may be, the Commission shall explain its analysis of each factor considered under clause (i), and identify each factor considered under clause (ii) and explain in full its relevance to the determination.

**(C) Evaluation of relevant factors**

For purposes of subparagraph (B)—

**(i) Volume**

In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

**(ii) Price**

In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—

(I) there has been significant price underselling by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

**(iii) Impact on affected domestic industry**

In examining the impact required to be considered under subparagraph (B)(iii), the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices,

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, and

(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the like product.

The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.

**(iv) Cumulation**

For purposes of clauses (i) and (ii), the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market.

**(v) Treatment of negligible imports**

The Commission is not required to apply clause (iv) or subparagraph (F)(iv) in any case in which the Commission determines that imports of the merchandise subject to investigation are negligible and have no discernable adverse impact on the domestic industry. For purposes of making such determination, the Commission shall evaluate all relevant economic factors regarding the imports, including, but not limited to, whether—

(I) the volume and market share of the imports are negligible,

(II) sales transactions involving the imports are isolated and sporadic, and

(III) the domestic market for the like product is price sensitive by reason of the nature of the product, so that a small quantity of imports can result in price suppression or depression.

For purposes of this clause, the Commission may treat as negligible and having no discernable adverse impact on the domestic industry imports that are the product of any country that is a party to a free trade area agreement with the United

10

19 U.S.C. § 1677(7)(G)(i)

### (iii) Effect of dumping in third-country markets

#### (I) In general

In investigations under part II of this subtitle, the Commission shall consider whether dumping in the markets of foreign countries (as evidenced by dumping findings or antidumping remedies in other WTO member markets against the same class or kind of merchandise manufactured or exported by the same party as under investigation) suggests a threat of material injury to the domestic industry. In the course of its investigation, the Commission shall request information from the foreign manufacturer, exporter, or United States importer concerning this issue.

#### (II) WTO member market

For purposes of this clause, the term ''WTO member market'' means the market of any country which is a WTO member.

#### (III) European Communities

For purposes of this clause, the European Communities shall be treated as a foreign country.

### (G) Cumulation for determining material injury

#### (i) In general

For purposes of clauses (i) and (ii) of subparagraph (C), and subject to clause (ii), the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which—

(I) petitions were filed under section 1671a(b) or 1673a(b) of this title on the same day,

(II) investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day, or

(III) petitions were filed under section 1671a(b) or 1673a(b) of this title and investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day,

if such imports compete with each other and with domestic like products in the United States market.

#### (ii) Exceptions

The Commission shall not cumulatively assess the volume and effect of imports under clause (i)—

(I) with respect to which the administering authority has made a preliminary negative determination, unless the administering authority subsequently made a final affirmative determination with respect to those imports before the Commission's final determination is made;

(II) from any country with respect to which the investigation has been terminated;

(III) from any country designated as a beneficiary country under the Caribbean Basin Economic Recovery Act (19 U.S.C. 2701 et seq.) for purposes of making a determination with respect to that country, except that the volume and effect of imports of the subject merchandise from such country may be cumulatively assessed with imports of the subject merchandise from any other country designated as such a beneficiary country to the extent permitted by clause (i); or

(IV) from any country that is a party to an agreement with the United States establishing a free trade area, which entered into force and effect before January 1, 1987, unless the Commission determines that a domestic industry is materially injured or threatened with material injury by reason of imports from that country.

#### (iii) Records in final investigations

In each final determination in which it cumulatively assesses the volume and effect of imports under clause (i), the Commission shall make its determinations based on the record compiled in the first investigation in which it makes a final determination, except that when the administering authority issues its final determination in a subsequently completed investigation, the Commission shall permit the parties in the subsequent investigation to submit comments concerning the significance of the administering authority's final determination, and shall include such comments and the administering authority's final determination in the record for the subsequent investigation.

#### (iv) Regional industry determinations

In an investigation which involves a regional industry, and in which the Commission decides that the volume and effect of imports should be cumulatively assessed under this subparagraph, such assessment shall be based upon the volume and effect of imports into the region or regions determined by the Commission. The provisions of clause (iii) shall apply to such investigations.

