Case No. 2025-2034

# BEFORE THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

TENARIS BAY CITY, INC., MAVERICK TUBE CORP., IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP., SIDERCA S.A.I.C., TUBOS DE ACERO DE MEXICO, S.A.,

Plaintiffs-Appellants,

TMK Group,

Plaintiff,

v.

UNITED STATES, UNITED STATES STEEL CORPORATION, BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, WELDED TUBE USA INC,

Defendants-Appellees.

Appeals from the United States Court of International Trade in Consol. Case No. 1:22-cv-00344, 1:22-cv-00346, 1:23-cv-00002
Judge Jennifer Choe-Groves

RESPONSE BRIEF OF UNITED STATES STEEL CORPORATION, BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, WELDED TUBE USA INC

Roger B. Schagrin
Luke A. Meisner
Jeffrey D. Gerrish

SCHAGRIN ASSOCIATES
900 Seventh Street N.W., Ste. 500
Washington, DC 20001
Phone: (202) 223-1700
Fax: (202) 429-2522

*Counsel to Borusan Pipe U.S. Inc.,
PTC Liberty Tubulars LLC, United
Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied
Industrial and Service Workers
International Union, AFL-CIO,
CLC, and Welded Tube USA Inc.*

Dated: January 30, 2026

Thomas M. Beline
Myles S. Getlan
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave. N.W., Ste.
300
Washington, DC  20037
Phone: (202) 567-2300
Fax: (202) 567-2301

*Counsel to United States Steel
Corporation*

**FORM 9. Certificate of Interest**                              Form 9 (p. 1)
                                                                 March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2025-2034 |
| **Short Case Caption** | Tenaris Bay City, Inc. v. US |
| **Filing Party/Entity** | United States Steel Corporation |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/25/2025

Signature:  /s/ Thomas M. Beline

Name:  Thomas M. Beline

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
|  | ☑ None/Not Applicable | ☐ None/Not Applicable |
| United States Steel Corporation |  | Nippon Steel Corporation |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Sarah E. Shulman<br>Appeared before: Originating Court, Agency | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)    ☑ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number**  25-2034

**Short Case Caption**  Tenaris Bay City, Inc. v. US

**Filing Party/Entity**  BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED ☐+

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/03/2025

Signature:  /s/ Roger B. Schagrin

Name:  Roger B. Schagrin

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Borusan Pipe U.S., Inc. | | Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. |
| PTC Liberty Tubulars LLC | | N/A |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC | | N/A |
| Welded Tube USA, Inc. | | Welded Tube of Canada Corp. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Benjamin J. Bay, Schagrin Associates | Joseph A. Laroski, Jr., Schagrin Associates | Kelsey M. Rule, Schagrin Associates |
| Michelle R. Avrutin, Schagrin Associates | Geert De Prest, Schagrin Associates | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☑    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# Table of Contents

STATEMENT OF ISSUES ........................................................................1

STATEMENT OF FACTS .......................................................................2

    A.  Cumulation .................................................................................3

    B.  Material Injury ...........................................................................4

SUMMARY OF ARGUMENT ...............................................................7

ARGUMENT ......................................................................................10

I.  Standard of Review .......................................................................10

    A.  Substantive Challenges ...........................................................10

    B.  Waiver Challenges ...................................................................11

II.  Cumulation .................................................................................13

    A.  Tenaris Misunderstands the CIT's Waiver Finding, Which
        Is Undisputed ...........................................................................16

    B.  As the CIT Held, the Commission Adopted a Lawful
        Framework for Cumulating POI Injury Data by Assessing
        the "Reasonable Overlap of Competition" during the POI ...........20

        1.  As the Commission Reasoned, the Term "Such Imports"
            in 19 U.S.C. § 1677(7)(G)(i) Concerns Imports During
            the POI      ..................................................................21

            i.  The Interlocking Cumulation and Injury Provisions
               Demonstrate that the Relevant Time Period for
               Assessing Competition During an Investigation Is
               the POI ...................................................................22

            ii.  Chaparral Is Inapposite, Outdated Precedent and
               Is Otherwise Misconstrued by Tenaris .............................29

  iii. Statutory Due Process Obligations Are Incompatible with Requiring the Commission to Obtain or Consider New Information Up Through "Vote Day" .......................................................36

 C. Tenaris Does Not Assert that the Commission Failed to Account for any Evidence Concerning the POI..............................38

III. The Commission's Determination That Significant Volumes of Low-Priced Subject Imports Materially Injured the Domestic Industry Was Lawful and Supported by Substantial Evidence ........39

 A. Substantial Evidence Demonstrates that Subject Import Volumes Were Significant....................................................40

  1. Tenaris Misunderstands the Statute; The Commission Lawfully Assessed the Significance of Subject Import Market Share Gains and Found No Evidence of Domestic Supply Constraints ........................................41

   i. The Court should disregard Tenaris' untimely definitional argument..............................................42

   ii. Statutory text and legislative history confirm that assessing whether subject import volume is "significant" does not require consideration of the conditions of competition ........................................42

   iii. The Commission lawfully considered domestic supply and demand issues when analyzing subject import volumes. ........................................................46

  2. The Commission Lawfully Accorded Less Weight to Post-Petition Market Share Data.................................49

  3. The Commission Was Not Required to Accord Less Weight to Post-Petition Absolute Volume Data......................52

 B. Substantial Evidence Supports the Commission's Lawful Determination that the Domestic Industry Is Materially Injured by Reason of Subject Imports..............................................54

1. The Commission Considered Market Conditions And Reasonably Concluded That Subject Imports Adversely Impacted Domestic Producers ........................................................ 56

   i. Demand .......................................................................... 56

   ii. Supply constraints ..................................................... 59

   iii. Tenaris' investment in U.S. OCTG production ................. 65

2. The Domestic Industry's Dramatically Better Performance After Subject Import Market Share Declined in Interim 2022 Shows That the Surge of Subject Imports from 2020 to 2021 Caused Injury. ................ 66

3. The Commission Articulated a Rationale for Observed Trends in Domestic Industry Performance; Tenaris Conflates Disparate Parts of the Commission's Analysis ........................................................................... 68

CONCLUSION ................................................................................ 75

Statement Regarding Confidential Information Pursuant to Federal Circuit Rule 25.1(e)(1)(B)

Confidential material enclosed in brackets and appearing on pages 2, 5, 9, 40, 48, 54, 61-64, 66, and 72 has been redacted from this brief. The following material was omitted: on page 2, import volume, market share, and sales data; on page 5, import volume data, market share data, and entity identifying information; on page 9, sales data and market share information; on page 40, import volume and market share data; on page 48, company performance information; on page 54, import volume and market share data; on page 61, company performance information; on page 62, source identifying information; on page 63, market trend information; on page 64, market trend information; on page 66, company performance information; on page 72, market share data.

# Table of Authorities

Page(s)

<u>Statute</u>

1 U.S.C. § 1 ................................................................................... 24

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................... 10

19 U.S.C. § 1671d(b)(1)(A)(i) ...................................................... 68

19 U.S.C. § 1671d(b)(2) ............................................................... 37

19 U.S.C. § 1673d(b)(1)(A)(i) ................................ 20, 22, 25, 68

19 U.S.C. § 1673d(b)(1)(A)(ii) .................................................... 25

19 U.S.C. § 1673d(b)(2) ............................................................... 37

19 U.S.C. § 1675(c)(1) .................................................................. 26

19 U.S.C. § 1677(7)(A) ................................................................ 39

19 U.S.C. § 1677(7)(B)(i) ............................................................. 39

19 U.S.C. § 1677(7)(B)(i)(I) .................................................. 40, 68

19 U.S.C. § 1677(7)(B)(i)(III) ..................................................... 68

19 U.S.C. § 1677(7)(C) .......................................................... 43, 45

19 U.S.C. § 1677(7)(C)(i) ..................................................... *passim*

19 U.S.C. § 1677(7)(C)(ii) ........................................................... 22

19 U.S.C. § 1677(7)(C)(iii) ................................................... *passim*

19 U.S.C. § 1677(7)(C)(iv) (1988) ....................................... 29, 32

19 U.S.C. § 1677(7)(F)(ii) ............................................................ 25

19 U.S.C. § 1677(7)(G)(i) ..................................................... *passim*

19 U.S.C. § 1677(7)(G)(i)(I) ........................................................ 36

19 U.S.C. § 1677(7)(G)(i)(II) ....................................................... 36

19 U.S.C. § 1677(7)(G)(i)(III) ...................................................... 36

19 U.S.C. § 1677(7)(G)(iii) .................................................... 35, 38

19 U.S.C. § 1677(7)(I) ......................................... 5, 49-54, 70, 72

19 U.S.C. § 1677m(g) ................................................................. 37

19 U.S.C. § 3512(d) ......................................................... 10, 25, 50

28 U.S.C. § 2639(a)(1) ................................................................ 11

Pub. L. 98-573, Title VI, § 612(a)(2)(A), 98 Stat. 2948, 3033 (1984) ...... 32

Pub. L. 103–465, Title II, § 231(a), 108 Stat. 4809, 4893 (1994). ........... 37

Pub. L. 100-418, § 1328(2)(C) (1988) ................................... 44, 45

Regulations

19 C.F.R. § 207.30(a) .................................................................. 37

Rules

Fed. Cir. R. 31(a)(2) ..................................................................... 1

Court Decisions

*3G Licensing, S.A. v. Honeywell Int'l Inc.*, No. 2023-1557, 2024 WL 5054806 (Fed. Cir. Dec. 10, 2024) ................................. 17

*Altx, Inc. v. United States*, 26 C.I.T. 709 (2002) ..................................... 45

*Anderson v. Bessemer City*, 470 U.S. 564 (1985) ................................... 12

*AWP Indus., Inc. v. United States*, 35 C.I.T. 774 (2011) ........................ 24

*Camreta v. Greene*, 563 U.S. 692 (2011) ............................................... 45

*Chaparral Steel Co. v. United States*, 901 F.2d 1097
(Fed. Cir. 1990) .............................................................. *passim*

*Chemours Co. FC, LLC v. United States*, 443 F. Supp.
3d 1315 (Ct. Int'l Trade 2020) ................................................. 23

*Chevron, U.S.A., Inc. v. Natural Resources Defense
Council, Inc.*, 467 U.S. 837 (1984) .......................................... 27

*Companhia Paulista De Ferro-Ligas v. U.S.*, 20 C.I.T.
473 (1996) ...................................................................... 28

*Connecticut Nat. Bank v. Germain*, 503 U.S. 249 (1992) ...................... 43

*Cooper v. Harris*, 581 U.S. 285 (2017) ...................................... 12

*CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337
(Ct. Int'l Trade 2014) ..................................................... 11, 47

*CP Kelco US, Inc. v. United States*, 623 F. App'x 1012
(Fed. Cir. 2015) .............................................................. 47

*Diamond Sawblades Manufacturers Coal. v. United
States*, 33 C.I.T. 48 (2009) ............................................... 11, 64

*Diamond Sawblades Manufacturers Coal. v. United
States*, 612 F.3d 1348 (Fed. Cir. 2010) ...................................... 11

*Dynacraft Indus., Inc. v. United States*, 24 C.I.T. 987
(2000) ........................................................................ 45

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239
(2012) ........................................................................ 19

*Fine Furniture (Shanghai) Ltd. v. United States*, 748
F.3d 1365 (Fed. Cir. 2014) ................................................... 50

*Full Member Subgroup of Am. Inst. of Steel Constr.,
LLC v. United States*, 81 F.4th 1242 (Fed. Cir. 2023) ......... 49, 56, 58, 63

*Fundicao Tupy, S.A. v. United States*, 678 F. Supp. 898,
902 (Ct. Int'l Trade 1988) ................................................... 13

*Fundicao Tupy, S.A. v. United States,* 859 F.2d 915 (Fed. Cir. 1988) .......................................................... 13

*Haggart v. United States*, 943 F.3d 943 (Fed. Cir. 2019) ....................... 12

*Kenda Rubber Indus. Co. v. United States*, 630 F. Supp. 354 (Ct. Int'l Trade 1986) ......................................................... 23

*Kyocera Solar, Inc. v. United States Int'l Trade Comm'n,* 844 F.3d 1334 (Fed. Cir. 2016) ............................................... 10

*LG Elecs., Inc. v. USITC*, 26 F. Supp. 3d 1338 (Ct. Int'l Trade 2014) .......................................................................... 54

*Loper Bright Ent. v. Raimondo*, 603 U.S. 369 (2024) .................... *passim*

*Mexichem Fluor Inc. v. United States*, 179 F. Supp. 3d 1238 (Ct. Int'l Trade 2016) ........................................ 23-24, 38

*Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867 (Fed. Cir. 2008) ................................................... 71

*Nevinnomysskiy Azot v. United States*, 32 C.I.T. 642 (2008) ................................................................... 43

