**25-2034**

TENARIS BAY CITY, INC., MAVERICK TUBE CORP.,
IPSCO TUBULARS INC., TENARIS GLOBAL
SERVICES (U.S.A.) CORP., SIDERCA S.A.I.C., TUBOS
DE ACERO DE MEXICO, S.A.,

*Plaintiffs-Appellants,*

and

TMK GROUP,

*Plaintiff,*

v.

UNITED STATES, UNITED STATES STEEL
CORPORATION, BORUSAN MANNESMANN PIPE U.S.
INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL,
PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL
AND SERVICE WORKERS INTERNATIONAL UNION,
AFL-CIO, CLC, WELDED TUBE USA INC.,

*Defendants-Appellees.*

Appeal from the United States Court of International Trade
in Consol. Court No. 1:22-cv-00344, Judge Jennifer Choe-Groves

**NONCONFIDENTIAL RESPONSE BRIEF OF
DEFENDANT-APPELLEE UNITED STATES**

**MADELINE R. HEEREN**
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
margaret.macdonald@usitc.gov
500 E Street, S.W.
Washington, DC 20436
Tel: (202) 708-1529
Fax: (202) 205-3111
Email: madeline.heeren@usitc.gov

**MARGARET D. MACDONALD**
General Counsel
Tel: (202) 205-2561
Email:

**KARL VON SCHRILTZ**
Assistant General Counsel for
 Litigation
Tel: (202) 205-3096
Email: karl.von-schriltz@usitc.gov

*Counsel for Defendant-Appellee*
*United States*

**DATED: January 30, 2026**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................vi

STATEMENT OF RELATED CASES ...................................................................1

STATEMENT OF THE ISSUES............................................................................1

STATEMENT OF THE CASE................................................................................2

STATEMENT OF THE FACTS .............................................................................3

     I.     The Commission's Final Determinations..................................................3

          A.     Cumulation .................................................................................3

          B.     Conditions of Competition ........................................................4

          C.     Volume......................................................................................5

          D.     Price Effects..............................................................................5

          E.     Impact .......................................................................................5

     II.     *Tenaris I* ...............................................................................................7

     III.     The Commission's Remand Determinations .........................................8

     IV.     *Tenaris II* ...........................................................................................10

SUMMARY OF THE ARGUMENT .....................................................................12

ARGUMENT ........................................................................................................16

     I.     Standard of Review................................................................................16

     II.     The Court Should Sustain the Commission's Cumulation
          Determination.......................................................................................19

          A.     Background...............................................................................19

          B.     The CIT Correctly Held Appellants Forfeited Their
                 Post-POI Cumulation Argument ...............................................21

          C.     The Commission's Cumulation Analysis Was in
                 Accordance with Law ...............................................................25

III. The Commission's Volume Finding Is Supported by Substantial Evidence and in Accordance with Law ........................... 36

    A. The Commission's Volume Finding Should Be Sustained ..................................................................................... 37

    B. The Commission Is Not Required to Expressly Address Conditions of Competition in Its Volume Analysis ..................................................................................... 38

    C. The Commission's Post-Petition Effects Analysis Was Reasonable and in Accordance with Law ....................... 42

IV. The Commission's Impact Finding Is Supported by Substantial Evidence and in Accordance with Law ........................... 49

    A. The Commission Reasonably Determined that Cumulated Subject Imports Had a Significant Impact on the Domestic Industry .............................................. 49

    B. The Commission Reasonably Considered the Relevant Conditions of Competition in Its Analysis ................. 51

        1. Appellants' Demand Argument Is Unsupported ..................................................................... 52

        2. Appellants' Supply Arguments Are Without Merit ................................................................................ 54

        3. Appellants' Claims Regarding Foreign Investment and Intra-Industry Competition Lack Merit ........................................................................ 58

        4. Appellants' Other Arguments Lack Merit ...................... 60

CONCLUSION ........................................................................................ 64

**TABLE OF CONTENTS (cont'd)**

**CONFIDENTIAL MATERIAL OMITTED**

Material bracketed on pages 37-38, 43, 47-48, 50, 55-60, and 63 describes sensitive nonpublic information regarding OCTG shipment volume and market share of importers and domestic producers, employment information of domestic producers, and inventory reports submitted by parties which were all granted confidential treatment by the Commission. *See* 19 U.S.C. § 1677f(b)(1)(A); 19 C.F.R. § 201.6(a).

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*3G Licensing, S.A. v. Honeywell Int'l Inc.*,
No. 2023-1557, 2024 WL 5054806 (Fed. Cir. Dec. 10, 2024) ................... 22, 23

*Adisseo Espana S.A. v. United States*,
No. 1:21-cv-562-MMB, 2023 WL 8866562 (Ct. Int'l Trade Dec. 18, 2023) ...................................................................................................... 41

*Altx, Inc. v. United States*,
26 CIT 709 (2002) ...................................................................................... 42

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) .................................................................. 17

*AWP Indus., Inc. v. United States*,
783 F. Supp. 2d 1266 (Ct. Int'l Trade 2011) ............................................. 32

*CBOCS West, Inc. v. Humphries*,
553 U.S. 442 (2008) .................................................................................... 33

*Ceramica Regiomontana, S.A. v. United States*,
810 F.2d 1137 (Fed. Cir. 1987) .................................................................. 39

*Chaparral Steel Co. v. United States*,
901 F.2d 1097 (Fed. Cir. 1990) ...................................................... 7, 8, 20, 34

*Chemours Co. FC, LLC v. United States*,
443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) ......................................... 46, 47

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) .................................................................................... 33

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007) ...................................................... 16, 48, 53

*CP Kelco US, Inc. v. United States*,
24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014), *aff'd*, 623 F. App'x 1012 (Fed. Cir. 2015) ................................................................................ 39

**Cases (cont'd)**                                                                **Page(s)**

*Delverde, SrL v. United States*,
989 F. Supp. 218 (Ct. Int'l Trade 1997) ............................................29

*Dickerson v. United States*,
530 U.S. 428 (2000) .......................................................................33

*Forshey v. Principi*,
284 F.3d 1335 (Fed. Cir. 2002) (en banc) ........................................24

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
582 F.3d 1288 (Fed. Cir. 2009) ...........................................39, 57, 63

*Fundicao Tupy, S.A. v. United States*,
678 F. Supp. 898 (Ct. Int'l Trade 1988), *aff'd*, 859 F.2d 915 (Fed.
Cir. 1988) ......................................................................................12

*Gen. Ins. Co. of Am. v. Mezzacappa Bros., Inc.*,
110 F. App'x 183 (2d Cir. 2004) ..............................................22, 24

*In re Google Tech. Holdings LLC*,
980 F.3d 858 (Fed. Cir. 2020) .........................................................21

*Goss Graphic Sys., Inc. v. United States*,
216 F.3d 1357 (Fed. Cir. 2000) ..................................................19, 20

*Haggart v. United States*,
943 F.3d 943 (Fed. Cir. 2019) .........................................................18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .......................................................................33

*Hitachi Metals, Ltd. v. United States*,
949 F.3d 710 (Fed. Cir. 2020) .........................................................17

*Hosiden Corp. v. Advanced Display Mfrs. of Am.*,
85 F.3d 1561 (Fed. Cir. 1996) .........................................................26

**Cases (cont'd)**                                                      **Page(s)**

*ITG Voma Corp. v. U.S. Int'l Trade Comm'n*,
    253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x
    913 (Fed. Cir. 2019) ...................................................................................41

*King v. Taylor*,
    694 F.3d 650 (6th Cir. 2012) ...............................................................18

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ..............................................................................33

*Metallverken Nederland B.V. v. United States*,
    744 F. Supp. 281 (Ct. Int'l Trade 1990) ........................................44, 45

*Mexichem Fluor Inc. v. United States*,
    179 F. Supp. 3d 1238 (Ct. Int'l Trade 2016) .................................48, 59

*Mitsubishi Heavy Indus., Ltd. v. United States,*
    275 F.3d 1056 (Fed. Cir. 2001) .............................................................18

*Mukand Ltd. v. United States*,
    937 F. Supp. 910 (Ct. Int'l Trade 1996) ..............................................19

*NEC Corp. v. Dep't of Comm*.,
    36 F. Supp. 2d 380 (Ct. Int'l Trade 1998) .....................................28, 29

*Nevinnomysskiy Azot v. United States*,
    565 F. Supp. 2d 1357 (Ct. Int'l Trade 2008) .......................................19

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) .....................................16, 18, 56, 57

*Nucor Corp v. United States*,
    318 F. Supp. 2d 1207 (Ct. Int'l Trade 2004), *aff'd*, 414 F.3d 1331
    (Fed. Cir. 2005) ...............................................................................34, 35

*Nucor Corp. v. United States*,
    414 F.3d 1331 (Fed. Cir. 2005) .................................27, 35, 39, 48, 53

**Cases (cont'd)**                                                                **Page(s)**

*OCP S.A. v. United States*,
658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) ...............................................39, 42

*OCTAL Inc. v. United States*,
539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ....................................................41

*United States v. Olano*,
507 U.S. 725 (1993)...........................................................................................21

*Par Pharm., Inc. v. Eagle Pharms., Inc.*,
44 F.4th 1379 (Fed. Cir. 2022) .........................................................................19

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997).....................................................................................25, 26

*Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*,
528 F.3d 1365 (Fed. Cir. 2008) .........................................................................19

*Siemens Energy, Inc. v. United States*,
992 F. Supp. 2d 1315 (Ct. Int'l Trade 2014), *aff'd*, 806 F.3d 1367
(Fed. Cir. 2015)..................................................................................................17

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)...........................................................................................33

*SolarWorld Ams., Inc. v. United States*,
910 F.3d 1216 (Fed. Cir. 2018) .........................................................................36

*Steel Authority of India, Ltd. v. United States*,
146 F. Supp. 2d 900 (Ct. Int'l Trade 2001) ................................................32, 33

*Timken U.S. Corp. v. United States*,
421 F.3d 1350 (Fed. Cir. 2005) .........................................................................17

*U.S. Steel Corp. v. United States*,
637 F. Supp. 2d 1199 (2009), *aff'd*, 621 F.3d 1351 (Fed. Cir. 2010) ...............48

*U.S. Steel Grp. v. United States*,
96 F.3d 1352 (Fed. Cir. 1996) ...........................................................................17

**Cases (cont'd)**                                                                           **Page(s)**

*U.S. Trust Co. of N.Y. v. Shapiro*,
  835 F.2d 1007 (2d Cir. 1987) ....................................................22, 24

*USX Corp. v. United States*,
  682 F. Supp. 60 (Ct. Int'l Trade 1988) .........................................26, 27

*Vivint, Inc. v. ADT LLC*,
  No. 2023-1995, 2024 WL 5074569 (Fed. Cir. Dec. 11, 2024) ..........................25

*In re Whirlpool Corp. Front–Loading Washer Prods. Liability Litig.*,
  678 F.3d 409 (6th Cir. 2012) ...................................................18

*United States v. Ziegler Bolt & Parts Co.*,
  111 F.3d 878 (Fed. Cir 1997) ...................................................18

**USITC Publications**

*Certain Aluminum Plate from South Africa*,
  Inv. No. 731-TA-1056 (Final), USITC Pub. 3734 (Nov 2004)..................63, 64

*Emulsion Styrene-Butadiene Rubber from Czechia and Russia*,
  Inv. Nos. 731-TA-1575 and 731-TA-1577 (Final), USITC Pub.
  5392 (Jan. 2023) ...............................................................53

*Certain Flat-Rolled Carbon Steel Products from Argentina, Australia,
  Austria, Belgium, Brazil, Canada, Finland, France, Germany,
  Italy, Japan, Korea, Mexico, the Netherlands, New Zealand,
  Poland, Romania, Spain, Sweden, and the United Kingdom*,
  Inv. Nos. 701-TA-319-332, 334, 336-342, 344, and 347-353 and
  731-TA-573-579, 581-592, 594-597, 599-609, and 612-619
  (Final), USITC Pub. 2664 (Aug. 1993) ............................................29

