2025-2034

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP., SIDERCA S.A.I.C., TUBOS DE ACERO DE MEXICO, S.A.,

Plaintiffs-Appellants

TMK GROUP,

Plaintiff

v.

UNITED STATES, UNITED STATES STEEL CORPORATION, BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, WELDED TUBE USA INC.,

Defendants-Appellees.

---

Appeal from the United States Court of International Trade
in Case Nos. 1:22-cv-00344-JCG, 1:22-cv-00346-JCG, 1:23-cv-00002-JCG
Judge Jennifer Choe-Groves

---

**NON-CONFIDENTIAL VERSION**

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS
TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO
TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP.,
SIDERCA S.A.I.C., TUBOS DE ACERO DE MEXICO, S.A.**

Frank J. Schweitzer
Gregory J. Spak
Kristina Zissis
Matthew W. Solomon
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs-Appellants
Tenaris Bay City, Inc., Maverick Tube

March 6, 2026

Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corp., Siderca S.A.I.C., Tubos de Acero de Mexico, S.A.

# TABLE OF CONTENTS

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted on pages 21 and 23 describes the data collected by the U.S. International Trade Commission ("Commission"), or submitted by parties to the underlying investigation, relating to the market conditions, demand trends, and inventory levels during the period of investigation.

INTRODUCTION ..................................................................................1

SUMMARY OF REPLY ........................................................................1

ARGUMENT ........................................................................................5

I.    Tenaris did not abandon its argument that the Commission's interpretation of the term "compete with" is inconsistent with 19 U.S.C. § 1677(7)(G)(i) ..............................................................5

    A.    Like the CIT, the Government and Petitioners also erroneously conflate the POI with the timeframe (beyond the POI and up to and including vote day) that the Commission should consider relevant information to carry out its statutory mandate ..........................................................................5

    B.    The plain meaning of the term "compete with" requires the Commission to consider information beyond the POI....................9

II.    The Commission's interpretation of "significant" is contrary to its plain meaning and the finding of significant import volume is unsupported by substantial evidence.........................................14

i

A. Assessing whether subject import volume is "significant" requires consideration of the market context ................................ 14

B. The market context confirmed that domestic producers could not meet the demand for OCTG and that imports were needed ........................................................................................ 17

III. The Commission failed to evaluate causation and impact in the context of the conditions of competition distinctive to the OCTG industry ............................................................................................. 19

A. Describing certain conditions separately in isolation does not satisfy the statutory mandate to evaluate causation and impact in the context of conditions of competition distinctive to the domestic industry ........................................................... 19

B. The historic collapse of OCTG demand harmed the domestic industry ............................................................................. 20

C. Supply constraints prevented domestic producers from meeting the rapidly rising demand in the wake of the historic collapse .............................................................................. 22

IV. The domestic industry was already recovering before the petitions were filed and the data for first half of 2022 confirmed domestic industry's full recovery ............................................................... 26

A. The statute does not permit the Commission to discount post-petition data based on market share ................................ 26

B. The Commission's practice does not justify selectively discounting the post-petition data that severed the causal nexus ................................................................................. 28

C. The Commission arbitrarily switched its causation analysis when an increase in subject import volume accompanied the domestic industry's recovery ......................................... 29

CONCLUSION AND RELIEF SOUGHT ............................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams v. United States*,
  59 F.4th 1349 (Fed. Cir. 2023) ....................................................6

*Altx, Inc. v. United States*,
  26 C.I.T. 709 (2002) ...........................................................16, 17

*Altx, Inc. v. United States*,
  167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) ..........................21, 22, 26, 29

*Altx, Inc. v. United States*,
  370 F.3d 1108 (Fed. Cir. 2004) .................................................16

*CamelBak Prods., LLC v. United States*,
  649 F.3d 1361 (Fed. Cir. 2011) ..................................................8

*Chaparral Steel Co. v. United States*,
  901 F.2d 1097 (Fed. Cir. 1990) .................................................13

*Chemours Co. FC, LLC v. United States*,
  443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) ...............................30

*Chr. Bjelland Seafoods A/S v. United States*,
  19 C.I.T. 35 (1995) ...............................................................13

*Heinzelman v. Sec'y of HHS*,
  681 F.3d 1374 (Fed. Cir. 2012) .................................................15

*Hynix Semiconductor, Inc. v. United States*,
  431 F. Supp. 2d 1302 (Ct. Int'l Trade 2006) ...............................22

*In re Walter*,
  698 Fed. Appx. 1022 (Fed. Cir. 2017) ..........................................6

*Interactive Gift Express, Inc. v. CompuServe Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001) .................................................15

*Metallverken Nederland B.V. v. United States*,
  744 F. Supp. 281 (Ct. Int'l Trade 1990) ...............................27, 28

*Nucor Corp. v. United States,*
    318 F. Supp. 2d 1207 (Ct. Int'l Trade 2004) ................................................14

*OCP S.A. v. United States,*
    658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) ......................................passim

*Par. Pharm., Inc. v. Eagle Pharms., Inc.,*
    44 F.4th 1379 (Fed. Cir. 2022) ......................................................................8

*Sneed v. Shinseki,*
    737 F.3d 719 (Fed. Cir. 2013) .....................................................................15

*Tenaris Bay City, Inc. et al. v. United States,*
    698 F. Supp. 3d 1287 (Ct. Int'l Trade 2024) .................................................9

*Tenaris Bay City, Inc. et al. v. United States,*
    789 F. Supp. 3d 1352 (Ct. Int'l Trade 2025) ......................................6, 8, 16

*United States v. Nordic Vill., Inc.,*
    503 U.S. 30 (1992) .......................................................................................15

*United States v. Olano,*
    507 U.S. 725 (1993) .......................................................................................6

*United States v. United States Gypsum Co.,*
    333 U.S. 364 (1948) .......................................................................................8

*Usinor v. United States,*
    26 C.I.T. 767 (Ct. Int'l Trade 2002) .............................................12, 13, 31