### (H) Cumulation for determining threat of material injury

To the extent practicable and subject to subparagraph (G)(ii), for purposes of clause (i)(III) and (IV) of subparagraph (F), the Commission may cumulatively assess the volume and price effects of imports of the subject merchandise from all countries with respect to which—

(i) petitions were filed under section 1671a(b) or 1673a(b) of this title on the same day,

(ii) investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day, or

(iii) petitions were filed under section 1671a(b) or 1673a(b) of this title and investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day,

11

19 U.S.C. § 1677(7)(I)

if such imports compete with each other and with domestic like products in the United States market.

**(I) Consideration of post-petition information**

The Commission shall consider whether any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition in an investigation under part I or II of this subtitle is related to the pendency of the investigation and, if so, the Commission may reduce the weight accorded to the data for the period after the filing of the petition in making its determination of material injury, threat of material injury, or material retardation of the establishment of an industry in the United States.

**(8) Subsidies Agreement; Agreement on Agriculture**

**(A) Subsidies Agreement**

The term "Subsidies Agreement" means the Agreement on Subsidies and Countervailing Measures referred to in section 3511(d)(12) of this title.

**(B) Agreement on Agriculture**

The term "Agreement on Agriculture" means the Agreement on Agriculture referred to in section 3511(d)(2) of this title.

**(9) Interested party**

The term "interested party" means—

(A) a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise or a trade or business association a majority of the members of which are producers, exporters, or importers of such merchandise,

(B) the government of a country in which such merchandise is produced or manufactured or from which such merchandise is exported,

(C) a manufacturer, producer, or wholesaler in the United States of a domestic like product,

(D) a certified union or recognized union or group of workers which is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a domestic like product,

(E) a trade or business association a majority of whose members manufacture, produce, or wholesale a domestic like product in the United States,

(F) an association, a majority of whose members is composed of interested parties described in subparagraph (C), (D), or (E) with respect to a domestic like product, and

(G) in any investigation under this subtitle involving an industry engaged in producing a processed agricultural product, as defined in paragraph (4)(E), a coalition or trade association which is representative of either—

(i) processors,

(ii) processors and producers, or

(iii) processors and growers,

but this subparagraph shall cease to have effect if the United States Trade Representative notifies the administering authority and the Commission that the application of

this subparagraph is inconsistent with the international obligations of the United States.

**(10) Domestic like product**

The term "domestic like product" means a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle.

**(11) Affirmative determinations by divided Commission**

If the Commissioners voting on a determination by the Commission, including a determination under section 1675 of this title, are evenly divided as to whether the determination should be affirmative or negative, the Commission shall be deemed to have made an affirmative determination. For the purpose of applying this paragraph when the issue before the Commission is to determine whether there is—

(A) material injury to an industry in the United States,

(B) threat of material injury to such an industry, or

(C) material retardation of the establishment of an industry in the United States,

by reason of imports of the merchandise, an affirmative vote on any of the issues shall be treated as a vote that the determination should be affirmative.

**(12) Attribution of merchandise to country of manufacture or production**

For purposes of part I of this subtitle, merchandise shall be treated as the product of the country in which it was manufactured or produced without regard to whether it is imported directly from that country and without regard to whether it is imported in the same condition as when exported from that country or in a changed condition by reason of remanufacture or otherwise.

**(13) Repealed. Pub. L. 103–465, title II, § 222(i)(2), Dec. 8, 1994, 108 Stat. 4876**

**(14) Sold or, in the absence of sales, offered for sale**

The term "sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers in commercial quantities, or

(B) in the ordinary course of trade to one or more selected purchasers in commercial quantities at a price which fairly reflects the market value of the merchandise,

without regard to restrictions as to the disposition or use of the merchandise by the purchaser except that, where such restrictions are found to affect the market value of the merchandise, adjustment shall be made therefor in calculating the price at which the merchandise is sold or offered for sale.

**(15) Ordinary course of trade**

The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the

(Form 19)

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

## CAFC Court No. 2025-2034

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes <u>13,957</u> words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: October 20, 2025

Signature: <u>/s/ Frank J. Schweitzer</u>

Name: <u>Frank J. Schweitzer</u>