*Nippon Steel Corp. v. United States*, 182 F. Supp. 2d 1330 (Ct. Int'l Trade 2001) .............................................. 45-46

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ....................................................... 10

*Nitrogen Solutions Fair Trade Comm. v. United States*, 358 F. Supp. 2d 1314 (Ct. Int'l Trade 2005) .......................... 23

*Nucor Corp. v. United States*, 28 C.I.T. 188, 204 (2004) ................. 31, 68

*Nucor Corp. v. United States*, 414 F.3d 1331 (Fed. Cir. 2005) ...................................................... *passim*

*OCP S.A. v. United States*, 658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) .............................................. 45-46

*Par Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F.4th 1379 (Fed. Cir. 2022) ................................................................ 12

*Puckett v. United States*, 556 U.S. 129 (2009) ...................................... 12

*Ratzlaf v. United States*, 510 U.S. 135 (1994) ...................................... 51

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ...................................... 10

*Stauffer v. Brooks Bros. Grp.*, 758 F.3d 1314 (Fed. Cir. 2014) ............................................................................... 42

*Steel Auth. of India Ltd. v. United States*, 146 F. Supp. 2d 900 (Ct. Int'l Trade 2001) ............................................... 26-28

*Swiff-Train Co. v. United States*, 999 F. Supp. 2d 1334 (Ct. Int'l Trade 2014) ................................................................ 24

*Swiff-Train Co. v. United States,* 793 F.3d 1355 (Fed. Cir. 2015) ............................................................................... 24

*Tenaris Bay City, Inc. v. United States*, 698 F. Supp. 3d 1287 (Ct. Int'l Trade 2024) ............................................... 4

*Tenaris Bay City, Inc. v. United States*, 789 F. Supp. 3d 1352 (Ct. Int'l Trade 2025) ........................................ *passim*

*U.S. Steel Grp. v. United States*, 96 F.3d 1352 (Fed. Cir. 1996) ............................................................................... 71

*United States v. Great Am. Ins. Co.*, 738 F.3d 1320 (Fed. Cir. 2013) ............................................................................... 20

*United States v. Ziegler Bolt & Parts Co.*, 111 F.3d 878 (Fed. Cir. 1997) ................................................................ 12

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ........................ 11

Administrative Determinations

*Carbon Steel Structural Shapes from Norway*, Inv. No. 731-TA-234 (Final), USITC Pub.1785 (Nov. 1985) ................................. 34

*Certain Aluminum Plate From South Africa*, Inv. No. 731-TA-1056 (Final), USITC Pub.3734 (2004) ..................................... 74

*Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub.4489 (Sept. 2014) ................................................................... 14

*Certain Steel Wire Rod From Canada, Germany, Trinidad & Tobago, and Venezuela*, Inv. Nos. 731-TA-763-766 (Final), USITC Pub.3087 (1998) ........................................ 74-75

*Emulsion Styrene-Butadiene Rubber from Czechia and Russia*, Inv. Nos. 731-TA-1575 and 731-TA-1577 (Final), USITC Pub.5392 (Jan. 2023) .................................................. 58

*Oil Country Tubular Goods from Argentina, Austria, Italy, Japan, Korea, Mexico, and Spain*, Inv. Nos. 701-TA-363-364 and 731-TA-711-717 (Final), USITC Pub.2911 (Aug. 1995) ............................................... 14

*Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico*, Inv. Nos. 731-TA-711 and 713-716 (Second Review), USITC Pub.3923 at 34 (June 2007) ................................................................... 65

*Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, Mexico*, Inv. Nos. 701-TA-364 and 731-TA-711 and 713-716 (Review), USITC Pub.3434 (June 2001) ................................................................... 14

*Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub.5090 (July 2020)................................................................... 14

*Organic Soybean Meal from India*, Inv. Nos. 701-TA-667 and 731-TA-1559 (Final), USITC Pub.5321 (May 2022) ........................ 52

*Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the Netherlands, Saudi Arabia, Taiwan, Turkey, and the United Arab Emirates*, Inv. Nos. 701-TA-646 and 731-TA-1502-1504, 1508-1509, 1512, 1514, and 1516 (Final), USITC Pub.5153 (Jan. 2021) .................................................................................. 52

*Silicomanganese from Brazil, the People's Republic of China, Ukraine, and Venezuela*, Inv. Nos. 731-TA-671-674 (Final), USITC Pub.2836 (Dec. 1994) ............................. 28

*Stainless Steel Wire Rod from Brazil and France*, Inv Nos. 731-TA-636-637 (Final), USITC Pub.2721 (Jan. 1994) .................................................................................. 28

*Steel Nails from India, Oman, Sri Lanka, and Turkey*, Inv. Nos. 701-TA-673-675 and 677 (Final), USITC Pub.5370 (Oct. 2022) ...................................................... 58

## Other Legislative Materials

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ..................................................... *passim*

H. Conf. Rep. 100-576 (1988) ................................................... 44

S. Rep. 100-71 (1987) ............................................................... 44

S. Rep. No. 96-249 (1979) ........................................................ 45

## Other Reference Material

Black's Law Dictionary (2024) ................................................ 12

Pursuant to Federal Circuit Rule 31(a)(2), United States Steel Corporation, Borusan Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA Inc. (together collectively "Defendant-Intervenors" or "Petitioners") respectfully submit this response to the brief filed by appellants Tenaris Bay City, Inc., Maverick Tube Corp., IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corp., Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A. (together collectively, "Tenaris") (CM/ECF Docs. 18-19) ("Tenaris Br.").

## STATEMENT OF ISSUES

1. When Tenaris narrowly focused its arguments on "whether the Commission reasonably determined present material injury during the {period of investigation}" (POI), did the CIT clearly err in finding that Tenaris waived the argument that the use of cumulated imports to determine material injury must be based on post-POI "vote day" conditions?

2. Assuming *arguendo* that the CIT clearly erred in finding waiver, did the Commission's cumulative treatment of Russian OCTG that competed with other subject imports during the 42-month POI comport with the statutory instruction to determine whether the domestic industry "is materially injured" during the POI based on subject imports' cumulative volume and impact "if such imports compete with each other"?

3. Was the Commission's determination that subject imports
   materially injured the domestic industry supported by substantial
   evidence and in accordance with law?

## STATEMENT OF FACTS

In response to Petitioners' request, the Commission investigated whether the domestic OCTG industry was injured by OCTG imports from Argentina, Mexico, Russia, and South Korea.  The Commission considered data and evidence from 2019 through the first half of 2022 (the "POI") and concluded that significant volumes of low-priced subject imports had materially injured the domestic industry.  Appx173. Specifically, subject import volumes increased by [  #  ] percent and captured [  #  ] percentage points of U.S. market share from 2019-2021.  Appx212.  Throughout the POI, subject import prices undersold the domestic industry in [ # ] out of 170 quarterly comparisons, accounting for [  #  ] percent of commercial sales volume.  Appx217. Consequently, the domestic industry lost 8.2 percentage points of market share to [      trend      ] while suffering significant declines in production, capacity utilization, employment, financial performance, among other indicators.  Appx222-225.

Tenaris now challenges aspects of the Commission's decision to cumulate subject imports from Russia and its material injury analysis.

### A. Cumulation

Applying its usual four-factor analysis, the Commission evaluated evidence spanning the full 42-month POI and found that all factors indicated a reasonable overlap of competition among subject imports and domestically produced OCTG—consistent with final determinations concerning OCTG from 1995, 2001, 2014, and 2020—and thus cumulated subject imports for purposes of its material injury analysis. Appx194-200. In so doing, the Commission rejected TMK's request to decumulate Russia based on sanctions imposed in response to Russia's invasion of Ukraine. Appx199-200. The Commission observed that the sanctions in question arose only during the POI's final months and that subject imports from Russia remained significant even after the sanctions. Appx193-195, Appx199-200.

To satisfy due process requirements and facilitate informed analysis, the Commission received briefs, held a hearing, and received further written submissions *after* compiling data concerning conditions through the end of the POI in June 2022. *See, e.g.*, Appx27141-27142. On October 26, 2022, a.k.a., "Vote Day," the Commission voted on whether the domestic industry had been materially injured during the

POI. Before the CIT, TMK (not Tenaris), argued that the Commission must consider the overlap of competition as of "Vote Day," and that failure to do so rendered cumulation of Russia unlawful. *Compare* Appx39448-39450 *with* Appx38921-38922; Appx39073-39074. The CIT remanded for further explanation of this issue, *Tenaris Bay City, Inc. v. United States*, 698 F. Supp. 3d 1287 (Ct. Int'l Trade 2024) (hereinafter "*Tenaris I*") at Appx139.[1] The Commission provided further explanation on remand, oral argument was held, and the CIT undertook a *Loper Bright* evaluation of the statute, ultimately determining that the Commission was not required to weigh conditions of competition more heavily at the POI's end and thus the Commission's "assessment of competition throughout the 42-month {POI} was in accordance with law." *Tenaris Bay City, Inc. v. United States*, 789 F. Supp. 3d 1352 (Ct. Int'l Trade 2025) (hereinafter "*Tenaris II*") at Appx022.

## B. Material Injury

As the statute requires, the Commission assessed material injury by reference to subject imports' volume, price effects, and impact on

---

[1] Additional aspects of the Commission's cumulation determination were remanded and ultimately sustained. *Tenaris II* at Appx023-036. Tenaris abandoned these claims on appeal.

domestic producers.  The Commission found the volume of subject

imports to be significant, based on an analysis of both absolute volume

(which increased [   #   ] percent) and volume relative to U.S.

consumption, *i.e.*, market share (which increased [   #   ] percentage

points).  Appx212.  While subject imports gained market share over the

POI, the Commission noted that this trend reversed after the October

2021 filing of the petition.  Recognizing this, the Commission invoked

19 U.S.C. § 1677(7)(I) and opted to discount post-petition market-share

data.  Appx213.  Because subject imports' absolute volume continued to

rise in the interim period (consistent with demand), the Commission did

not discount that data.  *Id.*

 The Commission's price analysis considered the existence of

significant underselling and price suppression.  Appx214-221.  Owing to

strong evidence of underselling, the Commission determined that

adverse price effects had occurred, obviating the need to render a

finding about the significance of price suppression. Appx221.

 As a broad decline in domestic industry performance—including

[    name    ] operations—coincided with increasing subject import

market share and significant underselling, the Commission concluded

that subject imports had negatively impacted the domestic industry. Appx222-233. The Commission undertook this analysis "within the context of" conditions of competition identified by interested parties. Appx222-223. The Commission acknowledged substantial demand decreases coinciding with the COVID-19 pandemic early in the POI. *Id.*

The Commission also considered Tenaris' allegations that labor constraints hindered domestic production as demand rebounded but found contrary testimony from several other domestic producers. Appx232 (fn.265). The Commission also rejected Tenaris' assertion that the need to draw down post-COVID OCTG inventories hampered the domestic industry, reasoning that any inventory overhang was resolved before the domestic industry lost market share to subject imports and that any overhang would have likewise affected subject imports. Appx230-231. Finally, cognizant of the significant increase in hot-rolled steel coil prices during the POI, which increased welded OCTG production costs, the Commission observed that unused capacity at domestic producers of seamless OCTG could have nevertheless satisfied U.S. demand. Appx232. Having rejected all of Tenaris' alternative purported causes of injury, the Commission concluded that the domestic

industry was materially injured by significant volumes of low-priced subject imports.

In CIT proceedings, Tenaris challenged various aspects of the Commission's volume, price, and impact analysis. The CIT sustained the Commission's determination in all challenged respects. *See Tenaris II* at Appx007.

Tenaris subsequently launched this appeal.

## SUMMARY OF ARGUMENT

The Commission's injury determination in this investigation is supported by the administrative record and consistent with the Commission's numerous prior affirmative injury determinations concerning OCTG. Record evidence of growing volumes, lost market share, predominant underselling, and declining domestic industry performance all confirmed the adverse impact of subject imports on the domestic industry. After weighing the evidence, the Commission declined Tenaris' request to upend the usual analysis, espousing a lawful injury finding supported by substantial evidence. Tenaris' only hope on appeal is for the Court to reweigh the evidence—an outcome precluded by the statutory standard of review which the CIT correctly

rejected.

The Commission found all four of its usual factors favored cumulation of OCTG from Russia (and other subject sources) based on evidence spanning the full three-and-a-half year POI. Although Tenaris embraced a POI material injury analysis during oral argument, it now argues that the Commission erred as a matter of law by assessing whether Russian OCTG competed over the same period that the Commission assessed material injury. To the extent Tenaris now attempts to push the Commission's analysis outside the POI, the CIT found that Tenaris waived such argument. Moreover, although Tenaris never clearly articulates what it believes the statute to require, the statute's plain text, "authoritative" legislative history, and the practical demands of procedural due process all confirm the lawfulness of the Commission's analysis here.