*Certain Hot-Rolled Lead and Bismuth Carbon Steel Products from
  Brazil, France, Germany, and the United Kingdom*,
  Inv. Nos. 731-TA-552-555 (Final), USITC Pub. 2611 (Mar. 1993)............29, 30

*Certain Magnesia Carbon Bricks from China and Mexico*,
  Inv. Nos. 701-TA-46 and 731-TA-1166-1167 (Final), USITC Pub.
  4182 (Sep. 2010)................................................................46

**USITC Publications (cont'd)** Page(s)

*Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico*,
  Inv. Nos. 731-TA-711 and 713-716 (Second Review), USITC Pub. 3923 (June 2007) ...........................................................................58, 59

*Steel Nails from India, Oman, Sri Lanka, and Turkey*,
  Inv. Nos. 701-TA-673-675 and 677 (Final), USITC Pub. 5370 (Oct. 2022) .............................................................................................53

*Steel Wire Rope from the Republic of Korea and Mexico*,
  Inv. Nos. 731-TA-546 and 547 (Final), USITC Pub. 2613 (Mar. 1993) ...................................................................................................29

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...........................................................16

19 U.S.C. § 1516a(a)(2)(B)(i) ...........................................................16

19 U.S.C. § 1675(b) ...........................................................................36

19 U.S.C. § 1675(c) ...........................................................................18

19 U.S.C. § 1677(7)(C)(i) ...........................................................*passim*

19 U.S.C. § 1677(7)(C)(ii) .................................................................40

19 U.S.C. § 1677(7)(C)(iii)................................................11, 14, 40, 41, 51

19 U.S.C. § 1677(7)(C)(iv) ................................................................41

19 U.S.C. § 1677(7)(C)(iv) (1988) ....................................................34

19 U.S.C. § 1677(7)(G)(i) ...........................................................*passim*

19 U.S.C. § 1677(7)(G)(iii)...........................................................30, 31

19 U.S.C. § 1677(7)(I) .................................................................*passim*

19 U.S.C. § 1677(7)(J).......................................................................62

**TABLE OF AUTHORITIES (cont'd)**

**Statutes (cont'd)**                                                                 **Page(s)**

19 U.S.C. § 1677m(g) .................................................................................................28

19 U.S.C. § 3512(d) ............................................................................................28, 29

**Legislative Materials**

URUGUAY ROUND AGREEMENTS ACT,
   Pub. Law 103-465, 108 Stat. 4809 (Dec. 8, 1994) ........................8, 18, 28, 30, 34

STATEMENT OF ADMINISTRATIVE AUTHORITY ACCOMPANYING THE
   URUGUAY ROUND AGREEMENTS ACT,
   H.R. Doc. No. 103-316, vol. I (1994).........................................................*passim*

# STATEMENT OF RELATED CASES

Counsel for Defendant-Appellee, the U.S. International Trade Commission (the "Commission"), is not aware of any other appeal in or from the same civil action or proceeding in the lower court that was previously before this Court or any other appellate court.

# STATEMENT OF THE ISSUES

The Commission submits that the issues raised in this case are properly framed as:

1) Did the Court of International Trade ("CIT") abuse its discretion in finding that Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A. (collectively, "Tenaris" or "Appellants") forfeited their vote-day argument?

2) If Appellants did not forfeit their vote-day argument, did the Commission reasonably cumulate subject imports from Russia based on the reasonable overlap of competition found during the January 2019-June 2022 period of investigation ("POI") consistent with 19 U.S.C. § 1677(7)(G)(i)?

3) Was the Commission's volume finding supported by substantial evidence and in accordance with law?

4) Was the Commission's impact finding supported by substantial evidence and in accordance with law?

## STATEMENT OF THE CASE

In October 2022, the Commission unanimously determined that a domestic industry was materially injured by reason of imports of oil country tubular goods ("OCTG") from Argentina, Mexico, Russia, and South Korea. Appx173-239.

Tenaris and TMK Group ("TMK") appealed the Commission's determination to the CIT. In April 2024, the CIT remanded the determination for reconsideration consistent with its opinion concerning the Commission's cumulation analysis. *Tenaris Bay City, Inc. et al. v. United States*, 698 F. Supp. 3d 1287 (Ct. Int'l Trade 2024) (Appx123-170) ("*Tenaris I*").

In August 2024, the Commission issued its Remand Views and reconsidered its determinations consistent with the CIT's opinion in *Tenaris I* concerning cumulation. The Commission thoroughly addressed the CIT's concerns, explaining why its decision to cumulate subject imports was both lawful and supported by substantial evidence. The Commission continued to cumulatively assess subject imports, adopted its findings from the Original Views concerning all other issues, and found that a domestic industry was materially injured by reason of OCTG imports from all four subject countries. Appx065-122.

In June 2025, the CIT sustained the Commission's determinations. *Tenaris Bay City, Inc. et al. v. United States*, 789 F. Supp. 3d 1352 (Ct. Int'l Trade 2025) (Appx001-064) ("*Tenaris II*").

This appeal followed.

## STATEMENT OF THE FACTS

### I.    The Commission's Final Determinations

The Commission defined a single domestic like product. Appx180-181. It also determined to not exclude any domestic producer as a related party, and defined the domestic industry as all U.S. producers of OCTG. Appx191.

#### A.    Cumulation

The Commission examined whether the statutory cumulation provision required it to cumulatively assess subject imports for purposes of its present material injury analysis by assessing whether there was a reasonable overlap of competition. Appx191-200. The Commission found that subject imports from each source and the domestic like product were fungible, overlapped with respect to channels of distribution and geographic markets, and were simultaneously present throughout nearly the entire POI. In reaching these findings, the Commission considered and responded to TMK and Tenaris's various arguments against cumulation of subject imports from Russia. Appx192-194; Appx195-198;

Appx199-200. Having found a reasonable overlap of competition, the Commission cumulated subject imports from all four countries. Appx200.

## B. Conditions of Competition

The Commission described the conditions of competition that would serve as the background for its impact analysis. Appx205-212. Addressing demand, the Commission noted that the active U.S. rig count, an indicator of oil and gas production in the United States, fell from 2019 to an historic low in 2020, before recovering and growing through the end of the POI. Likewise, apparent U.S. consumption of OCTG fell from 2019 to 2020 before increasing, as did U.S. oil and gas prices. Appx205-206.

Addressing supply, the Commission noted the share of apparent U.S. consumption (*i.e.*, market share) held by the domestic industry, subject imports, and nonsubject imports during the POI, noting that the domestic industry was the largest supplier of OCTG throughout the POI, although its market share decreased from 2020 to 2021 as cumulated subject imports gained market share. Appx206-207.

In uncontested findings, the Commission determined that there was a moderate-to-high degree of substitutability between the domestic like product and cumulated subject imports, and that price was an important factor in purchasing decisions. Appx207-209.

4

## C.  Volume

For its volume analysis, the Commission considered volume and market share data for cumulated subject imports over the POI, uncontested by Appellants. Appx212-213; Appx24263. Finding the lower subject import market share in interim 2022 compared to interim 2021 related to the pendency of the investigations, the Commission attached less weight to these data in its volume analysis. Appx213. The Commission found that the volume of cumulated subject imports, and the increase in that volume, were significant in absolute terms and relative to U.S. consumption. Appx213.

## D.  Price Effects

The Commission found that subject imports significantly undersold the domestic like product, a finding uncontested by Appellants, leading the domestic industry to lose market share to subject imports, concluding that subject imports had significant adverse price effects. Appx221.

## E.  Impact

The Commission found a causal nexus between subject imports and the domestic industry's weak performance relative to the strong growth in apparent U.S. consumption from 2020 to 2021. Lower-priced subject imports had increased significantly in absolute and relative terms from 2020 to 2021, capturing 12.0 percentage points of market share from the domestic industry. Consequently, the

industry's production, employment, and financial performance remained weaker in 2021 than would have been expected considering the 32.2 percent increase in apparent U.S. consumption from 2020 to 2021. Appx227.

Notably, by several metrics, the industry's performance remained nearly identical in 2021, when demand significantly improved, as in 2020, when demand had collapsed to a historic low. By other metrics, the industry's performance was worse in 2021 than in 2020. Appx227.

The Commission found the interim period data instructive as to the causal link between subject imports and the domestic industry, observing that the domestic industry was able to improve its performance markedly in interim 2022 compared to interim 2021, as the pendency of the investigations caused subject imports to compete less aggressively and lose market share. Appx227-228.

The Commission considered and rejected Tenaris's argument that injury to the domestic industry was explained by the industry's supply constraints and not subject imports. Appx229. As it explained, large majorities of purchasers rated the availability of domestic OCTG as superior or comparable to that of subject imports, and the industry reported ample available capacity with which to produce and supply OCTG, including in 2021. The Commission likewise considered Tenaris's arguments that supposed domestic industry supply constraints stemming from "inventory overhang{s}," rising hot-rolled coil ("HRC") prices, and labor

shortages necessitated increased imports in 2021, and explained that each was unsupported by the record. Appx229-232. Finally, the Commission observed that Tenaris's intra-industry competition argument could not explain the industry's loss of market share to subject imports. Appx232.

The Commission concluded that cumulated subject imports had a significant impact on the domestic industry. Appx233.

## II.  *Tenaris I*

TMK challenged the Commission's cumulation of Russian OCTG with other subject imports, arguing that cumulation was improper because there was no reasonable overlap of competition between Russian OCTG and other subject imports due to sanctions imposed on Russian OCTG towards the end of the POI in response to Russia's invasion of Ukraine. Appx135. The court observed that the CAFC in *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1104 (Fed. Cir. 1990), upheld the Commission's interpretation that imports "subject to investigation," and thus eligible for cumulation, included only imports that remained under investigation on "vote day" and imports that were proven "unfair" and had a continuing impact on vote day. Appx137-138. The court relied upon *Chaparral* in finding that the Commission failed to address whether subject imports from Russia "were proven unfair and had a continuing impact during the full POI, including vote day." Appx139. It remanded the Commission's

determinations to reconsider its cumulation analysis in light of the Russian sanctions. Appx138-139. Second, it instructed the Commission to consider record evidence pertaining to the effects of the Russian sanctions, especially the suspension of American Petroleum Institute ("API")-certification for Russian OCTG. Appx144-145.

The court deferred its analysis of Plaintiffs' non-cumulation challenges. Appx169.

## III. The Commission's Remand Determinations[1]

In its remand determinations, the Commission explained that the issue in *Chaparral* had been abrogated by the 1994 amendments to the cumulation provision as part of the Uruguay Round Agreements Act ("URAA"). Appx076. Those amendments removed the assessment of whether imports are candidates for cumulation based on whether they are marketed reasonably coincident in time and have a continuing impact on vote day, and instead made imports eligible for

---

[1] TMK, a party to these proceedings, raised a statutory construction argument concerning the appropriate timeframe for assessing overlap of competition for cumulation for the first time in its reply brief before the CIT. Appx39106-39109. Neither the Commission nor Defendant-Intervenors had the opportunity to address this argument before the CIT's remand. On remand, the Commission explained how a change in the statute had limited the applicability of *Chaparral*. Subsequently, Tenaris adopted and modified TMK's statutory timeframe argument for overlap of competition.

cumulation if petitions are filed or self-initiated on the same day. Appx078-079.

Additionally, the Commission explained that "vote-day" could not be the operative

timeframe for cumulation as it would conflict with the current statutory

requirement that the Commission close the record before voting, as well as the

statutory framework for cumulation in staggered investigations. Appx079-081.