## STATUTES AND REGULATIONS

19 U.S.C. § 1677(7)(C)(i) ..........................................................................2, 14, 27

19 U.S.C. § 1677(7)(G)(i).................................................................................passim

19 U.S.C. § 1677(7)(G)(i)(I) ...............................................................................11

19 U.S.C. § 1677(7)(G)(i)(II) ..............................................................................11

19 U.S.C. § 1677(7)(G)(i)(III) .............................................................................11

19 U.S.C. § 1677(7)(I) .....................................................................................26, 27

19 U.S.C. § 1677m(g) ............................................................................12

**ADMINISTRATIVE DETERMINATIONS**

*Brass Rod from India*,
 Inv. No. 701-TA-686 (Final), USITC Pub. 5485 (Feb. 2024) ....................12

*Tin Mill Products from Canada, China, Germany, Netherlands, South Korea,
 Taiwan, Turkey, and United Kingdom*,
 Inv. Nos. 701-TA-685 and 731-TA-1599-1606 (Preliminary), USITC Pub.
 5413 (March 2023) ................................................................................12

**LEGISLATIVE MATERIALS**

Statement of Administrative Action to the Uruguay Round Agreements Act,
 H.R. REP. NO. 103-316, vol. 1 (1994) ...................................................passim

# INTRODUCTION

Plaintiffs-Appellants, Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation (collectively "Tenaris USA"), Siderca S.A.I.C., and Tubos de Acero de Mexico, S.A. (collectively, "Plaintiffs-Appellants" or "Tenaris") reply to the *Response Brief of Defendant-Appellee, United States* (CM/ECF Docs. 27-28) ("U.S.Br.") and the *Response Brief of Defendants-Appellees United States Steel Corporation, Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA Inc*. (CM/ECF Docs. 32-33) ("PetitionersBr.").

# SUMMARY OF REPLY

This appeal does not, as the Government and Petitioners contend, ask this Court to "reweigh evidence." Extraordinary economic conditions during 2020 stemming from oil supply wars and a global pandemic deeply impacted the U.S. industry that supplies steel pipe for drilling wells and extracting oil. Those conditions of competition caused mill closures, production curtailments, and layoffs that affected output, shipments, and inventories. Soon after the collapse, however, the market began to recover with demand dramatically rising during 2021. But a convergence of market supply constraints acting together prevented domestic

producers from meeting the growing demand. The record showed (1) large inventory buildups that needed to be drawn down before new orders could be placed, (2) rapidly rising prices for the primary input for welded oil country tubular goods ("OCTG") (with the input price exceeding at times the final product price), and (3) labor shortages. These constraints prevented domestic producers from ramping up production to meet demand.

But the Commission did not follow its statutory mandate. Instead, the Commission separately set out market conditions of competition in isolation and then largely ignored their impact on the U.S. OCTG industry. OCTG shortages confirmed that imports were needed to meet increasing demand. The Commission mechanically measured subject import volume without regard to the market context, however, and found subject import volume to be "significant" without giving meaning to that statutory term. But each word in a statute must be given meaning. Plain meaning confirms that assessing whether subject import volume is "significant" – as required by 19 U.S.C. § 1677(7)(C)(i) – is a contextual exercise. An occurrence is "significant" when it is "caused by something other than mere chance." Yet, the Government and Petitioners urge this Court not to open the dictionary. The baseless claims of "deemed waiver" should be rejected. Indeed, whether subject import volume was "significant" has been central to this litigation since its inception.

Consistent with the dictionary definition, the courts too have confirmed that the "touchstone" of the volume inquiry is "significance." The Commission must consider whether products are "practically unavailable from U.S. sources" and the Commission must consider "actual limitations" in assessing whether subject import volume is significant. The courts also recognize that subject import volume may not be "significant" if the imported quantities fill demand that the domestic industry is unable to meet "either because of incapability or lack of viability." Indeed, the Government recognizes this case law and these principles in its brief.

Here, the evidence demonstrated (1) OCTG shortages in the market, (2) that domestic producers could not meet the rising demand, and (3) that imports were needed. The Commission did not consider any market context in its three-paragraph summary (of a more than 50-page decision) of fluctuations in absolute and relative volumes during the period of investigation ("POI") to reach its conclusion that subject import volume was "significant." Simply recording volume figures, however, reflects neither analysis of the market context of "actual limitations" on U.S. producers nor whether imported quantities fill demand that the domestic industry is unable to meet "either because of incapability or lack of viability."

The Commission also failed to give the term "compete with" in 19 U.S.C. § 1677(7)(G)(i) its plain meaning when considering the effect of import restrictions imposed in response to Russia's invasion of Ukraine in early 2022. These

circumstances warranted review of post-POI information as close as possible to vote day to assess reasonable overlap of competition. Subject imports from Russia competed differently in the market and should not have been cumulated. And Tenaris did not "abandon" its argument that the Commission did not properly interpret the statute and the meaning of the phrase "compete with" in its assessment of reasonable overlap of competition. The transcript shows that counsel consistently maintained throughout the oral argument that the Commission, in its assessment of reasonable overlap of competition, should consider information beyond the POI as proximate to vote day as possible. The Court of International Trade ("CIT") apparently misunderstood the argument by conflating *the POI* set by the Commission *with the timeframe extending beyond the POI up to and including vote day* during which the Commission could consider information. The Government and Petitioners make the same mistake. The CIT committed clear error as to these facts. And, as for the interpretation of section 1677(7)(G)(i), the arguments of the Government and Petitioners are inconsistent with the statutory text, the Statement of Administrative Action to the Uruguay Round Agreements Act ("SAA," "URAA"), the case law, and the Commission's practice to consider information beyond the POI.