The Commission found material injury during the POI based on subject imports' significant volume *and* price effects *and* impact. Subject imports' absolute volume and market share both increased significantly until the petition restrained subject imports' market share. Giving less weight to post-petition market share data was well within

the Commission's statutory authority. The Commission's price effects finding was based on the predominance of underselling by number of quarters ([    #    ]) and volume ([    #    ]), at a 10.8% average underselling margin.  Tenaris does not challenge price findings on appeal.

The Commission's impact analysis noted the domestic industry's 8.2 percentage point loss of market [          trend          ], and its large decreases in production, capacity utilization, and employment, among other negative indicators.  Tenaris' challenges to this assessment are largely predicated on the notion that producing both domestic and subject OCTG entitled it to be included within the domestic industry, while treating Tenaris' U.S. operations data differently.  The Commission reasonably considered Tenaris' arguments, weighed the material record evidence, and declined to deviate from its usual analytical approach.  Tenaris has identified no error of law or want of substantial evidence.  Therefore, the Commission's determination should be sustained.

# ARGUMENT

## I. Standard of Review

### A. Substantive Challenges

This Court must uphold the Commission's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Kyocera Solar, Inc. v. United States Int'l Trade Comm'n*, 844 F.3d 1334, 1338 (Fed. Cir. 2016). On appeal, this Court gives "great weight to 'the informed opinion of the {CIT}.'" *Kyocera*, 844 F.3d at 1338 (quoting *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006)).

On questions of statutory interpretation, the Court must discern a statute's "best meaning" by "deploying its full interpretive toolkit," *Loper Bright Ent. v. Raimondo*, 603 U.S. 369, 409 (2024), including the "authoritative" Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA"), *see* 19 U.S.C. § 3512(d). While the Court may not "defer" to an administrative interpretation, its "thoroughness" and "validity" nonetheless retain the "power to persuade." *Loper Bright*, 603 U.S. at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

The Commission's factual determinations are "presumed to be correct" and those challenging the determination bear the burden of demonstrating otherwise. 28 U.S.C. § 2639(a)(1); *Diamond Sawblades Manufacturers Coal. v. United States*, 33 C.I.T. 48, 51 (2009), *aff'd*, 612 F.3d 1348 (Fed. Cir. 2010). Substantial evidentiary support requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). "{T}he Commission's discussion in the Views of the Commission need not be of some talismanic length or in some preordained place." *CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337, 1350 (Ct. Int'l Trade 2014), *aff'd*, 623 F. App'x 1012 (Fed. Cir. 2015). Even "{w}here an agency has not made a particular determination explicitly, the agency's ruling nonetheless may be sustained as long as 'the path of the agency may be reasonably discerned.'" *Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005).

### B. Waiver Challenges

Evidently latching on to the term "abandon{}" in the CIT's opinion, Tenaris appears to imply that the CIT's finding is reviewed under

stricter standards than waiver. *Compare Tenaris II* at Appx018-022, *with* Tenaris Br. at 57-62. That is incorrect. To "waive{}" is to "intentionally relinquish{} or abandon{}." *Puckett v. United States*, 556 U.S. 129, 138 (2009); *see also* Black's Law Dictionary (2024) ("Waive: 1. To abandon…").

The Federal Circuit reviews a lower court's "decision on the waiver issue for an abuse of discretion," *United States v. Ziegler Bolt & Parts Co.*, 111 F.3d 878, 883 (Fed. Cir. 1997), but factual findings underlying the CIT's conclusion are reviewed for clear error, *see Haggart v. United States*, 943 F.3d 943, 948 (Fed. Cir. 2019). "Under the clear-error standard, we defer to the district court's findings 'in the absence of a definite and firm conviction that a mistake has been made.'" *Par Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F.4th 1379, 1383 (Fed. Cir. 2022). This Court "may not reverse just because {it} 'would have decided {the matter} differently.'" *Cooper v. Harris*, 581 U.S. 285, 293 (2017) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). "A finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Id.* (quoting *Anderson*, 470 U.S. at 574).

## II. Cumulation

The Court should reject Tenaris's attempts to resurrect and modify another litigant's challenge to the cumulation of subject imports from Russia. *See* Tenaris Br. at 51-62. In assessing material injury, the Commission shall "cumulatively assess the volume and effect of imports of the subject merchandise" where, in relevant part,[2] "such imports compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1677(7)(G)(i).  The SAA requires only "a reasonable overlap of competition, based on consideration of relevant factors."  H.R. Doc 103-316, Vol. 1 (1994) at 848 (citing *Fundicao Tupy, S.A. v. United States*, 678 F. Supp. 898, 902 (Ct. Int'l Trade 1988), *aff'd*, 859 F.2d 915 (Fed. Cir. 1988)); *see also* Appx192 (fn.82) (citing same). Neither the statute nor the SAA requires a particular analysis but here, consistent with *Fundicao Tupy* and the Commission's usual practice, it considered four factors: the degree of fungibility, geographic overlap in "sales or offers to sell," "common or similar" channels of distribution, and simultaneous market presence. *Id.*

---

[2] Tenaris does not contest the remaining prerequisites.  *See* 19 U.S.C. § 1677(7)(G)(i).

The Commission evaluated evidence over the full three-and-a-half year POI (2019 through H1 2022) and concluded that all four factors show "a reasonable overlap of competition between and among domestically produced OCTG and imports from each subject country." Appx200. This is consistent with the Commission's past OCTG determinations finding a "reasonable" overlap of competition. *See, e.g.,* *Oil Country Tubular Goods from Argentina, Austria, Italy, Japan, Korea, Mexico, and Spain*, Inv. Nos. 701-TA-363-364 and 731-TA-711-717 (Final), USITC Pub.2911 (Aug. 1995) at I-24; *Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, Mexico*, Inv. Nos. 701-TA-364 and 731-TA-711 and 713-716 (Review), USITC Pub.3434 (June 2001) at 14; *Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub.4489 (Sept. 2014) at 23; *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub.5090 (July 2020) at 18. Indeed, Tenaris itself has supported such cumulation findings. Appx30507-30510.

As a practical matter, to satisfy due process requirements and facilitate informed analysis of conditions during the POI, the Commission first gathers questionnaire responses for the POI, then receives briefs, holds a hearing, and receives further written submissions before "Vote Day," here October 26, 2022. *See, e.g.*, Appx27141-27142. Before the CIT, TMK (not Tenaris) initially argued that the Commission was required to consider the overlap of competition as of "Vote Day" (rather than during the POI), and that failure to do so rendered cumulation of Russia unlawful. *Compare* Appx39448-39450, *with* Appx38921-38922; Appx39073-39074.

Now, Tenaris attempts to resurrect a modified version of TMK's argument and criticizes various aspects of the Commission's statutory analysis, but Tenaris never affirmatively states what it believes the statute to require. *See* Tenaris Br. at 26-27, 51-57. At most, Tenaris concludes that "*{b}y the end of the POI*, there was no reasonable overlap of competition based on the four factors relied on by the Commission." Tenaris Br. at 57 (emphasis supplied). Tenaris otherwise challenges the CIT's finding that Tenaris waived its "argument that *vote day* should be the proper timeframe for assessment." *Tenaris II*, Appx018 (emphasis

supplied); Tenaris Br. at 26-27, 57-62. Yet, the CIT recognized—consistent with Tenaris' own "end-of-the-POI" framing before this court—that Tenaris argued only in favor of "greater weight…to the last few months of the {POI}." *Compare Tenaris II*, Appx018, *with* Tenaris Br. at 57. Tenaris appears confused about the CIT's waiver finding and relies on broad and vague references to "its arguments related to its claim that the Commission failed to properly interpret" the statute, Tenaris Br. at 27, 59-60, while failing to articulate any argument that was unaddressed. (**Section II.A**). Moreover, as the CIT found, the Commission's determination satisfied the cumulation provision's requirements (**Section II.B**).

### A. Tenaris Misunderstands the CIT's Waiver Finding, Which Is Undisputed

As explained, TMK (not Tenaris) originally argued that the Commission must consider the overlap of competition as of the post-POI "Vote Day." Appx39448-39450. Only after the CIT ordered remand on this issue did Tenaris' papers introduce statutory arguments on this issue, including that the Commission erred in "focus{ing} only on the months included in the original POI, rather than analyzing data all the way up until vote day." Appx39145. During post-remand oral argument,

counsel to Tenaris opened by stating: "we are not asking to change the POI. We are asking the Court to consider whether the Commission reasonably determined present material injury *during the POI.*" Appx39361 (emphasis supplied). Determining material injury requires the Commission to assess whether cumulation is required. *See* 19 U.S.C. § 1677(7)(G)(i). The CIT thus found that Tenaris waived its contention that the post-POI "vote day is the appropriate time for assessing competition of imports." *Tenaris II*, Appx018. This is consistent with *3G Licensing*, which held that a party waived its former position by subsequently advancing a conflicting position. *3G Licensing, S.A. v. Honeywell Int'l Inc.*, No. 2023-1557, 2024 WL 5054806, at *4 (Fed. Cir. Dec. 10, 2024) ("{we} did not require {the party} to expressly abandon the argument for it to be waived.").

Tenaris makes no claim that it maintained its argument that the overlap of competition must be assessed as of Vote Day. *See* Tenaris Br. at 26-27, 57-62. Nor does Tenaris argue that the statute requires an assessment of conditions as of Vote Day. *See id.* at 51-57. Indeed, beyond quoting others, the term "Vote Day" doesn't even appear in Tenaris' brief. *See, e.g., id.* at 26-27, 51-62. Far from establishing that

the CIT "clearly erred," Tenaris does not appear to dispute the CIT's

waiver finding.

Instead, Tenaris argues that it did not "abandon{} the argument

that the Commission did not properly interpret 19 U.S.C. §

1677(7)(G)(i)," the cumulation provision. Tenaris Br. at 26. The CIT

made no such broad finding and proceeded to evaluate whether the

Commission's POI-based cumulation analysis comported with the

statute, concluding that it did. *See Tenaris II*, Appx018-023. This

included interpreting the statutory phrase "compete with," which

Tenaris continues to emphasize. *Compare id.* at Appx019-023, *with*

Tenaris Br. at 27, 59.

Tenaris never articulates which specific arguments were

incorrectly deemed waived. Tenaris broadly references "information and

data well after the POI," as well as certain record data pertaining to

various periods after the POI's end. Tenaris Br. at 60. But these post-

POI data points are inconsistent in their coverage and irrelevant to

Tenaris' argument about "whether the Commission reasonably

determined present material injury *during the POI.*" Appx39361

(emphasis supplied). Tenaris cannot have it both ways.

Tenaris otherwise vaguely claims that the CIT overlooked "several arguments advanced by Tenaris in support of its statutory interpretation claim," referencing "arguments related to the *Chaparral* decision, the SAA, staggered investigations, and the Commission's practice and ability to assess information on the record after the POI," without citing anything specific from its brief or the hearing. Tenaris Br. at 60-62. The CIT discussed *Chaparral*, *Tenaris II*, Appx016-017, and legislative history, *id.*, Appx020-022. As for staggered investigations and the Commission's information-gathering procedures, these were arguments *in favor of* the Commission's approach. *See* Tenaris CIT Remand Br. at Appx39133. Because the CIT did not rely on these for support, *see Tenaris II*, Appx019-023, there was no need to address Tenaris' counterarguments, *see* Appx39137-39138. *See, e.g.*, *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 258 (2012) (not addressing all arguments raised because they would be unnecessary to resolve the case). In any event, these two issues are only relevant to data for post-POI periods, *see id.*, and thus have no bearing upon Tenaris' argument, *viz.*, whether the Commission "reasonably

determined present material injury *during the POI*." Appx39361 (emphasis supplied).

It is not clear what more Tenaris expected. This issue originated with TMK (not Tenaris), and the first time Tenaris briefed any relevant statutory argument was in post-remand comments. Then, at oral argument, Tenaris backpedaled. The threadbare assertions of its appellate brief are too undeveloped to be interpreted any further. *See United States v. Great Am. Ins. Co.*, 738 F.3d 1320, 1328 (Fed.Cir.2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived.").

### B. As the CIT Held, the Commission Adopted a Lawful Framework for Cumulating POI Injury Data by Assessing the "Reasonable Overlap of Competition" during the POI

In investigations with multiple subject countries, "the Commission shall cumulatively assess the volume and effect of imports" for purposes of determining whether the domestic industry "is materially injured" during the POI "if *such imports* compete with each other…" 19 U.S.C. §§ 1677(7)(G)(i), 1673d(b)(1)(A)(i) (emphasis supplied). Even if the Court were to find that Tenaris did not waive its challenge to cumulation, Tenaris has not articulated what it believes this provision to require, or

how it would have altered the Commission's conclusion. As detailed
below, the Commission's cumulation analysis lawfully considered
whether Russian OCTG reasonably overlapped in competition with
OCTG from other subject countries during the POI.