Additionally, the Commission considered the potentially contrary evidence

highlighted by the court. Appx091-103. It further considered whether Russian

OCTG, after the suspension of API certification, were fungible with other subject

imports and the domestic like product. Appx092-094. The Commission found that

suspension of API certification did not prevent Russian green tube, a subject semi-

finished OCTG product, from competing in the U.S. market, both in limited

service applications not requiring API certification and for processing into API-

certified OCTG products. Accordingly, the Commission found that Russian OCTG

remained fungible with the domestic like product and other subject imports during

the POI. Appx117-119. Regarding simultaneous presence, the Commission found

subject imports from Russia and other subject imports were present in the U.S.

market for nearly the entire POI, including after the imposition of sanctions.

Appx121. The Commission also found that Russian OCTG and other subject

sources overlapped in channels of distribution and geographic markets. Appx120.

The Commission concluded that there existed a sufficient degree of competitive

overlap to require the cumulative assessment of subject imports. Appx121. The Commission adopted the analysis and findings from the Final Determinations concerning all other aspects of its determinations. Appx121.

## IV. *Tenaris II*

The CIT found that during oral argument, Plaintiffs abandoned their claim that vote-day should be the proper timeframe for assessing reasonable overlap of competition for purposes of cumulation, and instead argued that the Commission, in assessing reasonable overlap of competition, should have placed greater weight on the last few months of the POI after sanctions were imposed against Russian imports. Appx018; Appx022. Thus, the CIT focused on the Commission's assessment of competitive overlap during the POI rather than on vote-day. Appx018-022. The CIT held that the statute did not support Tenaris's contention that the Commission should have accorded greater weight to conditions of competition at the end of the POI. Appx022. Thus, the court held that the Commission's assessment of competitive overlap throughout the 42-month POI was in accordance with law. Appx022.

The CIT found that the Commission reasonably cumulated Russian OCTG because sanctions had not affected their simultaneous presence, as they remained in the U.S. market during the final four months of the POI, shared channels of distribution, or geographic overlap with other subject imports. Appx023-028.

Regarding volume, the CIT rejected Plaintiffs' arguments and held that the last section of 19 U.S.C. § 1677(7)(C)(iii) concerning "conditions of competition" should be read to apply only to the "impact on affected domestic industry" clause, not the "volume" clause. Appx041-042. The CIT also rejected Plaintiffs' argument that the post-petition effects provision, 19 U.S.C. § 1677(7)(I), did not apply to subject import volume relative to consumption in the United States, holding that because the provision only references "volume," without restrictions or limitations, the Commission reasonably concluded that the provision applies to changes in the volume of subject imports in absolute terms or relative to production or consumption in the United States, consistent with 19 U.S.C. § 1677(7)(C)(i). Appx045. Accordingly, the CIT sustained the Commission's volume finding, including its post-petition effects analysis. Appx045.

Regarding impact, the CIT rejected Tenaris's arguments and found that the Commission reasonably considered the factors argued by Tenaris, including the impact of demand and supply conditions, Tenaris's domestic investments, and intra-industry competition, for its impact analysis. Appx059-062.

The CIT also rejected Tenaris's argument that the Commission failed to give "full weight" to the recovery of the domestic industry, finding that the Commission fully considered this evidence. Appx062-063. The CIT also held that prior Commission determinations had not established any practice of treating

improvements in industry performance across interim periods as evidence of no adverse impact, as Tenaris argued. Appx063. Accordingly, the CIT affirmed the Commission's impact analysis. Appx064.

## SUMMARY OF THE ARGUMENT

The Commission properly analyzed whether there was a reasonable overlap of competition between and among subject imports from each source and the domestic like product during the POI in accordance with the statute and determined to consider subject imports on a cumulated basis. Applying its traditional four factors endorsed by *Fundicao Tupy, S.A. v. United States*, 678 F. Supp. 898, 902 (Ct. Int'l Trade 1988), *aff'd*, 859 F.2d 915 (Fed. Cir. 1988), the Commission assessed the competitive overlap of subject imports and the domestic like product over the POI, the same timeframe used for its injury analyses. It concluded that subject imports from each source and the domestic like product were fungible with each other, overlapped with respect to channels of distribution and geographic markets, and were simultaneously present throughout nearly the entire POI, and therefore cumulated the subject imports. Appx200.

Appellants seek to revive their argument that the Commission erred as a matter of law by assessing competitive overlap during the POI, rather than the post-POI period including vote day, despite forfeiting this position at oral argument before the CIT. As the CIT found, Appellants abandoned their argument

12

that the Commission was required to assess competitive overlap as of vote-day, and instead argued that the Commission should have given greater weight to the last months of the POI after sanctions had been imposed on Russian OCTG. Having conceded before the CIT that the POI was the correct timeframe for the Commission's analyses, Appellants cannot now resurrect their argument that the Commission should have focused on the post-POI period including vote day.

Nor did the CIT base its finding of abandonment on any conflation of the POI with the period during which the Commission may consider relevant information. The CIT relied on Tenaris's own statements at oral argument, where counsel repeatedly referenced the POI as the appropriate timeframe for assessing whether there was a reasonable overlap of competition for cumulation. The CIT properly exercised its discretion in concluding that Plaintiffs abandoned their argument.

Even if Tenaris had not forfeited this argument, the Commission's interpretation of the cumulation provision is consistent with the plain language of 19 U.S.C. § 1677(7)(G)(i), the statutory structure, the Statement of Administrative Action to the Uruguay Round Agreements Act ("SAA"), H.R. Doc. No. 103-316, vol. I, at 892 (1994), and CIT and Federal Circuit precedent. The Commission's cumulation analysis and findings were therefore in accordance with law and supported by substantial evidence.

The Commission also complied with the plain text of the statute, 19 U.S.C. § 1677(7)(C)(i), in finding that the volume of cumulated subject imports and the increase in that volume were significant in absolute terms and relative to apparent U.S. consumption in the United States. Nothing in section 1677(7)(C)(i) requires the Commission to expressly incorporate in its volume analysis particular conditions of competition, as Appellants mistakenly argue, as that requirement applies only to the Commission's consideration of impact under section 1677(7)(C)(iii). In its impact analysis, the Commission explained that the conditions of competition highlighted by Appellants did not draw subject imports into the U.S. market or otherwise explain the industry's market share loss and injury.

The Commission also appropriately discounted post-petition market share data pursuant to the post-petition effects provision, 19 U.S.C. § 1677(7)(I), finding the decline in subject import market share in interim 2022 compared to interim 2021 related to the pendency of the investigations. Under the statute, the Commission may consider whether any change in subject import volume since the filing of the petition is related to the pendency of the investigation and accord reduced weight to post-petition data. Given that "volume" is defined under 19 U.S.C. § 1677(7)(C)(i) to encompass subject import volume "in absolute terms" and "relative to . . . consumption in the United States," meaning market share, the

Commission reasonably discounted subject import market share data in interim 2022 for purposes of its volume analysis.

For its impact analysis, the Commission addressed the conditions of competition highlighted by Appellants, notwithstanding their arguments to the contrary. Having prefaced its injury analysis with a discussion of all relevant conditions of competition, Appx205-212, the Commission considered the conditions argued by Appellants for purposes of its impact analysis, including demand trends, which were influenced by the Russia-Saudi oil supply war and COVID-19 pandemic; supply constraints such as those caused by inventory overhangs, increasing HRC prices, and labor shortages; and Tenaris's role in the U.S. industry and intra-industry competition. Appx057-062. The Commission reasonably explained how each of these conditions of competition was consistent with its affirmative injury finding.

The Commission also reasonably found that cumulated subject imports had a significant adverse impact on the domestic industry. As the Commission explained, the increase in subject import volume from 2020 to 2021, driven by significant underselling, was significant and enabled subject imports to capture market share from the domestic industry, thereby preventing the industry from capitalizing on the increase in apparent U.S. consumption during the period. Appx227. Given these trends, the Commission reasonably found it instructive that in interim 2022,

after the filing of the petitions, subject imports competed less aggressively and lost

market share relative to interim 2021, allowing the domestic industry to improve

its performance markedly. Appx227-228. Appellants' assertion that these trends

required the Commission to reach negative determinations overlooks that they

resulted from the filing of the petitions, as the Commission explained in

discounting post-petition market share data, and not any magnanimous decision by

subject producers to retreat from the U.S. market.

## ARGUMENT

### I. Standard of Review

This Court applies the same standard of review as the Court of International

Trade, which means that this Court again assesses whether the Commission's

determination is "unsupported by substantial evidence on the record, or otherwise

not in accordance with law." 19 U.S.C. §§ 1516a(b)(1)(B)(i), (a)(2)(B)(i).

Although this Court performs anew the lower court's review on appeal, this Court

has stated that it will give "great weight to 'the informed opinion of the Court of

International Trade.'" *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir.

2007) (quoting *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir.

2006)).

Under the substantial evidence standard, this Court will affirm the

Commission's determination if it is supported by the record as a whole, even if

some evidence detracts from the Commission's conclusion. *Hitachi Metals, Ltd. v. United States,* 949 F.3d 710, 716 (Fed. Cir. 2020); *see also Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-64 (Fed. Cir. 1984). "It is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996).

The Commission is presumed to have considered the full record, and the fact that it did not explicitly discuss each piece of evidence does not establish that it "ignored" such evidence. *See, e.g.*, *Siemens Energy, Inc. v. United States*, 992 F. Supp. 2d 1315, 1324 (Ct. Int'l Trade 2014) ("The Commission need not address every piece of evidence presented by the parties; absent a showing to the contrary, the court presumes that the Commission has considered all of the record evidence."), *aff'd*, 806 F.3d 1367 (Fed. Cir. 2015). Instead, the Commission need only address the "issues material to {its} determination" so that the "'path of the agency may reasonably be discerned.'" *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354 (Fed. Cir. 2005) (quoting SAA, H.R. Doc. No. 103-316, vol. I, at

892.[2] In the end, when a party challenges the Commission's determination under the substantial evidence standard, it has "'chosen a course with a high barrier to reversal.'" *Nippon Steel*, 458 F.3d at 1352 (quoting *Mitsubishi Heavy Indus., Ltd. v. United States,* 275 F.3d 1056, 1060 (Fed. Cir. 2001)).

The CIT's finding that Plaintiffs' waived or forfeited their vote-day argument is reviewed for abuse of discretion. *See King v. Taylor*, 694 F.3d 650, 659–60 (6th Cir. 2012) (reviewing a district court's ruling on forfeiture for an abuse of discretion); *United States v. Ziegler Bolt & Parts Co.*, 111 F.3d 878, 882 (Fed. Cir. 1997) (reviewing the CIT's ruling on waiver for an abuse of discretion). "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.,* 678 F.3d 409, 416 (6th Cir. 2012). In determining whether a district court has abused its discretion, this Court reviews the district court's underlying factual determinations for clear error. *See Haggart v. United States*, 943 F.3d 943, 948 (Fed. Cir. 2019). Under the

---

[2] The SAA is an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements Act, which passed into law, 19 U.S.C. § 1675(c). *See* Pub. Law 103-465 §§ 102, 220, 108 Stat. 4809, 4819, 4861 (Dec. 8, 1994).

clear-error standard, the Federal Circuit upholds the district court's findings "in the absence of a definite and firm conviction that a mistake has been made." *Par Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F.4th 1379, 1383 (Fed. Cir. 2022) (quoting *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1374 (Fed. Cir. 2008)).