The Commission ultimately focused on a sliver of the investigation period, 2020 to 2021, employed a subjective standard based on its "expectation," and declared the domestic industry "weaker than would have been expected" given the

increasing demand. The Commission's "expectation" was detached from the commercial reality of the market. Objective metrics showed the domestic industry's condition was already improving in 2021 – before the petitions were filed – as demand was increasing and supply constraints were starting to ease. And, by nearly every production, employment, and financial indicator, the domestic industry was healthy and very profitable by the first half of 2022, as prices and volumes continued to increase for both domestic and imported products. The evidence confirming that the domestic industry's condition improved despite rising subject import volumes in interim 2022 forced the Commission to switch theories to find a causal link. The Commission "must draw all those inferences that the evidence fairly demands." The Commission cannot simply switch theories when "{h}aving employed a rationale to interpret data from {one} … part of the POI in such a manner as to support its conclusion" that "same rationale applied" would compel a different conclusion when applied to data from another part of the POI. Here that meant any harm to the domestic industry was not caused by subject imports.

## ARGUMENT

I. **Tenaris did not abandon its argument that the Commission's interpretation of the term "compete with" is inconsistent with 19 U.S.C. § 1677(7)(G)(i)**

   A. **Like the CIT, the Government and Petitioners also erroneously conflate the POI with the timeframe (beyond the POI and up to and including vote day) that the Commission should consider relevant information to carry out its statutory mandate**

The Government claims Tenaris "forfeited" its argument regarding the interpretation of section 1677(7)(G)(i) and contends that "forfeiture does not require an express or intentional relinquishment." U.S.Br.21-25. However, there is no reference to "forfeiture" or "waiver" in the CIT's reasoning; the term "abandoned" and "abandonment" are each referenced once. *Tenaris Bay City, Inc. et al. v. United States*, 789 F. Supp. 3d 1352 (Ct. Int'l Trade 2025) ("*Tenaris II*"), Appx018, Appx022. Moreover, as the cases cited by the Government make clear, it is well established that "{w}aiver is different from forfeiture." *United States v. Olano*, 507 U.S. 725, 733 (1993); U.S.Br.21. Petitioners argue something different: that the CIT correctly considered that Tenaris "waived" its argument, that "{t}o 'waive{}' is to 'intentionally relinquish{} or abandon,'" and that the standard of review is abuse of discretion for such findings. PetitionersBr.11-12. According to the CIT:

> Plaintiffs *apparently* abandoned their argument that vote day should be the proper timeframe of assessment, framing the issue instead as greater weight that the ITC should have accorded to the last few months of the period of investigation when sanctions were imposed against Russian imports and prevented reasonable competition with other subject imports.

*Tenaris II*, Appx018 (emphasis added). The CIT did not rule that Tenaris "forfeited" its argument. Nor did Tenaris waive, intentionally relinquish, or "abandon" its argument. To deem an argument waived the court must find that the argument was "unambiguously abandoned" or "expressly disavowed." *See* TenarisOp.Br.57-58 (citing *In re Walter*, 698 Fed. Appx. 1022, 1026 (Fed. Cir. 2017); *Adams v. United*

*States*, 59 F.4th 1349, 1366 (Fed. Cir. 2023)). There was no "unambiguous abandonment" or "express disavowal" of the argument. The CIT's finding of "apparent{}" abandonment stems from the CIT erroneously conflating the POI set by the Commission, on the one hand, with the *timeframe extending beyond the POI up to and including vote day* during which the Commission could continue to consider information available or on the record, on the other hand.

During oral argument Tenaris' counsel reiterated several times that "the latter months of the POI up to and including the vote day is the most relevant time period {.}" Appx39283; *see also* Appx39291 ("the months at the end of the POI up until the time of vote day is the most relevant information"), Appx39362 ("Let's look at what happened after … June 2022" – the end of the POI), Appx39365 ("And the most relevant information is toward the latter period up to and including vote day").

The transcript shows consistent presentation of the argument that the Commission should consider information beyond the end of the POI to properly interpret the phrase "compete with" in assessing overlap of competition. Counsel supported the argument by highlighting that the Commission routinely continues to collect information *after the POI and did so after the POI in this case. See, e.g.*, Appx39362 (referring to the October 2022 final comments), Appx39362-39363 (referring to OCTG rig count data collected through September 2022).

The transcript demonstrates that in fact the argument was not abandoned, establishing "a definite and firm conviction that a mistake has been made" and that the CIT committed clear error. *Par. Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F.4th 1379, 1383 (Fed. Cir. 2022); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948); *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011) ("factual findings of the Court of International Trade … are reviewed for clear error"). And even if the standard of review is abuse of discretion, the CIT abused its discretion in determining that Tenaris "apparently abandoned" its argument when the transcript refutes this characterization.

Also incorrect is the CIT's framing of Tenaris' argument as limited to the "greater weight that the ITC should have accorded to the last few months of the period of investigation." *Tenaris II*, Appx018. The Government and Petitioners parrot the contention "that Tenaris argued only in favor of 'greater weight…to the last few months of the {POI}'" or "'the latter months of the POI,' after the Russian sanctions." PetitionersBr.16 (first quote); U.S.Br.23 (second quote). This is wrong. Counsel did not limit the argument to the weight to be given to evidence during the POI. Appx39285-39286, Appx39291, Appx39362, Appx39365. It is correct that Tenaris argued that evidence in latter portions of the POI generally is more probative than evidence earlier in the POI. But presenting that separate argument is not abandonment of the statutory interpretation argument that the Commission should

continue to consider relevant information on the record *beyond the POI* and up to vote day in assessing "reasonable overlap" of competition.

**B.    The plain meaning of the term "compete with" requires the Commission to consider information beyond the POI**

Arguments advanced by the Government (U.S.Br.25-35) and Petitioners (PetitionersBr.20-38) regarding the meaning of "compete with" fail against the statutory language, the SAA, case law, and Commission practice to consider information beyond the POI.

***The statute.***    Because section 1677(7)(G)(i) employs the present tense ("compete with"), the CIT originally held it was "unreasonable" for the Commission to not have "consider{ed} the effects of competition at the end of the investigation and on vote day." *Tenaris Bay City, Inc. et al. v. United States*, 698 F. Supp. 3d 1287 (Ct. Int'l Trade 2024), Appx138-139.  Having a defined POI neither alters the statutory language nor changes Tenaris' argument.   The parties agree that the Commission's investigative period is not set by statute or regulation, but its "'normal practice is to consider data for the *three most recent calendar years, plus interim periods* where applicable.'"    TenarisOp.Br.59 (citations omitted); *see also* U.S.Br.27, PetitionersBr.22-23.