    1.   *As the Commission Reasoned, the Term "Such Imports" in 19 U.S.C. § 1677(7)(G)(i) Concerns Imports During the POI*

The Commission's Remand Views addressed the scope of the
statutory requirement to consider whether subject imports reasonably
overlap in competition. Appx075-081. Because the resulting analytical
framework represents the statute's best reading, the CIT sustained the
Commission's cumulation determination. *See Tenaris II*, Appx023. To
summarize, interlocking statutory provisions governing cumulation and
material injury, as well as "authoritative" characterizations of those
provisions in the SAA, demonstrate that the cumulation analysis must
focus on the entire POI. (**Section II.B.1.i**). *Chaparral*, the authority on
which Tenaris relies, is inapposite. *Chaparral* interpreted an earlier
statute, reached a fact-specific holding, and was subsequently
disavowed in the SAA. (**Section II.B.1.ii**). Moreover, additional statutory
context confirms that compliance with a "vote day" requirement in an

injury analysis is incompatible with the Commission's due process

obligations. (**Section II.B.1.iii**).

> i. *The Interlocking Cumulation and Injury Provisions Demonstrate that the Relevant Time Period for Assessing Competition During an Investigation Is the POI*

The material injury provision applicable to original investigations

asks whether a U.S. industry "is materially injured." 19 U.S.C. §

1673d(b)(1)(A)(i) (emphasis supplied). Material injury is based on, *inter*

*alia*, assessing subject imports' volume and price. *Id.* § 1677(7)(C)(i)-(ii).

The Commission assesses volume and price over a defined POI. *See*

*generally* Appx200-232. Meanwhile, the statute requires that import

data from different countries be cumulated "{f}or purposes of" assessing

volume and price where, in relevant part, "such imports compete with

each other." 19 U.S.C. § 1677(7)(G)(i) (emphasis supplied). Because

imports are cumulated for use in assessing their volume and price

during the defined POI, the Commission must assess conditions of

competition over that same POI, as it did here. Appx082 (fn.71). In

defining a POI, the Federal Circuit has held:

> the Commission has broad discretion with respect
> to the {POI} that it selects for purposes of making
> a material injury determination. As the {CIT} has

explained, because the statute "does not expressly command the Commission to examine a particular period of time…the Commission has discretion to examine a period that most reasonably allows it to determine whether a domestic industry is injured by {less than fair value} imports."

*Nucor*, 414 F.3d at 1337 (quoting *Kenda Rubber Indus. Co. v. United States*, 630 F. Supp. 354, 359 (Ct. Int'l Trade 1986)); *see also, e.g.*, *Chemours Co. FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1331 (Ct. Int'l Trade 2020) ("Determining the appropriate {POI} is within the discretion of the Commission"); *Mexichem Fluor Inc. v. United States*, 179 F. Supp. 3d 1238, 1254 (Ct. Int'l Trade 2016) ("{T}he ITC's broad discretion in choosing the time frame for its investigation and analysis has consistently been upheld ….") (quoting *Nitrogen Solutions Fair Trade Comm. v. United States*, 358 F. Supp. 2d 1314, 1325 (Ct. Int'l Trade 2005)) (alteration in *Mexichem*).  Thus, when determining whether a domestic industry "is materially injured" by reason of subject imports during the POI, that POI is the timeframe during which competition among "such imports" and the domestic like product must "reasonably overlap."[3]

---

[3] Neither Tenaris nor TMK challenged the Commission's definition of a 2019-H1 2022 POI.

Here, the Commission applied "its normal practice of considering data for the three most recent calendar years plus applicable interim periods," *Swiff-Train Co. v. United States*, 999 F. Supp. 2d 1334, 1351 (Ct. Int'l Trade 2014), *aff'd*, 793 F.3d 1355 (Fed. Cir. 2015), and neither respondent proposed that the Commission gather data from later periods, *see generally, e.g.*, Tenaris' Comments on Final Phase Draft Questionnaires (Feb. 16, 2022) (C.R.225; P.R.85); TMK Group's Comments on Final Phase Draft Questionnaires (Feb. 16, 2022) (C.R.223; P.R.84). "Just because {respondent} now identifies a different {investigation period} methodology that might support its own narrative does not mean that the Commission's normal practice is unlawful." *Mexichem*, 179 F. Supp. 3d at 1254. As the CIT held in *AWP Indus.*, "there is no requirement to include…post-POI data, as the POI is the centerpiece of the investigation's time frame." *AWP Indus., Inc. v. United States*, 35 C.I.T. 774, 790 (2011).

Tenaris bases its "vote day" requirement for material injury on "the statutory language {being} written in the present tense." Tenaris Br. at 54. But "context indicates" that this understanding is incorrect. *See* 1 U.S.C. § 1. In contrast with the "threat of material injury"

provision that asks "whether further dumped or subsidized imports are imminent," 19 U.S.C. § 1677(7)(F)(ii); *see also id.* § 1673d(b)(1)(A)(ii), the present material injury provision applied by the Commission in this investigation asks whether a U.S. industry "is materially injur<u>ed</u>" and the cumulation provision requires that "<u>such imports</u> compete with each other." 19 U.S.C. §§ 1677(7)(G)(i), 1673d(b)(1)(A)(i) (emphasis supplied). Moreover, the SAA, which constitutes an "authoritative" expression concerning the interpretation and application of the statute, *id.* § 3512(d), characterizes cumulation as applicable "when determining whether a U.S. industry <u>has been injured</u> by unfairly traded imports." SAA at 847 (emphasis supplied); *see also id.* ("This analysis recognizes that a domestic industry can <u>be injured</u> by a particular volume of imports and their effects regardless of whether those imports come from one source or many sources.") (emphasis supplied).

Tenaris emphasizes the SAA statement that "new section 771(7)(G)(i) requires imports to compete with each other," Tenaris Br. at 55 (quoting SAA at 848), but the relevant question is—***what "imports"***? The "imports" are those that will be used to answer the ultimate statutory question of whether a U.S. industry "is materially

injured" during the POI, *i.e.*, those that entered between 2019 and H1 2022. Subject imports' ability to *continue* inflicting injury is addressed through five-year reviews, which assess whether revocation of the order(s) "would be likely to lead to <u>continuation or recurrence</u> of…material injury." 19 U.S.C. § 1675(c)(1) (emphasis supplied). Forcing the Commission to prejudge that inquiry at the conclusion of an original investigation would contradict Congress' orderly framework.

Thus, the "present" versus "past" dichotomy that Tenaris attempts to impose would be grammatically incorrect. *See* Tenaris Br. at 54. As anyone who has ever broken a bone knows, one can <u>be</u> injur<u>ed</u> in the present well after the past triggering event has already concluded. On this point, the CIT's *SAIL* opinion is instructive. There, the POI ran from January 1996 through June 1999, and the plaintiff, a foreign exporter of subject merchandise, had "voluntarily withdr{awn} from the market from July 1998 through June 1999." *Steel Auth. of India Ltd. v. United States*, 146 F. Supp. 2d 900, 908 (Ct. Int'l Trade 2001) ("*SAIL*"). The plaintiff contended that its withdrawal precluded lawful cumulation. *Id.* The CIT rejected the plaintiff's "interpretation of the statute us{ing} the present continuous tense—*i.e.*, as contemplating an

action that is not completed or finished at the time," which "would limit the {Commission}'s cumulation to on-going competition that will end in the future." *Id.* at 905 n.9. Instead, the CIT sustained the Commission's reading that "the simple present tense of 'compete' refers to a state rather than an on-going action" such that "'imports compete with' refers to the state of the subject imports, broadening the scope of the cumulation provision to include imports that 'compete' during the time of investigation." *Id.* at 907. Accordingly, the CIT sustained the Commission's finding that plaintiff's imports were "simultaneously present" in the U.S. market and upheld its cumulation determination. *Id.* at 908. Similarly, in this case, the CIT concluded that the Commission's assessment of competition "throughout the 42-month {POI}" was consistent with "the present tense of the word 'compete with'." *See* Appx021-022.

Tenaris questions *SAIL*'s relevance on the basis that *SAIL* invoked *Chevron* and deferred to the Commission's approach, *see* Tenaris Br. at 53 (citing *SAIL*, 146 F. Supp. 2d at 905-07), but grammar is not *Chevron*-dependent. Tenaris omits, moreover, that *Chaparral* held that "neither the statute nor the legislative history <u>conclusively</u>

establishes the intended time frame for cumulation," *Chaparral*, 901 F.2d at 1104—a proposition for which *SAIL* quoted *Chaparral*, *SAIL*, 146 F. Supp. 2d at 906—and ultimately "defer{red} to the agency's interpretation of the statute" as "permissible," *Chaparral*, 901 F.2d at 1105. Underscoring that *Chaparral* was fact-specific, pre-URAA Commission determinations often focused cumulation analyses on subject imports' presence "<u>during</u> most of the {POI}," *e.g.*, *Stainless Steel Wire Rod from Brazil and France*, Inv Nos. 731-TA-636-637 (Final), USITC Pub.2721 (Jan. 1994) at I-16 (emphasis supplied); *see also Silicomanganese from Brazil, the People's Republic of China, Ukraine, and Venezuela*, Inv. Nos. 731-TA-671-674 (Final), USITC Pub.2836 (Dec. 1994) at I-13 (considering number of months' presence out of the 42-month POI and finding simultaneous presence based on: 34 for Brazil, 16 for China, 15 for Venezuela, and 8 for Ukraine), *aff'd* 20 C.I.T. 473 (1996). *Loper Bright* precludes this Court from simply imposing *Chaparral*'s fact-specific deference to the Commission's interpretation of an earlier statute upon the Commission's cumulation determination here.

ii. Chaparral *Is Inapposite, Outdated Precedent and Is Otherwise Misconstrued by Tenaris*

Tenaris' reliance on *Chaparral*, a case interpreting the pre-URAA and pre-SAA cumulation provision (19 U.S.C. § 1677(7)(C)(iv) (1988)), *see* Tenaris Br. at 53, is misplaced. As explained, *Chaparral* merely applied the *Chevron* doctrine, reviewing the Commission's interpretation for permissibility in that case and on those facts. It did not elucidate or impose a rule of general application. *See* 901 F.2d at 1098-1107. Furthermore, as the Commission explained, Appx076-078, the facts of *Chaparral* could hardly be more different than these investigations. There, countervailing duty ("CVD") investigations were initiated against steel products from South Africa (February 1982) and Spain (March 1982). CVD orders were subsequently imposed in September 1982 (South Africa) and January 1983 (Spain). More than a year later, antidumping investigations were initiated against steel products from Spain (March 1984), Norway (December 1984), and Poland (December 1984). 901 F.2d at 1098-1100. Poland and Spain entered into voluntary restraint agreements in early 1985. Consequently, the antidumping investigations were terminated, and Spain's CVD order was revoked. The CVD order against South Africa

was revoked for lack of interest, retroactive to October 1984. However, the investigation of Norway continued.

When the Commission concluded its investigation of Norway in October 1985, it first declined to cumulate dumped Polish and Spanish imports, reasoning that the Polish and Spanish imports "were not subject to a pending investigation and thus did not fall under the cumulation provision." *Id.* at 1100-01. The Commission considered it problematic that the investigation status had changed prior to "vote day." *See id.* Separately, the Commission declined to cumulate Spanish and South African "imports which were subject to the investigations resulting in {CVD} orders," reasoning that the nearly three-year gap between the South African (initiated February 1982), Spanish (initiated March 1982), and Norwegian (initiated December 1984) investigations meant that Spanish and South African CVD investigation period imports "did not enter the U.S. market reasonably coincident in time with the {Norwegian} imports currently under investigation." *See id.* at 1100 (quoting Commission's rationale). The problem facing the Commission in those cases had nothing to do with any alleged intervening change in shipping patterns after the POI and prior to "vote

day" and everything to do with the fact that the investigation periods associated with different subject countries were nearly three years apart. That is, there was not any contemporaneous competition.

Nothing in *Chaparral* requires that the Commission evaluate competitive overlap based on post-POI, "vote day" conditions. Even the single post-URAA case highlighted by Tenaris as citing *Chaparral* concluded that "{t}he statute…makes no mention of whether the ITC's determination must rest on current imports, earlier imports, or both" and invoked *Chevron* deference to sustain the Commission's focus on imports during the POI's final year. *Nucor Corp. v. United States*, 28 C.I.T. 188, 204 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2005); *see also* Tenaris Br. at 53. Nor did that opinion embrace a focus on *post*-POI conditions, but acknowledged "the limitations of the collected data," repeatedly characterized the final year of the POI as "current import data," and confirmed the "permissibility" of the Commission "focus{ing} its analysis on a specific time frame <u>within</u> the POI." *Id.* at 204-205 (emphasis supplied).

The scarcity of references to *Chaparral* in post-URAA cases dealing with cumulation is due to intervening changes in the

cumulation provision, as the Commission observed. Appx078-079.