## II. The Court Should Sustain the Commission's Cumulation Determination

### A. Background

The statute requires the Commission to cumulate subject imports from "all countries with respect to which . . . petitions were filed . . . on the same day" when "such imports compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1677(7)(G)(i). As the CIT has long recognized, "only a 'reasonable overlap of competition' is required to cumulate imports." *Nevinnomysskiy Azot v. United States*, 565 F. Supp. 2d 1357, 1364 n.6 (Ct. Int'l Trade 2008) (*citing Mukand Ltd. v. United States*, 937 F. Supp. 910, 916 (Ct. Int'l Trade 1996)). In making this assessment, the Commission has traditionally considered whether subject imports from each source and the domestic like product are (1) fungible; (2) sold in the same geographic markets; (3) sold in common or similar channels of distribution; and (4) simultaneously present in the U.S. market. Appx191-192. Both Congress and this Court have approved the Commission's reliance on these factors. *See* SAA, H.R. Doc. No. 103-316, at 848; *Goss Graphic*

*Sys., Inc. v. United States*, 216 F.3d 1357, 1361 (Fed. Cir. 2000). Given this, and the mandatory nature of the cumulation provision, the Commission is required to cumulate subject imports from different countries when it finds a reasonable overlap of competition between them and the domestic like product based on its traditional factors.[3]

Before the CIT, TMK challenged the Commission's cumulation of subject imports from Russia, arguing the Commission's determination was contrary to law because the Commission should not have assessed whether there was an overlap of competition based on information covering the POI, but on post-POI information through vote-day, relying on the CIT's decision in *Chaparral*. Appx016. In its comments in opposition to the Commission's remand determinations, Tenaris appeared to adopt TMK's vote-day argument. Appx39132-93133. Before the oral argument, the CIT issued three questions for parties to address at oral argument, the first being the appropriate timeframe for the Commission's cumulation analysis. Appx39463-39464.

---

[3] The petitions with respect to these countries were also filed on the same day and none of the statutory exceptions to cumulation applied.

In its opinion, the CIT found that during oral argument Appellants abandoned their argument that the Commission was required to analyze reasonable overlap of competition based on post-POI data through vote-day and held the argument they advanced instead – that the Commission was required to attach greater weight to the conditions of competition prevailing towards the end of the POI – unsupported by the statute. Appx022. For the reasons discussed below, the CIT did not abuse its discretion in holding that Appellants abandoned their vote-day argument and even if this Court were to hold otherwise, the Commission's consideration of POI data for purposes of its cumulation analysis was in accordance with law.

### B. The CIT Correctly Held Appellants Forfeited Their Post-POI Cumulation Argument

The CIT did not abuse its discretion in holding that Appellants forfeited their vote-day argument. Unlike waiver, forfeiture does not require an express or intentional relinquishment; it is sufficient that the party did not properly maintain the argument before the court. *United States v. Olano*, 507 U.S. 725, 733 (1993); *see also In re Google Tech. Holdings LLC*, 980 F.3d 858, 862–63 (Fed. Cir. 2020). At oral argument, Appellants appeared unable to answer certain of the court's questions concerning the Commission's consideration of post-POI data for analyzing cumulation, and instead argued that the Commission should have given more weight to evidence at the end of the POI, without providing any statutory

support. Appx39279-39280. A party is bound by concessions made by counsel during oral argument. *Gen. Ins. Co. of Am. v. Mezzacappa Bros., Inc.*, 110 F. App'x 183, 185 (2d Cir. 2004); *see also U.S. Trust Co. of N.Y. v. Shapiro*, 835 F.2d 1007 (2d Cir. 1987).

An examination of the transcript from the CIT's oral argument confirms the reasonableness of the court's holding that Plaintiffs abandoned their vote-day argument. The court's first question, asking counsel to address the "statutory interpretation of the terms 'competes with' and 'reasonable overlap of competition' … relevant to the time frame" for cumulation, occupied more than an hour and 50 minutes of the oral argument. Appx39274-39275, Appx39357, Appx39463-39464. In response, Tenaris repeatedly linked the Commission's analysis of whether there was a reasonable overlap of competition for cumulation purposes with the POI. For example, when the court asked about the "logistical and practical aspects" of assessing overlap of competition, Appx39277, Tenaris's counsel agreed that "the Commission has the discretion to set the POI… {and} the period of investigation in this case {is} January 2019 through June 2022." Appx39280. In responding that the appropriate timeframe for assessing reasonable overlap of competition was the POI defined by the Commission, Appellants abandoned their previous argument that the appropriate timeframe was the post-POI period through vote-day. A party waives its former position by subsequently advancing a conflicting position. *3G*

*Licensing, S.A. v. Honeywell Int'l Inc.*, No. 2023-1557, 2024 WL 5054806, at *4 (Fed. Cir. Dec. 10, 2024) ("{We} did not require {the party} to expressly abandon the argument for it to be waived.").

Tenaris then reinforced that the POI was the relevant timeframe for the Commission's analysis of whether subject imports "compete with" each other. Counsel explained that "all of the earlier information provides historical context" for the "most relevant, the current, the fresh data towards the latter months of the POI at the time that the Commission will vote to make that injury determination in connection with the threshold consideration of whether those imports compete with each other and there's reasonable overlap of competition." Appx39280. Again, Plaintiffs identified the POI, not any post-POI period, as the appropriate timeframe for evaluating reasonable overlap of competition.

Throughout the hearing, Tenaris consistently argued that the appropriate timeframe for the Commission's cumulation analysis, and its injury analysis, was "the latter months of the POI," after the Russian sanctions. Appx39281-39282 ("You're trying to determine material injury what you're trying to do with the threshold analysis of cumulation… is {to determine} whether those imports are competing. And again, the fresh, current data is most relevant to that assessment."). In doing so, Tenaris abandoned its prior argument that the post-POI period, including vote-day, was the appropriate timeframe.

Towards the end of the hearing, Tenaris further emphasized that it was no longer arguing that the Commission's cumulation analysis should have relied on post-POI data by stating "just to be clear, we are not asking to change the POI." Appx39361. Having clarified at oral argument that the POI was the relevant timeframe for the Commission's cumulation analysis, Appellants cannot seriously argue that the CIT abused its discretion by holding that they had abandoned their vote-day argument. *Forshey v. Principi*, 284 F.3d 1335, 1358 (Fed. Cir. 2002) (en banc) ("{T}he fact that the appellant specifically urged {below} the legal rule that he now challenges {on appeal} counsels against consideration of the issue.").

Appellants argue that the CIT abused its discretion by "conflat{ing} the POI with the period during which the Commission could consider information relevant to its decision." TnBr at 59-60. The claim is unfounded, as Appellants' arguments before the CIT could not have been clearer. When asked by the CIT what the appropriate timeframe was for the Commission's cumulation analysis, Appellants repeatedly responded that the POI was the proper timeframe. Instead of maintaining their vote-day argument, Appellants pivoted to argue that the Commission should give more weight to the evidence at the end of the POI. Appx39280. Appellants are bound by their counsel's concessions at oral argument, and this Court should reject their attempt to modify that argument retroactively. *Gen. Ins. Co.*, 110 F. App'x at 185; *see also U.S. Trust Co.*, 835 F.2d at 1007;

*Vivint, Inc. v. ADT LLC*, No. 2023-1995, 2024 WL 5074569, at *2 (Fed. Cir. Dec. 11, 2024).

Given Appellants' repeated assertions at oral argument that the POI was the appropriate timeframe for the Commission's cumulation analysis, the CIT properly exercised its discretion in concluding that Appellants forfeited their vote-day argument by not maintaining it when squarely presented with the opportunity to do so. The CIT's conclusion is supported by the transcript and should be upheld.

## C. The Commission's Cumulation Analysis Was in Accordance with Law

Even if the Court were to conclude that Appellants did not forfeit their vote-day argument, the Commission's remand determinations should be affirmed because the Commission's reasonable overlap of competition analysis was supported by substantial evidence and otherwise in accordance with law. The Commission's interpretation of 19 U.S.C. § 1677(7)(G)(i) – that the Commission assess overlap of competition based on data from the period the Commission is investigating, the POI – is well-grounded in the statutory framework, legislative history, and longstanding judicial precedent.

First, the Commission's application of the provision at issue, 19 U.S.C. § 1677(7)(G)(i), is consistent with the plain meaning of this provision and the clear context of the surrounding statutory provisions. *See Robinson v. Shell Oil Co.*, 519

U.S. 337, 341 (1997) (the meaning of statutory language "is determined by

reference to the language itself, the specific context in which that language is used,

and the broader context of the statute as a whole").  The statute directs the

Commission to cumulate such imports "{f}or purposes of" assessing the volume of

such imports and their price effects under section 1677(7)(C)(i) and (ii), instructing

the Commission to

> {C}umulatively assess the volume and effect of imports of
> the subject merchandise from all countries with respect to
> which . . . petitions were filed on the same day . . . if such
> imports compete with each other and with the domestic
> like products in the United States market.

19 U.S.C. § 1677(7)(G)(i). Because the Commission in its injury analysis considers

subject import volume, price effects, and impact retrospectively – measured over

the POI – the competitive overlap that requires the cumulation of subject imports

from different sources must be contemporaneous with the POI data used for the

Commission's injury analysis and naturally should be evaluated over the same

temporal period.  Nothing in the statute suggests that Congress intended the

competitive overlap inquiry for cumulation to be severed from the material injury

inquiry.  This interpretation accords with the Court's recognition that the "'purpose

of cumulation is to avoid a negative injury determination when unfairly traded

imports from various sources together injure an industry.'" *Hosiden Corp. v.*

*Advanced Display Mfrs. of Am.*, 85 F.3d 1561, 1569 (Fed. Cir. 1996) (quoting *USX*

*Corp. v. United States*, 682 F. Supp. 60, 73 (Ct. Int'l Trade 1988)); *see also* SAA,

H.R. Doc. No. 103-316, vol. I, at 847.

In turn, the Commission's present material injury analysis comprises an

examination of data covering the POI, primarily collected through questionnaires,

which typically covers the three most recently completed calendar years plus any

interim period of the following year for which data are available.  This Court has

recognized that "the Commission has broad discretion with respect to the period of

investigation that it selects for purposes of making a material injury

determination."  *Nucor*, 414 F.3d 1331, 1337 (Fed. Cir. 2005).

Given that the purpose of the Commission's competitive overlap analysis is

to determine whether subject imports from different sources should be considered

in the aggregate for purposes of its analysis of whether they caused material injury

*during* the POI, it would make little sense for the Commission to focus its

competitive overlap analysis on the post-POI period or vote-day.  Nor could the

substantial data necessary for an overlap of competition assessment realistically be

collected on vote-day.

Indeed, requiring the Commission's competitive overlap analysis to focus on

post-POI data through vote day, as Appellants advocate, would shed little, if any,

light on the relevant question, which is whether there was sufficient competition

between and among subject imports from different sources and the domestic like

product such that it is appropriate to examine these imports cumulatively in assessing whether they caused material injury to the domestic industry *during* the POI. To answer this question, the Commission must examine whether there was competitive overlap *during* the POI, as it correctly did in these investigations.

Second, the Commission's interpretation is consistent with other statutory provisions, such as the provision requiring the record to close and an opportunity for final comments:

> {T}he Commission, before making a final determination . . . shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained . . . upon which the parties have not previously had an opportunity to comment.

19 U.S.C. § 1677m(g). The Commission's ability to collect information is circumscribed by this requirement, which ensures procedural fairness, administrative finality, and meaningful judicial review. Any interpretation of the statute to require the Commission's reliance on data as of vote-day would conflict with 19 U.S.C. § 1677m(g). The Commission could not continue to collect data until the moment of its vote without depriving parties of their statutory right to comment on the information.

Third, the SAA expressly ratifies the Commission's longstanding POI-based approach to cumulation. The URAA fundamentally altered cumulation in 1994 and was accompanied by an SAA that Congress designated as an

"authoritative expression" of how the statute must be applied. 19 U.S.C. § 3512(d);

*NEC Corp. v. Dep't of Comm.*, 36 F. Supp. 2d 380, 392 n.8 (Ct. Int'l Trade 1998)

(quoting SAA, H.R. Doc. No. 103-316, vol. I, at 656); *see also Delverde, SrL v.*

*United States*, 989 F. Supp. 218, 229-30 n.18 (Ct. Int'l Trade 1997) ("'{I}t is the

expectation of the Congress that future Administrations will observe and apply the

interpretations and commitments set out in this Statement.'") (quoting SAA, H.R.