There is no statutory language that expressly confines the Commission's review to information solely within the POI in assessing whether imports "compete with" other subject imports and the domestic like product.  Petitioners invoke the

term "such imports" in section 1677(7)(G)(i) as language that should be interpreted as doing so. PetitionersBr.22-28. That argument fails. The reference to "such imports" does not speak to timeframe; indeed, the Government itself recognizes the absence of relevant statutory language defining the timeframe for reviewing information relevant to the Commission's determination of reasonable overlap of competition. U.S.Br.26 ("{*n*}*othing in the statute suggests* that Congress intended the competitive overlap inquiry for cumulation to be severed from the material injury inquiry" (emphasis added)). There is no tension with having a defined POI, on the one hand, and the Commission's statutory obligation – consistent with the plain meaning to "compete with" in section 1677(7)(G)(i) – to consider information probative of competitive overlap beyond the POI and as close as possible to vote day, on the other hand.

*The SAA and staggered investigations*. The Government and Petitioners' reliance on the SAA is also unavailing. U.S.Br.28-31; PetitionersBr.34-36. The Government and Petitioners focus on staggered investigations and the implication of the phrase "subject to investigation" that is not in the URAA but was in the 1988 version of the statutory cumulation provision. U.S.Br.30-31; PetitionersBr.32-35. *The SAA makes clear that that URAA statutory modification was unrelated to the reasonable overlap of competition analysis*: "As under current law, new section 771(7)(G)(i) requires imports to compete with each other and with the domestic like

product to be eligible for cumulation." SAA, H.R. REP. NO. 103-316, vol. 1 (1994) at 848. The current cumulation provision requires the Commission to cumulatively assess the effects of dumped and subsidized imports in situations when petitions are filed, or investigations self-initiated, on the same day. 19 U.S.C. § 1677(7)(G)(i)(I)-(III). The effect of the timing of a petition filing and/or initiation of an investigation is *wholly separate* from the separate statutory mandate to assess whether imports "compete with" other imports and the domestic like product.

Nor does the sentence in the SAA highlighted by the Government and Petitioners support their argument. U.S.Br.31; PetitionersBr.35 (quoting SAA848) ("This eliminates the need for the Commission to consider whether imports from the first-decided investigation that are subject to antidumping and countervailing duty orders have 'continuing effect' on 'vote day' of each subsequent investigation")). That sentence relates to the first investigation when there are staggered investigations. Even post-URAA, however, the statute imposes the separate and independent requirement that the Commission determine whether the subject imports "compete with" other subject imports and the domestic like product. The SAA confirms, post-URAA, the "requirement of simultaneous filing will promote certainty in antidumping and countervailing duty investigations by defining, at the time of filing, the countries *potentially* subject to cumulative analysis." SAA848 (emphasis added).

Contrary to purported procedural hurdles and overstated "due process" considerations cited, U.S.Br.28 (citing 19 U.S.C. 1677m(g)), and PetitionersBr.36-38, staggered investigations do not prevent the Commission from giving "compete with" its plain meaning.  Neither the Government nor Petitioners address the cases in which the Commission has considered record evidence of significant events or circumstances *after the POI*.  TenarisOp.Br.59-60 (citing *Tin Mill Products from Canada, China, Germany, Netherlands, South Korea, Taiwan, Turkey, and United Kingdom*, Inv. Nos. 701-TA-685 and 731-TA-1599-1606 (Preliminary), USITC Pub. 5413 at 18 n.74 (March 2023) ("in addition to considering evidence during the POI, we have also considered whether the known current effects of the post-POI earthquake render the cumulation of subject imports from Turkey inappropriate"); *Brass Rod from India*, Inv. No. 701-TA-686 (Final), USITC Pub. 5485 at 95 (Feb. 2024) (separate and dissenting views) ("for purposes of a making a present injury determination the Commission must address record evidence of 'significant circumstances and events' that occur after the POI and up to the vote day, if that evidence is otherwise reliable" (citing *Usinor v. United States*, 26 C.I.T. 767, 779 (2002))).  Here, the public record reflects that "the start of the Russia-Ukraine war had led to imports from Russia dropping to zero."  Appx33975.  The Commission collected data and information *after the POI* in this case through August and September of 2022, including related to the rig count (Appx33980), crude oil prices

(Appx34277), raw material prices (Appx34098), billet prices (Appx34101), and related to other "recent developments." Appx34015-34017. And final comments were submitted on October 21, 2022. TenarisOp.Br.59-61.

*Chaparral and the case law*. The Government and Petitioners dismiss *Chaparral Steel Co. v. United States*, 901 F.2d 1097 (Fed. Cir. 1990) on grounds that it involved a "different statutory scheme" that was "interpreting the pre-URAA and pre-SAA cumulation provision." U.S.Br.34 (first quote); PetitionersBr.29 (second quote). *Chaparral* remains persuasive reasoning and has been cited in other cases, including post-URAA. The Commission must take into account the "reliable record evidence of changed circumstances which occur between the date of the petition and vote day and which impact a present material injury inquiry" as this "accords with the purely remedial purpose of our trade laws." *Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 43 n.22 (1995). In post-URAA cases, the CIT has been "guided by the present injury determination rationale articulated in *Chr. Bjelland Seafoods* … that the Commission in making a present injury determination must consult evidence within a time frame as close as possible to the vote day." *Usinor*, 26 C.I.T. at 779-780. Similarly, post-URAA, the CIT cited *Chr. Bjelland Seafoods* and recognized that "the ITC must examine data within a time frame as close as possible to vote day in making its present material injury determination" because "without which any assessment of the extent of changed

circumstances would be impossible." *Nucor Corp. v. United States*, 318 F. Supp. 2d 1207, 1224 (Ct. Int'l Trade 2004). Here, Russia's invasion of Ukraine and the resulting sanctions created circumstances warranting review of information after the POI to assess reasonable overlap of competition.