*Chaparral* interpreted language that was introduced in 1984 and unchanged in the 1988 statute. It read:

> (iv) CUMULATION. — For purposes of clauses (i) and (ii), the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products <u>subject to investigation</u> if such imports compete with each other and with like products of the domestic industry in the United States market.

Pub.L. 98-573, Title VI, § 612(a)(2)(A), 98 Stat. 2948, 3033 (1984) (emphasis supplied), *unchanged in* 19 U.S.C. § 1677(7)(C)(iv) (1988).

For dumped Polish and Spanish imports, it was the "subject to investigation" clause of the 1988 statute that formed the basis of the Commission's determination and the Federal Circuit's affirmance, *Chaparral*, 901 F.2d at 1101, 1106 (affirming based on the Commission's rationale: "The terminations {of Polish and Spanish investigations} occurred <u>prior to any final determinations as to whether the imports were unfairly traded</u>. The statute does not require cumulation in such circumstances. Because these imports have not been and will not be determined to be unfairly traded and because they are not subject to a <u>pending investigation</u>, we conclude that it is not

appropriate to include them in any cumulative analysis.") (emphasis added in *Chaparral*), and the Federal Circuit's affirmance, *id.* at 1106. The Commission interpreted "subject to investigation" as "still under investigation on vote day." *Id.* at 1104. By contrast, for subsidized South African and Spanish imports entered three years prior, the Commission found the "compete with each other" clause of the 1988 statute unsatisfied, because "the pre-CVD order imports from Spain and South Africa…did not contemporaneously compete with the Norwegian imports." *Id.* at 1101, 1106.

The URAA amendments negated both issues encountered in *Chaparral*. The "subject to investigation" clause was replaced with new subsections (I), (II), and (III):

> For purposes of clauses (i) and (ii) of subparagraph (C), and subject to clause (ii), the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which--
>
> (I) petitions were filed under section 1671a(b) or 1673a(b) of this title on the same day,
>
> (II) investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day, or
>
> (III) petitions were filed under section 1671a(b) or 1673a(b) of this title and investigations were

initiated under section 1671a(a) or 1673a(a) of this title on the same day,

if such imports compete with each other and with domestic like products in the United States market.

19 U.S.C. § 1677(7)(G)(i). This change was intended to "promote certainty…by defining, at the time of filing, the countries potentially subject to cumulative analysis," SAA at 848, and would not have allowed cumulation of subsidized South African and Spanish imports in *Chaparral* for the simple reason that those petitions were not filed on the same day as the Norway petition.

Although the Commission itself never expressly addressed cumulation of imports from South Africa and Spain occurring <u>after</u> imposition of the CVD Orders, *see Carbon Steel Structural Shapes from Norway*, Inv. No. 731-TA-234 (Final), USITC Pub.1785 (Nov. 1985) at 6-7, the Federal Circuit surmised that such imports could be reasonably excluded because they were "not 'unfair' inasmuch as they are not marketed at unfair prices because of the imposition of duties," *Chaparral*, 901 F.2d at 1104. But the Federal Circuit did not purport to lay out a broad rule; rather, this observation concerned specific facts before the Court wherein unfair trading had already been remedied by

AD or CVD orders—the only method provided by law to cure unfair dumping and subsidization. *See id.* at 1103 (referring to these as "sales that <u>could not</u> be found unfair.") (emphasis supplied). But in the determination that Tenaris appeals, such a remedy was only possible after the Commission's vote.

Moreover, in the context of staggered investigations, defined as investigations concerning petitions against multiple countries filed on the same day but which return to the Commission from Commerce on different schedules, the SAA confirms that Congress did not intend the Commission to consider post-POI activity, regardless of when "vote day" occurs, explicitly contrasting Congress's preferred approach to that used in *Chapparal*, 901 F.2d at 1104:

> New section 771(7)(G)(iii) provides that the Commission will make its determination in each of the staggered investigations based on the record compiled in the first final investigation in which it makes a determination. **This eliminates the need for the Commission to consider whether imports from the first-decided investigation that are subject to antidumping and countervailing duty orders have a "continuing effect" {sic} on "vote day" of each subsequent investigation.** *Compare Chaparral Steel Co. v. United States*, 901 F.2d 1097 (Fed. Cir. 1990)…

SAA at 848. Because the post-URAA cumulation provision now limits cumulation to same-day petitions and initiations, 19 U.S.C. § 1677(7)(G)(i)(I)-(III), only a staggered investigation could present the situation discussed in *Chaparral*, wherein one of the countries considered for cumulation was already subject to an AD/CVD order on "vote day."

The "best meaning" of the statute must account for the SAA's authoritative interpretation. *See Loper Bright*, 144 S. Ct. at 2271. Here, the SAA confirms that the amended statute eliminates the need to <u>ever</u> adopt a "vote day" framework, including when the Commission is analyzing whether certain POI imports "compete with" other subject imports to determine whether a U.S. industry "is materially injured."

     iii.  *Statutory Due Process Obligations Are Incompatible with Requiring the Commission to Obtain or Consider New Information Up Through "Vote Day"*

As the Commission explained, Appx080, other statutory requirements preclude interpreting 19 U.S.C. § 1677(7)(G)(i) to require that the Commission consider competitive conditions on "vote day" in determining whether to cumulate imports. *First*, the Commission is subject to statutory deadlines within which it must obtain and analyze

information to determine whether a U.S. industry "is materially injured." 19 U.S.C. §§ 1671d(b)(2); 1673d(b)(2). *Second*, the statute requires that the Commission "shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the…Commission…upon which the parties have not previously had an opportunity to comment." 19 U.S.C. § 1677m(g); *see also* 19 C.F.R. § 207.30(a) (implementing regulation). This provision was entirely new to the URAA and therefore not part of the statute when *Chaparral* was decided. *See* Pub.L. 103–465, title II, § 231(a), 108 Stat. 4809, 4893 (1994).

As the Commission reasoned, it would not be possible to obtain current information and place it on the record, provide a meaningful opportunity for parties to comment upon the same, and conclude its vote all on the single day of October 26, 2022. Implicitly recognizing this impasse, Tenaris vaguely invokes post-POI data without asserting a "Vote Day" requirement. Tenaris Br. at 60-61. But once one moves away from a plain language understanding of "vote day," the supposed requirement becomes just another means of approximation, a *de facto* modification of the POI that the Commission selects at the outset. In

this regard, Courts have "consistently upheld" the Commission's "broad discretion with respect to the {POI} that it selects for purposes of making a material injury determination." *Nucor*, 414 F.3d at 1337 (second quote); *Mexichem*, 179 F. Supp. 3d at 1254 (first quote). Practical reality and statutory due process oblige the Commission to determine whether a U.S. industry "is materially injured" based on data corresponding to a prior time period, Appx081, and a respondent's curiosity does not dictate what timeframe is "close enough."[4] Furthermore, it would create an illogical disconnect to block the Commission from cumulatively considering injury data for a given period until the Commission assesses whether competition "reasonably overlapped" over some wider, later period.

C. **Tenaris Does Not Assert that the Commission Failed to Account for any Evidence Concerning the POI**

After analyzing the meaning of the cumulation provision, the CIT assessed whether substantial evidence supported the Commission's

---

[4] Tenaris argues that the Commission's analysis extends beyond the first investigation in staggered investigations. Tenaris Br. at 57. This is misleading. Parties may not add material after the record for the first investigation has closed. *See* 19 U.S.C. § 1677(7)(G)(iii). Rather, Parties may only comment on "the significance of {the subsequent *Commerce*} determination." *Id.* (emphasis supplied).

cumulation determination. *Tenaris II*, Appx023-028. The CIT concluded that the Commission had adequately explained the impact of sanctions on Russian OCTG and that the record supported the Commission's determination that Russian OCTG remained in the U.S. market and exhibited simultaneous presence, similar channels of distribution, and geographic overlap with subject imports. *Tenaris II*, Appx028. Tenaris does not challenge this analysis. *See* Tenaris Br. at 26-27, 51-62 (nor does it identify evidence of post-POI import patterns for Russian OCTG). Rather, the entirety of Tenaris' cumulation challenge rests on its flawed construction of statute. Consequently, if this Court holds that the Commission's consideration of the overlap of competition during the POI was lawful, the Commission's cumulation determination should be sustained.

### III. The Commission's Determination That Significant Volumes of Low-Priced Subject Imports Materially Injured the Domestic Industry Was Lawful and Supported by Substantial Evidence

By statute, the Commission's material injury determination considers subject imports' (1) volume, (2) effect on prices for domestic like products, and (3) impact on domestic producers. *See* 19 U.S.C. §§ 1677(7)(A), (B)(i). Here, the Commission's material injury

determination was based on significant subject import volumes, significant adverse price effects, and an adverse impact to the domestic industry. The CIT upheld the Commission's findings with respect to all three factors. *Tenaris II*, Appx036-064.

Tenaris abandoned its challenge to the Commission's price effects determination. *See* Appx38927-38934. Thus, no party disputes that the price effects factor supports the Commission's material injury determination. Appx214-221. As regards the remaining two factors, contrary to Tenaris' claims, the Commission's analysis was lawful and supported by substantial evidence.

### A. Substantial Evidence Demonstrates that Subject Import Volumes Were Significant

The statute directs the Commission to "consider…the volume of imports of the subject merchandise," including "consider{ation of} whether the volume…or any increase…, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. §§ 1677(7)(B)(i)(I), (7)(C)(i). Here, the Commission found material increases in cumulated subject imports' volume ([  #  ] percent) and market share ([  #  ] percentage points) from 2019 to 2021, concluding that "the volume of cumulated subject

imports, and the increase in that volume, are significant in absolute terms and relative to consumption in the United States." Appx212-213. Tenaris' objections to the Commission's analysis misstate the law and overlook the Commission's review of record evidence.

1. *Tenaris Misunderstands the Statute; The Commission Lawfully Assessed the Significance of Subject Import Market Share Gains and Found No Evidence of Domestic Supply Constraints*

The Commission lawfully concluded that the increase in subject imports' absolute volume and market share from 2019 to 2021 was "significant." Tenaris premises its challenge to the Commission's volume analysis on the notion that it "must consider conditions of competition," but Tenaris identifies no statutory basis for this supposed obligation. Tenaris Br. at 32. Next, Tenaris identifies the "condition of competition" at issue as "U.S. producers could not supply the surging demand in 2021, and imports were needed." *Id.* at 33. But Tenaris' argument purports to reweigh the evidence for the Commission, presupposing that the Commission must draw Tenaris' preferred conclusion (*i.e.*, material supply constraints existed) from the record evidence. The Commission *did* consider the record and weigh all the relevant evidence, only to conclude that imports were *not* needed to

meet demand. Tenaris' request to re-weigh the evidence must be rejected.

      i.   *The Court should disregard Tenaris' untimely definitional argument*

Before the CIT, Tenaris argued that certain prior CIT opinions had interpreted 19 U.S.C. § 1677(7)(C)(i) as requiring the Commission to consider "conditions of competition" in the volume analysis. *See* Appx38922-38923. The CIT rejected Tenaris' interpretation and sustained the Commission's finding. *Tenaris II*, Appx038-042. On appeal, Tenaris presses its original argument, but Tenaris *also* argues—for the first time—that the dictionary definition of "significant" obliges the Commission to generally consider "the market context." *Compare* Tenaris Br. at 29-32, *with* Appx38922-38923; Appx39075-39076. "Issues not properly raised before the district court are waived on appeal." *Stauffer v. Brooks Bros. Grp.*, 758 F.3d 1314, 1322 (Fed. Cir. 2014). Because Tenaris' dictionary definition argument was not exhausted below, it should be deemed waived.

      ii.   *Statutory text and legislative history confirm that assessing whether subject import volume is "significant"*

> *does not require consideration of the conditions of competition*

As the Commission recognized, consideration of "conditions of competition" in a material injury investigation is required by 19 U.S.C. § 1677(7)(C)(iii) (the "Impact" analysis), **not** by 19 U.S.C. § 1677(7)(C)(i) (the "Volume" analysis). Appx201 (fn.122); *see also Nevinnomysskiy Azot v. United States*, 32 C.I.T. 642, 660 (2008). Section 1677(7)(C)(iii) identifies the economic factors pertaining to the Commission's assessment of the impact on the affected domestic industry and mandates consideration of "conditions of competition" for economic factors within "this clause" (*i.e.*, 1677(7)(C)(iii)), as opposed to "this subparagraph" (*i.e.*, 1677(7)(C)). *See, e.g., Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"). The CIT agreed and further noted that the statutory mandate to evaluate "relevant economic factors" within the conditions of competition mirrors the statute's description of factors used to assess impact. *See* 19 U.S.C. § 1677(7)(C)(iii) (first and final paragraphs). By contrast, "relevant economic factors" does not appear in the volume section. *Id.* § 1677(7)(C)(i); *see Tenaris II*, Appx041.