Doc. No. 103-316, vol. I, at 656). The SAA makes explicit that the new cumulation

provision "w{ould} not affect current Commission practice," which then, as now,

assessed overlap of competition during the POI using the four traditional factors.

SAA, H.R. Doc. No. 103-316, vol. I, at 848; *see also Certain Flat-Rolled Carbon*

*Steel Products from Argentina, Australia, Austria, Belgium, Brazil, Canada,*

*Finland, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, New*

*Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom*, Inv. Nos.

701-TA-319-332, 334, 336-342, 344, and 347-353 and 731-TA-573-579, 581-592,

594-597, 599-609, and 612-619 (Final), USITC Pub. 2664 at 26-27 (Aug. 1993);

*Steel Wire Rope from the Republic of Korea and Mexico*, Inv. Nos. 731-TA-546

and 547 (Final), USITC Pub. 2613 at 21-23 (Mar. 1993); *Certain Hot-Rolled Lead*

*and Bismuth Carbon Steel Products from Brazil, France, Germany, and the United*

*Kingdom*, Inv. Nos. 731-TA-552-555 (Final), USITC Pub. 2611 at 40-41 (Mar.

1993) (Commission investigations before the amended URAA and SAA assessing overlap of competition, volume, price, and impact over the designated POI).

Fourth, the Commission's interpretation is consistent with the statutory framework for cumulation in staggered investigations.[4] Staggered investigations occur when the Commission is unable to make final determinations with respect to investigations involving different countries at the same time, often because Commerce issues its final determinations for some countries earlier than for other countries. In those circumstances, the Commission is statutorily required to base its cumulation analysis in the later ("trailing") investigation(s) on the record of the earlier ("leading") investigation(s), and may only add Commerce's trailing final determinations and comments addressing those determinations to the record. *See* 19 U.S.C. § 1677(7)(G)(iii). Nothing in Section 1677(7)(G)(iii) authorizes or contemplates that the Commission would reconsider cumulation in a trailing investigation based on additional information collected through vote-day for the trailing investigation. The statute requires that the overlap of competition analysis

_____

[4] Although the investigations here were not staggered, the statutory provision governing staggered investigations (19 U.S.C. § 1677(7)(G)(iii)) is relevant to the interpretation of cumulation under 19 U.S.C. § 1677(7)(G)(i) as they are part of the same statutory framework for cumulation for determining material injury.

in the trailing investigation be based on the record of the leading investigation, closed before the Commission's vote in the leading investigation.

Consistent with the statute, the SAA explains that the Commission's cumulation analysis in trailing investigation must be based on the record compiled in the leading investigation, thereby "eliminat{ing} the need for the Commission to consider whether imports from the first-decided investigation . . . have a 'continuing effect' on 'vote day'." SAA ,H.R. Doc. No. 103-316, vol. I, at 848. In this SAA passage, Congress emphasized that it did not intend for "vote day" to be the operative timeframe for the Commission's cumulation analysis. Indeed, the Commission could not base its cumulation analysis in a trailing investigation on information "at the end of the investigation up to and including vote day" without violating the requirement under the statute and the SAA that the Commission base its cumulation analysis in trailing investigations on the record of the leading investigations, which closes before vote-day in the leading investigations.

Appellants' argument that additional information can sometimes be added between the leading and trailing investigations is unavailing. TnBr. at 57. The statute permits only two additions to the record of the leading investigations in trailing investigations: Commerce's final determinations in the trailing investigations and party comments on those determinations. 19 U.S.C. § 1677(7)(G)(iii). Thus, the new information that may be added to the record of

trailing investigation is generally irrelevant to the Commission's cumulation analysis, and does not alter the requirement that the Commission base its cumulation analysis in trailing investigations on the record of the leading investigation.

Fifth, the Commission's interpretation has been upheld by the CIT. In *Steel Authority of India, Ltd. v. United States ("SAIL")*, the CIT upheld "the ITC's interpretation of the 'compete with' clause as granting the agency the discretion to choose the three-year period of investigation as the appropriate time frame" for its cumulation analysis. 146 F. Supp. 2d 900, 907 (Ct. Int'l Trade 2001). In construing 19 U.S.C. § 1677(7)(G)(i), the court explained that "compete with" is in not just the present tense, but the *simple* present tense, and thus "'imports compete with' refers to the state of the subject imports, broadening the scope of the cumulation provision to include imports that 'compete' during the time of investigation." *Id.* at 907. The *SAIL* reasoning supports the Commission's reliance on the POI as the appropriate timeframe for its overlap of competition analysis.[5]

---

[5] Similarly, the CIT has held that "there is no requirement to include . . . post-POI data, as the POI is the centerpiece of the investigation's time frame." *AWP Indus., Inc. v. United States*, 783 F. Supp. 2d 1266, 1282 (Ct. Int'l Trade 2011).

Appellants' suggestion that *SAIL* is no longer good law after *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024), is incorrect. TnBr. at 53-54. Appellants omit that the *SAIL* court explained that "the Commission reasonably interpreted the 'compete with' provision in choosing a three-year {POI} for its review of { } presence in the U.S. market" under both *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 838 (1984), and *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *SAIL*, 146 F. Supp. 2d at 906-07 n.10 (the Commission's interpretation of the statute is persuasive, and therefore "entitled to respect" under the less deferential standard set forth in *Skidmore*) (citing *Skidmore*, 323 U.S. at 140).

Indeed, *Loper Bright* held that courts should continue to "seek aid" and "guidance" from agency statutory interpretations under *Skidmore*. *Loper Bright*, 603 U.S. at 393 (quoting *Skidmore*, 323 U.S. at 140). Additionally, the Supreme Court emphasized that its decision in *Loper Bright* does not call into question prior cases that relied on the *Chevron* framework and those holdings "are still subject to statutory *stare decisis*." *Id*. at 412 (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014); *Dickerson v. United States*, 530 U.S. 428, 443 (2000)). Thus, the *SAIL* analysis sustaining the Commission's use of the POI for its cumulation analysis under 19 U.S.C. § 1677(7)(G)(i) remains highly persuasive.

Contrary to Appellants' argument otherwise, neither *Chaparral* nor *Nucor Corp v. United States*, 318 F. Supp. 2d 1207, 1223-24 (Ct. Int'l Trade 2004), holds that the Commission must analyze competitive overlap after the POI or as of vote-day. TnBr. at 52-53. Appellants ignore that the CIT in *Chaparral* construed a different statutory scheme, predating the URAA and the current cumulation provision. In *Chaparral*, this Court affirmed the Commission's determination that certain imports were ineligible for cumulation based on the pre-URAA threshold mandatory criteria (*i.e.*, whether imports were "subject to investigation") on vote-day in accordance with the old 1988 cumulation provision. *Chaparral*, 901 F.2d at 1104-05. As the Court explained, the cumulation statute, at that time, "mandate{d} cumulation of the volume and effect of imports "*subject to investigation* if such imports compete with each other and with like products of the domestic industry in the United States market." *Id.* at 1101 (quoting 19 U.S.C. § 1677(7)(C)(iv) (1988)).

Tenaris's reliance on *Nucor's* citation to *Chaparral* does not suggest the Commission must rely on information at the end of the POI or post-POI. TnBr. at 53. In *Nucor*, the CIT upheld the Commission's reliance on record evidence *from the POI* and explained only that the Commission *may* permissibly focus its analysis on a particular portion of the POI, consistent with *Chaparral's* recognition of the remedial purpose of the statute. *Nucor*, 318 F.Supp. 2d at 1223-24. On appeal, the Federal Circuit affirmed, likewise endorsing the Commission's reliance

on POI evidence and not requiring any consideration of post-POI or vote-day conditions. *Nucor*, 414 F.3d at 1337.

While ostensibly arguing that the Commission used the improper timeframe for assessing cumulation without clearly arguing what it believes the statute to require, Appellants' actual challenge to the Commission's cumulation analysis appears to be that "{b}y the end of the POI, there was no reasonable overlap of competition . . . ." TnBr. at 57. The Commission considered and reasonably rejected this argument on remand. As the Commission explained, subject imports from each source, including Russia, remained present throughout the POI, and were present in the last four months of the POI. Appx100-101. Additionally, the Commission found that the volume of subject imports from Russia was 47.5 percent higher in March and May 2022, after the imposition of various sanctions, than in March and May 2021. Appx101; Appx34075-34077; Appx34091. Moreover, subject imports from Russia accounted for a greater proportion of cumulated subject imports and U.S. importers' shipments of cumulated subject imports in interim 2022 than in interim 2021, further corroborating the Commission's conclusion that the sanctions did not prevent subject imports from Russia from competing with other subject imports or the domestic like product during the POI. Appx103. Thus, substantial evidence supported the Commission's finding that subject imports from each source, including Russia, competed in the

U.S. market both during the POI and in the last four months of the POI, supporting its conclusion that there was a reasonable overlap of competition sufficient to warrant cumulation. Appx101-103. Appellants' attempt to minimize subject imports from Russia towards the end of the POI invites the Court to impermissibly reweigh the evidence.[6] *SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018) ("While Appellants invite this court to reweigh this evidence, this court may not do so.").

Because the Commission's cumulation analysis was supported by substantial evidence and in accordance with law, the Court should reject Appellants' mistaken arguments and affirm this aspect of the Commission's determinations.

## III. The Commission's Volume Finding Is Supported by Substantial Evidence and in Accordance with Law

The Commission reasonably found that subject import volume was significant, consistent with the statutory framework. The CIT correctly upheld this finding, concluding that the Commission's analysis was supported by substantial

---

[6] Moreover, if Appellants believe that events after the POI substantially changed the relevant conditions of competition, the appropriate remedy would be for them to request that the Commission conduct a changed circumstances review under 19 U.S.C. § 1675(b). Congress balanced accuracy and administrability by channeling post-POI developments into changed circumstances reviews, which allow the Commission to assess whether existing orders remain necessary or appropriate based on current conditions.

evidence and properly construed 19 U.S.C. § 1677(7)(C)(i). This Court should do the same, as none of Tenaris's arguments withstand scrutiny.

## A.    The Commission's Volume Finding Should Be Sustained

The statute instructs the Commission to "consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i). In accordance with the statute, the Commission found that both the total volume of cumulated subject imports and the increase in that volume were significant in absolute terms and relative to consumption in the United States. Appx212-213.

The record showed that cumulated subject imports in absolute terms increased overall by [ # ] percent from 2019 to 2021, from [ # ] short tons to [ # ] short tons, and was [ # ] percent greater in interim 2022, at [ # ] short tons, than in interim 2021, at [ # ] short tons. Appx212; Appx34081; Appx34263-34265. Therefore, the Commission reasonably found that the volume of cumulated subject imports and the increase in that volume were significant in absolute terms.

The record also showed that cumulated subject import market share increased overall by [ # ] percentage points from 2019 to 2021, from [ # ] percent to [ # ] percent. Appx212-213; Appx34081; Appx34263-34265. Thus,

37

the Commission reasonably found that the volume of cumulated subject imports relative to apparent U.S. consumption (*i.e.*, market share) and the increase in their market share was significant.

Although cumulated subject import market share was [ # ] percentage points lower in interim 2022 compared to interim 2021, as the Commission explained, because the petitions for the investigations were filed between the interim periods, the decline in subject import market share across interim periods was related to the pendency of the investigations. Appx213; Appx34263; Appx43081. Accordingly, the Commission in its volume analysis placed less weight on the interim period data than it did on the data covering the three full years of the POI, Appx213, consistent with its statutory discretion to do so. 19 U.S.C. § 1677(7)(I) (allowing the Commission to reduce the weight accorded to post-petition data if any change in these data is "related to the pendency of the investigation").