## II. The Commission's interpretation of "significant" is contrary to its plain meaning and the finding of significant import volume is unsupported by substantial evidence

### A. Assessing whether subject import volume is "significant" requires consideration of the market context

The Government and Defendants-Intervenors argue that reliance on increased volume, whether absolute or relative, alone as sufficient to satisfy the statutory mandate to assess whether subject import volume is "significant." U.S.Br.37; PetitionersBr.40. It is not. The statute's plain meaning compels the conclusion that the assessment of whether volume is "significant" is a contextual exercise. *See* TenarisOp.Br.29. The Government and Petitioners seek to prevent this Court from consulting the dictionary definition of "significant" in interpreting the statute. U.S.Br.39.n.7; PetitionersBr.42. Reference to the dictionary meaning of "significant" in section 1677(7)(C)(i) aids in assessing whether the exercise is contextual (as recognized by the courts) and requires the Commission to consider

market conditions.  TenarisOp.Br.29-32.  The attempt to prevent this Court from consulting the dictionary is baseless and should be rejected.[1]

The Commission did not consider any market context in its three-paragraph summary of fluctuations in absolute and relative volumes during the POI in concluding that "the volume of cumulated subject imports, and the increase in that volume, are significant in absolute terms and relative to consumption in the United States."  Appx212-213.  Recounting data points alone failed to give the term "significant" any meaning. *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992) (noting the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect"); *Heinzelman v. Sec'y of HHS*, 681 F.3d 1374 (Fed. Cir. 2012) ("It is a well-settled principle of statutory interpretation that a

---

[1] Defendant and Petitioners "deemed" waiver argument is baseless.  U.S.Br.39.n.7; PetitionersBr.42.  Before the CIT, Tenaris challenged the Commission's finding that subject import volume was "significant" as unsupported by substantial evidence *and contrary to law.*  Appx38899, Appx38922-38923; Appx39074-39078.  Tenaris argued that reliance on data alone was insufficient because to assess whether subject import volume was "significant" necessarily requires the Commission to consider the market conditions, including whether imports were needed to satisfy demand that U.S. producers could not supply.  Appx38922-38923; Appx39074-39078.  "{I}n order to be reviewable on appeal, a claim or issue must have been pressed or passed upon below." *Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323, 1344 (Fed. Cir. 2001) (citation omitted).  The record is clear that Tenaris properly raised this "claim or issue" from the outset.  "{P}reserving an argument for appeal 'does not demand the incantation of particular words; rather, it requires that the lower court be fairly put on notice as to the substance of the issue.'" *Sneed v. Shinseki*, 737 F.3d 719, 724 n.6 (Fed. Cir. 2013) (citation omitted).

'statute is to be construed in a way which gives meaning and effect to all of its parts'" (citation omitted)).

The CIT recognized that the Commission "did not address the conditions of competition that were raised by Plaintiffs in its analysis of the volume of subject imports." *Tenaris II*, Appx040. Yet, the CIT did not address specific arguments nor discuss the precedent requiring consideration of market context to find volume "significant" in the five cases cited by Tenaris. *Compare Tenaris II*, Appx038-042 *with* TenarisOp.Br.29-32. The CIT in *OCP* stated that the Commission must "analyze the significance of subject import volume in terms of product types available and practically unavailable from U.S. source during the {period of investigation}… in a manner that reflects the actual limitations." *OCP S.A. v. United States*, 658 F. Supp. 3d 1297, 1313 (Ct. Int'l Trade 2023) (citing *Altx, Inc. v. United States*, 26 C.I.T. 709, 719 (2002), *aff'd*, 370 F.3d 1108 (Fed. Cir. 2004)). The Government and Petitioners continue to conflate the Commission's assessment of the impact of subject imports with the analysis of whether subject import volume is "significant," U.S.Br.38-42; PetitionersBr.44-46, and in doing so they fail to undermine the case law confirming that the "touchstone" of the volume inquiry is "significance." *OCP*, 658 F. Supp. 3d at 1319-1320. Indeed, the Government itself recognizes "that *OCP* and *Altx*" "stand{} for the principle that imported volumes may not be significant if the imported quantities fill demand that the domestic

industry is unable to meet 'either because of incapability or lack of viability,' *OCP*, 658 F. Supp. 3d at 1320 (quoting *Altx, Inc. v. United States*, 26 CIT 709, 717 (2002))." U.S.Br.42.

### B. The market context confirmed that domestic producers could not meet the demand for OCTG and that imports were needed

The Government argues that the record in this case showed that "the domestic industry was capable of meeting the increase in U.S. demand." U.S.Br.42. The record does not. Petitioners go further and assert, with emphasis, that "{t}he Commission *did* consider the record and weigh all the relevant evidence, only to conclude that imports were *not* needed to meet demand." PetitionersBr.41-42 (original emphasis). The record does not support that assertion. The Commission's volume analysis – comprising but a single page of a 52-page material injury analysis – reveals zero consideration of whether the domestic producers could meet market demand such that imports were needed. Appx212-213. Summarizing data points is not analysis of the evidence of the market context.

In fact, the record confirms that imports were needed to satisfy demand because the domestic industry could not. A large majority of U.S. purchasers reported that firms "had refused, declined, or been unable to supply" OCTG between January 1, 2019, and October 5, 2021, the petitions filing date. Appx33974. Purchasers explained that U.S. mills reduced their capacity in 2020 and had difficulty restoring it due to labor shortages and raw material shortages.