The "conditions of competition" proviso was added by the Omnibus Trade and Competitiveness Act of 1988, Pub.L. 100-418, § 1328(2)(C) (1988). Like the statutory text, the conference report makes clear that the "conditions of competition" mandate applied only to the Commission's impact analysis. *See* H. Conf. Rep. 100-576 (1988) at 617 (subsection c); *see also* S. Rep. 100-71 (1987) at 117 (describing the "third change" as relating to "examin{ation of} the impact of imports on domestic producers"). The CIT agreed that "the legislative history expresses Congressional intent that the conditions of competition requirement should apply only to the ITC's evaluation of impact." *Tenaris II*, Appx041. The CIT concluded that "the last section of 19 U.S.C. § 1677(7)(C)(iii) regarding 'conditions of competition' should be read to apply *only* to the 'impact on affected domestic industry' section of the statute." *Id.* (emphasis supplied).

Tenaris does not even acknowledge the CIT's analysis.[5] Instead, as before the CIT, Tenaris characterizes statements in prior CIT

---

[5] Ironically, Tenaris faults the CIT for not engaging with certain CIT opinions Tenaris cites. Tenaris Br. at 34. The CIT need not have done so. The standard of review changed in the interim, *see Loper Bright*, 603 U.S. at 409, and a "decision of a federal district court judge is not

*(footnote continued on next page)*

decisions as imposing a "conditions of competition" requirement with respect to volume. *See* Tenaris Br. at 29-30 (quoting *OCP S.A. v. United States*, 658 F. Supp. 3d 1297, 1312-1320 (Ct. Int'l Trade 2023)); *id.* at 31-32 (quoting *Altx, Inc. v. United States*, 26 C.I.T. 709, 719 (2002); *Nippon Steel Corp. v. United States*, 182 F. Supp. 2d 1330, 1335 (Ct. Int'l Trade 2001)); Appx38922 (same). As an initial matter, *Altx* mistakenly cites Section 1677(7)(C), *see Altx*, 26 C.I.T. at 719, despite the Public Law making it clear that the "conditions of competition" phrase appears only in Section 1677(7)(C)(iii), *see* Pub.L. 100-418, § 1328(2)(C). More broadly, none of these opinions address the statutory language and legislative history discussed above. The underlying opinion in this action is the first to do so; it rightly rejected the prior characterizations. *See Tenaris II* at Appx041

Ultimately, Tenaris' citations all rely on a Senate Committee Report underlying the Trade Agreements Act of 1979. S. Rep. No. 96-

---

binding precedent in either…the same judicial district, or even upon the same judge in a different case," *Camreta v. Greene*, 563 U.S. 692, 709 n. 7 (2011). Moreover, none of Tenaris' opinions discuss the divergent statutory language or legislative history, and a court is "not bound by precedent when the issue is not…discussed in the opinion of the court" *Dynacraft Indus., Inc. v. United States*, 24 C.I.T. 987, 994 (2000).

249 (1979) at 88; *see, e.g.*, *Nippon Steel*, 182 F. Supp. 3d at 1335 (citing same). However, the 1979 Act had no "conditions of competition" provision. Its legislative history cannot rewrite statutory text passed nearly a decade later. At most, considering volume data "in the context of conditions of competition," *Nippon Steel*, 182 F. Supp. 2d at 1335, can be *one reasonable way* to assess whether subject import volumes are "significant," but it is a matter of discretion. Here, the Commission's volume analysis lawfully considered domestic supply and demand trends.

      iii.   *The Commission lawfully considered domestic supply and demand issues when analyzing subject import volumes.*

There is no merit to Tenaris's argument that the ITC inadequately considered "whether subject imports are satisfying demand that the domestic industry cannot meet." Tenaris Br. at 32-33. The situation presented here is distinct from Tenaris' lead case, *OCP*, wherein the Commission relied solely on a single piece of evidence that "makes a point opposite to the one the Commission intended." *OCP*, 658 F. Supp. 3d at 1315-18. Here, by contrast, the Commission expressly weighed competing evidence of supply conditions and correctly cited sources that

are consistent with the Commission's finding. *See* Appx206-207.

Tenaris' baseline assertion that the Commission "made no reference" to such issues rings hollow. *See* Tenaris Br. at 30. Tenaris emphasizes that this discussion appears a few pages before the "Volume" section of the Commission's Views, *see id.*, but that is merely because the Commission discussed supply considerations and other contextual issues before beginning its analysis of volume, price, and impact, *see* Appx205-212. It is well established that "the Commission's discussion in the Views of the Commission need not be of some talismanic length or in some preordained place." *CP Kelco*, 24 F. Supp. 3d at 1350. Even "{w}here an agency has not made a particular determination explicitly, the agency's ruling nonetheless may be sustained as long as 'the path of the agency may be reasonably discerned.'" *Nucor*, 414 F.3d at 1339.

Here, the Commission's path with respect to possible supply constraints is more than reasonably discernible. Tenaris characterizes U.S. purchaser responses as indicative of supply constraints, Tenaris Br. at 32, but the Commission noted that "most purchasers rated both the availability and the reliability of supply of domestically produced OCTG as superior or comparable to that of subject imports from each

source, and domestic producers reported [        company metric

                    ]," Appx206. Tenaris also references U.S.

plant closings, Tenaris Br. at 32, but the Commission acknowledged

"U.S. producers…plant closings, shutdowns, and curtailments,"

Appx206, and also noted that "certain purchasers reported that supply

constraints were experienced 'globally' by domestic producers and

importers of subject (and nonsubject) merchandise alike." *Id.* at

Appx206 (fn.145). Tenaris otherwise points to two surveys that it placed

on the administrative record, *see* Tenaris Br. at 32-33, but these

surveys concern conditions at the tail end of the post-petition period (Q2

2022) and neither distinguishes between availability from domestic and

subject sources, *see* Appx31323-31324, Appx31379, Appx31384.

Moreover, as discussed below, the Commission lawfully placed lesser

weight on market share data for that post-petition period.  Elsewhere,

the Commission observed that pricing data undermine Tenaris' "short

supply" volume theory because "cumulated subject import underselling

remained nearly as predominant in 2021 as in 2020, whereas subject

imports drawn into the U.S. market by short supplies of domestic

OCTG would be expected to command higher prices." Appx229.

Ultimately, the Commission concluded that "the record does not indicate that the domestic industry's supply constraints drew subject imports into the U.S." *Id.*

In sum, the Commission weighed the relevant record evidence and reached a conclusion that Tenaris dislikes.  But "{i}t is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew." *Full Member Subgroup of Am. Inst. of Steel Constr., LLC v. United States*, 81 F.4th 1242, 1258 (Fed. Cir. 2023) ("*AISC*"). The Commission's determination should be upheld.

### 2. *The Commission Lawfully Accorded Less Weight to Post-Petition Market Share Data*

The statute requires the Commission to "consider whether any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition in an investigation…is related to the pendency of the investigation." 19 U.S.C. § 1677(7)(I). If that is so, the Commission may "reduce the weight accorded to the data for the period after the filing of the petition" in making its material injury determination. *Id.*  Here, the Commission found that "the decline in subject import market share in interim 2022 relative to interim 2021 was related to the pendency of the investigations and place{d} less

weight on the interim 2022 market share data in determining that the volume of subject imports is significant." Appx213 (fn.184). Although market share is simply volume relative to consumption, Tenaris argued below that the Commission had erred as a matter of law, theorizing that Section 1677(7)(I)'s reference to "volume" encompassed only absolute volume, not relative volume. Appx38923-38927.

The CIT held that Tenaris' one-dimensional reading of "volume" in Section 1677(7)(I) was not the statute's "best meaning," *See Tenaris II*, Appx042-045; *Loper Bright*, 603 U.S. at 409, relying on well-established sources of statutory meaning. First, the CIT considered the SAA, "which 'shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the {Uruguay Round Agreements Act}.'" *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014) (quoting 19 U.S.C. § 3512(d)). As the CIT recognized, *Tenaris II*, Appx044, the SAA explains that this mechanism was intended to address concerns "that the initiation of antidumping and countervailing duty proceedings can create an *artificially low demand* for subject imports, thereby distorting post-petition data compiled by the Commission," and is furthermore:

> intended to make clear that, when the Commission finds evidence on the record *of a significant change in data concerning the imports* or their effects subsequent to the filing of the petition or the imposition of provisional duties, the Commission may presume that such change is related to the pendency of the investigation.

SAA at 843 (emphases supplied).

Second, applying the canon of construction that a "term appearing in several places in a statutory text is generally read the same way each time it appears," *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994), the CIT recognized that 19 U.S.C. § 1677(7)(I) "only mentions 'volume' and does not have any restrictions or limitations." *Tenaris II*, Appx045. The CIT looked to 19 U.S.C. § 1677(7)(C)(i), which encompasses "volume, *either* in absolute terms *or* relative to production or consumption," and concluded that "the post-petition data statutory provision applies to volume of imports in absolute terms or relative to production or consumption in the United States." *Tenaris II*, Appx045 (emphasis supplied).

Before this Court, Tenaris continues to argue that the statute compelled the Commission to consider *absolute* volume alone, and that the Commission erred in considering volume *relative to consumption* (*i.e.*, market share) when discounting post-petition data. Tenaris Br. at

46-48. However, Tenaris offers no response to the CIT's statutory analysis and identifies no support for limiting "volume" to "absolute volume." *See id.* [6] As the CIT's analysis demonstrates, the Commission's consideration of whether post-petition effects distorted volume relative to consumption in the United States (*i.e.*, market share) is consistent with Section 1677(7)(I).

> 3. *The Commission Was Not Required to Accord Less Weight to Post-Petition Absolute Volume Data*

Tenaris makes a subsidiary argument that misconstrues the Commission's post-petition effects analysis. In assessing whether subject import volumes were significant, *see* 19 U.S.C. § 1677(7)(C)(i), the Commission placed less weight on "the decline in subject import

---

[6] Tenaris asserts that the Commission normally considers absolute volume changes when analyzing post-petition effects, citing two administrative determinations. Tenaris Br. at 47. Both are inapposite. Despite noting a decrease in interim period import volumes, *Soybean Meal* never mentions Section 1677(7)(I). *Organic Soybean Meal from India*, Inv. Nos. 701-TA-667 and 731-TA-1559 (Final), USITC Pub.5321 at 22-23 (May 2022). *Steel Wire Strand* applies Section 1677(7)(I) to reduce weight to interim period data because of "question{s about} the usefulness of interim period data in assessing subject import volume *and market share.*" *Prestressed Concrete Steel Wire Strand from Argentina, Colombia, Egypt, the Netherlands, Saudi Arabia, Taiwan, Turkey, and the United Arab Emirates*, Inv. Nos. 701-TA-646 and 731-TA-1502-1504, 1508-1509, 1512, 1514, and 1516 (Final), USITC Pub.5153 at 21 n.111 (Jan. 2021) (emphasis supplied).

market share in interim 2022 relative to interim 2021," finding that this trend "was related to the pendency of the investigations," Appx213 (fn.184). By contrast, the Commission did not accord less weight to absolute volume data, which increased over the period at issue. *See* Appx212. Tenaris inaccurately suggests that the Commission "accorded less weight to post-petition data" generally and mischaracterizes the Commission's independent analyses with "ignoring the increased import volume." Tenaris Br. at 45-46.[7]

Tenaris fundamentally misunderstands the purpose of Section 1677(7)(I). As explained, that provision creates an "if, then" situation: if the Commission observes "any {post-petition} change" in the "volume, price effects, or impact" data, then it may, in its discretion, presume this is due to the pendency of the investigation and afford less weight to the affected data point(s). *See* 19 U.S.C. § 1677(7)(I). As the statutory phrase "any change" and discretionary "may" each individually indicate, *id.*, it is not an all-or-nothing proposition, *see, e.g., LG Elecs., Inc. v.*

---

[7] Before this Court (unlike the CIT), Tenaris further confuses the issue by framing it as part of the Commission's impact (rather than volume) analysis. *Compare id.* at 48-50, *with* Tenaris CIT Opening Br. at Appx38925-38926. *See* Section III.B.3, *infra*.

*USITC*, 26 F. Supp. 3d 1338, 1354-55 (Ct. Int'l Trade 2014) (rejecting

argument that the Commission "improperly ignored post-petition data

for some analyses but included it for others"). The Commission did not

discount post-petition absolute volume data, observing that "cumulated

subject import volume was [ # ] percent greater in interim 2022, at

[    #    ] short tons, than in interim 2021, at [    #    ] short tons"

(unsurprising given the substantial demand increase in interim 2022).

Appx205-206, Appx212. As the CIT held, *see Tenaris II*, Appx045, the

Commission's decision to accord less weight to post-petition market

share data, which contrasted with market share trends for the rest of

the POI, *see* Appx213 (fn.184), was reasonable and comports with 19

U.S.C. § 1677(7)(C)(i) and the discretion afforded by 19 U.S.C. §

1677(7)(I).