### B. The Commission Is Not Required to Expressly Address Conditions of Competition in Its Volume Analysis

Appellants argue that the Commission was required to expressly address in its volume analysis whether subject imports were "needed" to determine whether the subject import volume was significant. TnBr. at 25-26, 31. This claim is misguided. As courts repeatedly have recognized, the Commission is not required

"to explicitly cite the Commission's findings on the conditions of competition" in its volume analysis. *OCP S.A. v. United States*, 658 F. Supp. 3d 1297, 1319-20 (Ct. Int'l Trade 2023); *see also CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337, 1350 (Ct. Int'l Trade 2014), *aff'd*, 623 F. App'x 1012 (Fed. Cir. 2015) ("{T}he Commission's discussion in the Views of the Commission need not be of some talismanic length or in some preordained place."); *Nucor*, 414 F.3d at 1339 ("Where an agency has not made a particular determination explicitly, the agency's ruling nonetheless may be sustained as long as 'the path of the agency may be reasonably discerned.'" (quoting *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987)). Thus, Appellants' claim should be rejected.[7]

The statute does not require the Commission to expressly address purported "volume effects" or particular conditions of competition in its volume analysis. Rather, the plain language of the volume statute only provides that the Commission "shall consider the volume of imports of the subject merchandise." 19 U.S.C. § 1677(7)(C)(i). Consistent with this directive, the Commission's longstanding

---

[7] We note that Appellants' statutory claim is raised for the first time here on appeal and, therefore, should be deemed waived. *See* TnBr. at 29-32. "If a party fails to raise an argument before the trial court ... {this Court} may deem that argument waived on appeal." *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1296 (Fed. Cir. 2009).

approach to assessing the significance of subject import volume has correctly focused on the available subject imports volume data.

The Commission's longstanding interpretation of this provision is consistent with the broader statutory scheme. First, whereas the statutory provision pertaining to volume directs the Commission to "consider the volume of imports of the subject merchandise," the statutory provisions pertaining to price and the impact of subject imports contain broader directives instructing the Commission to consider the effects of subject imports on domestic prices and the impact of subject imports on domestic producers. *Compare* 19 U.S.C. § 1677(7)(C)(i) (the Commission "shall consider the volume of imports of the subject merchandise"), *with* 19 U.S.C. § 1677(7)(C)(ii) (the Commission "shall consider *the impact* of imports of such merchandise *on domestic producers*"). Second, where the statute does directly instruct the Commission to consider relevant conditions of competition in its analysis, the statute does so with respect to its consideration of impact. Section 1677(7)(C)(iii) lists "relevant economic factors" the Commission must consider when examining the impact of subject imports on the domestic industry and requires the Commission to "evaluate all relevant economic factors described in this clause," meaning section 1677(7)(C)(iii), "within the context of

the business cycle and conditions of competition."[8] Thus, the CIT correctly held

that "the last section of 19 U.S.C. § 1677(7)(C)(iii) regarding 'conditions of

competition' should be read to apply only to the 'impact on affected domestic

industry' section of the statute." Appx041.

Consistent with the foregoing, courts, in rejecting arguments like those

Appellants raise here, have recognized that the statute permits the Commission to

determine that subject import volume is significant based on volume data "alone."

*OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1300 (Ct. Int'l Trade 2021);

*see also ITG Voma Corp. v. U.S. Int'l Trade Comm'n*, 253 F. Supp. 3d 1339, 1356-

57 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019) (rejecting

plaintiff's argument that the Commission was required to consider whether subject

imports had adverse effects on the domestic industry in order to determine if the

volume of these imports was significant under the statute); *Adisseo Espana S.A. v.*

*United States*, No. 1:21-cv-00562-MMB, Slip. Op. at 15-16, *available at* 2023 WL

8866562, at *6 (Ct. Int'l Trade Dec. 18, 2023).

---

[8] Lest there be any doubt that each of the four roman numerals under section 1677(7)(C) constitutes a "clause," this is made clear in the captive production clause (clause (iv)), wherein the statute explicitly refers to elements of the impact analysis as falling within "clause (iii)": "{T}he Commission, in determining market share and the factors affecting financial performance set forth in *clause (iii)*, shall focus primarily on the merchant market for the domestic like product." 19 U.S.C. § 1677(7)(C)(iv) (emphasis added).

Tenaris's reliance on *OCP* and *Altx* is misplaced. To the extent that *OCP*

and *Altx* "stand{} for the principle that imported volumes may not be significant if

the imported quantities fill demand that the domestic industry is unable to meet

'either because of incapability or lack of viability," *OCP*, 658 F. Supp. 3d at 1320

(quoting *Altx, Inc. v. United States*, 26 CIT 709, 717 (2002)), these cases are

distinguishable in that the record in the present case showed that the domestic

industry was capable of meeting the increase in U.S. demand. *See* Appx229. In its

impact analysis, the Commission found the domestic industry had substantial

excess capacity throughout the POI, and that in 2021, when the domestic industry

lost market share to subject imports, the domestic industry had a capacity

utilization rate of only 27.6 percent and excess capacity of 4.8 million short tons.

Appx229. Accordingly, Appellants' reliance on *OCP* and *Altx* is unavailing.

### C.    The Commission's Post-Petition Effects Analysis Was Reasonable and in Accordance with Law

Tenaris argues that the statute precluded the Commission from discounting

post-petition data in its volume analysis based on the decline in subject import

market share following the filing of the petitions. TnBr. at 46-48.  However,

Tenaris' claim is inconsistent with statutory language and related authorities.

The post-petition effects provision of the statute provides:

> The Commission shall consider whether any change in the
> *volume*, price effects, or impact. . . of {subject imports} . .

> . since the filing of the petition . . . is related to the
> pendency of the investigation and, if so, the Commission
> may reduce the weight accorded to the data for the period
> after the filing of the petition . . . .

19 U.S.C. § 1677(7)(I).  Here, the Commission found that a [ # ] percentage

point decline in subject import market share in interim 2022, the post-petition

period, compared to interim 2021 was related to the pendency of the investigations.

The Commission found a marked decrease in the intensity of subject import

competition for market share in this interim 2022 post-petition period relative to

the preceding full-year 2021, when subject import market share had increased

[ # ] percentage points relative to full year 2020, and that this decrease in the

intensity of subject import competition in the interim 2022 post-petition period had

coincided with Commerce's preliminary antidumping duty determinations with

respect to Argentina and Mexico and final antidumping duty determination with

respect to Russia. Appx213.  The Commission thus determined to attach relatively

less weight to interim 2022 market share data in reaching its volume findings.

Appx213.

Although Appellants argue that post-petition effects provision limits the

Commission's analysis of such effects to subject import volume in absolute terms,

Appellants' claim is without basis.  First, the Commission's construction of the

statute is consistent with its plain meaning, where the statute directs the

Commission to consider "whether any change in the volume . . . of {subject

imports} . . . since the filing of the petition . . . is related to the pendency of the investigation . . . ." 19 U.S.C. § 1677(7)(I). Here, the Commission's reliance on the decline in the volume of subject imports relative to apparent U.S. consumption is plainly a "change in the volume . . . of {subject imports}" and is consistent with the definition of "{v}olume" under 19 U.S.C. § 1677(7)(C)(i) as encompassing subject import volume "in absolute terms" and subject import volume "relative to . . . consumption in the United States {*i.e.*, subject import market share}." Had Congress intended to limit the Commission's analysis of post-petition effects to subject import volume in absolute terms alone, as Appellants argue (TnBr. at 46-47), the statute would specifically reference "volume in absolute terms" instead of the broader statutory concept of "volume." As the CIT correctly held, "19 U.S.C. § 1677(7)(I) only mentions 'volume' and does not have any restrictions or limitations" and thus the Commission may discount post-petition data based on the "volume of imports in absolute terms or relative to production or consumption." Appx045.

Further support for this interpretation is found in the SAA's authoritative expression on the interpretation and application of 19 U.S.C. § 1677(7)(I), which approvingly cites to *Metallverken Nederland B.V. v. United States*, 744 F. Supp. 281, 284 (Ct. Int'l Trade 1990), as an example of how the pendency of an investigation can "distort{} post-petition data compiled by the Commission." *See*

SAA, H.R. Doc. No. 103-316, vol. I, at 853-54. In that case, the CIT sustained

Commissioner Rohr's determination to "temper{} his reliance" on post-petition

data based on his assessment that the post-petition decline in subject import

"market penetration {*i.e.*, market share}" was "attributable to the agency

proceedings." *Metallverken*, 744 F. Supp. at 283-84. The SAA's approving citation

to this case confirms that the Commission's determination to discount post-petition

information based on a decline in subject import market share was consistent with

19 U.S.C. § 1677(7)(I).

Appellants' narrow interpretation of the post-petition effects provision is not

only contrary to the plain text of the provision and the SAA, but would also

frustrate the purpose of the provision. If, as Appellants claim, the Commission is

disallowed under 19 U.S.C. § 1677(7)(I) from considering if declines in subject

import market share are related to the pendency of investigations, then this would

hinder the Commission's ability to consider whether the proceedings have

"create{d} an artificially low demand for subject imports, thereby distorting post-

petition data compiled by the Commission." *See* SAA, H.R. Doc. No. 103-316,

vol. I, at 854. Artificially low demand for subject imports would be reflected by

lower market share.

Nor is it the "Commission's practice" to evaluate only absolute volumes in

its analysis of post-petition information, as Appellants suggest. TnBr. at 46-47. The

Commission has discounted post-petition data where it found subject import market share changes were related to the pendency of the investigations. *See*, *e.g.*, *Certain Magnesia Carbon Bricks from China and Mexico*, Inv. Nos. 701-TA-468 and 731-TA-1166-1167 (Final), USITC Pub. 4182 at 17 n.138 (Sep. 2010) (finding that "the filing of the petitions had an effect on the subject imports' *market share* in this investigation" and accordingly reducing the weight accorded to post-petition data pursuant to 19 U.S.C. § 1677(7)(I)) (emphasis added).

Moreover, Tenaris's citation to Commissioner Kearns' and Commissioner Schmidtlein's comments at the hearing are unavailing. TnBr. at 47. Comments or questions by Commissioners during a hearing represent part of the deliberative process; they do not constitute the position of the Commission or even the individual Commissioner. Nonetheless, neither Commissioner stated that the post-petition information provision disallows the Commission from discounting post-petition market share changes related to the pendency of an investigation. *See* Appx33714-33715. In fact, both Commissioners did so in the Commission's unanimous opinion. Appx213.

Similarly unpersuasive is Appellants' argument that the Commission somehow failed to address the *increase* in subject import volume in absolute terms in interim 2022 relative to interim 2021 as part of its assessment of post-petition information. TnBr. at 48 (citing *Chemours Co. FC v. United States*, 443 F. Supp.

3d 1315, 1329 (Ct. Int'l Trade 2020)).[9] The Commission did consider Tenaris's

argument concerning the absolute increase in subject import volume in interim

2022 compared to interim 2021, as Appellants concede, *id.*, but reasonably

explained that the [ **#** ] percentage point decline in subject import market share

in interim 2022 compared to 2021 was related to the pendency of the

investigations. Appx213. The SAA clearly indicates that under the post-petition

information provision, the Commission is meant to consider whether the pendency

of investigations has "create{d} an artificially low demand for subject imports,

thereby distorting post-petition data compiled by the Commission" – such as the

reduction in subject import volume relative to apparent U.S. consumption that

occurred here. SAA, H.R. Doc. No. 103-316, vol. I, at 854.