Appx33974-33975. After the petitions were filed, 26 out of 27 purchasers observed similar trends they attributed in part to "preexisting supply tightness." Appx33974-33975. Similarly, market surveys confirmed a lack of OCTG availability and that OCTG shortages impeded drilling activity. Appx30369-30370, Appx31379-31396. Finally, the Commission cited U.S. plant closings, shutdowns, and curtailments during the POI, and noted the majority of U.S. producers reported supply constraints since 2019. Appx206. These facts are consistent with "the principle that imported volumes may not be significant if the imported quantities fill demand that the domestic industry is unable to meet 'either because of incapability or lack of viability.'" *OCP*, 658 F. Supp. 3d at 1320 (citation omitted).

The Government points to the Commission's finding in its *impact* discussion that the domestic producers purportedly had excess capacity. U.S.Br.42. First, that analysis was *not* part of the Commission's assessment of whether subject import volume was "significant." Second, that conclusion is speculative and contradicted by the record. Purchasers explained that U.S. mills reduced their capacity in 2020 and had difficulty restoring it due to labor shortages and raw material shortages. Appx33974-33975. The Commission first ignored the impact of hot-rolled coil ("HRC") prices on the operations of welded OCTG producers and then speculated about the ability of seamless OCTG producers to meet that demand. *See* Section III.C below.

**III.    The Commission failed to evaluate causation and impact in the context of the conditions of competition distinctive to the OCTG industry**

   **A.    Describing certain conditions separately in isolation does not satisfy the statutory mandate to evaluate causation and impact in the context of conditions of competition distinctive to the domestic industry**

The Government considers that "discussing the relevant conditions in an earlier section of its {the Commission} opinion" is sufficient. U.S.Br.51. It is not. "{T}he Commission 'does not comply with its statutory mandate by simply describing various conditions of competition in isolation{.}'" *OCP*, 658 F. Supp. 3d at 1312 (citation omitted). "{R}ather, the Commission must apply its findings regarding the conditions of competition to its analysis of the three statutory factors: subject import volume, price effects, and impact on the domestic industry." *OCP*, 658 F. Supp. 3d at 1312. The Commission found a "causal nexus between cumulated subject imports and the domestic industry's weak performance relative to the strong growth in apparent U.S. consumption from 2020 to 2021" and that this causal nexus was confirmed because the industry's performance significantly improved in interim 2022 (January-June 2022) relative to interim 2021 (January-June 2021) as subject imports lost market share. Appx227; Appx34263-34265. The factual record does not support a causal nexus between subject imports and the domestic industry's performance during 2020-2021 or during the interim 2022 period, when subject import volume continued to increase and the domestic industry's condition

dramatically improved.  Appx38927-38944.

The claim that Tenaris asks this Court to "reweigh {the} evidence" (U.S.Br.52; PetitionersBr.41) also fails.  The Commission ignored the statutory mandate to analyze the factors in the context of the conditions of competition distinctive to the OCTG industry and instead presumed causation.  The Commission declared that "{d}eclining demand earlier in the POI obviously could not explain injury later in the POI, which occurred as demand increased" and "the very nature of this injury was that the industry's performance was weaker than would have been expected in light of the strong increase in demand."  Appx39055.  These statements speak for themselves.  The conditions of competition distinctive to the OCTG industry explained the exact conditions the Commission considered it "obviously could not."  Appx39055.

## B. The historic collapse of OCTG demand harmed the domestic industry

The Government claims the Commission "addressed the effects of all factors on U.S. OCTG demand" by "consider{ing} trends in apparent U.S. consumption, the active U.S. rig count, and U.S. oil and gas prices." U.S.Br.52.  Merely noting trends is not engaging with arguments regarding the reasons for such trends.  Where a "Final Determination merely cites to record evidence containing data on subject import indicators throughout the POI" the "reference to annual data cannot, by itself, constitute an acknowledgment of Plaintiffs' arguments, much less a reasoned

explanation for discounting them, as the statute requires." *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1359 (Ct. Int'l Trade 2001).

The Russia-Saudi oil supply war in early 2020 led to oil prices "well below $40 per barrel" and "negative for a period of time." Appx31362. The COVID-19 pandemic further suppressed demand for OCTG during 2020. Appx33979. The U.S. rig count plummeted from 1083 in December 2018 to 790 in February 2020, before hitting 251 in July 2020. Appx30355; Appx33980-33981. Operational consumption of OCTG [Number and Trend] net tons in January 2019 to [Number] in February 2020, [Number and Description] net tons in August 2020. Appx33982. U.S. plants were closed and shutdown, production was curtailed during the POI, and the majority of U.S. producers reported supply constraints since 2019. Appx206; Appx34015-34016.

Petitioners claim that "Tenaris elevates labels over the actual *condition*" and that Tenaris faults the Commission for a mere "failure to name-check" factors. PetitionersBr.56-57. Not so. The Commission's purported analysis of the extraordinary demand circumstances, including oil trading below zero $USD/barrel, presented no context of actual market conditions. The Commission simply stated that "U.S. oil and gas prices fell irregularly from January 2019 to mid-2020, and then increased irregularly through the end of the POI." Appx205. The Commission noted that the domestic industry's capacity, capacity utilization, employment, and

hours worked all remained nearly identical in 2021, when demand significantly improved, as in 2020, when demand had collapsed. Appx227. This demonstrates that market conditions – not subject imports – explain these data points. The Commission must "analyze compelling arguments that purport to demonstrate the comparatively marginal role of subject imports in causing that injury." *Hynix Semiconductor, Inc. v. United States*, 431 F. Supp. 2d 1302, 1317 (Ct. Int'l Trade 2006). The Commission did not.

The Government defends the Commission's failure to explain the different treatment of COVID-19 demand shocks affecting the OCTG market versus in contemporaneous cases with the familiar refrain that "'each injury investigation is *sui generis*.'" U.S.Br.52-53 (citation omitted). However, the Commission "must address significant arguments and evidence which seriously undermines its reasoning and conclusions{,}" *Altx*, 167 F. Supp. 2d. at 1374, particularly where the same conditions are treated differently by the Commission. The Commission must not attribute to subject imports injury caused by other factors. SAA851-52.