**B.    Substantial Evidence Supports the Commission's Lawful
Determination that the Domestic Industry Is Materially
Injured by Reason of Subject Imports**

The Commission found that subject imports impacted the

domestic industry, citing negative trends in domestic economic

performance between 2019 and 2021, including: the domestic industry's

8.2 percentage point loss of market share [        trend        ], 39.7

percent decrease in production, 17.0 percentage point decrease in capacity utilization, 44.3 percent decline in employment, and deepening operating losses. *See* Appx222-233. In particular, the Commission noted that despite "strong growth in apparent U.S. consumption" from 2020 to 2021, domestic industry performance in 2021 "remained similar to its performance in 2020, when the industry was experiencing a demand collapse due to the COVID-19 pandemic." Appx227. The domestic industry's poor, stagnant performance was due to an underselling-driven increase in subject import volumes (both absolute and relative), which captured 12.0 percentage points of market share from the domestic industry over the same period. *Id.* The Commission further noted that when subject imports pulled back in interim 2022, the domestic industry's performance improved markedly. Appx227-228.

Tenaris fails to explain how the Commission's determination fell short of the substantial evidence standard and simply asks the court to reweigh the evidence. *See* Tenaris Br. at 34-44. But "{i}t is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew." *AISC*, 81 F.4th at 1257–58.

1. *The Commission Considered Market Conditions And Reasonably Concluded That Subject Imports Adversely Impacted Domestic Producers*

The Commission must evaluate certain enumerated economic factors related to subject imports' impact on the domestic industry "within the context of the…conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). Tenaris argues that the Commission failed to do so, specifically alleging a failure to consider: (1) the impact of the Russia/Saudi oil supply war and the COVID-19 pandemic on demand; (2) three supply constraints that Tenaris claims made imports necessary: inventory overhangs, high hot-rolled steel coil ("HRC") prices, and labor shortages; and (3) Tenaris' investment in U.S. OCTG production. In fact, as the CIT held, *see Tenaris II*, Appx059-062, the Commission reasonably addressed—and rejected—Tenaris's arguments regarding all three conditions.

i. *Demand*

By presenting the issue as the "Russia/Saudi oil supply war" and "COVID-19 pandemic," Tenaris elevates labels over the actual *condition* that the Commission was instructed to consider. *See* Tenaris Br. at 36. As Tenaris acknowledges, these events overlapped and the relevant *condition* created was an oil demand collapse, precipitating a decrease

56

in the rig count, and consequently, OCTG demand. *See id.* The

Commission recognized as much, *see* Appx205 (fn.140), Appx222,

Appx223 (fn.219), Appx227 (fn.243) , Appx230 (fn.256), and its failure to

name-check each contributor to decreasing demand has no effect on the

completeness of its analysis. Affirmatively reciting "Russia/Saudi oil

supply war" would have no effect on U.S. demand trends. Appx34263.

In any case, as the CIT recognized, the Staff Report that informed the

Commission's determination expressly noted the Russia/Saudi price

dispute, further confirming the Commission's consideration thereof. *See*

*Tenaris II*, Appx059 (quoting Staff Report at Appx33979). The statute

instructs the Commission to consider "conditions of competition," not to

exhaustively "identify and name each cause" of such conditions. 19

U.S.C. § 1677(7)(C)(iii).

Tenaris claims that the Commission treated "COVID-19 demand

shocks" differently than in two non-OCTG decisions, but fails to explain

why the Commission's assessment of the steel nails and rubber

industries should control its assessment of the OCTG industry. *See*

Tenaris Br. at 37.[8] Here, the Commission recognized declining demand "from January 2019 to a historic low in August 2020" as a condition of competition, Appx205, which covers the period of both the "Russia/Saudi oil supply war" and the COVID-19 pandemic, *see* Tenaris Br. at 6. The Commission later recognized that this decline in demand was consistent with the domestic industry's poor performance through 2020, though demand conditions could not explain continued poor performance in 2021 when demand rebounded sharply. *See* Appx222-223. While Tenaris criticizes the Commission's degree of emphasis, *see* Tenaris Br. at 37, "{i}t is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew." *AISC*, 81 F.4th at 1257–58.

---

[8] Moreover, Tenaris' examples are factually opposite this case. In *Steel Nails*, the COVID-19 pandemic increased demand for steel nails and coincided with improved domestic industry performance. *Steel Nails from India, Oman, Sri Lanka, and Turkey*, Inv. Nos. 701-TA-673-675 and 677 (Final), USITC Pub.5370 at 32, 34, 52-56 (Oct. 2022). *Rubber* did not exist until after the OCTG determination. There, subject imports gained market share during periods of increased demand by overselling. *See Emulsion Styrene-Butadiene Rubber from Czechia and Russia*, Inv. Nos. 731-TA-1575 and 731-TA-1577 (Final), USITC Pub.5392 (Jan. 2023) at 42-43.

Finally, Tenaris illogically speculates that "nearly identical" performance in the face of increased demand demonstrates that performance metrics are explained by "market conditions—not subject imports." Tenaris Br. at 38. But if performance metrics simply followed demand trends, irrespective of the impact of imports, they would have improved alongside demand. Instead, domestic production, employment, and financial performance stagnated. Appx227. As the Commission reasoned, increased volumes of "significant subject import underselling" during the period of improved demand led domestic industry performance to "remain{} weaker in 2021 than would have been expected in light of the strong increase in demand." *Id.* What Tenaris derides as "mere{} speculat{ion}," Tenaris Br. at 38, the CIT correctly recognized as a reasoned assessment of the record evidence and consideration of demand trends, *Tenaris II*, Appx059.

ii.  *Supply constraints*

Tenaris insists that three supply constraints – high OCTG inventory, high HRC costs, and labor shortages – caused the domestic industry's poor performance. Tenaris Br. at 38-42. As the CIT held, *see Tenaris II*, Appx060-061, the Commission addressed and refuted the

argument for *each* of the three constraints. *See* Appx206-207, Appx206 (fn.145), Appx210-211, Appx224 (fns.225-226), Appx225, Appx229-232. The Commission weighed the evidence and concluded that none of these factors severed the causal link between subject imports and injury to the domestic industry. *See Id.*

Concerning labor shortages, Tenaris faults the Commission for finding Petitioners' evidence more compelling than what Tenaris proffered. *See* Tenaris Br. at 41. But what Tenaris mischaracterizes as "unsubstantiated assertions," *id.* at 42, the CIT recognized as sworn hearing testimony, Appx31784 (swearing in), and certified questionnaire responses, *see* Appx33973, Appx34011-34015; Appx1087 ("Certification" block). *Tenaris II*, Appx061; Appx232 (fn.265) (citing the foregoing); *see also* Appx224 (summarizing employment trends). The Commission addressed Tenaris' alternative viewpoint but found it less compelling. *See* Appx232 (fn.265). And the Commission is best positioned to judge the credibility of witnesses appearing before it.

Regarding HRC prices, Tenaris cannot now fault the Commission for reasoning that domestic seamless OCTG producers, unaffected by rising HRC prices, "were fully capable of serving the increase in OCTG

demand…in light of their low rate of capacity utilization," Appx232,

given that the Commission specifically recognized Tenaris' lack of

"dispute that…seamless OCTG is interchangeable with welded OCTG

in all applications," Appx22578 (fn.49); *see also* Appx193 (fn.84),

Appx195-196 (same argument). *See* Tenaris Br. at 39-40. Tenaris

frames high HRC prices as a "supply factor," *id.* at 39, so the

Commission's rationale that *seamless* producers—by themselves—could

have satisfied OCTG demand necessarily accounted for any "severe

effect…on welded producers," *see* Appx232; Appx38938. The CIT

sustained the Commission's analysis as reasonable. *Tenaris II*,

Appx060-061. Under the Commission's rationale, even if high HRC

prices eliminated U.S. welded OCTG producers from the market

*completely*, U.S. producers of seamless OCTG could still meet demand.

*See id.* This is not "speculation," insofar as it is grounded in objective

data comparing U.S. seamless producers' unused capacity

([        #        ]) and U.S. demand (3,504,858 ST), *see* Appx34022,

Appx34263, and evidence of seamless and welded OCTG's

interchangeability, *see* Appx193 (fn.84), Appx195-196.

As the CIT held, Tenaris' inventory arguments were likewise reasonably addressed. *Tenaris II*, Appx060. Tenaris claims the Commission "downplayed" certain U.S. distributors' need to draw down existing inventory before placing new orders from mills. *See* Tenaris Br. at 38-39.[9] But Tenaris' criticism implies that the Commission *did* discuss this point. Indeed, the Commission reasoned that Tenaris' preferred data demonstrated "any alleged inventory 'bulge' was largely worked down by the end of 2020, prior to the domestic industry's loss of market share to subject imports in 2021;" that the availability of domestically produced OCTG in inventory would not explain why increased consumption unmet by such inventory was "satisfied by increased subject imports rather than domestic producers;" and that data derived from [          source          ] indicated "relatively constant" inventory levels "between January 2019 and March 2021" suggesting no "'massive' draw down of inventories in 2020."[10] Appx230. Thus, the Commission reasoned, subject import volumes and

---

[9] Tenaris has abandoned arguments concerning its own supposedly "lean" inventory. *Compare* Appx38936-38937, *with* Tenaris Br. at 38-39.

[10] Tenaris has abandoned criticisms of the [          source          ] that the Commission cites. *Compare* Appx38937, *with* Tenaris Br. at 38-39.

underselling were a more convincing explanation for the injury endured

by the domestic industry.  *See* Appx231.

Finally, Tenaris suggests the Commission erred in considering

inventory questions as a "single factor," and should have "combin{ed}"

this with labor shortages and HRC prices, *see* Tenaris Br. at 39, but

given that the Commission concluded the latter two were non-issues, as

discussed above, "combining" them with inventory would have no

further effect. And because Tenaris did not identify *any* particular

interaction between the three factors in its moving papers before the

CIT, *see* Appx38910-38913, Appx38936-38937 (no such arguments),[11]

Tenaris' belated efforts to cure this deficiency on appeal should be

deemed waived, *see* Tenaris Br. at 39-40 (two such arguments). *See*

*AISC*, 81 F.4th at 1256 (finding "argument is forfeited because it was

not made before the {CIT}…").

The first interaction now claimed by Tenaris, *viz.*, that labor

shortages and HRC prices "emerged as inventory levels decreased,"

Tenaris Br. at 39, is [   trend   ] to what Tenaris claimed

---

[11] Defendant-Intervenors highlighted this omission. *See* Appx39001.

administratively, which was that "unprecedented HRC prices" were

followed by "*subsequent* [            trend            ]," *see* Appx30362

(emphasis supplied). Thus, in addition to waiving its argument, Tenaris

failed to exhaust its administrative remedies. *See Diamond Sawblades*,

612 F.3d at 1362 (finding "Appellants failed to exhaust their

administrative remedies" because "at no point in the {Commission's}

investigation did the respondents assert {this argument}") (internal

citations and quotes omitted). Regardless, the sequence in which these

factors emerged is irrelevant where, as here, the Commission found

HRC prices and labor shortages to be non-issues. *See* Appx232. The

second interaction that Tenaris now posits for the first time is that

"ramp up delays and worker shortages affecting U.S...seamless mills"

somehow "conflict{} with" the Commission's finding that any shortage in

welded OCTG due to HRC prices could be supplied by domestic

seamless OCTG. *See* Tenaris Br. at 40; Appx232. Substantively, this

theory fails because it is premised upon the Commission having found

labor shortages in the first instance, which the Commission did not do.

*Id*.

In short, as the CIT held, Tenaris identified no basis for remand. The Commission's findings were supported by substantial evidence and reasonably considered Tenaris' supposedly contrary evidence.

    iii.  *Tenaris' investment in U.S. OCTG production*

Before the CIT, Tenaris argued that the Commission had inadequately addressed "intra-industry competition" among domestic OCTG producers, including Tenaris' investment in U.S. operations. Appx38939-38941. The CIT rejected Tenaris' claim, holding that the ITC sufficiently addressed record evidence of Tenaris' role in the U.S. market. *Tenaris II*, Appx062. Before this Court, Tenaris narrows its argument, arguing that the Commission failed to address Tenaris' supposed lack of incentive to harm its U.S. investments, and making passing reference to the Commission's forward-looking "belief" in 2007 that Tenaris' interests "would not be served" by dumping OCTG from its foreign export platforms. *See* Tenaris Br. at 42 (quoting *Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico*, Inv. Nos. 731-TA-711 and 713-716 (Second Review), USITC Pub.3923 at 34 (June 2007)). This carries no weight in the face of actual record evidence that Tenaris later did exactly that during this investigation's POI

(2019-H1 2022). *See* Appx33941 (dumping margins of 78.30%

(Argentina) and 44.93% (Mexico)). The Commission cannot lawfully

overlook injurious subject imports merely because one member of the

domestic industry imported them.