Nor was the Commission's analysis of post-petition information here bound

by its analysis in past cases in which the Commission declined to discount post-

petition data based on trends in the absolute volume of subject imports or domestic

prices, as Appellants mistakenly claim. TnBr. at 48-50. As this Court has

recognized, because each Commission investigation is *sui generis*, prior

---

[9] Appellants' reliance on *Chemours* (TnBr. at 48) is misplaced. *Chemours* considered whether the Commission's assessment of a post-petition change in price, not volume, was related to the pendency of the investigation. 443 F. Supp. 3d at 1315. It is therefore irrelevant to Appellants' volume-specific arguments.

determinations are not "legally binding" on later determinations and provide "little

guidance" to the Commission in making them. *Mexichem Fluor Inc. v. United*

*States*, 179 F. Supp. 3d 1238, 1255 (Ct. Int'l Trade 2016). *See also U.S. Steel*

*Corp. v. United States*, 637 F. Supp. 2d 1199, 1218 (2009), *aff'd*, 621 F.3d 1351

(Fed. Cir. 2010); *Nucor*, 414 F.3d at 1340; *Cleo*, 501 F.3d at 1299. Moreover,

none of the prior determinations Appellants cite are analogous to the facts at issue

here. Unlike the cases in which the Commission found no significant post-petition

decline in subject import volume, the Commission here reasonably explained that

the [ # ] percentage point decline in subject import market share in interim 2022

compared to interim 2021 was related to the pendency of the investigations.

Appx213 (n.184). Unlike the cases in which the Commission found that post-

petition improvements in the domestic industry's performance or prices were

explained by improved demand or a continuation of pre-petition trends, the

Commission here explained that the post-petition decline in subject import market

share <u>reversed</u> the trend that prevailed before the petitions, when subject imports

gained [ # ] percentage points of market share from 2020 to 2021 despite a

smaller increase in apparent U.S. consumption over the same period (32.2 percent)

than in interim 2022 compared to interim 2021 (70.6 percent). Appx227-228.

**IV. The Commission's Impact Finding Is Supported by Substantial Evidence and in Accordance with Law**

    **A. The Commission Reasonably Determined that Cumulated Subject Imports Had a Significant Impact on the Domestic Industry**

The Commission reasonably determined that cumulated subject imports had a significant impact on the domestic industry during the POI. Although the Commission found that the performance of the domestic industry weakened significantly from 2019 to 2020 because of declining demand, due in part to the effects of the COVID-19 pandemic, the Commission reasonably found that the industry's performance remained weak in 2021, despite increased demand, due to cumulated subject imports. Appx222-223. Specifically, as apparent U.S. consumption increased by 32.2 percent from 2020 to 2021, the Commission explained, "the domestic industry's performance showed little if any improvement {in 2021}, as cumulated subject imports captured market share from the industry and prevented it from fully capitalizing on the strong recovery in demand." Appx223. Notably, between 2020 and 2021, the domestic industry's capacity, capacity utilization, employment, and hours worked all remained nearly flat, and its capital expenditures and research and development expenses decreased. Appx227; Appx34264-34265. Similarly, notwithstanding the strong demand recovery in 2021, the domestic industry still incurred operating losses and a negative ratio of

operating income to net sales that year, the Commission found. Appx226;

Appx34143.

Based on the foregoing, the Commission reasonably found a causal nexus

between cumulated subject imports and the industry's weak performance in 2021.

Appx227. Cumulated subject import volume and market share increased

significantly from 2020 to 2021, driven by significant underselling, capturing 12.0

percentage points of market share from the industry during the period, the

Commission found. Appx227. Consequently, the Commission observed, the

industry produced less, employed fewer workers, and performed worse financially

than would have been expected, given the strong recovery in demand. Appx227.

As further confirmation of the causal nexus between subject imports and the

domestic industry's injury, the Commission found that the domestic industry's

performance markedly improved after the filing of the petitions in interim 2022, as

subject imports competed less aggressively and lost [ # ] percentage points of

market share compared to interim 2021. Appx227-228; Appx34263-34265.

Consequently, the Commission explained, the domestic industry was able to more

fully capitalize on the growth in demand in interim 2022 compared to interim

2021, and improved its performance by nearly every measure between the interim

periods. Appx227-228.

Because the Commission's impact analysis is reasonable and supported by substantial evidence, the Court should affirm it.

**B.    The Commission Reasonably Considered the Relevant Conditions of Competition in Its Analysis**

Consistent with its statutory mandate, the Commission evaluated the impact of subject imports "within the context of the . . . conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). Specifically, the Commission explained that factors other than cumulated subject imports, including the conditions of competition argued by Tenaris, did not account for the injury to the domestic industry it had attributed to cumulated subject imports, ensuring that it did not attribute injury from these other factors to subject imports. Appx222-223; Appx228-232; SAA, H.R. Doc. No. 103-316, vol. I, at 851-52.

Appellants mistakenly argue that the Commission violated the statute by discussing the relevant conditions of competition in an earlier section of its opinion rather than repeating that discussion within the impact section. TnBr. at 36. This claim is without merit.  After setting out the relevant conditions of competition at the outset of its analysis, Appx205-212, the Commission further analyzed each of these conditions in the impact section, explaining its affirmative injury finding in light of them. Appx232. In particular, the Commission addressed, among other things, demand trends, which were affected by both the Russia-Saudi oil supply

war and COVID-19 pandemic; supply constraints, such as those related to inventory overhead, increasing HRC prices, and labor shortages; and Tenaris's role in the U.S. industry and intra-industry competition. Appx222-223; Appx228-232. As further discussed below, the Commission reasonably explained how each of the conditions of competition argued by Appellants was consistent with its affirmative determinations. The Court should reject Appellants' invitation to reweigh this evidence.

### 1. Appellants' Demand Argument Is Unsupported

Contrary to Appellants' arguments, the Commission considered the Russia/Saudi oil price war and the COVID-19 pandemic. Appx205-207; Appx222-223. In arguing that the Commission overlooked the Russia/Saudi oil price war, TnBr. at 36-37, Appellants appear to misapprehend that the Commission comprehensively addressed the effects of *all* factors on U.S. OCTG demand during the POI. To do so, the Commission considered trends in apparent U.S. consumption, the active U.S. rig count, and U.S. oil and gas prices. Appx205-206. The Commission found that OCTG demand had declined from January 2019 through August 2020 according to all three measures, with the active U.S. rig count decreasing to "an historic low," Appx205, and that Petitioners and Tenaris attributed the declines to the COVID-19 pandemic. In impact, the Commission found that the decline in domestic industry performance from 2019 to 2020 was

consistent with the decrease in demand during the period. Appx223. Accordingly, the Commission addressed any effect the "Russia/Saudi price war" and COVID-19 pandemic had on OCTG demand.

Appellants' reliance on other Commission investigations in its examination of the effects of the COVID-19 pandemic is misplaced. TnBr. at 37. As an initial matter, as this Court has recognized, "each injury investigation is *sui generis,* involving a unique combination and interaction of many economic variables." *Nucor*, 414 F.3d at 1340; *Cleo*, 501 F.3d at 1299. Accordingly, Tenaris's reliance on other Commission investigations is inapposite. Nonetheless, unlike in *Nails* and *Emulsion Styrene-Butadiene Rubber*, cited by Tenaris, in which the Commission reached negative determinations based in part on domestic supply constraints caused by the COVID-19 pandemic, the Commission here found that domestic supply constraints could not explain the industry's loss of market share to subject imports and consequent injury, as discussed below. *Compare Steel Nails from India, Oman, Sri Lanka, and Turkey*, Inv. Nos. 701-TA-673-675 and 677 (Final), USITC Pub. 5370 at 56 (Oct. 2022), *and Emulsion Styrene-Butadiene Rubber from Czechia and Russia,* Inv. Nos. 731-TA-1575 and 731-TA-1577 (Final), USITC Pub. 5392 at 40 (Jan. 2023) *with* Appx229.

## 2. Appellants' Supply Arguments Are Without Merit

Appellants' arguments that several supply conditions, including alleged domestic supply constraints, inventory overhangs, HRC prices, and labor shortages, constrained domestic supplies of OCTG and drew subject imports into the U.S. market were considered and reasonably rejected by the Commission. TnBr. at 38-42. As the Commission explained, the record did not indicate that these constraints could account for the industry's loss of market share to these imports and consequent injury.

First, the Commission reasonably found that the record did not support Tenaris's argument that domestic industry supply constraints drew subject imports into the U.S. market. The Commission explained, for example, that a large majority of purchasers rated the availability of domestically produced OCTG as superior or comparable to subject imports from each source. Appx229; Appx33992-33993. Further, the Commission explained, the domestic industry reported substantial unused capacity throughout the POI, including in 2021. Appx229; Appx34027. The Commission also found that subject imports drawn into the U.S. market by short supplies of domestic OCTG would be expected to command higher prices, but the record showed predominant underselling by subject imports in 2021. Appx229. Thus, the Commission reasonably found that the record evidence did not support

Tenaris's view that domestic industry supply constraints drew subject imports into the U.S. market.

Second, regarding Appellants' specific "inventory overhang" supply constraint argument (TnBr. at 38-39), the Commission reasonably found that inventories held by distributors had not significantly inhibited the ability of domestic producers to ramp up production at the time of the market share shift from the domestic industry to cumulated subject imports in 2021. Appx229-231. Rather than "downplay{ing} this buildup" (TnBr. at 38-39), the Commission explained that even Tenaris's preferred [ source ] inventory data showed that any alleged inventory "bulge" by distributors was largely worked down by the end of 2020. Appx230. The Commission also found Tenaris's argument contradicted by inventory data from [ source ], showing relatively constant monthly inventories from January 2019 to March 2021, while cumulated subject import volume increased 135.6 percent from 2020 to 2021, as subject imports captured market share from the domestic industry. Appx230-231. Thus, the Commission reasonably concluded that inventories could not account for the market share shift and the corresponding impact on the domestic industry.

Third, the Commission considered the effect of rising HRC prices on welded OCTG production in 2021, Appx232, contrary to Appellants' claim that it failed to do so. TnBr. at 39-40. The Commission explained that even if rising HRC prices

reduced the supply of welded OCTG, domestic seamless OCTG producers, which used billets rather than HRC, were unaffected by the rising HRC prices and had significant unused capacity to serve increased demand in 2021. Appx232; Appx33953; Appx34022. This was not "speculation," but a conclusion supported by the record evidence indicating domestic seamless OCTG producers' low [ # ] percent rate of capacity utilization and the interchangeability of seamless OCTG for welded OCTG. Indeed, the record showed that the share of domestic production by seamless producers rose sharply from 2020 to 2021, confirming the Commission's reasoning. Appx34022.

Fourth, Appellants' labor shortage argument is no more persuasive. Contrary to Appellant's argument that the Commission somehow dismissed Tenaris's arguments and evidence of labor constraints, TnBr. at 41, the Commission specifically cited parts of Tenaris's Prehearing Brief in considering the issue. Appx232. In finding that labor shortages did not significantly constrain domestic production, the Commission explained that responding domestic producers and industry witnesses at the hearing indicated that they were capable of hiring as warranted by demand. Appx232; Appx33661-33662. Appellants' characterization of this sworn hearing testimony as "unsubstantiated assertions" (TnBr. at 41-42) ignores the Commission's discretion to assess the weight to accord witness testimony. *See Nippon Steel*, 458 F.3d at 1356 ("The assessment of the proper

56

weight to accord to testimony is within the role of the Commission, not this court

and not the Court of International Trade."). Further, the Commission found this

testimony consistent with the 48.2 percent increase in industry employment in

interim 2022, "after the filing of the petitions caused subject imports to compete

less aggressively in the U.S. market." Appx232; Appx34039. Indeed, Tenaris itself

reported that it was able to increase its employment by [ # ] percent from 2020

to 2021, and its employment was [ # ] percent higher in interim 2022 than

interim 2021. Appx34040.

Appellants also unpersuasively argue that the Commission failed to consider

OCTG inventory "in combination" with HRC prices and labor shortage factors.