## C. Supply constraints prevented domestic producers from meeting the rapidly rising demand in the wake of the historic collapse

High OCTG inventory levels and subsequent destocking delayed ramp up. The Government asserts that Tenaris' argument "that the Commission failed to consider OCTG inventory 'in combination' with HRC prices and labor shortage factors" should be "deemed waived" because "Appellants failed to raise any

argument concerning the 'combination' of these factors before the CIT{.}" U.S.Br.57&n.10.  Petitioners reflexively assert the same.  PetitionersBr.63.  These claims are false.  Tenaris argued before the CIT that "the combination of inventories, high HRC prices and labor shortages constrained supply."  Appx38936.  In fact, Tenaris "emphasized" this point before the CIT:

> Tenaris has emphasized that no single factor, but rather a combination of three factors – inventories, HRC prices, and labor shortages – constrained domestic OCTG supply.  Indeed, additional supply constraints – the meteoric price rise of the key input for welded OCTG and worker shortages – emerged as inventory levels decreased relative to surging demand.

Appx39087.  And the Commission did fail to consider the impact of these factors together.

The Government and Petitioners point to the Commission's assertion that "any alleged inventory 'bulge' was largely worked down by the end of 2020" to defend the Commission's analysis.  U.S.Br.62; PetitionersBr.55; Appx230.  Months-on-hand inventory rose from [Number] months in January 2019 to [Number] months in August 2020 – a [Number and Characterization] percent increase.  Appx33976.  Destocking caused OCTG inventories to [Number and Trend] tons in September 2020 to [Number] tons in September 2021, the [Number and Description].  Appx30365-30366, Appx30962, Appx30967.  The destocking that delayed new orders along with the rising HRC costs and labor shortages prevented the domestic industry from ramping up production.  Yet, the Commission did not analyze the combined effects of the

supply constraints, and found that "inventories, or inventories alone, cannot explain why additional demand in 2021 was satisfied by increased subject imports, rather than domestic producers and nonsubject imports."  Appx231.

**_High HRC prices reduced welded OCTG production._**  The Government and Petitioners argue that domestic seamless OCTG producers were unaffected by rising HRC prices and their significant unused capacity could have served increased demand in 2021.  U.S.Br.56; PetitionersBr.60-61.  This speculation that seamless production could have replaced welded production is contradicted by the record evidence of factors impeding ramp up.

Welded Petitioners conceded they could not pass on increasing HRC costs to their OCTG customers, Appx33626, and several welded OCTG producers halted production.  Appx30364; Appx31094.  "A practice that is uneconomical will not be adopted by an industry as part of its conditions of competition."  _OCP_, 658 F. Supp. 3d at 1317.  The Commission speculated that domestic seamless producers were fully capable of compensating for any constraint in the supply of domestic welded OCTG.  Appx232.  This speculation conflicts with the evidence of ramp up delays and worker shortages affecting U.S. welded and seamless mills.  Appx38906-38914; Appx33973-33974.  "Industry conditions that are hypothetical, theoretical, or speculative are not part of the conditions of competition distinctive to the affected industry; and Commission findings that have been premised on such conjectures are

legally deficient." *OCP*, 658 F. Supp. 3d at 1314-15.  The Commission's conjecture stands in contrast to the record evidence that (1) Petitioners could not pass on increasing HRC costs; (2) several welded OCTG producers halted production; and (3) the fact that the Commission recognized the significant HRC price increases relative to downstream steel products during 2021 in other contemporaneous cases. TenarisOp.Br.9-10,39-40.

***Labor shortages impeded ramp up.***  The Government and Petitioners point to domestic producers' testimony about the purported ease of hiring as sufficient to support the Commission's finding that there were no labor constraints.  U.S.Br.56; PetitionersBr.60.  The Commission must of course weigh evidence, but it cannot ignore contemporaneously corroborated contradictory evidence.  The 2020 demand collapse led to the idling of operations and workers laid off.  Appx34015-34016.  As demand increased in 2021, U.S. producers faced challenges in hiring OCTG workers.  Appx33973-33974.  Tenaris, the largest OCTG producer, documented its difficulties in hiring the qualified workers needed to ramp up U.S. production to meet the increased demand.  Appx33771; Appx32215-32216, Appx32222-32223, Appx32339-32351.

The Commission relied on unsubstantiated assertions, albeit sworn testimony, about Petitioners' ability to hire employees.  Appx232.  That testimony was not otherwise substantiated.  "Commission findings that have been premised on such

conjectures are legally deficient." *OCP*, 658 F. Supp. 3d at 1314.  In contrast, the

Commission's determination reflects no analysis of detailed and contemporaneous

evidence reinforced by testimony that significantly detracts from the Commission's

conclusion.  *Compare* Appx232 *with* TenarisOp.Br.41-42.  The Commission's

failure to engage with detracting evidence of reduced capacity and labor shortages

that prevented U.S. mills from restoring their capacity "seriously undermines its

reasoning and conclusions." *Altx,* 167 F. Supp. 2d at 1374.

**IV.  The domestic industry was already recovering before the petitions were filed and the data for first half of 2022 confirmed domestic industry's full recovery**

 **A. The statute does not permit the Commission to discount post-petition data based on market share**

The Government and Petitioners argue that the plain language of the statute

allows the Commission to discount post-petition data based on changes in market

share, not just absolute volume.  U.S.Br.43-44; PetitionersBr.50-51.  They contend

that "volume" referenced in section 1677(7)(I) encompasses both absolute terms and

volume relative to consumption (*i.e.*, market share) and that the legislative history

supports this interpretation.  U.S.Br.43-44; PetitionersBr.50-51.

These arguments misread the statutory text and the SAA.  The statute refers

to "*change in the volume*" and does not reference market share.  19 U.S.C. §

1677(7)(I) (emphasis added).  The SAA confirms the statutory mandate to consider

changes in import *volume* and makes no reference to market share.  SAA854.  Here,

the Commission acknowledged increased interim import volume yet relied on market share as the basis for discounting interim 2022 evidence.  Appx212-213; Appx227-228.  Before Petitioners filed their petitions, the demand trends had improved and U.S. producers could not meet the growing demand and the market demanded imports.  Petitioners' response – adopted by the Commission – was that all the positive trends were the result of the filing of the petitions.  Appx213.  But they were not.