Fundamentally, Tenaris' willingness to favor its Argentine and

Mexican facilities and injure its U.S. assets as part of its global profit-

making strategy did not extinguish the material injury experienced by

the domestic industry. Tenaris [             company activity

             ]. Appx189-190. And the

Commission found material injury based on domestic industry data that

*included Tenaris' U.S. operations*, whose [     company activity

             ]. *See* Appx189-191, Appx219

(fn.206). Tenaris identifies no precedent wherein the Commission found

no present material injury in like circumstances.

  2.  *The Domestic Industry's Dramatically Better Performance
      After Subject Import Market Share Declined in Interim 2022
      Shows That the Surge of Subject Imports from 2020 to 2021
      Caused Injury.*

Tenaris argues, relying on a selective survey of 2020-2021 trends,

that the Commission overlooked a domestic industry recovery that

began prior to the October 2021 petition. *See* Tenaris Br. at 43-44. But

Tenaris omits that the Commission *did* consider 2021 trends and observed that "the industry's production, employment, and financial performance remained weaker in 2021 than would have been expected in light of the strong increase in demand." Appx227. The Commission provided further detail:

> in certain respects, the industry's performance in 2021 remained similar to its performance in 2020, when the industry was experiencing a demand collapse due to the COVID-19 pandemic. For example, U.S. mills' capacity and capacity utilization were only 1.3 percent and 3.7 percentage points greater, respectively, in 2021 than in 2020, and U.S. producers' employment and hours worked were only 1.1 percent and 2.2 percent greater, respectively, in 2021 than in 2020. Moreover, the industry's capital expenditures and R&D expenses were each lower in 2021 than in 2020.

*Id.* (fn.243) (internal citations omitted). Notably, Tenaris' analysis of the 2020-2021 data—itself incomplete by omission of the first year of the POI—completely ignores the specific points highlighted by the Commission. *See* Tenaris Br. at 43-44 (omitting discussion of the 2020-2021 trends for U.S. mills' capacity, capacity utilization, employment (*i.e.*, PRWs and wages), hours worked, capital expenditures, and R&D expenditures). Tenaris also fails to account for the over 850,000 short ton upswing in demand from 2020-2021, *see* Appx34263, which *should have* led to significant improvement in domestic industry performance,

but for subject imports' injurious impact. Yet again, Tenaris' complaints

reflect a difference in how Tenaris and the Commission weighed record

data, but the passage quoted above reflects reasoned consideration of

whether the industry's overall condition had improved before 2022. The

Commission need not robotically explain every data point. *See, e.g.*,

*Nucor Corp.*, 28 C.I.T. at 262. Moreover, the Commission's reference to

"certain respects" implies its awareness of other metrics. *See* Appx227

(n.243). A mere difference in opinion is no basis for remand under this

court's standard of review.

     3.  *The Commission Articulated a Rationale for Observed Trends in Domestic Industry Performance; Tenaris Conflates Disparate Parts of the Commission's Analysis*

In determining whether a U.S. industry is materially injured by

reason of subject imports, 19 U.S.C. §§ 1671d(b)(1)(A)(i),

1673d(b)(1)(A)(i), one factor that the Commission must consider is "the

{economic} impact of imports of such subject merchandise on {the state

of} domestic producers of domestic like products," *id.* §§

1677(7)(B)(i)(III), 1677(7)(C)(iii). A separate factor is whether the

volume of subject imports is significant. *Id.* §§ 1677(7)(B)(i)(I),

1677(7)(C)(i). Here, consistent with its usual practice, the Commission

analyzed each factor in turn. *Compare* Appx212-213 (volume analysis),

*with* Appx222-232 (impact analysis). Yet, before the CIT, Tenaris

conflated the two, arguing that because the Commission's *volume*

analysis had accorded less weight to the post-petition decline in subject

imports' market share, its *impact* analysis had erroneously

"discount{ed} favorable domestic industry performance data in interim

2022." Appx38926-38927. The CIT rejected this, holding that the

Commission "fully consider{ed} the evidence of the domestic industry's

recovery." *Tenaris II*, Appx063.

Before this Court, Tenaris continues to confuse the issue,

asserting (without citation) that the Commission "relied on the subject

imports{'} declining market share rather than the increase in subject

import volumes to discount favorable domestic industry performance

data in the first half of 2022." Tenaris Br. at 49. Tenaris then

introduces an entirely new concept absent from its moving brief before

the CIT, *viz.*, that the Commission employed a "presumption of

causation." *Compare* Appx38926-38927, *with* Tenaris Br. at 50. The

latter argument should be considered waived. *Stauffer*, 758 F.3d at

1322. The former argument misstates the facts and lacks merit.

It remains unclear what Tenaris means when asserting that the Commission "discount{ed}" favorable domestic industry performance data. Tenaris Br. at 49. It could be understood as an assertion that the Commission applied 19 U.S.C. § 1677(7)(I) to accord less weight to post-petition domestic industry performance data.  If so, Tenaris is simply incorrect. As explained in Section III.A.2, *supra*, the Commission discounted interim period market share data only for purposes of its volume analysis. *See* Appx212-213. The Commission did not discount economic performance data for purposes of its impact analysis. *See* Appx222-233.

Alternatively, "discount{ing}" could be understood as wishing the Commission had inferred from the overlapping decline in subject imports' market share and improvement of "nearly every measure" of the domestic industry's health in interim 2022 that the domestic industry was never injured—in other words, giving the data full weight (as the Commission did), but drawing the opposite conclusion. *See* Appx227-228.[12] If so, Tenaris again asks this Court to re-weigh the

---

[12] The statute does not require, and Tenaris does not argue, that material injury must be constant throughout the POI. If that were the

*(footnote continued on next page)*

evidence, something the standard of review does not permit. *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 873 (Fed. Cir. 2008) ("This court has no independent authority to tell the Commission how to do its job. We can only direct the Commission to follow the dictates of its statutory mandate. So long as the Commission's analysis does not violate any statute and is not otherwise arbitrary and capricious, the Commission may perform its duties in the way it believes most suitable.") (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)).

The statute frames the "impact" factor in terms of the domestic industry's economic performance, *see* 19 U.S.C. § 1677(7)(C)(iii); it does not envision a duplicative evaluation of "volume" trends, *see id.* § 1677(7)(C)(i). As explained, the Commission already addressed both absolute and relative volume trends in finding the volume of subject imports to be significant. *See* Section III.A.1, *supra*. In the impact

---

standard, domestic industries required to undergo three years of constant injury might not survive long enough to see the Commission's material injury determination. Here, improvement at the end of the POI after subject imports lost market share does not in any way diminish the material injury that subject imports inflicted earlier in the POI.

analysis, the Commission acknowledged improvements in domestic

industry performance at the end of the POI. *See* Section III.B.2, *supra*.

As the CIT held, *Tenaris II*, Appx063, the Commission articulated a

rationale for finding these improvements to be consistent with material

injury, stating:

> the domestic industry was able to improve its performance
> markedly in interim 2022 compared to interim 2021 after the
> filing of the petitions in October 2021. As discussed above,
> subject imports competed less aggressively in the U.S. market
> after the filing of the petitions, losing [ # ] percentage points
> of market share as the domestic industry gained 0.6
> percentage points of market share in interim 2022 compared
> to interim 2021. Consequently, the domestic industry was
> able to more fully capitalize on the 70.6 percent increase in
> apparent U.S. consumption in interim 2022 compared to
> interim 2021 and improved its performance by nearly every
> measure between the interim periods.

Appx227-228.[13] The statute does not require more. The Commission's

assessment of the evidence was logical—the correlation of a drop in

---

[13] The majority distinguished its position from that of Commissioner
Schmidtlein, who "agree{d} that the filing of the petitions and the
pendency of the investigations had an effect on the data (and thus she
accords less weight to the interim data), {but} does not find the effect on
the data to be evidence of present material injury." Appx228 (fn.245).
Insofar as Section 1677(7)(I) merely permits the Commission ("may") to
reduce the weight accorded to post-petition impact data, the majority
was not required to do so. Notwithstanding this technical distinction,
the aim of Section 1677(7)(I) is to avoid distortion in the Commission's
*(footnote continued on next page)*

subject imports' market share and an across-the-board rise in the domestic industry's performance metrics demonstrates that subject imports had heretofore held back (*i.e.*, injured) domestic industry performance. Rarely is there only one way to read the evidence, but Tenaris' preference for a different interpretation is no basis for remand.

Lacking any statutory basis for imposing its preferred narrative upon the Commission, Tenaris pivots to a supposed "practice" of treating improved domestic performance during periods of increasing subject import volumes as "break{ing} the causal link between subject imports and the domestic industry's performance." Tenaris Br. at 50. No such "practice" exists. Tellingly, after the CIT rejected the examples on which Tenaris originally relied, *compare Tenaris II*, Appx063, *with* Appx38944, Tenaris has proffered two entirely new examples before this court, *see* Tenaris Br. at 50. Plainly, Commission practice is not uniform.

---

analysis, *see* Section III.A.2, *supra* (discussing SAA and legislative history). Thus, both the majority's and Commissioner Schmidtlein's reasoning are logical, lawful, and yielded the same result.

Tenaris' new examples fare no better. In addressing the "price" factor, *Aluminum Plate* attributed low pre-petition prices to low demand coupled with high domestic supply, and linked post-petition price increases to "a general increase in prices…as demand rose sharply." *Certain Aluminum Plate From South Africa*, Inv. No. 731-TA-1056 (Final), USITC Pub.3734 (2004) at 27-28. The Commission declined to discount post-petition pricing data, found no link between subject imports and adverse price effects, and thus did not attribute price-driven financial performance to subject imports. *Id.* at 28. This was a fact-specific determination based on the POI-wide absence of a link between subject imports and pricing, not an example of reflexively treating post-petition improvements as "break{ing} the causal link." *See* Tenaris Br. at 50. Tenaris' other new case is likewise distinguishable. There, the Commission found subject import volumes insignificant because their increases did not correspond to domestic industry decreases, and it also found no significant adverse price effects because subject imports' presence did not correspond to periods of declining prices. *Certain Steel Wire Rod From Canada, Germany, Trinidad & Tobago, and Venezuela*, Inv. Nos. 731-TA-763-766 (Final), USITC

Pub.3087 (1998) at 10-11. That the Commission gave full weight to the domestic industry's recovery did not affect the ultimate outcome and was but one of many dynamics. *See id.* at 15 n.69. That determination is unlike this case where the Commission found significant subject import volumes and adverse price effects.

The record of each proceeding is distinct. Here, the Commission considered this record and espoused conclusions supported by substantial evidence. There is no basis for remanding the Commission's analysis.

## CONCLUSION

For the foregoing reasons, Tenaris's arguments lack merit and identify no ground for remand. This court should therefore sustain the Commission's Views in all challenged respects.

*       *       *

Respectfully submitted,

/s/ Thomas M. Beline

Thomas M. Beline
Myles S. Getlan
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA)
LLP
2112 Pennsylvania Ave, N.W.
Ste. 300
Washington, D.C. 20037
Phone: (202) 567-2300
Fax: (202) 567-2301

*Counsel to United States Steel Corporation*

/s/ Roger B. Schagrin

Roger B. Schagrin*
Jeffrey D. Gerrish
Luke A. Meisner

SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001
Phone: (202) 223-1700
Fax: (202) 429-2522

*Counsel to Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA Inc.*

January 30, 2026

*In accordance with Fed. Cir. R. 32(g)(3)(B), signing counsel with an asterisk accompanying their name have consented to the use of their electronic signatures on this document. The filer is Thomas M. Beline; his electronic signature complies with Fed. Cir. R. 25(g)(1).

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>2025-2034</u>

**Short Case Caption:** <u>Tenaris Bay City, Inc. v. US</u>

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes _13,965_ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>January 30, 2026</u>

Signature: <u>/s/ Thomas M. Beline</u>

Name: <u>Thomas M. Beline</u>

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number**    2025-2034

**Short Case Caption**    Tenaris Bay City, Inc. v. US

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on   January 30, 2026

by    ☐ U.S. Mail    ☐ Hand Delivery    ☑ Email    ☐ Facsimile
     ☐ Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Gregory J. Spak | White & Case LLP<br>701 Thirteenth Street, NW<br>Washington, DC 20005 |
| Madeline Heeren | U.S. International Trade Commission<br>500 E Street SW<br>Washington, DC 20436 |
| Roger Schagrin, Esq. | Schagrin Associates<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001 |
|  |  |
|  |  |

☐   Additional pages attached.

Date:   January 30, 2026

Signature:    /s/ Thomas M. Beline

Name:    Thomas M. Beline

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2025-2034

**Short Case Caption:** Tenaris Bay City, Inc. v. US

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains _____43_____ number of unique words (including numbers) marked confidential.

☐     This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑     This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐     This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: January 30, 2026     Signature: /s/ Thomas M. Beline

Name: Thomas M. Beline