TnBr. at 35-36.[10] As discussed above, however, the Commission considered each

of these factors and reasonably explained that they could not account for the

market share shift from the domestic industry to cumulated subject imports and the

resulting significant impact on the industry. Given the foregoing, it is unclear how

Appellants would have the Commission reevaluate these factors "in combination"

or how Appellants' proposed course of action would alter the Commission's

analysis.

---

[10] We note that Appellants failed to raise any argument concerning the
"combination" of these factors before the CIT, and therefore, these claims should
be deemed waived. *See Fresenius*, 582 F.3d at 1296.

Finally, Appellants' claim that the Commission "failed to consider the whole record" in its examination of declining demand earlier in the POI and alleged supply constraints later in the POI overlooks that the Commission thoroughly considered both conditions of competition. TnBr. at 35-36. As discussed above, the Commission acknowledged that declining demand from 2019 to 2020 accounted for the domestic industry's declining performance in 2020. Appx222-223. As apparent U.S. consumption increased 32.2 percent from 2020 to 2021, however, the Commission found that the factors argued by Tenaris, including alleged domestic supply constraints, inventories, HRC prices, and labor shortages, could not explain the [ # ] percentage point shift in market share from the domestic industry to subject imports that prevented the industry from fully capitalizing on this demand growth. Appx229-231. Thus, contrary to Appellants' argument, the Commission reasonably evaluated these factors across the entire POI and determined that they did not explain the significant impact of cumulated subject imports on the domestic industry. Appx222-223; Appx229.

### 3. Appellants' Claims Regarding Foreign Investment and Intra-Industry Competition Lack Merit

Appellants argue that the Commission failed to address Tenaris's argument that the largest U.S. OCTG producer had no incentive to harm its U.S. investments or the domestic industry, citing what it characterizes as the Commission's finding to that effect in *Oil Country Tubular Goods from Argentina, Italy, Japan, Korea,*

*and Mexico*, Inv. Nos. 731-TA-711 and 713-716 (Second Review), USITC Pub.

3923 (June 2007) ("*OCTG Second Review*"),[11] and that the Commission failed to

address the claim that intra-industry competition explained any adverse impact on

the domestic industry. TnBr. at 42-43; Appx062.  These claims do not withstand

scrutiny.

First, contrary to Appellants' claim that Tenaris would have managed its

own imports so as not to injure its own U.S. investments, which the Commission

considered in the context of its related parties analysis (Appx191), the Commission

found that the significant increase in cumulated subject import volume from 2020

to 2021, driven by underselling, captured market share from the domestic industry

and prevented the industry from fully capitalizing on strong demand growth.

---

[11] We again note that because each Commission investigation is *sui generis*,
prior determinations are not "legally binding" on later determinations and provide
"little guidance" to the Commission in making them. *Mexichem Fluor*, 179 F.
Supp. 3d at 1255. In the 2007 *OCTG Second Review*, the Commission cumulated
subject imports from Argentina, Italy, and Mexico and considered subject imports
from South Korea and Japan separately. In examining the likely impact of
cumulated subject imports, the Commission found that the domestic industry was
not in a vulnerable condition and that any adverse impact of subject imports on the
domestic industry would be mitigated by strong demand, Tenaris being responsible
for essentially all production of subject merchandise in Argentina, Italy, and
Mexico. *OCTG Second Review* at 28, 35-36, IV-11, IV-14, IV-23. Here, by
contrast, Tenaris was responsible for subject merchandise from only two of the
four cumulated subject countries and accounted for only [ **#** ] percent of
cumulated subject imports. Appx34034; Appx34263. Accordingly, *OCTG Second
Review* is distinguishable from the present case.

Indeed, even accepting Appellants' claim *arguendo*, Appellants overlook that

Tenaris's investments in its own U.S. OCTG production would not have prevented

it from importing OCTG in a manner injurious to the many other *unrelated* U.S.

producers with which it was competing – Appx34007 (Table III-1) – thereby

injuring the domestic industry *as a whole*. Nor would Tenaris's control of [ ▌

amount ] of cumulated subject imports have prevented the [ amount ] of

cumulated subject imports outside its control from injuring the domestic industry,

including Tenaris.

Second, the Commission found that intra-industry competition could not

explain the domestic industry's loss of market share because the domestic industry

cannot lose market share to itself. Appx232.

Based on the record of these investigations, the Commission reasonably

concluded that cumulated subject imports, including subject imports from Tenaris

affiliates, materially injured the domestic industry as a whole.

### 4.    Appellants' Other Arguments Lack Merit

Appellants argue that certain marginal improvements to the domestic

industry's performance from 2020 to 2021 and other more notable improvements

in interim 2022 compared to interim 2021 undermine the casual nexus between

subject imports and the domestic industry's injury. TnBr. at 43-44. This clam is

mistaken. Although the Commission recognized that the domestic industry's

production and net sales increased from 2020 to 2021, as Appellants emphasize, the Commission reasonably attached more weight to the fact that most other measures of the industry's performance, including capacity, capacity utilization, employment, and hours worked, showed little or no improvement despite the 32.2 percent increase in apparent U.S. consumption, and the industry's capital expenditures and research and development expenses decreased. Appx227; Appx34263-34265. Moreover, the domestic industry continued to experience operating losses and a negative ratio of operating income to net sales in 2021. Appx226; Appx34143 (VI-1).

Nor does the Commission dispute that the domestic industry's performance markedly improved in interim 2022 compared to interim 2021. In fact, the Commission relied upon the industry's improved performance during this period as support for its finding that subject imports adversely impacted the industry from 2020 to 2021, noting that the industry's improved performance in interim 2022 resulted from subject imports competing less aggressively and losing market share after the filing of the petitions. Appx227-228; Appx34263-34265.

Appellants' claim that the Commission "improperly accorded less weight to post-petition data confirming the positive state of the domestic industry" is simply false. TnBr. at 45-46. While discounting post-petition subject import market share data for purposes of its volume analysis, the Commission expressly considered

post-petition data, covering interim 2022, for purposes of its impact analysis. Appx223-228. Moreover, the Commission found interim 2022 data instructive and supportive of its finding of a casual nexus. Appx227-228.

Similarly unpersuasive is Appellants' argument that the domestic industry's improved performance in interim 2022 somehow mandated negative determinations. TnBr. at 43-45. As an initial matter, the Commission "may not determine that there is no material injury . . . to an industry in the United States merely because . . . the performance of that industry has recently improved." 19 U.S.C. § 1677(7)(J). Furthermore, the Commission did not "arbitrarily switch{} its causation rationale," as Appellants contend. *Id.* at 44-45. To the contrary, the Commission's finding that increased volumes of low-priced subject imports captured market share from the domestic industry from 2020 to 2021, preventing the industry from capitalizing on increased demand, was consistent with its finding that the domestic industry's performance improved in interim 2022 compared to interim 2021, after the filing of the petitions caused subject imports to compete less aggressively and lose market share. Appx227-228. The Court should reject Appellants' invitation to reweigh this evidence.

Nor did the Commission ignore that subject import volume in absolute terms was higher in interim 2022 than in 2021, as Appellants argue. TnBr. at 45-47. As discussed in section III above, the Commission recognized that subject import

volume increased between the interim periods. Nevertheless, the Commission

reasonably found that the more relevant information for assessing the casual

relationship between subject imports and the domestic industry was that subject

imports lost [ # ] percentage points of market share over the period, enabling the

domestic industry to more fully capitalize on the 70.6 percent increase in apparent

U.S. consumption. Appx227-228.

Appellants' attempt to recast the Commission's approach as a "presumption

of causation" (TnBr. at 50) ignores the Commission's explanation for how the

domestic industry's improved performance in interim 2022, after the filing of the

petitions, supported its causation finding. Appx227-228. Moreover, because

Appellants' "presumption of causation" argument is a new untimely argument that

was not raised in its opening brief before the CIT, *compare* Appx38926-38927

*with* TnBr. at 50, the argument should be considered waived. *See Fresenius*, 582

F.3d at 1296.

Similarly unavailing are Appellants' citations to prior determinations for the

proposition that improvements in industry performance across the interim periods

support a finding of no adverse impact. TnBr. at 50. Apart from the *sui generis*

nature of Commission determinations, in each of the cited cases, the Commission

found that improvements across the interim periods supported a negative injury

finding because they reflect a "lack of correlation" between subject imports and the

63

domestic industry's performance. *See Certain Aluminum Plate from South Africa*, Inv. No. 731-TA-1056 (Final), USITC Pub. 3734 at 31 (Nov. 2004). That was not the case here, as the Commission found that improvements between the interim periods, resulting from the filing of the petitions, confirmed such a correlation. Appx227-228.

Finally, the CIT did not "uncritically accept" Petitioner's causation theory in sustaining the Commission's injury determinations. TnBr. at 51. Rather, the CIT found that substantial evidence supported the Commission's finding of a casual nexus between subject imports and the domestic industry's performance and rejection of the alternative causes of injury argued by Appellants. Appx057-064. For the reasons discussed above, this Court, like the CIT, should affirm the Commission's impact analysis and affirmative determinations.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court affirm the Commission's remand determinations.

Respectfully submitted,

MARGARET D. MACDONALD
General Counsel

KARL VON SCHRILTZ
Assistant General Counsel for
Litigation

/s/  Madeline R. Heeren
MADELINE R. HEEREN
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, S.W.
Washington, DC 20436
Tel: (202) 708-1529
Fax: (202) 205-3111
madeline.heeren@usitc.gov

*Counsel for Defendant-Appellee*
*United States*

Dated: January 30, 2026

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE, AND TYPE STYLE REQUIREMENTS**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Federal Circuit Rule 32(b)(3), I hereby certify that the attached brief complies with the type-volume limitation and typeface requirements of Federal Rule of Appellate Procedure 32(a)(7) and Federal Circuit Rules 32(b)(1) and 32(b)(2). The brief has been prepared in a proportionally spaced typeface using Microsoft Office 365, in Times New Roman 14-point font. The brief contains a total of **13,817** words, obtained from the word-count function of the word-processing system, including all footnotes and citations.

/s/ Madeline R. Heeren
Madeline R. Heeren
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, S.W.
Washington, DC 20436
Tel: (202) 708-1529
Fax: (202) 205-3111
Email: madeline.heeren@usitc.gov

*Counsel for Defendant-Appellant
United States*

Dated: January 30, 2026

**CERTIFICATE OF COMPLIANCE FOR BRIEF
CONTAINING MATERIAL SUBJECT TO PROTECTIVE ORDER**

This brief complies with the limitations on confidential material as set forth in

Fed. Cir. R. 25.1(d)(1). This brief contains **21** unique words (including numbers)

marked as confidential, not including those words marked as confidential in

Plaintiffs-Appellants opening briefs, which does not exceed the maximum words

permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28

U.S.C. § 1491(b). All such confidential material has been properly identified with

required bracketing, page headers, and labeled redactions (in the nonconfidential

version of the brief).

/s/ Madeline R. Heeren
Madeline R. Heeren
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, S.W.
Washington, DC 20436
Tel: (202) 708-1529
Fax: (202) 205-3111
Email: madeline.heeren@usitc.gov

*Counsel for Defendant-Appellant
United States*

Dated: January 30, 2026

## CERTIFICATE OF SERVICE

I, Madeline R. Heeren, hereby certify on this 30th day of January 2026, that

I have caused the foregoing **NONCONFIDENTIAL RESPONSE BRIEF OF**

**DEFENDANT-APPELLEE UNITED STATES** to be filed via the Court's

CM/ECF system, which shall effect service of the brief on counsel of record.

*/s/ Madeline R. Heeren*
Madeline R. Heeren
U.S. International Trade Commission
500 E Street, S.W.
Washington, DC 20436
Telephone (202) 205-3096
Fax (202) 708-1529
madeline.heeren@usitc.gov