The Government's suggestion that Congress would have expressly limited the analysis to "absolute volume" if that were intended, U.S.Br.44, is unpersuasive; the statutory language is unambiguous.  Also unavailing is Petitioners' contention that the statute's reference to market share in other contexts (*i.e.*, 19 U.S.C. § 1677(7)(C)(i), *see* PetitionersBr.51) should override the plain meaning of "volume" in section 1677(7)(I).  To the contrary, section 1677(7)(C)(i) specifically refers to "volume, either in absolute terms or relative to production or consumption in the United States." Congress made no similar reference in section 1677(7)(I).

Finally, the Government's reliance on *Metallverken Nederland B.V. v. United States*, 744 F. Supp. 281 (Ct. Int'l Trade 1990), as cited in the SAA, is misplaced. U.S.Br.44-45; SAA853-854.  The SAA cites *Metallverken* for the uncontroversial proposition that "the initiation of antidumping and countervailing duty proceedings can create an artificially low demand for subject imports, thereby distorting post-

petition data compiled by the Commission." SAA853-854 (citing *Metallverken*, 744 F. Supp. at 284). Indeed, in the *very next sentence*, the SAA states: "{t}he imposition of provisional duties, in particular, can cause a reduction in *import volumes* …." SAA854 (emphasis added). The reference is not to market share but to volume.

## B. The Commission's practice does not justify selectively discounting the post-petition data that severed the causal nexus

The Government and Petitioners rely on the Commission's purported practice of discounting post-petition data where it finds that changes in market share are related to the pendency of the investigation. U.S.Br.46; PetitionersBr.52n.6. However, the domestic industry was already recovering *before the petitions were filed* and the data for first half of 2022 confirmed the domestic industry's full recovery. TenarisOp.Br.43-50.

The Government also argues that prior cases where the Commission declined to discount post-petition data based on absolute volume are not relevant. U.S.Br.47-48. Invoking "practice" as affirmative support when convenient is not persuasive when the Government simultaneously disavows determinations treating post-petition evidence differently. The Government relies on a prior case in which it reduced the weight accorded to post-petition data based on market share. U.S.Br.46. According to the Government, however, "each Commission investigation is *sui generis*." U.S.Br.47-48.

**C. The Commission arbitrarily switched its causation analysis when an increase in subject import volume accompanied the domestic industry's recovery**

The Government cites the Commission's finding that the domestic industry's performance improved alongside declining subject import market share during interim 2022 as sufficient to confirm that the domestic industry's harm was by reason of subject imports. U.S.Br.50 (citing Appx227-228; Appx34263-34265). The Commission arbitrarily switched its causation rationale to make that finding. The Commission considered *increasing subject import volume (and increasing subject import market share gains)* during 2020-2021 to confirm a causal link between subject imports and injury. Appx227. For interim 2022, *the Commission considered increasing subject import volume and decreasing subject import market share declines as the condition of the domestic industry also dramatically improved to also confirm* the causal link because "subject imports competed less aggressively" and lost market share. Appx227. "Having employed a rationale to interpret data from {one} … part of the POI in such a manner as to support its conclusion, the Commission may not ignore the fact that the same rationale applied to data from {another}… part of the POI weakens its conclusion." *Altx,* 167 F. Supp. 2d at 1363. This arbitrary switch undermines the causation finding, is unsupported by substantial evidence, and is inconsistent with the Commission's practice.

During the first half of 2022, the evidence demonstrated that the domestic industry's performance improved dramatically by every relevant metric in terms of output, employment, and financial indicators, even as the volume of subject imports also increased. Appx34263-34265. That recovery was corroborated by public statements of the domestic industry that they were experiencing "best ever" financial results involving "continued improvements in profitability." Appx34263-34265; Appx30359-30361, Appx31010-31082. Where "it is not clear, based on the Commission's Views, that the Commission considered all of the evidence on the record" in its "post-petition data" analysis, a remand is warranted. *Chemours Co. FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2020).

The Government's argument that "the filing of the petitions caused subject imports to compete less aggressively" (U.S.Br.62) ignores that the domestic industry's condition improved as the supply constraints eased. Market indicators showed increases from interim 2021 to 2022 across nearly every production, employment, and financial metric: *U.S. production, 84.4%* (Appx34264), *net sales, 69.2%* (Appx34265), *capital expenditures* (Appx34265), *average unit value of domestic net sales, 69.8%* (Appx34265), and *gross profits, $700.2 million* (Appx34265). Similarly, "{c}onsistent with the trend in the domestic industry's production over the POI," the Commission also found "the domestic industry's employment indicia generally declined from 2019 to 2020, increased somewhat

from 2020 to 2021, and were significantly higher in interim 2022 than in interim 2021" and further noted that "{t}he industry's employment, hours worked, and wages paid all followed this pattern." Appx224. The Commission has "responsibility to explain or counter salient evidence that militates against its conclusions." *Usinor*, 26 C.I.T. at 783. These positive trends occurred as subject import volume was increasing, as prices remained on a steadily increasing trend that began before the October 2021 petitions, and as the domestic industry's profitability had robustly returned. These trends confirmed the lack of any causal link between subject imports and any injury to the domestic industry.

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, this Court should provide the relief requested by Tenaris in its initial appellate brief. TenarisOp.Br.62-63.

Respectfully submitted,

/s/ Frank J. Schweitzer
Frank J. Schweitzer
Gregory J. Spak
Kristina Zissis
Matthew W. Solomon
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs-Appellants Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corp., Siderca S.A.I.C., Tubos de Acero de Mexico, S.A.

March 6, 2026

(Form 19)

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

## CAFC Court No. 2025-2034

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6,930 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: March 6, 2026

Signature:    /s/ Frank J. Schweitzer

Name:        Frank J. Schweitzer